# ATTACHMENT B

```
 1            IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

 2                      STATE OF WISCONSIN

 3    - - - - - - - - - - - - - - - - - - - - - - - - - -

 4    WISCONSIN HOUSING AND ECONOMIC
      DEVELOPMENT AUTHORITY,
 5
                  Plaintiff,
 6
          v.                          Case No. 07-CV-013965
 7
      TRI-CORP HOUSING, INC.,
 8
                  Defendants and Third-Party
 9                Plaintiff,

10    COMMUNITY BANK GROUP f/k/a LINCOLN
      COMMUNITY BANK, RELIABLE WATER SERVICES, LLC,
11    MILWAUKEE COUNTY HOME REPAIR, AND
      ZIGNEGO READY MIX, INC.,
12
                  Added Defendants,
13
          v.
14
      WISCONSIN HOUSING AND ECONOMIC
15    DEVELOPMENT AUTHORITY AND
      ROBERT BAUMAN, ALDERMAN,
16
                  Third-Party Defendants.
17
      - - - - - - - - - - - - - - - - - - - - - - - - - -
18

19               Deposition of MICHAEL S. BREVER

20                      March 10, 2009

21                       10:00 a.m.

22             GONZALEZ SAGGIO & HARLAN LLP

23               225 East Michigan Street

24                 Milwaukee, Wisconsin

25    Reported by David J. Sikora, RPR, RMR, CRR
```



GRAMANN
REPORTING

```
 1                    P R O C E E D I N G S
 2               MICHAEL S. BREVER was called as a witness
 3         herein, having been first duly sworn on oath, was
 4         examined and testified as follows:
 5               (Exhibit Numbers 1 and 2 were marked for
 6         identification)
 7                    EXAMINATION
 8    BY MR. KRILL:
 9    Q    Mr. Brever, would you state your full name for the
10         record?
11    A    My name is Michael Stephen Brever.
12    Q    And, Mr. Brever, what is your current occupation?
13    A    I'm the executive director of Tri-Corp Housing.
14    Q    Is that a corporation?
15    A    It is.
16    Q    And how long have you been the executive director?
17    A    Tri-Corp was created in 1998, and I was the initial
18         executive director.
19    Q    I want to show you -- we have Exhibits Number 1 and
20         2.  Exhibit Number 1 is the notice for your
21         deposition?
22    A    Okay.
23    Q    Yes?
24    A    Yes.
25    Q    And you're appearing today pursuant to that notice,
```

| | | |
|---|---|---|
| 1 | A | There is no real estate in Housing With Help's name. |
| 2 | Q | Okay.  So but there was real estate in Housing With |
| 3 | | Help's name prior to that time, was there not? |
| 4 | A | That is correct. |
| 5 | Q | So that real estate was transferred to Tri-Corp. |
| 6 | A | Tri-Corp.  Right. |
| 7 | Q | So South Community Organization still exists, and |
| 8 | | the real estate still is in its name, correct? |
| 9 | A | There are parcels of real estate in South |
| 10 | | Community's name, that is correct. |
| 11 | Q | And Southeast Affordable Housing, there are still |
| 12 | | parcels of real estate in its name, correct? |
| 13 | A | Yes. |
| 14 | Q | And then whatever real estate Housing With Help has, |
| 15 | | or had, is in the name of Tri-Corp, correct? |
| 16 | A | That is correct. |
| 17 | Q | Does South Community Organization, does it file a |
| 18 | | separate tax return? |
| 19 | A | It does not. |
| 20 | Q | How about Southeast Affordable Housing? |
| 21 | A | It does not. |
| 22 | Q | I want to identify -- well, this lawsuit, this |
| 23 | | foreclosure lawsuit concerns -- part of it is |
| 24 | | property that's known as West Samaria, correct? |
| 25 | A | That is correct. |

1   Q   And that's located 1200 Richards Street?

2   A   No.  2713 West Richardson Place.

3   Q   Okay.  I want to focus on January 1, 2007.  And

4       looking at this, the SCO organization, the Southeast

5       Affordable Housing, and the Tri-Corp Housing With

6       Help, it's my understanding that as of January 1,

7       2007 that there were three loans outstanding with

8       WHEDA, my client, correct?

9   A   I believe that's correct, yes.

10              (Exhibit Number 3 was marked for

11      identification)

12              MR. KRILL:

13  Q   I want to show you what we've marked as Exhibit

14      Number 3.  And can you identify this as copies of

15      the note and mortgage for the Housing With Help loan

16      which is the subject of this foreclosure action?

17  A   Well, I know why you call it Housing With Help, but

18      I believe in 2003, at the writing of this note, at

19      the request of WHEDA, the property was changed in

20      the name of Tri-Corp.

21  Q   Okay.  All right.

22  A   But yes.

23  Q   Let's just look at -- there's one loan with

24      Tri-Corp, directly with Tri-Corp, correct?

25  A   That is correct.

1  Q   And that is the loan that is represented in Exhibit

2      3, correct?

3  A   And I do understand why you call it Housing With

4      Help.  I believe as a program it was still

5      referenced that way.

6  Q   Okay.  Well, what I want to do, I want to talk about

7      this, and then we're going to give a shorthand name

8      to it.

9  A   Okay.

10 Q   This loan is the -- Exhibit 3, this is a note and

11     mortgage for the loan which is the subject of this

12     foreclosure proceeding, correct?

13 A   That is correct.

14 Q   And this loan is secured by, first of all, this

15     property West Samaria?

16 A   Yes.

17 Q   On the Richardson Place address.  And it's also

18     secured by property -- what is it known as, the

19     other one?

20 A   New Samaria.

21 Q   New Samaria.  Where is that located?

22 A   Sixty-seven hundred West Beloit.

23 Q   So Exhibit Number 3, and that's secured by West

24     Samaria and New Samaria.  All right.  Why don't

25     we -- can we refer to this as the Samaria loan?

Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 6 of 28   Document 12-3

```
 1   Q    And Exhibit Number 8 is a copy of the financial
 2        statements for Tri-Corp Housing Inc. for the years
 3        ended December 31, 2006 and 2005, right?
 4   A    Yes.
 5   Q    And these are financial statements that Tri-Corp
 6        Housing Inc. supplied to WHEDA, correct?
 7   A    Yes.
 8   Q    And it's your understanding, Mr. Brever, that WHEDA
 9        did require, pursuant to loan documents, you supply
10        annual or semiannual financial statements?
11   A    Yes.
12   Q    And you understood that when presenting these
13        financial statements, that Tri-Corp was providing
14        this as a representation of the financial condition
15        of Tri-Corp as of the date of each statement,
16        correct?
17   A    Yes.
18   Q    All right.  Now, I want you to take a look at
19        Exhibit Number 7, if you would.  And if you go to
20        the third page of the exhibit, itself.
21   A    So page number three?
22   Q    No, no.  The actual third page of that particular
23        exhibit.
24   A    Okay.
25   Q    At the top, it says, independent auditor's report,
```

```
1              correct?

2      A       Okay.  Right.

3      Q       Now, I'd like you to read please the last full

4              paragraph of that statement.

5      A       The accompanying financial statements have been

6              prepared assuming that Tri-Corp Housing Inc. will

7              continue as a going concern.  As discussed in Note 1

8              to the financial statements, Tri-Corp Housing has

9              suffered recurring losses, negative cash flows, and

10             has current liabilities which significantly exceed

11             current assets, which raise substantial doubt about

12             the ability of Tri-Corp Housing Inc. to continue as

13             a going concern.  Management's plans in regard to

14             these matters are described in Note 1.  The

15             financial statements do not include any adjustments

16             that might result from the outcome of this

17             uncertainty.

18     Q       Now, you had seen that before you supplied this to

19             WHEDA, had you not?

20     A       Yes.

21     Q       And you agree with that statement by your auditors,

22             correct?

23     A       Well, it's a statement from our auditors.

24     Q       But I mean you don't have any reason to disagree

25             that that's a correct statement.
```

```
 1   Q    Exhibit 7.  The numbered page seven.  I want to talk
 2        about Note 1.
 3   A    Okay.
 4   Q    Now, it appears to me that this is the Note 1 that
 5        the auditor's referring to in that last thing you
 6        read as discussed in Note 1 of the financial
 7        statement.  Does that appear correct to you?
 8   A    I see nothing else referenced as Note 1, so I would
 9        presume that this is the Note 1 that the audit
10        refers to.
11   Q    Now, if you look at numbered page eight.  And
12        there's a section there that says going concern.
13        And the auditor states as follows:  At December 31,
14        2005, Tri-Corp is in arrears in paying amounts to
15        vendors, and its current liabilities exceed its
16        current assets by approximately $860,000.  That
17        statement is correct, is it not?
18   A    It's in the audit.
19   Q    Correct.  So I mean if it's in the audit, you would
20        assume it's correct.
21   A    I would assume it's correct, yes.
22   Q    Okay.  I want you to take a look at Exhibit Number
23        8, if you would.  And, again, if you take a look at
24        the third page of Exhibit Number 8.  And, again,
25        it's the independent auditor's report.  And on that
```

1    rejected in 2007, correct?

2  A    Yes.

3  Q    And, similarly, Exhibit Number 11 is another -- is a

4    payment being rejected in April of 2007 for the

5    Packard Hall property, correct?

6  A    I'm sorry, what number are you on now?

7  Q    Eleven.  Nine, 10, 11.  You got 11?

8  A    I do.  You're referencing it as the Packard Hall

9    payment.  I'm not certain I see any reference to

10    that.

11  Q    I've got the wrong one.  Exhibit Number 11 is an

12    E-mail exchange between you and Dan Prast of WHEDA.

13    And this regards, generally, defaults in your

14    mortgage payments, generally, correct?

15  A    Delays, yes.

16  Q    Delays.  Okay.  All right.  So we have the spring of

17    2007, and there are a series of delayed payments and

18    ACH rejections in payments made by Tri-Corp to WHEDA

19    for the various loans that were outstanding,

20    correct?

21  A    Yes.

22  Q    And then is it not true, Mr. Brever, that there

23    actually was a formal default with respect to the

24    May payment that was due on the Samaria loan?

25         MR. MACHULAK:  Let me object to the question

1 as being vague, and perhaps asking for a legal

2 question.  What do you mean by a formal default?

3   MR. KRILL:

4 Q Well, let me say this.  Let me just say this.

5 Tri-Corp did not make the payment due for the month

6 of June, 2007 for the Samaria loan, did it?

7 A I'm not sure.  I thought it was July, the date that

8 we're talking about.

9 Q Okay.

10   MR. KRILL:  Mark this as Exhibit Number 12.

11   (Exhibit Number 12 was marked for

12 identification)

13   MR. KRILL:

14 Q Exhibit Number 12 is a letter dated July 2, 2007 to

15 you from Nelson Flynn of WHEDA, is it not?

16 A It would appear to be that, yes.

17 Q And that letter is actually a notice of default, is

18 it not?

19 A It is.

20 Q And this is a notice of default that WHEDA gave you

21 with respect to the Samaria loan, isn't that true?

22 A Yes.

23 Q And is there anything -- let's look at the first

24 paragraph of this notice of default on Exhibit

25 Number 12.  WHEDA sets out the nature of the

```
 1        to argue with the word default.
 2    A   I couldn't argue with the letter.  The letter is
 3        what it is.
 4    Q   And this letter was sent because --
 5            MR. MACHULAK:  Well, let me just -- if
 6        you're asking him about the letter, to the extent it
 7        calls for a legal conclusion, it says WHEDA may also
 8        proceed to exercise further rights.  We disagree
 9        that WHEDA should have been able to do that.
10            MR. KRILL:  I understand.  I understand.  I
11        understand that.
12    Q   But my question to you is this.  Is that Tri-Corp
13        had not made the payment, I think it was for the
14        month of June of 2007, correct?
15    A   It was my recollection that it was July, but I can't
16        argue with the letter.  The letter says what it
17        says.
18    Q   And after receiving Exhibit Number 12, is it not
19        true that Tri-Corp never cured the default that is
20        set forth in Exhibit Number 12?
21            MR. MACHULAK:  Well, object to the -- that
22        it's calling for a legal conclusion.
23            MR. KRILL:  That's fine.
24    Q   You can answer the question.
25    A   If your question is were funds forwarded to WHEDA,
```

1    the answer is no.

2  Q   All right.  And did Tri-Corp make any payment on the

3    Samaria loan in the month of August of 2007?

4  A   No.

5  Q   Did Tri-Corp make any payment on the Samaria loan in

6    September, 2007?

7  A   No.

8  Q   Did Tri-Corp make any payment on the Samaria loan

9    for October, 2007?

10  A   No.

11  Q   How about November, 2007?

12  A   No.

13  Q   How about December, 2007?

14  A   No.

15  Q   As a matter of fact, Tri-Corp never made a single

16    payment on the Samaria loan subsequent to July 2,

17    2007, the date of Exhibit 12, correct?

18  A   I believe that's correct.

19  Q   Very good.  Okay.  Let's talk about Packard Hall.

20    That was the loan that's referenced in Exhibit

21    Number 6.  And, again, I want to refer back to July

22    2, 2007, which is the date of Exhibit 12.  To your

23    knowledge, Mr. Brever, did Tri-Corp make any payment

24    on the Packard Hall loan subsequent to July 2, 2007?

25  A   I don't really know that.

Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 13 of 28   Document 12-3

1          MR. KRILL:

2    Q    Do you know what the word default means?  If you're

3         in default of a loan obligation?

4    A    I think that would mean that an action has been

5         taken by your lender.

6    Q    But the default -- let me do this.  Let's look at it

7         this way.  Is it not true, Mr. Brever, that by July

8         of 2008, WHEDA commenced a mortgage foreclosure

9         action against Southeast Affordable Housing to

10        foreclose on the Packard Hall property?

11   A    I don't recall the specific date.  But yes, there

12        was an action started against Packard Hall.

13             (Exhibit Number 13 was marked for

14        identification)

15             MR. KRILL:

16   Q    I'm going to show you what we marked as Exhibit

17        Number 13.  Mr. Brever, you will acknowledge this is

18        a copy of the summons and complaint that was filed

19        by WHEDA against Southeast Affordable Housing in

20        connection with foreclosing on the Packard Hall

21        property, correct?

22   A    I believe that's correct.

23   Q    And would you agree that ultimately WHEDA took

24        judgment of foreclosure?

25   A    That's what my attorney informed us.

| | | |
|---|---|---|
| 1 | Q | I want to show you what we marked as Exhibit 14. |
| 2 | | (Exhibit Numbers 14 and 15 were marked for |
| 3 | | identification) |
| 4 | | MR. KRILL: |
| 5 | Q | I'm going to show you Exhibit Number 14, Mr. Brever. |
| 6 | | It is a copy of the judgment for foreclosure for the |
| 7 | | Packard Hall property, correct? |
| 8 | A | It appears that that's it, yes. |
| 9 | Q | And Exhibit Number 15 is a copy of a stipulation for |
| 10 | | judgment of foreclosure is it not? |
| 11 | A | It appears that that's what it is, yes. |
| 12 | Q | And this demonstrates that Southeast Affordable |
| 13 | | Housing Corporation actually consented to the entry |
| 14 | | of default -- of the judgment of foreclosure, |
| 15 | | correct? |
| 16 | A | Our attorney has signed representing us. |
| 17 | Q | And you authorized your attorney to do that, right? |
| 18 | A | Yes. |
| 19 | Q | Now, is it not true, Mr. Brever, that sometime |
| 20 | | certainly before July 7, 2008, the date the Packard |
| 21 | | Hall foreclosure was commenced, that Tri-Corp ceased |
| 22 | | making payments on the Packard Hall loan? |
| 23 | A | I believe that's correct. |
| 24 | Q | So by July 7, 2008, Tri-Corp had ceased making |
| 25 | | payments on the Packard Hall loan, and it had for |

Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 15 of 28   Document 42-3

 1        approximately a year not made any payments on the
 2        Samaria loan, correct?
 3     A  I believe that that's correct.
 4     Q  And as a matter of fact, that during that same time
 5        frame, say July, '07 to July, '08, Tri-Corp ceased
 6        making payments on the SCO 2 loan also, did it not?
 7     A  That could be.
 8     Q  Do you have -- I mean you don't know whether that's
 9        true or not?
10     A  Off the top of my head, I'm not personally familiar.
11        If you have the record, I could review it and
12        probably certify that, yeah.
13     Q  All right.
14           MR. KRILL:  Why don't we take a break.
15           (Short recess was taken)
16           MR. KRILL:
17     Q  All right, Mr. Brever, back on the record.  Just to
18        kind of recap.  Now, we have three loans we talked
19        about.  We have the SCO 2 loan, we have the Packard
20        loan, and we have the Samaria loan, correct?
21     A  Yes.
22     Q  All right.  And the SCO 2 loan is a loan which was
23        in the name of Southern Community Organization,
24        correct?
25     A  South Community.  But yes.

www.GramannReporting.com · 414.272.7878

GRAMANN
REPORTING

```
 1        like one month we decide not to send a check.
 2   Q    No, I understand.  I understand.  But what I'm
 3        wondering about is, I understand that things
 4        happened over at West Samaria, which you say put
 5        some pressure on your ability to pay that mortgage.
 6        But there's nothing going on at Packard or SCO 2.  I
 7        mean those continued to operate just as they have in
 8        the past, correct?
 9   A    Correct.
10   Q    Okay.  The payments on the Samaria loan were about
11        12,000 a month, correct?
12   A    No.
13   Q    How much were they?
14   A    Payments on the Samaria loan were about 18,000 a
15        month.  You're talking principle and interest.
16   Q    Right.
17   A    In addition to a $300,000 replacement reserve, WHEDA
18        took an additional payment to increase the reserve
19        on a monthly basis.
20   Q    So, but after July of 2007, that was no longer
21        coming out of your account, correct?
22   A    Correct.
23   Q    So that was $18,000 less in expenses that you were
24        incurring every month.
25   A    Right.  Correct.
```

1     damages.

2  A  Okay.

3  Q  Now, I note on page six, there is a statement of

4     damages.

5  A  Okay.

6  Q  And, curiously, the statement doesn't have any

7     numbers on there at all.

8  A  Right.

9  Q  And what I'd like to know is, I want to have the

10    number provided to me today, and then I want to

11    determine how you calculated it.  Then I want to

12    know which documents support it, okay?

13 A  Okay.

14 Q  So the first item you have here, and I mean -- okay.

15    Loss in value of West Samaria and other properties.

16 A  Right.

17 Q  The first thing, you know, I need to have that

18    number specified.  What is it?

19 A  The value of West Samaria, in my mind, is the value

20    of the 92 beds at -- we are property tax exempt at

21    West Samaria.  So you can't look at assessed value

22    as a calculation of loss.  At New Samaria we have 75

23    beds.  And the assessed value in the City of West

24    Allis is approximately $1.2 million.  Based on that,

25    the value of a bed for chronically mentally ill

Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 18 of 28   Document 12-3

```
 1        supportive housing is, I believe, in the 16 or
 2        $17,000 range.  That would probably mean that the
 3        value of West Samaria as a placement facility for
 4        chronically mentally ill would be in the 1.5, $1.6
 5        million range.  The other calculation that I might
 6        take a look at is what Milwaukee County is doing to
 7        replace those beds.  Heartland and Mercy both have
 8        24 bed campuses that either are under construction
 9        or have already been constructed.  Those campuses
10        cost in excess of a million dollars.  In a situation
11        like that, the value of a bed is -- I can't do the
12        math that quick.  But I believe about $45,000.
13        Based on that --
14   Q    Well, I --
15             MR. MACHULAK:  Let him finish.
16             THE WITNESS:
17   A    Based on that, you're looking at maybe 3 1/2, $4
18        million.
19             MR. KRILL:
20   Q    Okay.  Now, I'm going to break this down, because I
21        ultimately want to get all the figures here.  Who is
22        the witness that you will be calling to calculate
23        the damages that are set forth here, loss of value
24        of West Samaria and other properties?
25   A    I will be testifying based on lost rents and
```


Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 19 of 28   Document 12-3

```
 1        came up with the calculation please.
 2   A    I would give you the calculation, and then come up
 3        with the number.
 4   Q    Okay.  Please do that.
 5   A    I believe the way to do this is to look at the
 6        replacement cost of the beds that were lost at West
 7        Samaria.  My understanding is that two new campuses
 8        being designed by Heartland and Mercy are costing
 9        over a million dollars apiece, and are generating 24
10        beds.  I think you would take the million dollars,
11        divide by the 24 beds, and calculate the cost of
12        what 92 beds provide to the community.  And I think
13        that that number comes, approximately, to $4.2
14        million.
15   Q    Okay.  And then so that includes both East Samaria
16        and West Samaria?
17   A    No.  I do believe you could come up with a more
18        objective calculation for New Samaria based on the
19        fact that it is a taxable property.  West Allis does
20        assess it at $1.2 million.
21   Q    It still does, doesn't it?
22   A    One point one seven, 1.18, somewhere -- roughly $1.2
23        million.
24   Q    It still does.
25   A    I'm sorry?
```

```
 1        important for Tri-Corp to take a look at these
 2        facilities and figure out whether the revenue
 3        generated meets or exceeds the expense, correct?
 4    A   That is correct.
 5    Q   And it's a nice thing when a facility is run so that
 6        the revenue exceeds the expenses, isn't it?
 7    A   That is correct.
 8    Q   Because that now could be used for other things
 9        perhaps, right?
10    A   Potentially.
11    Q   All right.  Okay.  And what do you --
12    A   Like losses on other campuses.
13    Q   In the nonprofit world -- in the profit world, we
14        call that a profit.  In the nonprofit world, what do
15        you call that?
16    A   Profit.
17    Q   Okay.  Good.  Now, what was the annual monthly
18        profit at West Samaria for the year 2006?
19    A   The two Samaria campuses were a mission driven
20        service model.  They were not what you might term
21        loosely cash cows.
22    Q   I see.
23    A   This provided housing for 167 individuals who were
24        chronically mentally ill.  My board of directors
25        made the commitment that that was what we were going
```

1    to do.  It was not driven by a profit motive.  So it

2    was a break even venture.

3  Q    Okay.  Is it possible that revenues for 2007 -- or

4    2006 were less than expenses?

5              MR. MACHULAK:  For 2006, or --

6              MR. KRILL:  Two thousand six, yeah.

7              MR. MACHULAK:  You have the figures there.

8              MR. KRILL:  Well, I got a bunch of -- I'm

9    here to ask him.

10             MR. MACHULAK:  I know.  Asking him in the

11   absence of documents is different than --

12             MR. KRILL:  Well, I know.

13             MR. MACHULAK:  I mean do you want him to

14   look at the documents?  We provided them all to you.

15   I didn't bring my own set.

16             MR. KRILL:  Well, I mean, quite frankly, I

17   had thought you were going to bring the documents,

18   and I was going to simply ask him to pull out the

19   documents.

20             MR. MACHULAK:  I delivered them.  You got

21   them yesterday.

22             MR. KRILL:  Those were the documents that we

23   selected.

24             MR. MACHULAK:  They're in -- I'm positive

25   they're in your selection.

```
 1        give an affidavit in that regard.
 2               MR. MACHULAK:  All right.
 3               MR. KRILL:  Okay?  Can you do that say
 4        within ten days?
 5               MR. MACHULAK:  Yeah.
 6               MR. KRILL:  Okay.  All right.  So you have
 7        that to me by -- what day is today?  The 10th.
 8        March 20th.  Okay.  Very good.
 9                         EXAMINATION
10   BY MR. SMOKOWICZ:
11   Q    Just a few questions.  Mr. Brever, briefly, tell me
12        about your educational background.
13   A    I have a undergraduate degree, a Bachelor of Arts
14        from UWM, I have a master's degree in management
15        from Cardinal Stritch University.  I attended high
16        school at a Catholic seminary.
17   Q    What was your major at UWM?
18   A    I had a Bachelor of Arts with a focus on history.
19   Q    With a what?
20   A    Focus on history.  But it's actually a Bachelor of
21        Arts General that I was awarded.
22   Q    Is it correct that you do not have any degrees in
23        accounting?
24   A    I have a Masters degree in management.
25   Q    Mr. Brever, would you please for once today answer a
```

```
 1        this witness is answering -- not answering
 2        questions, I'm not going to tolerate it.
 3             MR. SMOKOWICZ:  John, let your witness
 4        answer the question.
 5   Q    What's -- do you have a degree in accounting?
 6   A    I do not.
 7   Q    Okay.  Thank you very much on that one.
 8   A    You're welcome.
 9   Q    Now, Mr. Brever, were you involved at all in the
10        original purchase -- you mentioned some purchase of
11        this property back in the 1970s by an individual.
12        Were you involved in that at all?
13   A    I was not.
14   Q    Are you familiar with the purchase price that was
15        paid for the property back then?
16   A    I am not.
17   Q    So you have no idea what the property was purchased
18        for, correct?
19   A    I presume we're talking West Samaria now.
20   Q    Yes.
21   A    I have no idea what was paid in 1976.
22   Q    Now, what was the purpose of the mortgage that you
23        took out -- or that Tri-Corp took out on the
24        property?  From WHEDA.
25   A    Remember that initially the mortgage was taken out
```



```
 1         in 1993 by Housing With Help.  I believe the purpose
 2         of that mortgage, at that time, was to purchase the
 3         buildings in the name of Housing With Help from
 4         Joseph Apollo.
 5    Q    Okay.
 6    A    In 2003, Tri-Corp sold East Samaria and purchased
 7         New Samaria, and the mortgage was rewritten to
 8         accommodate the two parcels.
 9    Q    All right.  So the mortgage that we were talking
10         about with respect to New Samaria included, at least
11         in part, a purchase of West Samaria, is that
12         correct?
13    A    No.
14    Q    Okay.
15    A    Just a transfer of title.
16    Q    So the last time that the building that is now
17         referred to as West Samaria was purchased in any
18         form or other was the purchase by Housing With Help
19         from Mr. Apollo, correct?
20    A    I believe that's correct, yes.
21    Q    Now, what was the purchase price for that, if you're
22         familiar with it?
23    A    I'm not familiar with it.
24    Q    Do you have any documents that relate to that?
25    A    I personally did not bring any today.  I really
```

```
 1    A    I took the pay cut in 2008, and it carries forward.
 2    Q    And when in 2008 did you take the pay cut?
 3    A    I believe it was January 1.
 4    Q    And why did you take the pay cut?
 5    A    Tri-Corp was having issues with cash flow, and I
 6         made a voluntary concession to ease some of that.
 7    Q    Was that at the request of the board, or at your own
 8         suggestion?
 9    A    Neither.  I just did it.
10    Q    With respect to the operation that you have at New
11         Samaria, that continues to this date, correct?
12    A    It does.
13    Q    And what's the occupancy there now?
14    A    I believe we have 70 beds full.
15    Q    And do you charge the same amount for each one of
16         those beds?
17    A    No.
18    Q    What is the range then you charge for those beds?
19    A    I believe 72 beds are charged 535 a month, and three
20         beds are charged 560.
21    Q    Okay.
22    A    We also charge $20 for laundry if any resident
23         chooses to take advantage of it.
24    Q    Are you making any payments for the mortgage that
25         supports that property?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | When was the last time you made a payment for the |
| 3 | | mortgage that supports that property? |
| 4 | A | I believe it was the time frame that Mr. Krill |
| 5 | | referenced, July of 2007. |
| 6 | Q | And why have you not made any payments since July |
| 7 | | 2007 to support that property? |
| 8 | A | Cash flow does not allow us to do so. |
| 9 | Q | So what is that income that's being generated by |
| 10 | | that property being used for? |
| 11 | A | We have 12 individuals that work in that building |
| 12 | | providing 24 hour staffing.  We pay utilities.  We |
| 13 | | provide three meals a day, 365 days a year.  There |
| 14 | | is maintenance and upkeep of the facility. |
| 15 | Q | So, in essence, what you're saying is that every |
| 16 | | single penny that you bring in in revenue in that |
| 17 | | property is being consumed entirely by the expenses |
| 18 | | for that property. |
| 19 | A | At this point in time. |
| 20 | Q | And for how long has that been the case? |
| 21 | A | Since West Samaria closed. |
| 22 | Q | Were the expenses any different before West Samaria |
| 23 | | closed for that property? |
| 24 | A | When West Samaria was at peak occupancy, there was |
| 25 | | the ability to accommodate all of our expenses |

Case 2:12-cv-00216-CNC   Filed 01/11/13   Page 27 of 28   Document 12-3

```
 1        Machulak, I'd also like to have the right, at some

 2        point, to see the documents.  I know you produced

 3        them for Mr. Krill.  But I have not had an

 4        opportunity.  I was not invited to come see them,

 5        but I'd like to see them.

 6              MR. MACHULAK:  You're always welcome, Jan.

 7        Why do you need an invitation.

 8                           EXAMINATION

 9   BY MR. KRILL:

10   Q    I have just two questions.  Mr. Brever, you're not a

11        real estate appraiser, are you?

12   A    I am not.

13   Q    Have you had any training in real estate appraising?

14   A    I have not.

15   Q    Have you been involved with Tri-Corp when Tri-Corp's

16        purchased properties?

17   A    I have.

18   Q    And when Tri-Corp purchases a property, do you

19        generally get an appraisal of the property?

20   A    We do.

21              MR. KRILL:  That's all I have.

22              MR. SMOKOWICZ:  One item off the record for

23        a minute.

24              (Discussion off the record)

25              MR. SMOKOWICZ:  One other request I'm going
```

