UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

**TRI-CORP HOUSING, INC.,**

        Plaintiff,                Case No. 12-C-216

vs.

**ROBERT BAUMAN**

        Defendant.
_____

**AFFIDAVIT OF MICHAEL S. BREVER**
_____

STATE OF WISCONSIN    )
                                ) SS
MILWAUKEE COUNTY    )

       MICHAEL S. BREVER, being first duly sworn on oath, deposes and says:

       1.      I am submitting this affidavit in opposition to the defendant, Robert Bauman's motion to exclude my testimony on damages in the above captioned action. I believe I have sufficient background to present the damages that Tri-Corp Housing, Inc. ("Tri-Corp") has sustained in these proceedings.

       2.      Tri-Corp is a nonprofit-profit organization which was organized to promote low income housing for residents of Milwaukee County. One of Tri-Corp's missions is and always has been to provide housing for individuals with mental illness who are not in need of confinement.

       3.      I served as the executive director of Tri-Corp from the inception of the company in 1998 forward. Tri-Corp was a corporation formed by the merger of three nonprofit corporations,

1

one of which I was an executive director. The three corporations were South Community Organization, Southeast Affordable Housing, and Housing with Help, Inc. I had served as executive director of South Community Organization from 1982 forward and had been an employee of South Community Organization as a vista volunteer since 1981. South Community Organization was the largest of the three organizations involved in the merger, and I in essence, expanded my duties when all three of the organizations merged. To date, I have held executive positions in the nonprofit sector for over thirty years.

4. As a result of the events complained of in this action, Tri-Corp lost its ability to continue operations and became inactive in 2009. While I have continued on in a voluntary basis with Tri-Corp, in 2010 I accepted the position and became executive director of Friedens Community Ministries, Inc., a nonprofit organization which operates, among other things, three emergency food pantries in the Greater Milwaukee Area. More recently, in 2012, I became the development manager at Milwaukee Public Television, which is operated as a part of Milwaukee Area Technical College.

5. Prior to the defendant, Robert Bauman's misconduct, as alleged in the complaint, Tri-Corp was a community leader in the area of low income and supportive housing. While serving as the full-time executive director, I saw the organization grow from a budget of approximately $35,000 per year in 1981, to an annual budget of $6.5 million in 2004. The staff of our nonprofit grew from two to sixty-five employees over the same time period. Tri-Corp had approximately 850 low income and supportive housing units under its management of which 250 were owned by a peer agency.

2

6. Although I do have a graduate degree in management from Cardinal Stritch University, the mainstay of my expertise comes from over thirty years of working with nonprofit organizations, most of which were involved in affordable and supportive housing. In the course of my experience, I was involved in thousands of real estate transactions related to affordable and supportive housing and I have developed an expertise in this particular sector of the market. Many of the units that Tri-Corp acquired and managed involved Section 8 Housing (rent assistance), Section 42 Housing (tax credit funded housing-low income), HOME Funds, and CDBG Funds. The last two programs were subsidized by the U.S. Department of Housing and Urban Development.

7. Prior to the events complained of in our complaint, Tri-Corp, which was always under my direct management, was a recognized expert in low income housing, so much so, that we were allocated the highest dollar amount of funds per year by the City of Milwaukee (approximately $1 million per year) and were asked by WHEDA to take over the management of 250 housing units by a peer agency when that agency went into default.

8. I was the person directly in charge of the supportive housing that Tri-Corp offered for persons with mental disabilities. In 1998, Tri-Corp had two such facilities known as West Samaria and East Samaria. In 2001, I oversaw the acquisition of the New Samaria facility in West Allis, Wisconsin as well as the physical relocation of the people we served from one facility to the other. This involved locating and developing the New Samaria facility (which was formerly a nursing home), preparing financial information to assess the feasibility of the facility and to attract financing, securing and closing financing for the new facility, and in connection with that, obtaining appraisals and evaluations of the buildings and securing the financing. With respect to

the day to day operations, I oversaw 30 to 35 employees involved in Tri-Corp's providing supportive housing, contracted with Milwaukee County and the American Red Cross to offer the facilities at established rates to people with mental disabilities, oversaw the revenues and managed and approved the expenses of the facilities. I did this on a day to day basis from 1998 forward.

9. Housing With Help (one of the organizations merged to form Tri-Corp) purchased West Samaria (then known as Richardson House) in 1993, not 1976. I was not Housing With Help's executive director at that time, but I am generally familiar with the 1993 purchase. I managed West Samaria after it was acquired by merger in 1998, when it was extensively remodeled with over $400,000 raised by Tri-Corp's fund-raising efforts, and when in 2003 it was pledged as collateral to support the acquisition of New Samaria, a similar additional facility providing housing for low-income individuals with mental disabilities.

10. I can testify as to the losses sustained by Tri-Corp as a result of Mr. Bauman's conduct because at all times involved in this case I managed all of Tri-Corp's housing facilities, including West Samaria, on a day to day basis and tracked the expenses and revenues and saw the impact of his conduct. In this I was assisted by Tri-Corp's bookkeeping staff, including a controller whom I had worked with for approximately twenty years. From my experience, I know what it costs to develop units of low income housing for the disadvantaged in the Milwaukee area, as well as what it costs to operate them, based on business records that I personally used and continually reviewed over those years.

11. At the time I signed the March 20, 2009 affidavit, which Mr. Smokowicz has attached to his affidavit in these proceedings, Tri-Corp had been seriously damaged by Mr. Bauman's conduct. By 2007, Mr. Bauman's persistent efforts to undermine Tri-Corp and in

particular, West Samaria, led to his interfering with Tri-Corp's relationship with, among others, its lender and with Milwaukee County. As a result of Mr. Bauman's conduct, Milwaukee County began to relocate and discontinue placing residents at West Samaria toward the end of 2007.

12. When fully occupied, West Samaria provided room and board for ninety-two individuals. For approximately eight years, part of the West Samaria facility had been leased to the Red Cross, where the Red Cross provided for up to thirty-one individuals with chronic mental illness. All residents had certified chronic mental illness and some form of certified disability. Each of these individuals had a case manager who served as an advocate for the individual and helped them with various functions including interaction with government agencies, scheduling appointments, and in many cases serving as payee with respect to funds received by or on behalf of the individual. These case workers were generally either Milwaukee County employees or employees of private nonprofit organizations funded by Milwaukee County.

13. Based on my own personal knowledge, supported by Tri-Corp's records, Tri-Corp at a minimum lost rents as follows, as a result of Mr. Bauman's conduct:

| Month | Full rent | Actual rent | Loss |
|---|---|---|---|
| Dec-07 | 51,559.00 | 44,139.00 | 7,420.00 |
| Jan-08 | 51,559.00 | 39,899.00 | 11,660.00 |
| Feb-08 | 51,559.00 | 32,479.00 | 19,080.00 |
| Mar-08 | 51,559.00 | 32,479.00 | 19,080.00 |
| Apr-08 | 51,559.00 | 18,699.00 | 32,860.00 |
| May-08 | 51,559.00 | 18,699.00 | 32,860.00 |
| Jun-08 | 51,559.00 | 18,699.00 | 32,860.00 |
| Jul-08 | 51,559.00 | 16,057.00 | 35,502.00 |
| Aug-08 | 51,559.00 | 13,415.00 | 38,144.00 |
| Sep-08 | 51,559.00 | 13,415.00 | 38,144.00 |
| Oct-08 | 51,559.00 | 3,198.00 | 48,361.00 |
| Nov-08 | 51,559.00 | 0.00 | 51,559.00 |
| Dec-08 | 51,559.00 | 0.00 | 51,559.00 |
| Jan-09 | 51,559.00 | 0.00 | 51,559.00 |
| Feb-09 | 51,559.00 | 0.00 | 51,559.00 |
| Mar-09 | 51,559.00 | 0.00 | 51,559.00 |
| Apr-09 | 51,559.00 | 0.00 | 51,559.00 |
| | | | $625,325.00 |

From December 2007 through March 2008, all of the individuals placed at West Samaria by Milwaukee County were relocated. Tri-Corp could not abandon the other occupants of West Samaria while this occurred and continued to incur expenses in connection with the facility, including such items as utilities. After March 2008, the much reduced rental income came from the American Red Cross, which through October of 2008, continued to use West Samaria under its contract with Tri-Corp. In November 2008, West Samaria was vacant. To the extent that there were any cost savings when the building was vacated, they are reflected on in the financial detail which we furnished the other parties much earlier in this case.

14. Even prior to this time frame, Mr. Bauman's conduct had an impact on occupancy at West Samaria. As noted by the Wisconsin Court of Appeals in its decision relating to this case, since at least 2005 Mr. Bauman publicly opposed Tri-Corp's special use permit to operate West Samaria by making "factually untruthful" and "unsubstantiated" accusations. While ultimately, Tri-Corp retained its permit, Mr. Bauman's constant outlandish claims did injure West Samaria during these years.

15. The very substantial loss of revenue at West Samaria beginning in late 2007 damaged Tri-Corp's ability to continue to provide low income housing for individuals with mental disabilities at its New Samaria facility and impacted every facet of Tri-Corp's operation. Tri-Corp had a single mortgage through WHEDA against both West Samaria and New Samaria. Before these events, the combined expected rents from West Samaria and New Samaria covered the mortgage. When Tri-Corp lost its rents from West Samaria, this was no longer the case. Consistent with Tri-Corp's nonprofit mission, rents were set and expenses budgeted to make this housing affordable and available to low income individuals with mental disabilities. The fact that

6

Case 2:12-cv-00216-CNC   Filed 02/01/13   Page 6 of 15   Document 14

Tri-Corp operated as a typical nonprofit corporation made it susceptible to the type of injury shown in this case.

16. By way of background, in 2003, Tri-Corp acquired and occupied what came to be called New Samaria, a former nursing home located at 6640 West Beloit Road, West Allis, Wisconsin. At that time it sold a third facility providing housing for mentally disabled individuals, which was located at 506 North 18th Street, Milwaukee, Wisconsin and known as East Samaria, and then moved East Samaria's residents to New Samaria. Tri-Corp acquired New Samaria with the combination of proceeds from the sale of East Samaria and new financing from WHEDA.

17. Tri-Corp's object was to obtain enough financing to remodel the nursing home and relocate residents from East Samaria to New Samaria. The eventual financing package resulted in a $1,629,000.00 mortgage loan, amortized over 15 years, secured by mortgages against West Samaria and New Samaria. WHEDA did not disburse the entire $1,629,000.00 loan. Of the total $1,629,000.00, the sum of $407,952.56 was placed into a replacement reserve and $3,058.10 was placed into a tax escrow. This left $1,180,369.23 to repay the existing loan on West Samaria and add acquisition money for New Samaria. Tri-Corp was to pay 4% interest on the entire $1,629,000 loan.

18. The loan closed on April 18, 2003. Tri-Corp remodeled the New Samaria facility and over the next year, WHEDA disbursed $389,356.13 from Tri-Corp's funded replacement reserve toward the cost of this remodeling. In the years that followed, WHEDA disbursed substantial additional funds from the reserve account toward repairs and improvements to both buildings. This was over and above money Tri-Corp raised from other sources to perform substantial renovation work at West Samaria. In 1999 and 2000, Tri-Corp raised and spent $400,000 for a major overhaul of the West Samaria building.

19. With respect to the WHEDA loan, in 2003 and subsequent years, Tri-Corp replenished the replacement reserve account with payments of $4,166 per month. Tri-Corp's replacement reserve escrow was at a low of $105,425.90 in January 2004, was replenished by these monthly payments (and to a lesser extent, interest earned on the money in escrow), and exceeded $300,000.00 by the end of 2007.

20. In the years following the 2003 closing, Tri-Corp made regular monthly payments of $19,387.38 on the loan. This broke down as $12,049.52 toward principal and interest, $4,166.00 toward replacement reserve, and $3,171.86 toward the tax escrow. WHEDA had substantial security for this and two other loans.

21. I have reviewed the brief that Mr. Smokowicz has submitted with his motion and disagree with his opinions and conclusions as to Tri-Corp's financial status. For example, he states at page 3 of his brief, that "[b]y the spring of 2007, there was a series of delayed payments and automatic bank withdrawal rejections of amounts owed by Tri-Corp to WHEDA. ... WHEDA issued a notice of default on the mortgage on July 2, 2007 to Tri-Corp for the mortgage for West Samaria and New Samaria after a failure to make the June 2007 payment....Tri-Corp never cured the default and continued to fail to make payments in the subsequent months. " This is not correct.

22. The fact that there were postings on Tri-Corp's "ACH" account (which was an automatic withdrawal system that Tri Corp had set with WHEDA did not mean that Tri-Corp was in default on its loan payments. Furthermore, Tri-Corp's records show that on July 2, 2007, WHEDA sent Tri-Corp a notice that it had missed a payment due on June 11, 2007. What in fact happened on that day is WHEDA, as was its practice, attempted an automatic withdrawal from Tri-Corp's bank account of $19,508.95, but there were insufficient funds to cover that payment.

8

WHEDA attempted another automatic transfer on July 11, 2007, which also did not clear. However, on August 10, 2007, WHEDA initiated an automatic transfer which did clear Tri-Corp's account, and consequently was able to draw $20,111.43 (which was the regular payment plus a $602.48 late fee) and applied the payment (less the late fee) to principal and interest ($12,049.52), replacement reserve ($4,166.00) and tax escrow ($3,293.43).

23. I understand that at the deposition referred to by Mr. Smokowicz (at page 27) I testified that Tri-Corp did not make a payment in August 2007. I did not have the payment records in front of me when I testified, and I misspoke, as is shown by the actual payment records.

24. In his brief Mr. Smokowicz refers to my testimony (at pages 16-17) regarding a letter from our auditor regarding Tri-Corp's finances. What is not clear from the testimony is that the letter, and accompanying audit, were first issued in November 2007, after Mr. Bauman interfered with our relationship with WHEDA and WHEDA responded. [See Exhibit A] Also, while the questions asked of me at the deposition highlight Tri-Corp's then current liabilities, I would note that the audit report for 2006 also shows that Tri-Corp reduced its long-debt by $1,015,705 between 2005 and 2006. In short, I do not agree that the financial information selected by Mr. Smokowicz negates the damage done to Tri-Corp by Mr. Bauman's conduct.

25. With WHEDA's cooperation, Tri-Corp had the ability to make its payments on the loan. Before late 2007, Tri-Corp had WHEDA's cooperation, but things changed after Mr. Bauman interfered with the relationship.

26. When in late 2007 it appeared that Tri-Corp would get behind on its payments on the West Samaria and New Samaria loan, Marie Banach, Tri-Corp's controller, and I drove to Madison and met with representatives of WHEDA in Madison to discuss various means of bringing the loan current. These included using sale proceeds of other properties in Tri-Corp's

9

portfolio to make up the missed payments and using the replacement reserves from West Samaria and New Samaria or from other Tri-Corp properties. I explained that Mr. Bauman's efforts to close West Samaria had taken their toll on occupancy in the previous year, but that occupancy was coming back to its previous levels. I am and was familiar with the occupancy levels, and Tri-Corp's rent rolls substantiate this representation.

27. In August 2007 I met with WHEDA representatives, including Rae Ellen Packard, and we discussed the status of the loan. Ms. Packard told me that WHEDA would work with Tri-Corp on the loan, and I understood her to mean that WHEDA would look at other options to bring the loan current.

28. No one from WHEDA threatened to foreclose upon Tri-Corp for this or any of its other loans until Mr. Bauman interfered with Tri-Corp's relationship with WHEDA. But for Mr. Bauman's conduct all payments due, including late payments, would have been made and Tri-Corp would have continued to conduct its housing program at full capacity, eventually paying off the loan from WHEDA. On November 19, 2007, the loan balance due WHEDA, net of $340,892 in cash on deposit with WHEDA for a replacement reserve, was $936,394 in principal and interest.

29. Instead, WHEDA foreclosed upon the mortgage against both West Samaria and New Samaria. Tri-Corp was unable to refinance the mortgage, given that West Samaria was vacant and not generating any revenue, even though New Samaria remained occupied and continued to generate revenue during the foreclosure proceedings. Tri-Corp lost both West Samaria and New Samaria in the foreclosure proceedings.

30. I believe that I have sufficient personal knowledge and expertise to testify as to the amount of this loss to Tri-Corp. Tri-Corp's cost of these two facilities, as shown by Tri-Corp's

10

audited accounting records, was $3,011,958 before depreciation and $2,232,133 after depreciation. [See Exhibit B]

31. New Samaria, which provided 75 units of housing for mentally ill residents, had a fair market value of $1,235,100.00 based on city assessment. [See Exhibit C] West Samaria itself did not have an assessed value because of its historic nonprofit status. However, I believe it is reasonable to calculate the comparable value of West Samaria by applying a value per housing unit at New Samaria by the assessor's fair market value ($1,235,100.00 / 75 units = $16,468.00) to the number of units at West Samaria ($16,468.00 x 92 units = $1,515,056.00). The total result, which is $2,750,156.00, is in the range of Tri-Corp's cost.

32. I believe that these figures understate the value of these facilities as homes for individuals with mental disabilities. I have spent the better part of my career developing low income housing, including housing for individuals with mental disabilities. In my opinion, as I stated in my affidavit submitted as an exhibit by Mr. Smokowicz, creating housing for individuals with mental disabilities is extremely time consuming and expensive. This can be shown by comparing market data, such as information published in the Milwaukee Journal. There I referred to the article that appeared in the Milwaukee Journal on December 17, 2008, entitled "Special Needs Housing Expanding." The article shows what it cost to develop a new bed for mentally ill individuals in that year. According to this article, the total development cost of 149 units was $25.7 million. This works out to $172,483.00 per unit. The subsidized cost alone of these 149 units is $1,450,000.00, or $9,731.00 per unit. Furthermore, the cost of bricks and mortar to develop a new bed for mentally ill individuals does not take into account the time and effort a nonprofit organization expends in getting a project like this off the ground.

11

33. I believe that I have sufficient personal knowledge and expertise to testify as to the damages arising from Tri-Corp's loss of reputation and goodwill as a result of Mr. Bauman's conduct.

34. Before the events involved in this case, Tri-Corp (through its predecessor organizations) had a long history of dealing with WHEDA. In 1992, South Community Organization received a $497,000 loan from WHEDA to refinance the renovation of twelve single family homes and duplexes (a total of 26 housing units) targeted for low income residents, which facilitated lower rents. In 1993, South Community Organization received a second $694,975 loan for approximately eight single and multi-family homes (a total of 27 units) for low income families. During these years Tri-Corp/South Community Organization received the distinction of being the highest rated nonprofit producer of low income housing in the City of Milwaukee. It received substantial funding from Community Block Grant and other sources.

35. In 2000 Tri-Corp received a plaque and award from WHEDA "in recognition of [its] commitment to provide affordable housing to the citizens of the State of Wisconsin." Likewise in 2000 West Samaria received an award from NAMI (The National Alliance for the Mentally Ill of Greater Milwaukee "in appreciation for [its] commitment to the pursuit of wellness." As executive director of Tri-Corp, I received an award from WHEDA in 1999 "[i]n appreciation of your excellence in management practices, provision of affordable housing and your willingness to share your talents with other nonprofit Organizations in need." See Exhibits D, E, and F.]

36. In the year 2000, because of Tri-Corp's good standing, WHEDA asked Tri-Corp to assist WHEDA when another nonprofit organization known as Westside Housing Cooperative became seriously in default with its obligations. Westside was on the brink of bankruptcy, in

12

default on its loans with its lenders, including M&I Bank, TCF Bank, Interbay, WHEDA, and the Milwaukee County HOLF program, in default on the payment of its property taxes, and obliged to pay approximately $30,000 in fines for building code violations. Tri-Corp, which had no prior relationship with Westside, was asked by WHEDA, Alderman Henningsen, Municipal Judge Gramling, and others to assist in the management of this troubled agency. Tri-Corp did not replace Westside's board of directors; rather it entered into a contract to hopefully translate its own success in low-income housing rehabilitation into assistance for Westside's board.

37. When Tri-Corp began its work, Westside had 283 housing units which were subject to foreclosure and at risk of becoming board-ups. From 2000 forward, Tri-Corp assisted in the improvement and orderly sale of 233 of the original 283 units. Of the units sold, 115 went to low-income owner occupants and "buy in your neighborhood" investors. Tri-Corp wrote a grant for and obtained a grant for Federal Home Loan Bank funds, which in turn enabled 14 low-income families to become first time home buyers when they acquired 14 of these properties. By November 30, 2003, Westside's portfolio was reduced to 50 units without any foreclosure actions, all property taxes were current, and there were no outstanding fines for building code violations. Through Tri-Corp's intervention, Westside obtained a grant to complete an audit of its books and filed tax returns which had been seriously delinquent.

38. Throughout this process of fixing Westside Housing Cooperative, Tri-Corp worked with WHEDA. WHEDA's agreements with Westside had provisions requiring Westside to pay into replacement reserves, as do the documents at issue in this foreclosure action. In salvaging Westside Housing Cooperative, Tri-Corp was able to use Westside's replacement reserves to, among other things, pay delinquent property taxes, pay fines, pay off M&I Bank on

13

prior mortgages, and generally, to accomplish a multitude of purposes that did not involve property repairs or capital improvements.

39. In 2002, Tri-Corp obtained a $400,000 loan from WHEDA as part of a $4,122,000 purchase of 58 duplexes from a rental company known as Metro Homes. Bank One provided a $3 million loan as part of this effort and LISC provided a $750,000 loan. Tri-Corp's object was to perform rehabilitation where needed and, to the extent possible, sell the properties to low-income owner-occupants. The programs succeeded, and all three loans were paid back in full in 2003.

40. As stated in my earlier affidavit, Tri-Corp had tremendous stature in the community as a nonprofit organization before the events made part of this lawsuit. Tri-Corp was the recipient of grants of up to $1.5 million per year and the recipient of numerous awards. Awards and grants had declined to less than $20,000 in 2008. Based on my years of experience in this field, awards and grants are typically leveraged into programs and housing developments that will return $300,000 in cash flow for the organization's growth for each $1,000,000 received in grants and awards. This is demonstrated by Tri-Corp's growth in the decade before the events of this case. Measuring reputation and goodwill by this standard, Tri-Corp's loss of goodwill easily amounts to $300,000 per year, and there is no doubt in my mind that Tri-Corp would be in existence today and for many years to come but for Mr. Bauman's conduct.

41. Mr. Smokowicz has attached to his affidavit as Exhibit B pages from the transcript of a deposition taken at the request of another attorney, R. Jeffrey Krill, at his office on March 10, 2009. Before this deposition took place, Tri-Corp produced for him a considerable quantity of financial documents and made available documentation supporting the statements I am making in

14

this affidavit. During this deposition, Mr. Krill was selective in his questioning, did not make available Tri-Corp's entire document production, and questioned me only on selected documents. Mr. Smokowicz attended this deposition and asked questions, but had not asked me to bring any documents at all.

42. After this deposition, I compiled the documents attached to my March 20, 2009 affidavit, but these certainly do not represent all of Tri-Corp's business records. At no time after I prepared this affidavit was I ever deposed by either Mr. Krill or Mr. Smokowicz.

          */s/ Michael S. Brever*
          Michael S. Brever

Subscribed and sworn to before me
this 1st day of February, 2013.

*/s/ John E. Machulak*
Notary Public, Milwaukee County
State of Wisconsin
My Commission is Permanent