UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TRI-CORP HOUSING, INC,

        Plaintiff,

        v.                                             Case  No. 12-C-216

ROBERT BAUMAN, ALDERMAN

        Defendant.

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Tri-Corp Housing, Inc. ("Tri-Corp") commenced its action against Robert Bauman with the filing of a third-party complaint against him in the Wisconsin Circuit Court on March 14, 2008. See, http://wcca.wicourts.gov/courtRecordEvents.xsl;jsessionid=30A82087AF1062A36D58D B1734978482.render6?caseNo=2007CV013965&countyNo=40&cacheId=3DCE473CAF 364E0DB163DCE5FCD9B719&recordCount=79&offset=21&linkOnlyToForm=false&s ortDirection=DESC (Docket item 143).   Tri-Corp alleged that Bauman conspired with the Wisconsin Housing and Economic Development Authority (WHEDA) to harm Tri-Corp and that Bauman tortiously interfered with its actual or prospective business relations.  Smokowicz Affidavit, Attachment F (decision of Wisconsin Court of Appeals, Appeal No. 2010AP1443), p. 2, ¶1.  Ultimately, in the course of proceedings in the state

trial court, the Wisconsin Circuit Court judge, Judge Mel Flanagan, granted summary judgment dismissing both of Tri-Corp's claims against Bauman. *Id*.

Tri-Corp appealed that judgment and on review, the Wisconsin Court of Appeals upheld the dismissal of the conspiracy claim. It reversed Judge Flanagan's decision with respect to her dismissal of the claim of tortious interference with actual or prospective business relationships. *Id.*, p. 10-19.

On remand, Tri-Corp filed an amended third-party complaint against Bauman, alleging against the alderman for the first time certain claims under federal law. Tri-Corp asserts that Bauman deprived the corporation of the right to assist persons with disabilities in violation of the Fair Housing Act, the Americans With Disabilities Act, and the Rehabilitation Act. Amended Third Party Complaint, ¶51, p. 10-11. Tri-Corp also claims that this conduct violates the provisions of 42 U.S.C. §1983. Amended Third Party Complaint, ¶52, p. 11. Tri-Corp also added a new claim under state law, alleging that Bauman had defamed it. *Id.*, ¶¶'s 42-46, p. 9-10.

Bauman answered the amended pleadings. *See* Notice of Removal, Attachment A. With the addition of claims under federal law, Bauman then filed a Notice of Removal.

## ARGUMENT

## I.    STANDARD FOR GRANTING SUMMARY JUDGMENT

### A.    Summary Judgment Generally

The defendant is moving for summary judgment pursuant to Fed.R.Civ.P. 56. That rule reads in relevant part as follows:

2

(a)… .  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law...

(c)(1)    A party asserting that a fact…is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials; or,

(B) showing that the materials cited do not establish the absence…of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

A party seeking summary judgment must demonstrate that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law. *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir. 1990).

If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).  If he or she fails to do so, summary judgment is proper. *National Diamond Syndicate, Inc. v. UPS*, 897 F.2d 253, 260 (7th Cir. 1990).  A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).  Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Krist v. Eli Lilly and Co.*, 897 F.2d 293, 296 (7th Cir. 1990).

The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990), or upon conclusory

allegations in affidavits.  *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).  The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989), as long as the inferences are reasonable.  *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989).

The non-moving party must show that the disputed fact is material, or outcome - determinative, under applicable law.  *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is proper against a plaintiff who fails to establish an element of his claim on which he will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Justice White in *Anderson*, 477 U.S. 242, 247-49, set forth the Court's position on what constitutes genuine issues of material fact precluding the entry of summary judgment. Justice White stated with respect to the previous version of the rule:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Id.* at 249. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

Justice White noted that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a) which dictates that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Id.* at 250. The Court indicated in *Anderson* that it has long been the law that judges are not required to submit a question to the jury merely because some evidence has been introduced by the party bearing the burden of proof. Such issues need only be submitted where the evidence is sufficient to warrant a jury verdict in favor of the party in question.

This mandate requires more than a scintilla of evidence. Rather, it requires an inquiry by the court before submitting matters to juries as to whether there is sufficient evidence upon which a jury could properly proceed to find a verdict for the party bearing the burden of proof. *Id.* at 251. It is incumbent upon the court to grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law.

**B.      Summary Judgment And Qualified Immunity**

The threshold question of qualified immunity is properly resolved on summary judgment because its analysis is ostensibly objective. *See Rakovich v. Wade*, 850 F.2d 1180, 1203-04 (7th Cir. 1988), *abrogated on other grounds Spiegla v. Hull*, 371 F.3d 929 (7th Cir. 2004). Although intertwined with a case's facts, the qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cir. 1988). The

5

Seventh Circuit has determined that the court is to decide the issue of qualified immunity even when facts are in dispute. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988); *see also Rakovich*, 850 F.2d at l20l-02.

In *Hunter v. Bryant*, 502 U.S. 224, 116 L. Ed. 2d 589 (1991), the United States Supreme Court stressed the importance of resolving immunity questions at the earliest possible stage in the litigation. *Id.*, 116 L. Ed. 2d at 595. The Supreme Court reversed the Ninth Circuit's denial of summary judgment holding:

> The decision of the Ninth Circuit ignores the import of these decisions. The Court of Appeals' confusion is evident from its statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment..... based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

*Id.* at 595-96 (citations omitted).

The United States Supreme Court has emphasized that the claimed right must be "clearly established" in a "particularized" sense. *Anderson*, 483 U.S. at 639-640. As the Seventh Circuit has explained in an opinion affirming a decision of this district:

> In ascertaining whether a particular right has been "clearly established" within the meaning of *Harlow*, this court has not required binding precedent from the Supreme Court or the Seventh Circuit. *Cleveland-Perdue [v. Brutsche]*, 881 F. 2d [427] at 431 [(7th Cir. 1989)]. In the absence of controlling authority on point, "we seek to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* In identifying the relevant trends, plaintiffs need not direct the court to cases "on all fours" with the case at bar; however, "case law in a closely analogous area

6

is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly." *Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1067 (1986).

*Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 1251, 150 L.Ed.2d 272 (2001), the Supreme Court addressed the issue of the proper application of qualified immunity to an excessive-force claim. *Id.*, 121 S.Ct. at 2154-55. The particular issue before the Court was "whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest, that qualified-immunity and constitutional-violation issues should be treated as one question, to be decided by the trier of fact." *Id.*, 121 S.Ct. at 2153. In resolving this issue, however, the Supreme Court provided significant guidance on the doctrine of qualified immunity beyond just this narrow question, and made clear that its guidance applied to all cases involving this immunity, and not just those cases involving claims of excessive force.

The Supreme Court explained first that in ruling on a qualified-immunity issue, there is a "threshold question" which it phrased as follows:

> Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?

*Id.*, 121 S.Ct. at 2156. That is, however, only the "threshold" issue. A court addressing the issue of qualified immunity may also have to do the following:

> If a violation could be made out on a favorable view of the parties' submissions the next, sequential step is to ask whether the right was clearly established.

*Id.*

To answer the second question, the Supreme Court's holdings in *Saucier* unequivocally establish that simply referring to a general constitutional doctrine does not resolve the issue of qualified immunity. That may answer the "threshold" question, but it does not resolve the second, much more fact-specific inquiry. It "is not enough," for example, simply to contend that the Fourth Amendment prohibits arrests without probable cause. *Id.,* 121 S.Ct. at 2156.

To answer the second question, the Court emphasized that, "[t]his inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citation omitted).

The Court in *Saucier* also notes that qualified immunity has a further dimension. The doctrine acknowledges that police officers can make reasonable mistakes about the legal constraints on their conduct. Accordingly, if the officer's mistake of what the law requires is reasonable, the officer is entitled to qualified immunity. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Saucier*, 121 S.Ct. at 2158.

The Supreme Court has previously held that, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Supreme Court first revisited its holding in *Saucier* in *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 599 (2004). In reviewing *Saucier's* holding that qualified immunity works "to protect officers from the sometimes 'hazy border between excessive and acceptable force,'" (*Saucier*, 533 U.S. at 206), the *Brosseau* court reemphasized that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau*, 543 U.S. at ___, 125 S.Ct. at 599.

The *Brosseau* court also reaffirmed that, "[i]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau*, *supra*, quoting *Saucier*, 533 U.S. at 201. The *Brosseau* court went on to explain that it is inappropriate in cases that are "far from the obvious one" simply to look at earlier decisions that are "cast at a level of high generality" in order to determine whether a law enforcement official would have fair notice that particular conduct violated a right under the Fourth Amendment. *Brosseau*, *supra*.

More recently, the Supreme Court again revisited *Saucier* in *Pearson v. Callahan*, 555 U.S. 223 (2009). There the Court held that, "[o]n reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 555 U.S. at 236. "The judges of the district courts and the courts of appeals should be permitted to

9

exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. In order to permit that exercise of discretion, both prongs are addressed below, but in the order suggested by *Saucier* as the *Pearson* court viewed that approach as "often beneficial." *Pearson*, 555 U.S. at 236.

Once the defense of qualified immunity is raised, it is the plaintiff's burden to produce case law in which "the facts of the existing case law must closely correspond to the contested action before the defendant official is subject to liability." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1994). The law is "clearly established" if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from facts presented in the case at hand...." *Campbell v. Peters III*, 256 F.3d 695, 701 (7th Cir. 2001) (quoting *Saucier v. Katz*, ___ U.S. ___, 121 S.Ct. 1251, 2157) (emphasis added by Seventh Circuit).

## II.     THE FAIR HOUSING ACT CLAIM

### A.     Dismissal on Substantive Grounds

Pursuant to the pertinent provision of 42 U.S.C. §3604, "it shall be unlawful…[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter… ." 42 U.S.C. §3604(f)(1)(A). Tri-Corp is apparently basing its Fair Housing Act claim against Alderman Bauman on the assertion that he "otherwise ma[d]e unavailable" housing to mentally ill individuals at West Samaria.

A "handicap" is defined to include, "a physical or mental impairment which substantially limits one or more of such person's major life activities," or "a record of having such an impairment." 42 U.S.C. §3602(h)(1) and (2). A person suffering from long-term mental illness, though living in a community setting, is considered for purposes of the statute to be suffering from a "handicap." *ARC of New Jersey v. New Jersey*, 950 F. Supp. 637, 644 (D. N.J. 1996).

For Alderman Bauman to be found to have violated the statute, however, Tri-Corp must show that he "otherwise ma[d]e unavailable" housing for mentally ill individuals at West Samaria. 42 U.S.C. §3604(f)(1)(A). Tri-Corp cannot make this required showing because there is no evidence that the alderman had the authority or power to effect the claimed discrimination directly.

In *Meadowbriar Home for Children, Inc. v. G. B. Gunn*, 81 F.3d 521, 525-6 (5th Cir. 1996), the appellate court considered a housing discrimination claim brought by a corporation which planned to develop a treatment center, including housing, for emotionally disturbed women. Certain local residents organized a group to oppose this development and complained to the municipal attorney's office that certain deed restrictions precluded the development. *Id*. at 526. Subsequently, an assistant city attorney "allegedly instructed the city's Public Works Department to refrain from issuing Meadowbriar an occupancy permit" and also allegedly "contacted the city's Fire Marshal to prevent the issuance of a fire permit." *Id*. A senior fire inspector subsequently informed Meadowbriar that the permit which had been issued "was inadequate and had to be withdrawn;" lacking those permits, the state then would not award the needed permits

to open the center. *Id*. Months later, a state court ruled that the deed restrictions were unenforceable, but by that time the health care provider that was to provide the requisite treatment at the facility decided it would not go forward with any contract. *Id*. Meadowbriar sued members of the community group, the assistant city attorney, and the fire inspector, alleging that they took "an active role in preventing the opening of the treatment center" and that their actions "created obstacles to the opening of the center which Meadowbriar argues resulted in the denial of dwellings for the handicapped." *Id*.

As to the assistant city attorney and the fire inspector, both were sued in their individual and official capacities, and as for the individual capacity claims, the district court conclude that they "were entitled to qualified immunity on Meadowbriar's Fair Housing Act claims… ." *Id*. at 529. In affirming their dismissal, the Fifth Circuit Court of Appeals held that it must determine whether either of these local government employees "alleged actions…'denied or otherwise made unavailable' to Plaintiff's a dwelling." *Id*. at 531.

"Liberally construing the complaint, the alleged conduct of [these two individuals] does not fall within the 'otherwise make unavailable or deny' purview of the Fair Housing Act." *Id*. at 531. The fifth circuit determined that while, "the 'otherwise make unavailable or deny' phrase seems all-encompassing, its scope is not limitless." *Id*. at 531. The court then held that, "[i]t is axiomatic that for an official to make a dwelling unavailable, that official must first have the authority and power to do so." *Id*. at 531. "In other words, the official must be in a position to directly effectuate the alleged

discrimination." *Id*. at 531. The appellate court held that the complaint in that case did not allege that either the municipal attorney or the inspector had such authority. *Id*.

This analysis has been followed and applied by two district courts in the seventh circuit. In *Flores v. Village of Bensenville, Illinois*, 2001 U.S. Dist. LEXIS 13953, *2-*3 (N.D. Ill. 2001), the plaintiffs were Hispanic residents of the defendant village and claimed discrimination with four houses that they owned on two parcels of land. The village's zoning ordinance permitted only one house on any lot. *Id*. at *3. The village sued to enjoin use of the second home on each lot, and the state courts issued the injunction, though it was not clear whether the relief related to one of the homes occupied by the plaintiffs themselves. *Id*. Apparently after the state trial court had issued the injunction, the village moved the water meter from one house, refused to re-establish water service to that home, refused certain other municipal services to certain of the homes, including the ordering of "a 'slow down' of fire fighting services to one home in which a fire erupted and which resulted in significant damage. *Id*. at *5. In their Fair Housing Act suit, the Mr. and Ms. Flores sued each member of the village board of trustees and the building division supervisor. *Id*. at *2.

As to the individual capacity claims, the district court in *Flores* relied upon the *Meadowbriar* decision. *Flores*, 2001 U.S. Dist. LEXIS 13953, *22-*23. The Flores court held that in order to state a claim under the Fair Housing Act, the "plaintiffs must allege that the individually named defendants had the authority and power to effectuate the alleged discriminatory acts." *Id*. at *22. "With respect to the Fair Housing Act

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 13 of 28   Document 16

claims, the plaintiffs have failed to allege that the individually named defendants had the authority or power to effectuate the alleged discriminatory acts." *Id*. at *23.

In *Crestview Village Apartments Limited Partnership v. United States Department of Housing and Urban Development*, 2002 U.S. Dist. LEXIS 26508, *2 (N. D. Ill. 2002), the plaintiff owned an apartment complex in Kankakee, Illinois providing 150 rental units and "the majority of tenants are African-American." In the fall of 1999, Kankakee sued in state court, alleging that the apartments presented serious health hazards and were unfit for human habitation. *Id*. at *2-*3. In response, the partnership admitted to numerous building code violations and agreed to make repairs. *Id*. at *3.

"In November 2000, HUD became aware of Plaintiff's violations of local building codes as charged in the state court complaint and notified Plaintiff it intended to foreclose on the properties because the physical decline and disrepair of the apartments and buildings violated the parties' regulatory agreement." *Id*. at *4. Three months later, a real estate service inspected the properties and "reported to HUD that Plaintiff had not cured the property's deterioration." *Id*. at *4.

The partnership sued HUD and certain of its employees as well as the City of Kankakee and certain of its officials and employees. *Id*. at *4-*5. With respect to the Fair Housing Act claims against Kankakee's officials and employees, the *Crestview* court held that, "a plaintiff must allege the individually named defendants had the authority and power to effectuate the alleged discriminatory acts." *Id*. at *15, citing *Meadowbriar*, *supra*. It then held that, "[w]ith respect to the Fair Housing Act claims, Plaintiff has failed to indicate a discriminatory motive and further failed to allege the individually

14

named defendants had the authority or power to effectuate the alleged discriminatory acts." *Crestview*, 2002 U.S. Dist. LEXIS 26508, *16.

This Court should also conclude that Tri-Corp's Fair Housing Act claim against Bauman fails because Tri-Corp cannot establish that Alderman Bauman was "in a position to *directly* effectuate the alleged discrimination." *Meadowbriar*, 81 F.3d at 531 (emphasis supplied). The alleged discriminatory act was the deprivation of housing for mentally ill individuals through the closing of West Samaria. Smokowicz Affidavit, Attachment A (Amended Third Party Complaint), p. 10, ¶49. It is obvious from the pleadings and evidence developed through discovery, however, that Alderman Bauman was not in a position and did not have the authority to directly effectuate this closing.

As even Tri-Corp alleges, in spite of alleged efforts to persuade BOZA, he could not get the city's board to revoke Tri-Corp's occupancy permit. PFOF 15. Alderman Bauman obviously did not have the authority or power to revoke the permit.

Furthermore, he did not have the authority or power to direct WHEDA, a creature of the State of Wisconsin (Wis. Stats. §234.02(1)) and not an agency of the city, to take any particular action on Tri-Corp's mortgage. As an official of the City of Milwaukee, Alderman Bauman at most could simply ask WHEDA to foreclose on the mortgage but he did not have the direct authority or power to take any such action.

Even if the Court somehow deems the alderman's power of advocacy to be significant, he could only be found to have persuaded WHEDA to have acted in an non-discriminatory fashion to foreclose on the mortgage. This is because the Wisconsin Court of Appeals has held as a matter of law that Tri-Corp's Fair Housing Act claim fails

15

against WHEDA in part because there was no "evidence showing that WHEDA's decision to foreclose on Tri-Corp's loan was based on the disabilities of West Samaria's residents." Smokowicz Affidavit, Attachment E (Decision of the Wisconsin Court of Appeals, Appeal No. 2010AP418), ¶31, p. 14. As a party to that suit and that appeal, Tri-Corp is bound by that determination. *Local 322, Allied Industrial Workers of America, AFL-CIO v. Johnson Controls, Inc.*, 969 F.2d 290, 292 (7th Cir. 1992).

Thus, even if Tri-Corp can produce evidence that Alderman Bauman was motivated by a discriminatory intent with respect to West Samaria, Tri-Corp cannot show either that he had the power or authority to directly effectuate the removal of disabled tenants of West Samaria and cannot show that what influence he did possess led to anything but a non-discriminatory decision by the entity that had such power to foreclose on the property. Tri-Corp simply cannot maintain an action against Alderman Bauman under the Fair Housing Act.

**B.    Dismissal on Qualified Immunity Grounds**

Qualified immunity is available as a defense to individual government officials and employees to a claim under the Fair Housing Act. *Omni Behavioral Health v. Miller*, 285 F.3d 646, 656 (8th Cir. 2002). The cases cited in the preceding section of this brief establish that a reasonable official in Alderman Bauman's position would not know that his conduct was unlawful in advocating for foreclosure on the Tri-Corp mortgage. None of the authorities establish that a government official advocating for a particular action before another government body which is not controlled or beholden to the official can by such an action violate the Fair Housing Act. Tri-Corp further cannot show that such

action violates the Fair Housing Act when all that the government body (here WHEDA) does is act in a non-discriminatory manner to take the requested action (here, foreclose on the mortgage). Alderman Bauman is, therefore, entitled to qualified immunity from Tri-Corp's Fair Housing Act claim.

## III.   THE CLAIM UNDER TITLE II OF THE ADA AND THE REHABILITATION ACT CLAIM

Tri-Corp attempts to assert a claim under 42 U.S.C. §12132 and 29 U.S.C. §794. Smokowicz Affidavit, Attachment A (Amended Third Party Complaint), ¶51, p. 10. With respect to Title II of the ADA, 42 U.S.C. §12132 provides that, "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   Aside from the National Railroad Passenger Corporation and commuter authorities, 42 U.S.C. §12131(1) defines a "public entity" to include "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."   As for the Rehabilitation Act, 29 U.S.C. §794(a) provides in pertinent part that, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any program or activity receiving Federal financial assistance or any program or activity conducted by any Executive agency or by the United States Postal Service."

In the present case, Tri-Corp has attempted to sue Alderman Bauman to enforce rights established by these federal statutes through 42 U.S.C. §1983. Amended Complaint, ¶52. It is barred from doing so, however, because these federal statutes do not provide for individual liability.

In *Walker v. Snyder*, 213 F.3d 344, 345 (7th Cir. 2000), *overturned on other grounds Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001), the plaintiff state prisoner claimed that state corrections officials had failed to provide him certain necessary accommodations in violation of 42 U.S.C. §§'s 12331-65. "Under Title II of the ADA, which forbids discrimination by 'any public entity,' 42 U.S.C. §12131, the proper defendant is that 'entity.'" *Walker*, 213 F.3d at 346. Walker sued the director of the corrections department, but the "director and all of the other defendants must have been sued in their official capacities—that is, as proxies for the state…--rather than their individual capacities, because the ADA addresses its rules to employers, places of public accommodation, and other organizations, not to the employees or managers of these organizations." *Walker*, 213 F.3d at 346. The seventh circuit then agreed with "*Alsbrook v. Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999)(en banc) [overturned on other grounds, *Tennessee v. Lane*, 541 U.S. 509 (2004)], that as a rule there is no personal liability under Title II either." *Walker*, 213 F.3d at 346.

As to the issue of individual liability under the Rehabilitation Act, the seventh circuit has held that a prima facie under the act "must set out four elements: '(1) that [she] is a "handicapped individual" under the act, (2) that [she] is "otherwise qualified" for the [benefit] sought, (3) that [she] was [discriminated against] solely by reason of

[her] handicap, and (4) that the program or activity in question receives federal financial assistance.'" *Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116, 119 (7th Cir. 1997), *quoting Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992). The seventh circuit then held that the plaintiff Grzan's "section 504 claim against Greer…fails for a fundamental reason—Greer [a counselor employed by the co-defendant hospital] is not a recipient of federal funds, the fourth element above." *Grzan*, 104 F.3d at 119. "Employees of the recipients of federal financial assistance are not in themselves the recipients of such assistance." *Id.*, 104 F.3d at 120.

As to and any attempt to circumvent such limitations through suit under 42 U.S.C. §1983, the Ninth Circuit Court of Appeals also followed the lead of the eighth circuit in *Alsbrook* and two other sister circuits to preclude any such claim. It held that "a plaintiff cannot bring an action under 42 U.S.C. §1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002), *citing Alsbrook*, *supra*, *Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir. 1999) and *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997). Though not yet adopted by the seventh circuit, these holdings, at least with respect to Title II of the ADA, were followed by the district court in *Jones v. Regional Transportation Authority*, 2012 U.S. Dist. LEXIS 98119, *19-*21 (N.D. Ill. 2012).

In the present case, Tri-Corp has sued Alderman Bauman in his individual capacity under Title II of the ADA, the Rehabilitation Act, and section 1983. Following the authorities cited above, all these claims should be dismissed. There is no personal

liability under Title II of the ADA. With regard to the Rehabilitation Act claim, Alderman Bauman, at most, is an official of an entity that receives federal financial assistance, but he himself is not a direct recipient of such assistance. Lastly, as to section 1983, Tri-Corp cannot therefore employ the statute to enforce these other federal statutory rights or to seek such relief independent of those statutes.

## IV.  THE RETALIATION CLAIM

For its final claim under federal law, Tri-Corp attempts to assert a retaliation claim under 42 U.S.C. §12203. Smokowicz Affidavit, Attachment A (Amended Third Party Complaint), ¶51, p. 10. It does not identify whether it is attempting to proceed under sec. 12203(a) or sec. 12203(b), but for purposes of this motion, that distinction is irrelevant.

42 U.S.C. §12203(c) states that "[t]he remedies and procedures available under sections 121117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter respectively." Focusing on this provision, the second circuit has held that because with respect to employment retaliation claims, sec. 12203 made the remedies available under sec. 12117 available, and because sec. 12117 remedies are limited to those available under 42 U.S.C. §2000e-5, and because that section does not provide for individual remedies, there then can be no individual liability for employment retaliation claims under sec. 12203. *Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010).

With respect to the present case, sec. 12203(c) refers to Title II remedies under sec. 12133. 42 U.S.C. §12133, however, limits remedies available under it to those

available under 29 U.S.C. §794a. As noted above, there is no recovery against individuals under the Rehabilitation Act in general because they are not recipients of federal aid. Tri-Corp thus cannot maintain a retaliation claim against Alderman Bauman individually under sec. 12203.

## VI.    THE STATE LAW CLAIMS

### A.    Dismissal with the dismissal of all federal claims

Pursuant to 28 U.S.C. § 1367(c)(3), once this Court dismisses all the claims under federal law, it should also dismiss the state law claims by declining to exercise supplemental jurisdiction over them. *See also Ross ex rel. Ross v. Bd. of Education*, 486 F.3d 279, 281 (7th Cir. 2007). It has long been the general rule that "when all the federal claims are dismissed before trial, the district court should relinquish jurisdiction over any pendent state claims as well." *Bowman v. City of Franklin*, 980 F.2d 1104, 1109 (7th Cir. 1992) (citation omitted).

State law claims that are not analyzed on their merits should be dismissed without prejudice. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 564-5 (7th Cir. 2005).

### B.    Substantive dismissal of the claims under state law

There is "a recognized exception to the general rule stated above:  '[I]f it is absolutely clear that the pendent claim[s] can be decided in only one way, the district judge can and should decide [them], to save the time of the state court.'"  *Martin-Trigona*

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 21 of 28   Document 16

*v. Champion Federal Sav. & Loan Assn.*, 892 F.2d 575, 578, (7ᵗʰ Cir. 1989). *See also Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7ᵗʰ Cir. 1997) (affirming what is described there as the "'no brainer' exception to the duty to relinquish federal jurisdiction over the supplemental claim when the main claim drops out before trial."). The court should follow this exception to the general rule if it concludes that there is only one way to decide all of Tri-Corp's claims under state law.

### 1. The defamation claim

In its amended complaint, Tri-Corp alleges the following facts to support its defamation claim: 1) at a May 18, 2006 BOZA hearing, Bauman falsely testified that Mr. Rutledge, a tenant of West Samaria who was fatally beaten on the street, was not helped by anyone and there was no security guard present in the building to ask what happened or to call for assistance; and, 2) at an October 19, 2007 meeting among Bauman, county officials, a city employee, WHEDA representatives and a representative from Heartland, Bauman stated that West Samaria was a combination of three things—bad design, bad location, and a bad operator. Smokowicz Affidavit, Attachment A (Amended Third Party Complaint), ¶¶'s 13, 23-26, p. 4, 6-7. Tri-Corp cannot maintain a defamation claim based upon the testimony at the BOZA hearing because it is absolutely privileged. Tri-Corp also cannot maintain a defamation claim based upon the statement at the October 19, 2007 meeting because it is nothing more than an expression of opinion.

Bauman uttered the first statement in the course of a BOZA hearing to determine whether a reasonable accommodation should be granted following the denial of a special use permit. PFOF 5. It was a "contested public hearing" and both Tri-Corp and the City

of Milwaukee appeared through counsel at the hearing who had the opportunity to make opening statements, present witnesses, and to cross-examine witnesses produced by the opposing party. PFOF 6.

The Wisconsin Supreme Court has recognized generally that, the "primary function" of a municipal board of zoning appeals "*is the quasi judicial one of granting variances from the express terms of the ordinance… .*" *State ex rel. Skelly Oil Company v. Common Council, City of Delafield*, 58 Wis. 2d 695, 703, 207 N.W.2d 585 (1973) (emphasis in original). Though it has refused to grant absolute privilege to unsworn voluntary statements made in the course of legislative proceedings, the Wisconsin Supreme Court has "extended the absolute privilege to participants in quasi-judicial and investigatory proceedings, such as statements to a grand jury or to a district attorney relating to matters pending for grand jury investigation…, statements made to a real estate broker's board…, and petitions to a governor for removal of a sheriff." *Vultaggio v. Yasko*, 215 Wis. 2d 326, 334, 572 N.W.2d 450 (1998) (citations omitted).

Bauman's statement to BOZA is thus absolutely privileged. It was made during the course of a quasi-judicial proceeding. Both Tri-Corp and the city were represented by counsel. PFOF 6. Both sides had the opportunity to make opening statements, present witnesses, and cross-examine the opponent's witnesses. PFOF 6. The testimony provided was done so under oath. PFOF 5. No greater protections exist to ensure against false statements. Absolute privilege should and does apply to statements made in the course of such a proceeding.

Turning next to Alderman Bauman's statement in the meeting of October 19, 2007, the Supreme Court has made clear that, "[u]nder the First Amendment, there is no such thing as a false idea [and h]owever pernicious an opinion my seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) (footnote omitted). Wisconsin, of course has followed this holding. In its jury instructions law note for trial judges, it affirms that, "[a]n expression of opinion generally cannot be the basis of a defamation action." Wis JI-Civil 2500, p. 1.

Alderman Bauman's statement at the meeting was nothing more than a qualitative expression of opinion and cannot form the basis for a defamation action. By referring to Tri-Corp as a "bad operator," he did not state or imply any particular fact about the corporation. In the context of the meeting, such an opinion could have referred to nothing more than the truthful fact that Tri-Corp had by then defaulted on its mortgage. PFOF 17, 20. There is no implied factual assertion of, for example, illegal corporate misconduct. The statement, as an expression of pure opinion, cannot form the basis for a viable defamation claim.

### 2.    The claim of tortious interference with business relations

For its final claim under state law, Tri-Corp alleges that Bauman tortiously interfered with the business relationship between Tri-Corp and Milwaukee County. Smokowicz Affidavit, Attachment A (Amended Third-Party Complaint), ¶38, p. 9 and Attachment F (Wisconsin Court of Appeals decision in *Wisconsin Housing and Economic Development Authority v. Tri-Corp Housing, Inc. v. Bauman*, Appeal No.

2010AP1443), ¶18, p. 11.[1]  To establish such a claim under Wisconsin law, Tri-Corp must show:

> (1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere.

*Dorr v. Sacred Heart Hosp.*,  228 Wis.2d 425, 456-457, 597 N.W.2d 462, 478 (Ct.App.1999).

The Wisconsin Court of Appeals concluded that summary judgment on this claim would then be inappropriate on the record then before it.  "Tri-Corp also contends that a jury might properly infer that Alderman Bauman interfered with Tri-Corp's commercial relationship with Milwaukee County by persuading the County to remove residents from West Samaria."  Smokowicz Affidavit, Attachment F (Wisconsin Court of Appeals decision in *Wisconsin Housing and Economic Development Authority v. Tri-Corp Housing, Inc. v. Bauman*, Appeal No. 2010AP1443), ¶25, p. 16. Bauman then argued that "there were other reasons the County had for moving residents, namely, the WHEDA foreclosure."  *Id.*  As this Court will recall, however, the mortgage covered both West Samaria and New Samaria.  PFOF 16.  "Because the County did not move residents from New Samaria [when it did move residents from West Samaria and], despite New Samaria

---

[1] Tri-Corp may also be attempted to assert a claim that Bauman somehow interfered with its relationship with WHEDA (see Smokowicz Affidavit, Attachment A (Amended Third-Party Complaint), ¶37, p. 8  , but Bauman's alleged interference through statements at the August 2007 meeting with Antonio Riley (PFOF 17) and the October 2007 meeting (PFOF 18 and 20) both occurred after Tri-Corp's default on the mortgage (PFOF 17), and, as to the latter statement, came after Riley announced at the beginning of the meeting that WHEDA would foreclose on the mortgage.  A party may not maintain a tortious interference with contract claim based upon actions that occur after a breach in the contract that is at the heart of such a claim.  Restatement (Second) of Torts, §766, Comment f.

being under the same mortgage as West Samaria, we conclude that the competing inference that Alderman Bauman did interfere with Tri-Corp's relationship with Milwaukee County as to West Samaria made summary judgment improper." Smokowicz Affidavit, Attachment F (Wisconsin Court of Appeals decision in *Wisconsin Housing and Economic Development Authority v. Tri-Corp Housing, Inc. v. Bauman*, Appeal No. 2010AP1443), ¶25, p. 16.

That factual issue has now, however, been completely erased as the competing inference is eliminated by the affidavit of James Hill. At the time of the October 19, 2007 meeting, Mr. Hill functioned as Director of Housing at the Milwaukee County Department of Health and Human Services pending the formal creation of the position in the County's 2008 budget, effective January 1, 2008. PFOF 23. His responsibilities as Director of Housing included the supervision and management of programs aimed at providing decent, safe, affordable and permanent housing for Milwaukee County residents with mental illnesses who were living in the community and who were receiving services through the Milwaukee County Behavioral Health system. PFOF 23.

As a part of his responsibilities, prior to October 19, 2007, he had visited the property then known as West Samaria and then located in the 2700 block of West Richardson Place in Milwaukee, Wisconsin. PFOF 24. The living conditions that he observed at West Samaria convinced him that clients receiving services through the County Behavioral Health system should not continue to live at that location. Accordingly, he determined some time around October 19, 2007 that those individuals should be relocated. PFOF 25.

He believed at that time that the living conditions at New Samaria were better than those existing at West Samaria.  PFOF 26.  For that reason, he determined that at that time the residents of New Samaria did not need to be relocated.  PFOF 27.

Tri-Corp thus cannot establish that Alderman Bauman interfered with its business relationship with Milwaukee County through his statement at the October 19, 2007 meeting.  The director of the county program made the choice to move the residents not because of Bauman's statements, but, rather, because he had previously observed the living conditions at West Samaria, determined that the county's clients should no longer continue to live there, and determined not to move any residents from New Samaria because of what he believed to be better living conditions there.  This Court should, therefore, also dismiss the tortious interference with business relations claim against Alderman Bauman.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Tri-Corp's claims under federal law with prejudice and with costs and should remand the state law claims to the Wisconsin circuit court.  In the alternative, if this Court determines that it should address the merits of the claims under state law, it should dismiss Tri-Corp's claims under federal law and under state law with prejudice and with costs

Dated at Milwaukee, Wisconsin this 1st day of March, 2013.

GRANT F. LANGLEY
City Attorney


s/JAN A. SMOKOWICZ
Assistant City Attorney
State Bar No. 1008429
Attorneys for Defendant
jsmoko@Milwaukee.gov

P.O. ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI  53202
(414) 286-2601
Facsimile:  (414) 286-8550

1033-2008-967.003:189658