# ATTACHMENT B

Page 1

```
 1              CITY OF MILWAUKEE
 2          BOARD OF ZONING APPEALS
 3
 4   In the Matter of:
 5   2713 West Richardson Place    Case No. 26203
 6
 7
 8          BOARD MEMBERS
 9      CRAIG H. ZETLEY - Chairman
        HENRY P. SZYMANSKI
10      CATHERINE M. DOYLE
        GEORGIA M. CAMERON
11      DONALD JACKSON
        LENI M. SIKER - Alternate
12      CLIFTON W. CRUMP - Secretary
13   ROBERT PLEDL, Attorney at Law, 1110 North
     Old World Third Street, Milwaukee, Wisconsin, appeared
14   on behalf of the Applicant.
15   GREGORY J. COOK, Attorney at law, 111 East
     Wisconsin Avenue, Suite 1760, Milwaukee, Wisconsin,
16   appeared on behalf of the City of Milwaukee.
17          Proceedings had and testimony given in the
18   above-entitled matter before the BOARD OF ZONING
19   APPEALS OF THE CITY OF MILWAUKEE on the 18th day of
20   May, 2006, before Terese M. Schiebenes of Milwaukee
21   Reporters Associated, Inc.
```

Page 2

```
 1              PROCEEDINGS
 2        THE SECRETARY: Item No. 51, Case No. 26203,
 3   premises known as 2713 West Richardson Place. This is
 4   a request to continue occupying the premises as a
 5   transitional facility for 92 clients. This is a
 6   special use request pertaining to this use, was denied
 7   by the Board on June 9th, 2005. The applicant, as
 8   part of that appeal, reserved the right to a
 9   reasonable accommodation proceeding in the event that
10   the special use permit was denied.
11        Subsequent to that action, the Board denied
12   a reconsideration request on March 16th, 2006, in
13   which the applicant petitioned the Board to reconsider
14   its denial of the initial special use request, based
15   upon new information being brought forth. That was
16   the last official action taken by this Board.
17        Due to the contested nature of this
18   application, the item has been scheduled for a
19   contested public hearing and will follow the rules as
20   such. Notice has been sent to all interested parties.
21        CHAIRMAN ZETLEY: Thank you. Would the
22   parties state their appearances for the record.
23        MR. PLEDL: Robert Pledl here on behalf of
24   Tri-Corp and American Red Cross Greater Milwaukee
25   Chapter.
```

Page 3

```
 1        MR. COOK: Gregory Cook hired as special
 2   counsel for the City of Milwaukee.
 3        CHAIRMAN ZETLEY: Thank you. For everyone's
 4   knowledge, the Board held a scheduling conference and
 5   set a scheduling order dated March 27th, 2006. There
 6   has been substantial information submitted to the
 7   Board, trial memorandums and affidavits by both the
 8   City of Milwaukee and by Tri-Corp. The scheduling
 9   order included specific information regarding this
10   hearing. The times were worked out regarding the
11   hearing. There's a notice of public hearing dated May
12   9th, 2006, which indicates the following procedure:
13        The case will be called by the secretary,
14   there will be reports from DCD, DNS, and Department of
15   Public Works, the applicant will be given then 30
16   minutes for opening statement, presentation, and
17   presentation of witnesses in support total of 30
18   minutes, there will be cross-examination by the
19   opposition, then the opposition will be giving opening
20   statement, presentation, and presentation of witnesses
21   in support total 30 minutes and cross-examinations by
22   the applicant. In both cases, the cross-examination
23   will be considered as part of the 30 minutes, comments
24   from the alderman and other elected officials. The
25   order indicated that information must be previously
```

Page 4

```
 1   submitted in affidavit form and total of 10 minutes it
 2   will be deemed part of the time allocated for the
 3   opposition. We'll then allow cross-examination by the
 4   applicant, and then the applicant will be given a
 5   total of five minutes to present their closing
 6   statement, then we'll have questions by the Board and
 7   deliberations by the Board.
 8        Attorney Pledl and Attorney Cook, do you
 9   have any objections to that order?
10        MR. PLEDL: No, Chairman.
11        MR. COOK: No.
12        CHAIRMAN ZETLEY: We'll then proceed under
13   that. A few other administrative matters that the
14   Chair wanted to discuss. There is or there was a
15   motion to strike affidavits of Richard Lucas, Jack
16   Arnett, Kimberly Williams' second affidavit, Alderman
17   Robert Bauman, portions of the City's supplement trial
18   memorandum. There was a memorandum by the City of
19   Milwaukee indicating that they oppose that. The Chair
20   has looked at that, and the Chair has informed
21   Attorney Pledl that I will advise the Board not to
22   strike the affidavits and not to strike the affidavits
23   and portions of the City's supplemental trial
24   memorandum.
25        The basis for the Chair's decision is to, I
```

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 2 of 37    Document 19-2

**Page 5**

1 believe, and although, Attorney Pledl, I think you
2 made a strong argument regarding the issue of the
3 supplemental memorandum, the Chair's view was that the
4 memoranda were done in order to allow both sides to
5 prepare adequately for this hearing and to get the
6 information to the Board prior to the hearing. I
7 believe that you have had adequate time to prepare.
8 If, in your opinion, you do not have adequate time or
9 want to submit anything additional after the hearing,
10 I would allow you to make a motion at the end of the
11 evening to supplement your memorandum to this Board
12 with an opportunity for the City to respond to it. I
13 don't want to prejudice you in any way, but I do
14 believe that this hearing and allowing you, if you
15 wish to submit anything further after today, will deal
16 with that situation.
17      Secondly, this Board uses very liberally, we
18 allow testimony and allow information to be
19 submitted to the Board, and that is another reason why
20 I'm allowing it in. Is there anybody on the Board who
21 objects at this time to the Chair's ruling? Hearing
22 none, that will be the ruling of the Chair and the
23 Board. And Attorney Pledl, at the end of the night,
24 I'll ask you if you do want to submit anything further
25 after the hearing. I will give you the opportunity to

**Page 6**

1 do that.
2      Let the record reflect, also, that Board
3 Member Winkler is not here. Attorney Pledl, you
4 earlier requested that Board Member Winkler be recused
5 from this and also that his comments be stricken from
6 the record. I have reviewed your statements on that
7 and your written materials. I believe that Board
8 Member Winkler's comments should be taken in context
9 of all of his statements, not just the single
10 statement. I would urge the Board to -- I don't think
11 -- We don't operate by the standard rules in a court.
12 I don't think we have stricken material in the past.
13 I would advise the Board members to take that comment
14 that Board Member Winkler had in the context of his
15 full statement and to give it the weight that the
16 Board thinks is appropriate, and I as the Chair will
17 suggest that you not give it a lot of weight and that
18 you each consider the record which you have in front
19 of you. Every Board member has the transcript.
20      One other comment regarding procedure --
21 And Attorney Cook, I am going to ask you to address
22 this because I do not believe that your material has
23 to date -- the City Attorney Opinion given to this
24 Board dated October 3rd, 2003 deals with the rules and
25 procedures that this Board should operate under, and

**Page 7**

1 on a political comment with the Alderman here, I do
2 believe the Common Council should deal with the issue
3 of reasonable accommodations, and if it doesn't want
4 the Board to operate the way it is, should come up
5 with you some different procedure, but we'll use the
6 procedure we have and have used in the past until the
7 Common Council or a court tells us not to use it.
8      But specifically that City Attorney Opinion
9 stated -- and I'm going to read from parts of the
10 opinion -- "Holding that the Board's consideration of
11 whether the application met the ordinance criteria for
12 a zoning variance did not provide a reasonable
13 accommodation, the Court analyzed the application and
14 the Board's denial based on federal case law
15 applicable to consideration of a request for a
16 reasonable accommodation. That analysis was very
17 different from the traditional certiorari review of
18 Board's decision undertaken by Wisconsin state courts.
19 The decision focused upon whether the request was
20 reasonable and necessary to afford an equal
21 opportunity to access housing under federal law rather
22 than a review of the record before the Board. In such
23 instances, initially the burden is on the applicant to
24 demonstrate that the accommodation sought meets the
25 federal criteria. Once the applicant has made a prima

**Page 8**

1 facie showing, the City must demonstrate that the
2 requested accommodation is unreasonable or creates an
3 undue hardship for the City itself in order to justify
4 a denial of the request."
5      This opinion goes on to say which factors
6 the Board should consider, there's case law in regard
7 to what factors the Board can consider, but Attorney
8 Cook, I believe it's important for you to address,
9 assuming that -- and I'm not saying whether it's true
10 or not -- but assuming that the applicant has met his
11 burden that the prima facie case has been met, the
12 Chair believes that there's a very high burden that
13 the courts have established, and I believe it's
14 important for you as the attorney for the City to
15 demonstrate that the accommodation is unreasonable or
16 creates an undue hardship for the City, and I'll leave
17 that up to you. I'm not going to tell you what you
18 have to do, but I believe -- and some of this is still
19 in litigation as both you and Attorney Pledl know, but
20 I believe this issue has been discussed by several
21 courts, and it's an issue that this Board has to
22 consider, and therefore, I'd like it addressed, and I
23 don't think it has been addressed.
24      So with those procedural issues, I would ask
25 the departments now to make their comments. DCD, any

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 3 of 37    Document 19-2

## Page 9

1 further comments?

2      DCD: Just for clarity, my understanding,

3 the case before us tonight involved West Samaria and

4 the two programs operated by the American Red Cross.

5 Just for clarification, the case before us tonight

6 involves the West Samaria program and the two Red

7 Cross programs that operate in this building.

8      CHAIRMAN ZETLEY: That is correct. Attorney

9 Pledl, that's your understanding, correct?

10      MR. PLEDL: That's my understanding.

11      CHAIRMAN ZETLEY: Attorney Cook?

12      MR. COOK: Yes, that is.

13      CHAIRMAN ZETLEY: Anything further DCD?

14      DCD: Nothing further.

15      CHAIRMAN ZETLEY: DNS?

16      DNS: Nothing additional.

17      CHAIRMAN ZETLEY: Traffic?

18      TRAFFIC: Nothing additional.

19      CHAIRMAN ZETLEY: One other procedure that I

20 want to highlight. These matters have been briefed,

21 witnesses have been asked to give affidavits, all

22 parties that will be speaking tonight will be at the

23 direction of the attorneys on both sides. We'll not

24 be asking for further comments from anybody because

25 there are attorneys on both sides, and they have gone

## Page 10

1 ahead and prepared their presentations. At this time,

2 I'd like the appellant to go forward.

3      I do want to make one other comment. I'm

4 not going to harp on this during the hearing, but like

5 I said in this case, this is not the special use

6 hearing, this has gone into phase two of the hearing,

7 this is the reasonable accommodation, it is not the

8 criteria under the special use. The Board has made a

9 determination under that already. The issue before us

10 is the reasonable accommodation hearing and the

11 standards that the courts have set up -- not just the

12 courts but federal law has set up for a reasonable

13 accommodation. Attorney Pledl, you now have 30

14 minutes. Thank you.

15      MR. PLEDL: I'm not making an opening

16 statement. Let's just call Mr. Brever up here.

17      CHAIRMAN ZETLEY: Attorney Pledl, tell me

18 all the witnesses you're going to call, and I'll swear

19 them in.

20      MR. PLEDL: It will be the three people that

21 submitted affidavits, Mr. Brever, Ms. Lowry, and Dr.

22 Frank.

23      CHAIRMAN ZETLEY: Attorney Cook, how many

24 witnesses will you be calling?

25      MR. COOK: Two. Ms. Williams and Richard

## Page 11

1 Lewis.

2      CHAIRMAN ZETLEY: And the Alderman, I

3 believe, will testify, also.

4      MR. COOK: Yes, and the Alderman will

5 testify.

6      CHAIRMAN ZETLEY: Alderman, you've been

7 sworn in previously but because this is a contested

8 hearing, I'm going to ask that you stand also and be

9 sworn in.

10      (Speakers duly affirmed.)

11      CHAIRMAN ZETLEY: Let the record reflect

12 those six witnesses have been sworn in. Go ahead,

13 Attorney Pledl.

14      MR. PLEDL: Your name is Michael Brever; is

15 that correct?

16      MR. BREVER: That's correct.

17      MR. PLEDL: Put your affidavit in front of

18 you. I'm just going to be going through that. The

19 first page lists your professional background; is that

20 right?

21      MR. BREVER: That is correct, it does.

22      MR. PLEDL: And you are currently executive

23 director of Tri-Corp, the applicant in this case; is

24 that correct?

25      MR. BREVER: I am, that is correct.

## Page 12

1      MR. PLEDL: Turning to Page 2 of your

2 affidavit, is that an accurate description of the

3 fiscal plan and where the different problems are at

4 West Samaria.

5      MR. BREVER: Yes, it is.

6      MR. PLEDL: So there are 66 West Samaria

7 resident rooms on the first and second residences; is

8 that correct?.

9      MR. BREVER: That is correct.

10      MR. PLEDL: Then there are Autumn West and

11 transitional housing program resident rooms on the

12 third floor; is that right?.

13      MR. BREVER: That is correct.

14      MR. PLEDL: Who operates the program on the

15 third floor?

16      MR. BREVER: The American Red Cross operates

17 the program on the third floor.

18      MR. PLEDL: Now, turning to the next page,

19 you describe what it is that West Samaria does, and

20 one of the things you describe is something to do with

21 case management. Can you describe that for me.

22      MR. BREVER: West Samaria operates as a

23 supportive housing facility. The actual clinical

24 needs of our residents are provided for by case

25 managers who are assigned on an individual basis to

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 4 of 37    Document 19-2

Page 13

1 each of our residents.

2     MR. PLEDL: And do the case managers work

3 for you or are they employed by other agencies?

4     MR. BREVER: They are all employed by other

5 agencies.

6     MR. PLEDL: And the employees that Tri-Corp

7 has on site, what do they do?

8     MR. BREVER: We have a twofold purpose. The

9 first is to serve as the landlord and the provider of

10 the room and Board facility, and the second is to

11 assist the case managers by being an on-site eyes and

12 ears for them because they can't be present all the

13 time.

14     MR. PLEDL: How is West Samaria's portion of

15 the building funded?

16     MR. BREVER: West Samaria is funded by rent

17 that our residents pay us.

18     MR. PLEDL: How much do they pay?

19     MR. BREVER: Our residents pay $515 per

20 month.

21     MR. PLEDL: What's the source of that?

22     MR. BREVER: The primary source of that is

23 our residents' income, which is SSI and other related

24 income for individuals with disabilities.

25     MR. PLEDL: And does your organization

Page 14

1 receive a financial benefit from operating the West

2 Samaria Program; that is, do people pay more in rent

3 than the cost to serve them there?

4     MR. BREVER: They do not.

5     MR. PLEDL: So does your agency from time to

6 time subsidize the operation of West Samaria?

7     MR. BREVER: It does.

8     MR. PLEDL: And do you ever have vacancies

9 at West Samaria?

10     MR. BREVER: We traditionally have less than

11 3 percent vacancy. That is typically as a result of

12 someone moving out, we make adjustments to the room,

13 and then someone moves in.

14     MR. PLEDL: And then in the paragraph that

15 begins at the bottom of Page 3 and goes to the top of

16 Page 4, I believe it's Paragraph 16, you list where

17 various people who have lived at West Samaria, where

18 they ended up after they left West Samaria?

19     MR. BREVER: That is correct.

20     MR. PLEDL: Would it be accurate to say some

21 of them moved to more independent settings?

22     MR. BREVER: That is correct.

23     MR. PLEDL: And did some of them move to

24 less independent settings, such as a CBRF and nursing

25 home?

Page 15

1     MR. BREVER: That is also correct.

2     MR. PLEDL: On Page 5 you have a list of

3 resident demographics. First of all, is it a

4 requirement that people at West Samaria have either a

5 mental or physical disability?

6     MR. BREVER: It is.

7     MR. PLEDL: And could you characterize the

8 severity of those disabilities.

9     MR. BREVER: Typically, the mental

10 disability is a chronic mental illness, it's a

11 lifelong chronic need, most typically paranoid

12 schizophrenia-related disorders. Physical

13 disabilities range anywhere from amputees to one

14 individual has cancer.

15     MR. PLEDL: Now, turning to the next page,

16 Page 6, you have a number of paragraphs that relate to

17 safety and security; is that correct?

18     MR. BREVER: That is correct.

19     MR. PLEDL: And do those paragraphs set out,

20 first of all, the characteristics of the fiscal plan

21 that you've set up there to provide for the safety of

22 the individuals?

23     MR. BREVER: They do.

24     MR. PLEDL: And then going forward in those,

25 did you make any changes to the West Samaria security

Page 16

1 arrangements after the David Rutledge tragedy?

2     MR. BREVER: We did. There was an

3 adjustment to the size of our off-hours security

4 forces. That was doubled for the remainder of that

5 particular summer. The security staff that we had

6 actually patrolled the surrounding neighborhood in

7 addition to their usual duties at West Samaria. We've

8 also made adjustments to the entryway system,

9 enhancing our video cameras and the actual door

10 mechanisms to the facility. We also worked with our

11 residents on training and making them more comfortable

12 with stranger awareness, going out with a buddy,

13 things like that.

14     We also met with a group of area residents

15 several times last year, and one of the suggestions

16 that came from the area residents was to make

17 adjustments to a cyclone fence gate we had on the

18 south end of the property, adjusting it so that

19 residents could exit but that neighborhood residents

20 could not enter through that gate. We've made those

21 adjustments, as well.

22     MR. PLEDL: And then after the summer of

23 2004, did you return to the previous single security

24 staff person during off hours?

25     MR. BREVER: We did.

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 5 of 37    Document 19-2

## Page 17

1  MR. PLEDL: And you believe that that's
2  sufficient?
3  MR. BREVER: We do.
4  MR. PLEDL: Is that something that you
5  re-evaluate on a continuing basis?
6  MR. BREVER: We do.
7  MR. PLEDL: There's been some discussion in
8  your affidavit about your looking into some
9  alternative possibilities for West Samaria. At the
10  current time, keeping in mind what Alderman Bauman has
11  suggested for the particular property, do you think
12  there are any feasible alternative properties?
13  MR. BREVER: I do not.
14  MR. PLEDL: Are you pursuing any
15  alternatives at this time?
16  MR. BREVER: We are not.
17  MR. PLEDL: Would you be willing to
18  participate with the City in evaluating whether there
19  would be an appropriate alternative property?
20  MR. BREVER: We're always looking at what's
21  in the best interest of our residents in the service
22  model that we have, but we also believe if there are
23  resources available, potentially the service model for
24  the industry itself is something that could be looked
25  at.

## Page 18

1  MR. PLEDL: The particular suggestion was
2  that place at 33rd and Highland is appropriate.
3  What's your reaction to the idea of just picking a
4  place as an alternative right now as you sit here
5  today?
6  MR. BREVER: Any analysis of whether a
7  particular facility is appropriate for the needs of
8  our residents would have to be made in conjunction
9  with the partner that we currently work with at West
10  Samaria, Case Management Entities, the Red Cross. So
11  a particular facility I don't believe could be singled
12  out at this point in time.
13  MR. PLEDL: On Page 10 of your affidavit,
14  you make a number of statements about your belief that
15  the individuals are disabled, that your request is
16  reasonable, that your request is necessary, that your
17  request provides for equal opportunity. Are those
18  statements all accurate?
19  MR. BREVER: Yes, they are.
20  MR. PLEDL: And is every other thing that is
21  in your affidavit true and correct?
22  MR. BREVER: It is.
23  MR. PLEDL: Nothing further.
24  CHAIRMAN ZETLEY: Thank you.
25  MR. COOK: Good evening, Mr. Brever.

## Page 19

1  MR. BREVER: Good evening.
2  MR. COOK: I assume after the death of Mr.
3  Rutledge you wanted to make sure that this never
4  happened again?
5  MR. BREVER: The death of Mr. Rutledge was a
6  tragic issue, and it's incredible that something like
7  that happened, and we believe that we have made all
8  adjustments to provide for the care of our residents
9  to the best of our ability.
10  MR. COOK: So your answer is yes, you wanted
11  to make sure that this never happened again, correct?
12  MR. BREVER: We provide security on our
13  premises to ensure that our residents are safe and
14  secure, and I believe that -- It's a tragedy when
15  anybody is victimized like this. We don't like to see
16  this happen to anybody in the community at large.
17  MR. COOK: You've been quoted in the press
18  saying you don't feel you're culpable because of his
19  death.
20  MR. BREVER: I do not believe Tri-Corp is
21  culpable to the tragedy that occurred to Mr. Rutledge,
22  that's correct.
23  MR. COOK: Assuming you don't want this to
24  happen again and make sure your clients are safe in
25  the neighborhood, did you go out and hire a security

## Page 20

1  expert following his death?
2  MR. BREVER: We have a security force that
3  we work with already, and we sought their guidance on
4  things that could be done on our campus.
5  MR. COOK: My question was did you hire a
6  security expert for consulting services?
7  MR. BREVER: Well, given the fact that we
8  have a security expert working with us already and we
9  consulted with that security expert, I think the
10  answer would be yes.
11  MR. COOK: Outside of the security service
12  that was apparently in place at the time of Mr.
13  Rutledge's death, did you contact anybody else?
14  MR. BREVER: No, we did not.
15  MR. COOK: Did you, Mr. Brever, investigate
16  where your clients go during the day in the
17  neighborhood?
18  MR. BREVER: We have a feel for where our
19  clients go, but it's important to understand that our
20  facility is a supportive housing facility, it is not a
21  medical facility. Our residents have the right to
22  come and go as they please.
23  MR. COOK: My question, though, was in a
24  broader sense. Following Mr. Rutledge's death, did
25  you sit down and say look, let's find out where these

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 6 of 37   Document 19-2

1   people are going during the day, did you do that in
2   any type of official investigative capacity?
3          MR. BREVER: It was important to us that our
4   residents, no matter where they go, were informed of
5   how to work with each other to be more comfortable
6   with avoiding potentially dangerous issues, to go out
7   with a buddy, to identify issues that may place them
8   in harm. So we work with them on that, yes.
9          MR. COOK: Well, did you form an official
10  investigation, and you can show this Board any
11  documentation following that investigation?
12         MR. BREVER: We did not survey each of our
13  residents at that point.
14         MR. COOK: Where is the nearest restaurant
15  to Richardson House?
16         MR. BREVER: There is a hot dog stand about
17  a block away on 27th Street, Red Hots.
18         MR. COOK: You're talking about Judy's Red
19  Hots?
20         MR. BREVER: Yes.
21         MR. COOK: Are you aware of any problems
22  with regard to Judy's Red Hots as far as dealing drugs
23  in that area?
24         MR. BREVER: I don't know of issues that
25  have resulted in any sanctions of Judy's Red Hots or

1   anything.
2          MR. COOK: Where is the nearest library?
3          MR. BREVER: Some of our residents frequent
4   the Downtown Library. I'm not certain where the other
5   close proximity library is, but the downtown is the
6   one that our residents utilize because of public
7   transportation.
8          MR. COOK: Where is the nearest barber?
9          MR. BREVER: We actually have a barber who
10  comes in on a semi-regular basis to apply haircuts to
11  our residents if they so choose.
12         MR. COOK: Where is the nearest hairdresser?
13         MR. BREVER: I don't know that.
14         MR. COOK: Where is the nearest medical
15  clinic?
16         MR. BREVER: Our residents receive clinical
17  services from case managers who come to the site.
18         MR. COOK: My question is outside of your
19  site, where is the nearest medical clinic to
20  Richardson House?
21         MR. BREVER: I would guess the closest is
22  the former Mount Sinai campus.
23         MR. COOK: Did your company institute any
24  type of outreach, in which you went out and talked to
25  businesses in the area?

1          MR. BREVER: Our agency instituted a
2   community outreach effort last fall, and we invited
3   everybody from the neighborhood to come in to meet
4   with our residents, to meet with us to discuss issues
5   at the facility, ways that we can get better, ways
6   that they can work with us, ways that we can interact
7   better.
8          MR. COOK: Did you go talk to, for example,
9   the people at any locations where Mr. Rutledge may
10  have been or associated himself prior to his death?
11         MR. BREVER: We did not.
12         MR. COOK: Did you talk to anybody, for
13  example, at the nearest drug store to find out how you
14  could transport your clients in a safe fashion back
15  and forth if they needed to go there for incidentals,
16  medications, et cetera?
17         MR. BREVER: We did not.
18         MR. COOK: You said that you met with
19  neighbors in the area, as I understand it, correct?
20         MR. BREVER: That is correct.
21         MR. COOK: There was a reference to a
22  community -- I think you referred to it as a Community
23  Advisory Committee in your HUD application last year,
24  correct?
25         MR. BREVER: That's correct.

1          MR. COOK: Now, they concluded that it was
2   their recommendation to relocate this to a new
3   facility in a safer neighborhood, didn't they?
4          MR. BREVER: That was a discussion of topic
5   at those meetings, that's correct.
6          MR. COOK: Now, when you met with the
7   neighbors, did you promise them increased security at
8   the facility?
9          MR. BREVER: We did not.
10         MR. COOK: Did you tell them that you could
11  not afford security cameras?
12         MR. BREVER: We did discuss the cost
13  limitations of things like that, and we explained
14  that, to the best of our ability, we're always
15  exploring options that make life better for our
16  residents.
17         MR. COOK: Do you today have with you any
18  type of price quotes or price estimates from any type
19  of companies as to the actual cost involving
20  installing security cameras?
21         MR. BREVER: We do. We had a security
22  company come out last summer, and the estimate was in
23  the $18,000 range.
24         MR. COOK: There is evidence in this case
25  that a woman will testify that you told them that it

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 7 of 37   Document 19-2

Page 25

1   would cost $12,000.

2    MR. BREVER: That is correct.

3    MR. COOK: Was it 12 or was it 18?

4    MR. BREVER: The estimate that we received

5   from the security firm was approximately $18,000.

6    MR. COOK: Well, where did the $12,000 come

7   from?

8    MR. BREVER: We presumed that there were

9   options that might be available to us.

10    MR. COOK: Why did you tell the people in

11   the community that you could not afford a real estate

12   broker?

13    MR. BREVER: I explained to the individuals

14   at the meeting that to utilize the services of a real

15   estate broker, we would have to have a facility in

16   mind, and we didn't have a facility in mind at that

17   time.

18    MR. COOK: But you don't hire a real estate

19   broker, do you?

20    MR. BREVER: You could hire the services of

21   a buyer broker.

22    MR. COOK: But normally when you retain the

23   services of a real estate broker, they're going to get

24   compensated if they find you a location, correct?

25    MR. BREVER: If they find us a location,

Page 26

1   their commission is typically provided by the seller.

2    MR. COOK: They work on commission, right?

3    MR. BREVER: That's correct.

4    MR. COOK: So you would not have had to

5   spend anything to work with a real estate broker,

6   correct?

7    MR. BREVER: Well, it's a matter of degrees.

8   If there's a commission built into a sales price of a

9   property, it can affect the sales price, as well.

10    MR. COOK: Now, in your HUD application, you

11   talked about the fact that ideally a replacement

12   facility for West Samaria would be similar to New

13   Samaria that you have out in West Allis, correct?

14    MR. BREVER: We did, in fact, move residents

15   to New Samaria several years ago, and we find that

16   very adequate to the needs of our residents at that

17   facility.

18    MR. COOK: New Samaria is a former nursing

19   home?

20    MR. BREVER: That is correct.

21    MR. COOK: And it has quite a substantial

22   green space area west of the building that is fenced

23   in and contains a green area as well as some tables,

24   and I think even it must have been used as a day care

25   center one time because there's a swing set?

Page 27

1    MR. BREVER: That is correct.

2    MR. COOK: Also green space on the south of

3   the facility with some picnic tables set up, et

4   cetera?

5    MR. BREVER: That's correct.

6    MR. COOK: So you agree that a former

7   nursing home would be a good facility, correct?

8    MR. BREVER: Well, I agree that a former

9   nursing home was an appropriate relocation for our

10   East Samaria facility. I'm not necessarily convinced

11   that the accommodations available at West Samaria do

12   not already meet the needs of our residents.

13    MR. COOK: This former Havenwood Nursing

14   Facilities at 3333 West Highland Boulevard has been on

15   the market, I believe, for some time. Do you

16   understand that?

17    MR. BREVER: I've been made aware of it

18   recently, yes.

19    MR. COOK: Did you contact Mr. Arnett, who

20   is one of the people handling the sale, or anybody on

21   their behalf to determine any information about this

22   property?

23    MR. BREVER: I did not.

24    MR. COOK: That's all the questions I have.

25   Thank you.

Page 28

1    CHAIRMAN ZETLEY: Thank you. He used nine

2   minutes of your time, Attorney Cook. That comes out

3   of your 30 minutes including the Alderman. I want you

4   to be aware of your time limitation. Thank you.

5    MR. COOK: I understand.

6    CHAIRMAN ZETLEY: Attorney Pledl.

7    MR. PLEDL: Where am I at?

8    CHAIRMAN ZETLEY: You used nine-and-a-half

9   minutes.

10    MR. PLEDL: And you are Jeanne Lowry; is

11   that correct?

12    MS. LOWRY: That's correct.

13    MR. PLEDL: And just going through your

14   affidavit, the first page contains a list of your

15   education and experience, correct?

16    MS. LOWRY: Correct.

17    MR. PLEDL: And you also included a

18   curriculum vitae listing all your background and

19   experience; is that correct?

20    MS. LOWRY: That is correct.

21    MR. PLEDL: And you currently hold active

22   credentials as a registered nurse, advanced practice

23   nurse, prior clinical specialized in adult psychiatric

24   and mental health nursing?

25    MS. LOWRY: That's correct.

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 8 of 37   Document 19-2

Page 29

1   MR. PLEDL: Now, one of the things that you
2 discuss in your affidavit beginning at Page 3 is the
3 background of the need for supported housing for
4 people with mental illness. My question is, you use
5 the phrase supported housing. What does that mean?
6   MS. LOWRY: Supported housing means that the
7 people who are living in the facility have people
8 there that can help them with certain kinds of
9 activities that they would have difficulty performing
10 on their own.
11   MR. PLEDL: And what happens if we don't
12 have supported housing, there just wasn't any
13 available at all?
14   MS. LOWRY: I think that many of the people
15 would be in either very difficult situations in terms
16 of housing, or as I -- I know from the years of the
17 work that I've done that they often become homeless.
18   MR. PLEDL: At some point in time, did
19 Milwaukee begin to set up different Safe Haven
20 Programs?
21   MS. LOWRY: Yes.
22   MR. PLEDL: What is Safe Haven?
23   MS. LOWRY: Safe Haven is a program that's a
24 HUD-funded program that's designed to work with people
25 who have a serious mental illness and who also are

Page 30

1 homeless and that provides a place for them to stay
2 besides staying either on the streets or in shelters
3 and gives them the opportunity to work with a case
4 manager to resolve some of the issues that have
5 prevented them from living in stable housing.
6   MR. PLEDL: Now, I understand that there are
7 several Safe Haven sites in Milwaukee. Are there any
8 unmet needs for that type of service?
9   MS. LOWRY: We always have a waiting list of
10 at least five, six, seven, eight people that are
11 waiting to get into these programs.
12   MR. PLEDL: What about people out in the
13 community who need the services, has there ever been
14 any study of whether there are such individuals?
15   MS. LOWRY: There's been some counts
16 specifically of homeless people, and I think I have
17 this information in here, but it was a study that was
18 done in 2004, and they found 761 homeless adults in
19 Milwaukee. I think it was over -- It's all written
20 here, but many of them were living on the streets, and
21 a large proportion of them identified mental health as
22 a service that they were in need of.
23   MR. PLEDL: Now, did you have anything to do
24 with helping to get the Red Cross program at West
25 Richardson set up?

Page 31

1   MS. LOWRY: I did. I worked with this
2 population since 1989, and a difficulty in working
3 with this group of people has always been that they
4 lived in shelters and they lived on the streets, and
5 so it was very difficult to have ongoing relationships
6 and contact with the people in order to be able to
7 address the needs that they had, and so that's the
8 purpose of this program, and I felt that Milwaukee was
9 greatly in need of these beds to treat these folks.
10   MR. PLEDL: Now, when you were looking at
11 possible places to put the Red Cross Safe Haven
12 Program, was there anything about the neighborhood
13 around West Samaria that was positive from your
14 perspective?
15   MS. LOWRY: I think a positive part of that
16 particular neighborhood is it's often a neighborhood
17 that the clients that we work with are accustomed to.
18 Many of the homeless services are east of there,
19 there's clinics for homeless people, there's meal
20 sites in the area, and so many of the clients that we
21 work with are very comfortable in that neighborhood
22 and are used to being in that area of Milwaukee and
23 the downtown west side neighborhood.
24   MR. PLEDL: And you describe the Red Cross
25 program there. I'm not going to go into any more

Page 32

1 detail beyond your affidavit. Tell me about the
2 Transitional Housing Program. What is that?
3   MS. LOWRY: The Transitional Housing Program
4 is a program that's funded through the Behavioral
5 Health Division, and they had a need to have places to
6 go with homeless -- people that were in the hospital
7 that didn't have anyplace to go when they left, and so
8 they approached us and asked us to do this as an
9 add-on to the program that we were already running,
10 and these folks were people that were already
11 connected with services, but maybe they wouldn't
12 received any financial benefits, and so they needed a
13 place to be for a while while case managers helped
14 them with that.
15   MR. PLEDL: You included as part of your
16 affidavit a letter from Mr. Radonski, Milwaukee
17 County. Does that describe how people get into the
18 Transitional Housing Program?
19   MS. LOWRY: Yes, it does.
20   MR. PLEDL: Now, are the Red Cross programs
21 and Richardson Place, are those intended to be a
22 permanent housing for individuals?
23   MS. LOWRY: Our program is intended to be a
24 sort of transitional or temporary program where people
25 can come and get off the streets and have an

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 9 of 37   Document 19-2

Page 33

1 opportunity to kind of step away from that life and be
2 able to look forward into how they can have a stable
3 life and get back into stable housing, and so we
4 worked very hard to get the financial benefits and
5 then to move people into stable housing.
6      MR. PLEDL: And then where do people move to
7 after they leave the Red Cross programs at West
8 Richardson?
9      MS. LOWRY: They move to all different
10 places. Some of them move in -- Actually, some of
11 them stay at West Samaria because they become
12 accustomed to it and they like that kind of an
13 environment, some of them go to Milwaukee public
14 housing facilities. We make referrals there. Some of
15 them go to county programs, where they have
16 independent apartments in the community.
17      MR. PLEDL: And while they are at Red Cross
18 and THP, is that their only residence, they live on
19 the third floor at the West Richardson House?
20      MS. LOWRY: Yes, only residents.
21      MR. PLEDL: Now, are you familiar with the
22 operation of the West Samaria Program?
23      MS. LOWRY: Yes, I am.
24      MR. PLEDL: How is that?
25      MS. LOWRY: Well, even before we had our

Page 34

1 program there, we would have clients that stayed
2 there, and we would oftentimes see those people when
3 they were staying there, or they would move there, you
4 know, after they had an income and might be able to
5 move in there.
6      MR. PLEDL: Are you familiar with the
7 operation of the case management agencies that work in
8 the Milwaukee area?
9      MS. LOWRY: Yes, I am.
10      MR. PLEDL: And how is that?
11      MS. LOWRY: I work very closely with the
12 Behavioral Health Division, and there's a group out
13 there called Service Access to Independent Living, and
14 they are presented people that need community
15 services, and they make decisions about what type of
16 community service they need, and they assign them case
17 managers.
18      MR. PLEDL: And have you described how it is
19 that case managers decide whether someone is
20 appropriate for the West Samaria or THP or whatever,
21 is that described in your affidavit?
22      MS. LOWRY: Yes, it is.
23      MR. PLEDL: Then on the last page of your
24 affidavit, you say that all of the residents of West
25 Samaria have a serious disability; is that right?

Page 35

1      MS. LOWRY: That is correct.
2      MR. PLEDL: And you say that you believe
3 that it's reasonable to grant this request that they
4 be allowed to continue there and the programs that are
5 there be allowed to continue; is that right?
6      MS. LOWRY: I believe that.
7      MR. PLEDL: And then do you believe it's
8 necessary for these individuals to do that?
9      MS. LOWRY: I believe that it's necessary.
10      MR. PLEDL: And then do you believe that
11 this gives them an equal opportunity to live in the
12 community?
13      MS. LOWRY: It does.
14      MR. PLEDL: Now, have you read any of the
15 affidavits that the City has submitted where there's
16 reference to the idea that there should be additional
17 security and escorts that accompany people in the
18 neighborhood? Did you read those?
19      MS. LOWRY: Yes, I did.
20      MR. PLEDL: Are you aware of any programs
21 like Autumn West, the Transitional Housing Program, or
22 West Samaria that have escorts that take people out
23 when they go in the community?
24      MS. LOWRY: I'm not aware of any programs
25 that aren't community-based residential facilities or

Page 36

1 nursing homes that do that.
2      MR. PLEDL: So a place that's licensed as a
3 transitional living facility and where people have
4 mental illness -- I'll just try that again. So
5 restricting your answer to places that are
6 transitional living facilities or room and boards or
7 apartments where people with chronic mental illness
8 live, are you aware of any of those sorts of places
9 that provide a security escort when people leave the
10 building and go into the community?
11      MS. LOWRY: No.
12      MR. PLEDL: Nothing further.
13      MR. COOK: Good evening.
14      MS. LOWRY: Hi.
15      MR. COOK: I think that that last question
16 was attempting to limit your questions, and I don't
17 know if it was completely encompassing, so I'm going
18 to ask you. There are programs that are out there
19 that provide for transportation of people with the
20 same disabilities as the people in this property,
21 aren't there; transportation, for example, to the drug
22 store or to get incidentals, to the barber shop, to a
23 restaurant, things of that nature?
24      MS. LOWRY: I'm aware that case managers
25 often come and pick up clients and take them to those

Case 2:12-cv-00216-CNC Filed 03/01/13 Page 10 of 37 Document 19-2

Page 37

1   places. They take them shopping, they take them to
2   get their hair cut, they take them to their doctors'
3   appointments. So I'm aware of facilities where case
4   managers actually come in, and this is also true of
5   West Samaria.
6      MR. COOK: What have you done, if anything,
7   to determine the compatibility of the residents to
8   this neighborhood?
9      MS. LOWRY: I have done -- I mean I'm not
10   quite sure exactly what you mean what have I done.
11      MR. COOK: You testified before that you
12   found the area to be compatible. I want to know what
13   did you do or what did you assess, what did you
14   formulate that you can tell this Board that you did to
15   make that determination that the area was compatible
16   to residents of the neighborhood.
17      MS. LOWRY: I know that the people that I'm
18   working with have lived in that neighborhood for many
19   years, they have been living in that neighborhood
20   definitely since I've been doing this work and that I
21   know that they are comfortable in that neighborhood
22   and that they feel like it's a place where they
23   belong.
24      MR. COOK: You are aware of prior instances
25   of assaults on these residents, aren't you?

Page 38

1      MS. LOWRY: I think the clients that I work
2   with, the homeless people and people with mental
3   illness, are assaulted in many different areas of the
4   City of Milwaukee.
5      MR. COOK: So that's a yes?
6      MS. LOWRY: That's a yes.
7      MR. COOK: Strong armed robberies?
8      MS. LOWRY: Yes, I have heard of that.
9   Rapes.
10      MR. COOK: And with regard to this
11   particular facility, would you agree with me that it
12   does not have adequate elevators, for example, to
13   transport anybody from the second or third floor down
14   to the first?
15      MS. LOWRY: I believe that there is an
16   elevator in the building and that it does transport
17   people between floors.
18      MR. COOK: But it is incapable of
19   transporting somebody. Should a resident ever need to
20   be removed from the facility by stretcher, they would
21   have to be carried down the stairs, wouldn't they?
22      MS. LOWRY: Probably, yes.
23      MR. COOK: Thank you. That's all I have.
24      CHAIRMAN ZETLEY: Attorney Pledl, you have
25   nine-and-a-half minutes for the rest of your

Page 39

1   presentation and cross-examination.
2      MR. PLEDL: Dr. Frank. You are Dr. Nancy
3   Frank; is that right?
4      DR. FRANK: I am.
5      MR. PLEDL: And I believe you filed an
6   affidavit which lists your qualifications both within
7   the affidavit and in a curriculum vitae; is that
8   correct?
9      DR. FRANK: That is correct.
10      MR. PLEDL: And prior to your testimony
11   today, you submitted a certain amount of background
12   information, which is listed on the top of Page 2?
13      DR. FRANK: Yes, I did.
14      MR. PLEDL: Now, one of the things that you
15   address in your affidavit is that at the previous BOZA
16   hearings on this matter that the Department of
17   Neighborhood Services, Traffic, the DPW, and the
18   Department of City Development did not have any
19   specific objections to approving the continuation of
20   this use; is that right?
21      DR. FRANK: That's correct, yes.
22      MR. PLEDL: How is that significant?
23      DR. FRANK: The significance of that is that
24   that provides the empirical basis for the Board of
25   Zoning Appeals to reach some of the factual

Page 40

1   understanding about what the potential impacts or
2   concerns might be about placing, or continuing in this
3   case, the use that's been in the neighborhood.
4      MR. PLEDL: Does it make a difference that
5   this is a use that's presently in the neighborhood as
6   opposed to being a proposed use?
7      DR. FRANK: I think it makes quite a
8   difference because one doesn't need to speculate about
9   what the impacts will be. There's a long 30-year
10   record.
11      MR. PLEDL: And did you ultimately come to a
12   conclusion as to whether there's any undue negative
13   influence or impact on the community from the
14   continuation of this use?
15      DR. FRANK: I didn't see anything in the
16   record or in my visit to the facility that would lead
17   me to believe that it had an adverse impact.
18      MR. PLEDL: Now, one of the things you
19   address in your affidavit is the question of whether
20   concerns about the quality of care or the quality of
21   the supervision or the security provided to
22   individuals in a facility such as the one at West
23   Richardson is an appropriate zoning matter. Would
24   that be accurate?
25      DR. FRANK: That's correct.

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 11 of 37    Document 19-2

Page 41

1     MR. PLEDL: And could you speak to that.

2     DR. FRANK: Well, the general notion about

3 zoning is that you're trying to prevent incompatible

4 land uses, and when you have a special use that

5 requires a special permit, you're simply looking to

6 make sure that the way in which the proposed use is

7 going to be built, designed, and operated is basically

8 consistent with the other kinds of uses that have

9 already been approved by right.

10     MR. PLEDL: And so is the quality of

11 services, the quality of security, or issues like that

12 within a facility related to the concerns that you've

13 just identified?

14     DR. FRANK: I don't believe so, if I

15 understand your question, because typically what

16 occurs within the facility, except for things having

17 to do with things like unsafe stairways and fire

18 hazards and vermin wouldn't be the kinds of things

19 that one would be concerned with. The actual sort of

20 operation internally is generally the focus of those

21 concerns.

22     MR. PLEDL: Now, do you understand part of

23 the opposition to be that this neighborhood is too

24 dangerous for people with disabilities to live there?

25     DR. FRANK: Yes, I understand.

Page 42

1     MR. PLEDL: What's your response to that

2 concern?

3     DR. FRANK: It seems to me to be a novel

4 concern in the first place, and this is the way that

5 I've come to look at it. One needs to look at health,

6 safety, and welfare in this sense in a broad way and

7 not just assume that if the facility is not operating

8 on Richardson Place that the residents will be safer.

9 You have to compare the risks that the residents will

10 incur if the special use is not granted to the risks

11 that they incur if it is granted, and I think when you

12 look at the totality of the evidence that's been

13 presented that there's really no basis for thinking

14 that even the residents will be safer if the special

15 use is not granted because we have great uncertainties

16 about where they would end up living, whether they

17 would end up living with anywhere near the supportive

18 environment that they are currently receiving at West

19 Samaria and whether the neighborhood in which they

20 would ultimately end up would pose fewer risks than

21 what they experience living at West Richardson Place.

22     MR. PLEDL: And in your analysis on this

23 particular issue, was it significant as to whether or

24 not there are any prohibitions against people without

25 disabilities living, working, et cetera in that

Page 43

1 neighborhood?

2     DR. FRANK: Yeah, I think it's quite

3 significant.

4     MR. PLEDL: And how is that significant?

5     DR. FRANK: Well, if the point is to not

6 discriminate against people, then if the area is

7 unsafe, it is presumably unsafe for all kinds of

8 people, for ordinary adults, for children, for people

9 with other kinds of disabilities. And so I'm not

10 clear why these mentally disabled individuals are

11 being singled out as being particularly unsafe.

12     MR. PLEDL: And the issue of neighborhood

13 safety, how is that customarily dealt with if that's

14 perceived to be a problem?

15     DR. FRANK: Well, I would think that

16 improved increased police patrols and other kinds of

17 public services would be the appropriate response.

18     MR. COOK: Now, you make a suggestion that

19 in order to comply with the Comprehensive Plan

20 requirement that the City of Milwaukee assess the

21 needs for supported housing and housing for the

22 homeless and other things; is that right?

23     DR. FRANK: Excuse me?

24     MR. PLEDL: You make a recommendation at one

25 point in your affidavit that the City of Milwaukee, in

Page 44

1 order to comply with the Comprehensive Plan provisions

2 of the State Statute, do something with regard to

3 assessing the need for certain types of services?

4     DR. FRANK: That's right.

5     MR. PLEDL: Could you go forward with that.

6     DR. FRANK: Yes, I will. Under the law that

7 the City currently has to comply with, there is no

8 specific requirement that they have a comprehensive

9 plan and, therefore, no specific requirement that they

10 have a plan that is compliant with certain state law,

11 but starting in 2010, the City will need to have a law

12 that complies with all sort of things that need to be

13 considered in a formally adopted comprehensive plan.

14 The City's approach to comprehensive planning is to do

15 these area plans, of which the West Side Plan is one

16 of them, and then to also do a broader city-wide plan.

17     And the point that I was making is that

18 currently the area plan that's been done for the near

19 west side does not have a housing element much less

20 any real attention to meeting the needs of the

21 disabled, and so that in order to make that plan

22 ultimately comply in time for 2010, the City will need

23 to do some additional planning.

24     CHAIRMAN ZETLEY: Attorney Pledl, you have

25 two minutes.

Case 2:12-cv-00218-CNC   Filed 03/01/13   Page 12 of 37   Document 19-2

Page 45

1      MR. PLEDL: And you quote heavily from a
2 City attorney's letter dated October 15th, 2003, and
3 is the statement that you just made consistent with
4 the recommendation the City attorney made back at that
5 time about doing an assessment of essentially services
6 and housing concerning people with disabilities?
7      DR. FRANK: Yes, I consider it consistent.
8      MR. PLEDL: On the last two pages of your
9 affidavit, you state that, based on the information
10 available to you, the residents appear to be disabled;
11 is that correct?
12      DR. FRANK: That's correct.
13      MR. PLEDL: You state in a fairly long
14 paragraph that you believe that the request to permit
15 West Samaria to continue in operation there is a
16 reasonable one?
17      DR. FRANK: Yes, I do.
18      MR. PLEDL: Does the fact that it's already
19 been granted special use permission in the past by
20 predecessors to this Board, does that weigh in your
21 analysis in any way?
22      DR. FRANK: It does, because, again, we're
23 not dealing with some unknown operator that we don't
24 know what's going to happen there.
25      MR. PLEDL: And then is it your opinion that

Page 46

1 granting reasonable accommodation is necessary?
2      DR. FRANK: Yes, I do.
3      MR. PLEDL: And have you taken into account
4 the testimony of both Mr. Brever and Ms. Lowry about
5 the need for these services?
6      DR. FRANK: Exactly, exactly. And again, I
7 do just want to point out that my analysis of the
8 reasonableness point also gets down to what would be
9 the impacts on the disabled residents at West
10 Richardson if they were forced to relocate, especially
11 on some very short time limit.
12      MR. PLEDL: Do you also believe that this
13 request will lead to equal opportunities to these
14 residents?
15      DR. FRANK: The request for accommodation?
16      MR. PLEDL: Yes.
17      DR. FRANK: Yes, I do.
18      MR. PLEDL: Would there be anything to stop
19 the residents of West Samaria from moving into an
20 apartment building or a room and Board within a block
21 or two of their current residence?
22      DR. FRANK: Not that I'm aware of.
23      MR. PLEDL: Would there be anything to
24 prevent the residents of West Samaria from coming back
25 to the same neighborhood to shop, visit friends, or

Page 47

1 whatever if they moved 10 miles away?
2      DR. FRANK: No.
3      CHAIRMAN ZETLEY: Time's up.
4      MR. PLEDL: Thank you.
5      CHAIRMAN ZETLEY: Thank you.
6      MR. COOK: Good evening, Doctor. There is
7 no evidence that you have that whoever left Richardson
8 House or West Samaria ever located in the neighborhood
9 following their departure from the facility, do you?
10      DR. FRANK: No, I don't. But I don't
11 believe that was the question I answered.
12      MR. COOK: You're not saying here that the
13 City is going to put these people out on the street I
14 understand from your testimony, are you?
15      DR. FRANK: Well, I do sort of wonder what
16 would happen if a special use permit was to simply be
17 denied, if no accommodation was being provided.
18      MR. COOK: A special use permit has been
19 denied for over a year now, and we're here talking
20 about reasonable accommodation, correct?
21      DR. FRANK: Um-hum.
22      MR. COOK: Would you agree with me this is a
23 unique situation, you've never testified before in a
24 situation like this where a resident was brutally
25 beaten and murdered within 50 feet of the residence

Page 48

1 and the property lost its special use permit, in part,
2 due to that?
3      DR. FRANK: That's correct, I didn't have to
4 testify to that.
5      MR. COOK: Doesn't the protection of these
6 residents' safety become a concern when you are here
7 on behalf of the applicant testifying that they are
8 entitled to reasonable accommodation?
9      DR. FRANK: I'm not sure that I see the
10 logic of your question because it presumes, I believe,
11 that the death of David Rutledge was in some way the
12 result of inappropriate and deficient operation of the
13 sort of facility that it is, and from the record that
14 I've seen, I don't see the indications of that.
15      MR. COOK: Well, you know the type of people
16 that are being serviced here, right?
17      DR. FRANK: Yes, I do.
18      MR. COOK: Wouldn't it have been reasonable
19 for an operator to have put, at least, security
20 cameras that would have looked at the approaches to
21 the building so that they could have seen this
22 incident occurring? This is within 50 feet of the
23 structure.
24      DR. FRANK: I don't know if that is
25 reasonable or unreasonable because I don't know what

Case 2:12-cv-00218-CNC   Filed 03/01/13   Page 13 of 37   Document 19-2

**Page 49**

1  all of the options are. I also have to wonder what
2  other reasonable efforts might have been undertaken by
3  the City to also make sure that this was a safe place
4  for all of the residents.
5      MR. COOK: One final question, Doctor. In
6  light of this murder and in light of what we're going
7  through here today, do you see any reason why it would
8  not have been reasonable to have installed a security
9  camera system that would encompass the area where Mr.
10  Rutledge was murdered?
11      DR. FRANK: I can't tell you how that would
12  have necessarily prevented his murder, and I don't
13  know that we can even say that if one did that that it
14  would prevent a murder of a West Richardson resident
15  or any other resident in the neighborhood.
16      MR. COOK: But in seeking reasonable
17  accommodation and trying to establish to this Board
18  that you're entitled to that as a result of a
19  reasonable request or as a result of necessity, what
20  can you point to that this applicant did, if anything,
21  to address that issue?
22      DR. FRANK: I think that the applicant has a
23  responsibility to be sure that the residents are safe
24  in the facility and that they have made efforts to do
25  that, that they have actually gone beyond what they

**Page 50**

1  need to do by also trying to provide some service,
2  some training, some buddy systems to try and keep the
3  residents safer, but I don't believe that a housing
4  facility of this sort has a responsibility to do more,
5  and in fact, what I understand is that federal law
6  puts the onus on the local government to be sure that
7  it is flexible in making sure that people with
8  disabilities can live in the same areas as people
9  without disabilities.
10      MR. COOK: I have no further questions.
11      CHAIRMAN ZETLEY: Thank you. Do you want to
12  take a two-minute break?
13      MR. PLEDL: May I inquire? My question is
14  just I didn't know if I understood what the Board said
15  earlier. Will these three witnesses be subject to
16  questions from the Board later on?
17      CHAIRMAN ZETLEY: Yes, they will be subject.
18      (Break.)
19      CHAIRMAN ZETLEY: We're back in session. I
20  just wanted to clear up one procedural issue. Both
21  attorneys agree that the City of Milwaukee now has 30
22  minutes to make their presentation, including the
23  witnesses and including the Alderman's statements, and
24  Attorney Pledl, you have equal to the amount of time
25  that each witness testifies to cross-examine. Is that

**Page 51**

1  both of your understanding?
2      MR. COOK: That's correct.
3      MR. PLEDL: Yes.
4      CHAIRMAN ZETLEY: Attorney Cook, you now
5  have 30 minutes to begin your presentation.
6      MR. COOK: I'd like to make a brief opening
7  statement to everybody. First of all, in connection
8  with the Chairman's concerns about the burden of proof
9  here and what the City must demonstrate, it's been our
10  position in our submission that a prima facie case has
11  not been made by the applicant. They have not
12  demonstrated any reasonable efforts on their behalf
13  since the last time they were here to seek
14  accommodation, and therefore, we believe we have
15  demonstrated that giving a request here would be
16  unreasonable.
17      In July of 2004, of course, we know that Mr.
18  Rutledge died. Mr. Bauman will be talking about that
19  a little bit, but one of the main concerns that
20  everybody needs to take into account is that Mr.
21  Rutledge did not die on the street. He got up, he
22  went into the facility, and you'll hear some comments
23  about that, as well.
24      Since June of '05, when the applicant was
25  turned down with the special use permit, they have

**Page 52**

1  been put on notice, and of course, we can see that
2  from the earlier testimony, to do something about
3  this, and the evidence in this case I think as shown
4  through the cross-examination and will continue to
5  show through our case, that the applicant has done
6  very little, and certainly not enough that would be
7  sufficient to allow a reasonable accommodation to be
8  granted here. There are fundamental design problems
9  with the structure, there is no green space on the
10  structure, there is no safe haven in the property
11  other than a kind of a large room as well as the rooms
12  for the individuals. There is really no flexibility
13  in the design of this property.
14      Now, Tri-Corp has admitted as much, they
15  acknowledge there were safety concerns, they
16  acknowledge problems with regard to the structure both
17  in the affidavits and in the cross-examination. And
18  it certainly would be a different story here today, I
19  believe, if they'd come forward and basically said
20  look, we're aware that there's a problem and we're
21  aware that something needs to be done about it and
22  that these are the things that we think we need to
23  address it.
24      That, I believe, has not occurred. There
25  has not really been a forthright and frank approach on

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 14 of 37    Document 19-2

Page 53

1 behalf of the applicant to deal with this. In the
2 testimony that you're about to hear, they did not
3 really deal very well with the neighborhood in this
4 matter. They pretty much blew them off, and you will
5 hear that testimony from Kimberly Williams, and
6 therefore, nothing here was done substantial. They
7 did not deal with the neighborhood concerns
8 adequately, they did not address the Rutledge murder
9 in larger terms, in terms of looking at the facility
10 and decide where do their people go during the day,
11 what can we do to prevent this from occurring.
12 Therefore, they have done nothing to justify the
13 request for reasonable accommodation. They just kind
14 of expect that it's going to be given.
15      If the City grants reasonable accommodation
16 in this case, we respectfully submit, on the minimum
17 facts that the applicant has provided here, then when
18 would you ever deny it? If not now, when? We'll call
19 for our first witness, Richard Lucas.
20      MR. COOK: Mr. Lucas, you've been previously
21 sworn, and you have submitted an affidavit in
22 connection with this matter?
23      MR. LUCAS: Yes.
24      MR. COOK: You are an adult resident of the
25 City of Milwaukee, and you have been in the business

Page 54

1 of providing private security?
2      MR. LUCAS: Yes.
3      MR. COOK: Have you worked on the west side
4 area extensively?
5      MR. LUCAS: Yes.
6      MR. COOK: Can you tell the Board how
7 extensive your work in the west side area has been.
8      MR. LUCAS: Last 18 years, from 1988.
9      MR. COOK: Have you had an opportunity in
10 that time frame to examine what goes on at Judy's Red
11 Hots?
12      MR. LUCAS: Yes.
13      MR. COOK: Tell the Board what type of
14 establishment Judy's Red Hots is. We know it's a
15 restaurant, but can you tell us what type of clientele
16 generally accumulate there and what type of problems,
17 if any, you are specifically and personally aware of.
18      MR. LUCAS: I run the people off the corner
19 of 27th and Kilbourn, and they go over to Judy's
20 because I don't do security there. It's a drug haven.
21 I was there across the street at 1:00 in the morning,
22 and drug dealers got into a shoot-out. 52 shots were
23 fired. A girl was shot -- Two people were shot.
24 It's just a bad place to be.
25      MR. COOK: Have you in the past had an

Page 55

1 opportunity prior to July of 2004 to see residents of
2 the applicant's property in the neighborhood?
3      MR. LUCAS: Yes.
4      MR. COOK: Has anybody ever reported to you
5 that any of those residents were assaulted or suffered
6 injuries as a result of attacks?
7      MR. LUCAS: Yes.
8      MR. PLEDL: Object to the hearsay. Ever
9 reported to him is quite a reach.
10      CHAIRMAN ZETLEY: The Board allows it.
11 We'll give it the weight.
12      MR. COOK: I'm talking about the residents
13 actually speaking with you and tell us how close in
14 time frame to the incident. In other words, did they
15 say I was attacked three weeks ago, or did they
16 provide any evidence to you as to how soon the attacks
17 occurred?
18      MR. LUCAS: I was stopped a couple times by
19 residents and asked -- They thought I was police, I
20 said I was private security. They asked if I could
21 call the police because they were just robbed.
22      MR. COOK: And how many times do you recall
23 this happening prior to Mr. Rutledge's death?
24      MR. LUCAS: Two or three times.
25      MR. COOK: Did you know Mr. David Rutledge?

Page 56

1      MR. LUCAS: Yes.
2      MR. COOK: Can you tell the jury about your
3 observations of him in the neighborhood, what he
4 normally did, how he looked, how he dressed, et
5 cetera.
6      MR. LUCAS: He used to have an I call it a
7 Farcon hat with a bow tie, and he carried a Bible. I
8 was shocked when he got killed. I used to have him
9 move off the corner of 27th and Kilbourn because of a
10 safety issue with the drug dealers being around.
11      MR. COOK: What problem do you perceive,
12 based upon your experience with the property,
13 concerning the ability of residents to use the green
14 space on the facility to be outside during the day,
15 for example, if the weather permits?
16      MR. LUCAS: There is no green space, there's
17 no supervision, they just -- they walk the alleyways.
18 It's like a T-bone alley. They will walk down the
19 alley, and the drug dealers or the gang members or
20 whatever will take advantage of them, take their
21 money. They will hardly report it, and if they do,
22 nothing becomes of it.
23      MR. COOK: At any time either before or
24 after the death of Mr. Rutledge, have you ever seen
25 security from that building outside the property?

Case 2:12-cv-00216-CNC    Filed 03/01/13    Page 15 of 37    Document 19-2

Page 57

1      MR. LUCAS: No.

2      MR. COOK: And how often would you normally

3 patrol that area, based upon your clientele in the

4 area?

5      MR. LUCAS: I think I only average about 15

6 to 20 times a day.

7      MR. COOK: 15 to 20 times a day?

8      MR. LUCAS: Yeah.

9      MR. COOK: Does the 27th and Kilbourn area

10 have a nickname that's known on the street as it's

11 described in street talk?

12      MR. LUCAS: Drug haven. That's where people

13 go pick up their drugs, prostitution.

14      MR. COOK: Thank you. That's all the

15 questions I have.

16      CHAIRMAN ZETLEY: Attorney Pledl, you have

17 four minutes.

18      MR. PLEDL: Mr. Lucas, do you ever see

19 children walking with adults on 27th Street past

20 Judy's Red Hots?

21      MR. LUCAS: Yes.

22      MR. PLEDL: And there's a school a few

23 blocks away, right?

24      MR. LUCAS: Yes.

25      MR. PLEDL: And children live in that

Page 58

1 neighborhood; is that right?

2      MR. LUCAS: Yes.

3      MR. PLEDL: Do you think that we ought to

4 move all those children out of that neighborhood

5 because it's unsafe?

6      MR. LUCAS: No.

7      MR. PLEDL: You mentioned that there have

8 been some residents who have stopped you and said that

9 they've been the victims of crime. My question is do

10 residents in that area who don't apparently have

11 disabilities to your observation, do they ever report

12 to you that they have been the victims of crime?

13      MR. LUCAS: No, not on 27th and Kilbourn.

14 On Wells.

15      MR. PLEDL: Now, you say in your affidavit

16 that you've seen various things in the neighborhood,

17 and I'm reading from Paragraph 10. It says, "At no

18 time were the residents accompanied by security guards

19 or staff members working at Richardson House." Now,

20 my question is do you know of any legal requirement

21 that the kind of people who live at Richardson House

22 be accompanied by security guards or by other staff

23 when they go for a walk in the neighborhood?

24      MR. LUCAS: No. But if I knew there was

25 issues of their safety being out there, I would figure

Page 59

1 somebody would take steps forward to do something

2 about it.

3      MR. PLEDL: Let's put it this way. Have you

4 ever run a transitional living facility?

5      MR. LUCAS: No.

6      MR. PLEDL: Okay. So you don't know what

7 the rules would be for someone who does run a

8 transitional living facility, as to whether they have

9 to provide experts in the neighborhood?

10      MR. LUCAS: No.

11      MR. PLEDL: Nothing further. Thank you.

12      MR. COOK: Thank you, Mr. Lucas. I call

13 Kimberly Williams. Good evening.

14      MS. WILLIAMS: Hello.

15      MR. COOK: I understand you're not feeling

16 very well, so I'll keep this short. You provided an

17 affidavit in connection with this?

18      MS. WILLIAMS: Yes.

19      CHAIRMAN ZETLEY: Where do you live?

20      MS. WILLIAMS: 2808 West Wells.

21      MR. COOK: In that area, do you serve in any

22 special capacity?

23      MS. WILLIAMS: Outreach minister at St.

24 Paul's Lutheran Church.

25      MR. COOK: What does that involve?

Page 60

1      MS. WILLIAMS: I work in the community

2 anywhere from drug treatment programs, emergency food,

3 clothes, I give books to the school that this attorney

4 referred to.

5      MR. COOK: And with regard to your work in

6 that area, have you had prior occasions to come in

7 contact with residents of the applicant's property?

8      MS. WILLIAMS: Yes. I've been in my house

9 for five years, and it's constant. Even as of this

10 Wednesday, one of their residents stopped -- we were

11 going grocery shopping and stopped our car in the

12 street because they wanted money.

13      MR. COOK: Have you in the past and are you

14 currently concerned about the safety of these

15 individuals?

16      MS. WILLIAMS: I am concerned, not only for

17 them but for our regular residents, as well.

18      MR. COOK: Now, after the death of David

19 Rutledge, did there come a time when community

20 meetings were either held or instituted on behalf of

21 the applicant?

22      MS. WILLIAMS: Yes.

23      MR. COOK: Did you attend any of those

24 meetings?

25      MS. WILLIAMS: Yes.

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 16 of 37   Document 19-2

Page 61

1     MR. COOK: How many meetings in your
2 knowledge do you recall ever occurring?
3     MS. WILLIAMS: One.
4     MR. COOK: And at the meeting that you were
5 at, was Mr. Brever present?
6     MS. WILLIAMS: Yes.
7     MR. COOK: Was he asked to address the
8 safety issues following the murder of Mr. Rutledge?
9     MS. WILLIAMS: Yes.
10     MR. COOK: What was his response?
11     MS. WILLIAMS: I couldn't get a straight
12 answer. I asked how many residents live there, he
13 said 80-plus, I asked about the surveillance with the
14 camera and monitoring just directly by their building,
15 he told me if I could find it cheaper, I need to do
16 that and come back and let him know.
17     MR. COOK: When he indicated to you, what
18 did he say that it would cost to provide the security
19 cameras around the property?
20     MS. WILLIAMS: $12,000.
21     MR. COOK: And you when you told him it
22 could be done cheaper, you're testifying his response
23 was for you to go find it cheaper and then tell him
24 how much it would cost and that they would then
25 consider it?

Page 62

1     MS. WILLIAMS: Right.
2     MR. COOK: What about the question of
3 increased security to provide better safety for the
4 residents?
5     MS. WILLIAMS: He just said it's not their
6 responsibility to follow the residents everywhere.
7     MR. COOK: Now, was there some discussion
8 about relocation?
9     MS. WILLIAMS: Yes.
10     MR. COOK: And was there some discussion
11 about the applicant obtaining the services of a real
12 estate agent?
13     MS. WILLIAMS: Right. Another resident in
14 the neighborhood asked that question, and they said
15 they could not afford it, then they told him you don't
16 have to pay for that, and he just kind of blew him
17 off, there was no straight answer.
18     MR. COOK: Was there any satisfactory
19 response to any of the questions that you and other
20 residents had about the operation of this property as
21 it related to the safety of its individuals after the
22 death of Mr. Rutledge?
23     MS. WILLIAMS: No, there was not.
24     MR. COOK: That's all the questions I have.
25     CHAIRMAN ZETLEY: Attorney Pledl.

Page 63

1     MR. PLEDL: Ma'am, do you think it is the
2 responsibility of people who operate the place like
3 West Samaria, the Red Cross programs, to follow their
4 residents around in the community?
5     MS. WILLIAMS: Well, I think if it's their
6 responsibility, if they're going to rent to people
7 with special needs, they should make some kind of
8 attempt to find out what's going on, even in a one- or
9 two-block radius. We're not talking miles, this is in
10 the immediate area.
11     MR. PLEDL: And if I understand your
12 testimony, you're saying that if they provided
13 security within two blocks, then it would be okay if
14 the resident walked beyond the two blocks and then
15 wasn't supervised anymore? Tell me what you're
16 saying.
17     MS. WILLIAMS: That is not what I'm saying.
18 There has been no effort made at all, period.
19     MR. PLEDL: Let me ask this question. If a
20 place like West Samaria did escort its residents up to
21 two blocks away and then said you're on your own,
22 would that be okay with you?
23     MS. WILLIAMS: That's not what I'm saying.
24 I help a resident right now that used to live there, I
25 help him. We take him to the doctor, we take him

Page 64

1 grocery shopping, we go to the store with him. I do
2 not get paid for this. This is one of my -- just
3 because I work in the neighborhood and there is a need
4 for it.
5     MR. PLEDL: And you say you've lived at your
6 house for five years; is that right?
7     MS. WILLIAMS: Yes.
8     MR. PLEDL: And do you know that over half
9 the people at West Samaria have lived there for over
10 five years?
11     MS. WILLIAMS: I'm sure there are residents
12 that have lived there for five years.
13     CHAIRMAN ZETLEY: One minute.
14     MR. PLEDL: Do you think it's fair to ask
15 them to move?
16     MS. WILLIAMS: Well, I don't think it's fair
17 for their residents to scare my younger children when
18 I go to the store and ask for money or follow them
19 home asking for money.
20     MR. PLEDL: Just that incident you
21 described, the incident you described with the
22 resident who stopped you and asked for money, did you
23 report that to the staff at West Samaria?
24     MS. WILLIAMS: No, I did not. At the
25 meeting, that was one of my concerns was the


Case 2:12-cv-00218-CNC   Filed 03/01/13   Page 17 of 37   Document 19-2

Page 65

1  harassment of a resident.
2       MR. PLEDL: Did they ask you to report each
3  incident when it occurs so they can do something about
4  it?
5       MS. WILLIAMS: Yeah. When I called the
6  police for one of the residents that was stopping
7  traffic on 27th and Wells, I called the police. They
8  didn't want me to do that. I'm supposed to go home
9  and call them and tell them who it was. I don't know
10  their name.
11       CHAIRMAN ZETLEY: No further time, Attorney
12  Pledl.
13       MR. PLEDL: Thank you.
14       CHAIRMAN ZETLEY: Attorney Cook.
15       MR. COOK: I'll reserve the rest of my time
16  to be directed to Alderman Bauman's response.
17       CHAIRMAN ZETLEY: Okay, go ahead.
18       MR. COOK: Go ahead, Mr. Bauman.
19       ALDERMAN BAUMAN: Mr. Chair, members of the
20  committee, I have listened patiently to 40 minutes of
21  testimony, 30 minutes of testimony from the
22  applicants. Frankly, we need a reality check here.
23  We have Mr. Brever making what I find to be an
24  astounding statement that he's not even convinced West
25  Samaria does not meet the needs of its residents.

Page 66

1  Apparently he was not at the last hearing when this
2  Board found, based on testimony presented to the
3  Board, that the public health, safety, and welfare of
4  the residents was not served by continued operation of
5  this establishment at this particular location.
6       When this Board heard extensive testimony
7  from other witnesses, which are part of the record,
8  involving precisely how unsafe this neighborhood is
9  for vulnerable individuals, we stipulate that
10  everybody is vulnerable to some degree in this
11  particular neighborhood. We're talking about the
12  special needs, the admitted special needs of these
13  individuals. We basically have a situation here where
14  they are even arguing a case stronger than their last
15  case. The last case was they are taking the position
16  at this point that not only is there not a problem
17  here, not only do we not have to do anything about the
18  problem, there is no problem, that is a wonderful
19  neighborhood, that is a safe area.
20       It's either safe or unsafe or for everybody
21  just the same. Basically, they're advancing the
22  proposition for this Board to consider that it is
23  reasonable and necessary to have persons with paranoid
24  schizophrenia, who suffer from alcohol and drug
25  dependency located in the neighborhood variously

Page 67

1  described as Cocaine Alley, Dope City, and an area
2  with a high level of street crime, with a high level
3  of prostitution, with a high level of street violence
4  testified to extensively in the last hearing,
5  testified to in this hearing.
6       This is not your ordinary urban
7  neighborhood. The police reports, which are in front
8  of you, involving drug arrests for March and April of
9  2006 indicate that drug arrests for felony drug
10  charges within a quarter mile of Richardson House/West
11  Samaria accounted for 40 percent of the new cases
12  started in the 3rd District Police District, which
13  comprises an extensive area in the City of Milwaukee.
14  40 percent of all prosecutions in the 3rd Police
15  District originate within a quarter mile of West
16  Samaria, and yet, as the good nurse testified, she
17  feels that the residents are comfortable in this
18  neighborhood, that this is good for them, they are
19  near the things they are used to, they are near their
20  services.
21       Which services precisely? Drug dealing
22  services for those that have a chemical dependency and
23  substance abuse problems? Which services is she
24  testifying to? Obviously, these individuals do have
25  special needs. We acknowledge that. They have to

Page 68

1  live somewhere. We acknowledge that. The issue is
2  whether it is reasonable and necessary at this
3  particular location.
4       At the last hearing, I reviewed the comments
5  of the Board members that were part of the record, and
6  it was very clear to me that there was an expectation
7  in that the period of time from the decision back in
8  June of 2005 to this hearing, that they would hear
9  from the applicant a plan of how security was being
10  improved, of how cameras were being added, about how
11  green space had been provided for their residents so
12  if they chose to recreate out of doors, they are not
13  forced to recreate on the street. Certainly at New
14  Samaria, the facility in West Allis, they are not
15  forced to recreate on the street. They are able to
16  stay on-premise, on-site in a secure environment if
17  they chose. If they chose to recreate on the street,
18  that is their choice. I acknowledge that.
19       These people are not in custody, these
20  people are not in a secure environment. If they
21  choose to walk the streets, that is their right, but
22  they cannot choose not to walk the streets, given the
23  design and layout of this particular facility. It's
24  impossible to make that choice. They have no choice
25  but to recreate on the streets in an environment which

Case 2:12-cv-00218-CNC Filed 03/01/13 Page 18 of 37 Document 19-2

## Page 69

1   has been established is very unsafe.

2      I think a particular note here -- and I

3   could go on at great length, but I think I will focus

4   on the issue of relocation. My affidavit and the

5   letters that are attached indicate pretty clearly that

6   Mr. Brever approached me inquiring whether I would

7   support their interest in relocating the facility, and

8   as the record indicates, I was, of course, interested.

9   I referred them to the Department of City Development

10   officials. Meetings were held. I attended some of

11   those meetings internally. And there certainly was

12   willingness on the part of the City to work with the

13   organization to find a suitable place that was better

14   for these residents. We truly have the best interests

15   of these residents at heart in this neighborhood.

16      As we have discussed at the last hearing, no

17   one has ever mentioned the typical arguments about

18   property values, safety. We were solely concerned

19   with the well-being of the residents, and based on the

20   testimony I've heard today, the neighbors have a

21   greater sense of care for the well-being of these

22   residents than the operators, the experts, and the

23   nurses that staff the facility, because to hear some

24   of the statements I've heard about we're not even sure

25   West Samaria doesn't meet their needs is frankly

## Page 70

1   absurd on its face. That defies reality.

2      To say that, as Dr. Frank indicated, that it

3   is unsafe for all kinds of persons, of course it's

4   unsafe for all kinds of persons, there's always risk

5   in an urban neighborhood, but to not recognize that

6   persons with paranoid schizophrenia, who suffer from

7   drug and alcohol dependency do not have a greater risk

8   of being victimized than me walking down 27th Street

9   defies common sense, it's an absurd statement.

10      It's very clear to me that the strategy

11   adopted here that is we're not going to try to improve

12   or look at alternative facilities, we're going to

13   stick our head in the sand and defy the process, we're

14   going to defy the City, we're going to even defy the

15   best interests of our own residents, we think we're

16   right on the law, forget the facts, forget any type of

17   security, forget any type of improvements, forget

18   green space, forget relocation. The facility on 33rd

19   and Highland, it's in the neighborhood, it's six

20   blocks away, it's got 168 rooms, it's priced right.

21   The asking price is $14,000 per unit. It has common

22   areas, it has a bathroom in every room. West Samaria

23   has six bathrooms for 92 rooms. The nursing home is a

24   Taj Mahal in comparison.

25      They moved to a nursing home once already.

## Page 71

1   They showed they know how to do it. They showed they

2   have an inclination to do it. Why not now? Why this

3   arrogance to come before this Board, this Board, which

4   was expecting a plan to improve safety, to improve the

5   conditions, come forward and say we think it's fine,

6   we tried extra security going from one to two guards

7   over the summer, and we abandoned the effort because

8   we didn't see the need anymore is frankly thumbing

9   their nose at this Board and thumbing their nose in

10   the interest of all the citizens in the city to take

11   care of the less fortunate citizens in the city.

12      To say that Richardson House is a great

13   location because they are comfortable being near their

14   customary and usual environment is absurd on its face.

15   But even assuming that's true, 33rd and Highland is in

16   the neighborhood, it is close to all thse same

17   services. It's on the bus routes, the same bus

18   routes, it has outdoor space, it has a stand-alone

19   house on the property that could be used for

20   administrators or extensive parking on the property.

21   It is listed at $2.4 million ready to run, completely

22   intact, all furniture and fixtures present. And the

23   bold assertion in the affidavit this is the only place

24   we can go and there's no other place not even possible

25   and we're not even going to look, we're not even going

## Page 72

1   to hire a real estate agent on commission, no up-front

2   cost to go out and find an alternative to explore the

3   market, to test waters to see if it's affordable, to

4   come with a price and go to the City and say here's

5   our deal, here's our budget, we have an accepted offer

6   to purchase contingent on the City finding earmark or

7   block grant funding or redevelopment assistance

8   funding in some way, here's the plan, here's the

9   budget, now work with us. No. It's submitting a lump

10   sum request for $1 million for a block grant category

11   that doesn't exist. It's a fraud on this body, it's

12   not in good faith. They are not proceeding in good

13   faith here.

14      CHAIRMAN ZETLEY: You have three minutes.

15      ALDERMAN BAUMAN: Fine. The cavalier

16   comment was made, well, it's not the applicant's

17   responsibility to watch over Mr. Rutledge 50 feet from

18   the door of the establishment, but that's not all that

19   happened in that case. While it's true that Mr.

20   Rutledge was beaten on the public right-of-way, he

21   also stumbled into the premises after he was beaten.

22   He stumbled in. No one was there to ask him what

23   happened, are you hurt, do you need attention, no one

24   called the police, no one even knew what happened to

25   the poor man. No one knew what happened until days

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 19 of 37   Document 19-2

Page 73

1  later about that crime, and that delay in learning
2  that a crime had occurred had a major impact on the
3  subsequent prosecution in that case because the police
4  lost three or four days of investigation.
5      That is the level of care that this fine
6  establishment likes to maintain. A man can get beaten
7  nearly to death 50 feet in front of the door, and
8  while it is the public's responsibility in the public
9  right-of-way, he goes back into his home, and no one
10 gives a damn. This is bad faith, this is arrogance.
11 This is an establishment that should be looking at
12 alternatives, that could look at alternatives, that
13 has looked at alternatives in the past. They exist,
14 they are present, it is, therefore, not necessary that
15 they continue operating as they operate today at this
16 particular location. Thank you.
17     CHAIRMAN ZETLEY: Thank you. Attorney
18 Pledl.
19     MR. PLEDL: Did you hear Chairman Zetley ask
20 earlier whether you were going to be going under the
21 criteria whether it's unreasonable or whether it's an
22 undue burden? And my first question is I think Mr.
23 Cook has said on your behalf that it's unreasonable.
24 Is that your position?
25     ALDERMAN BAUMAN: No. You have not met your

Page 74

1  prima facie case it is neither reasonable or
2  necessary.
3      MR. PLEDL: So you have not attempted to
4  make a showing here that it is unreasonable or it is
5  an undue burden?
6      ALDERMAN BAUMAN: I certainly have.
7      MR. PLEDL: In what way is it an undue
8  burden?
9      ALDERMAN BAUMAN: You have not even met your
10 burden of proof, so as far as I'm concerned, I'm not
11 going to the issue of undue burden on the City of
12 Milwaukee. You have not met your criteria of proving
13 that this is A, necessary, and B, reasonable. It is
14 not necessary because there are better locations
15 reasonably priced within six blocks of this location.
16 We're not talking about sending these unfortunate
17 citizens to West Allis -- you already went to West
18 Allis, so maybe West Allis isn't so bad -- let's say
19 Brookfield, Fox Point, or Whitefish Bay. We're
20 talking about a six-block move. It is, therefore, not
21 necessary to operate at this location when a superior
22 location, by any common sense standard, a better
23 location exists a short distance away still in the
24 neighborhood, still close to the services that has
25 been testified to these residents are familiar with.

Page 75

1      MR. PLEDL: Is there any other member of the
2  Common Council who's talking with you about supporting
3  City funding for this site at 33rd and Highland that
4  you suggested?
5      ALDERMAN BAUMAN: Yes.
6      MR. PLEDL: Do you have cosponsors who would
7  come up with the funding?
8      ALDERMAN BAUMAN: Cosponsors of what?
9  There's been no proposal, there's been no presentation
10 of a budget. In my letter to Mr. Brever -- If I have
11 to read the letter --
12     CHAIRMAN ZETLEY: It's part of the record.
13     ALDERMAN BAUMAN: The letter very clearly
14 asks fine, give us a budget, tell me what it's going
15 to cost to acquire a new site, what your relocation
16 expenses will be, what your renovation costs will be,
17 what your attorney and architect and engineering fees
18 will be, your hard costs, your soft costs, and net out
19 what you think you can realize from the sale of the
20 current premises, if anything, and give us a budget so
21 we have a target so we have something to sponsor
22 legislation about.
23     MR. PLEDL: Do you have any assurances from
24 this Board that it will grant a special use permit for
25 a transitional living facility at 33rd and Highland?

Page 76

1      ALDERMAN BAUMAN: I'd support it.
2      MR. PLEDL: But you don't have any
3  information as to whether it would be granted,
4  obviously, right? You can't.
5      ALDERMAN BAUMAN: I wouldn't know -- I
6  would assume the Board would follow the good judgment
7  of the local elected officials of the community and of
8  all the other interest groups that typically speak to
9  these issues and that based on that evidence and my
10 experience as an Alderman for three years and
11 experience as an attorney in the community for 30
12 years, those types of evidence tend to be followed by
13 this Board, so my answer would be I would have every
14 expectation that that request for a special use would
15 indeed be followed, based on my experience.
16     MR. PLEDL: Now, do you have any reason to
17 disagree with the statistic that Ms. Lowry cited of
18 there being a need for several hundred more units of
19 this type of supported housing?
20     ALDERMAN BAUMAN: Absolutely. That's why
21 Havenswood, 33rd and Highland would be ideal because
22 it's one-and-a-half times, it's half again as big,
23 with better accommodations.
24     MR. PLEDL: Would you agree with me,
25 Alderman, if the City was in a position to throw a

Case 2:12-cv-00218-GMS Filed 03/01/13 Page 20 of 37 Document 19-2



## Page 77

1 couple million dollars at this problem that it would
2 be better to create new and increased capacity and not
3 replace West Samaria?
4     ALDERMAN BAUMAN: West Samaria should not be
5 occupied by anybody for any purpose, not disabled, not
6 non-disabled, not anyone. It is not fit for human
7 habitation, in my opinion, based on its design, based
8 on its layout, based on its parking, based on its
9 access. So my answer is an emphatic no. I would
10 first move to a better -- I would first make things
11 better for my current residents, then I would attack
12 the challenge of expanded capacity City-wide.
13     MR. PLEDL: Alderman, you have filed a
14 letter from Delbert Reynolds, who's with the HUD
15 office local here to Mayor Barrett, have you not?
16     ALDERMAN BAUMAN: Part of my affidavit.
17     MR. PLEDL: Yes. And you would agree with
18 me that it says in the third paragraph talking about
19 the Westhaven Project, "We have found this project to
20 be well run with excellent oversight and management by
21 the Red Cross. Other partners in the program are
22 Milwaukee County's Behavioral Health Division,
23 Homeless Outreach Nursing Center, and Tri-Corp's
24 Housing with Health." Do you see that?
25     ALDERMAN BAUMAN: The letter speak for

## Page 78

1 itself, I agree.
2     MR. PLEDL: You agree with that?
3     ALDERMAN BAUMAN: I have no idea.
4     MR. PLEDL: Do you have any criticisms of
5 the Red Cross programs there as opposed to the West
6 Samaria program?
7     ALDERMAN BAUMAN: I have no specific
8 knowledge of what the Red Cross does inside the
9 building other than knowing that that building has 92
10 rooms and six bathrooms. We're talking about a
11 facility at 33rd and Highland, which they haven't even
12 looked at or considered or even had the judgment to
13 walk through on a survey that has individual rooms
14 with individual toilets with the common area,
15 television room on each floor, with elevators that can
16 handle stretchers. It is clearly not necessary to be
17 at this location, given all the other facts in the
18 record, when there is a better facility six blocks
19 away that will be infinitely superior in terms of
20 accommodating the needs and the comfort of these
21 residents.
22     MR. PLEDL: I believe you said that you
23 believe this neighborhood is too dangerous for people
24 with disabilities, specifically those who are paranoid
25 schizophrenics and AODA issues; is that right?

## Page 79

1     ALDERMAN BAUMAN: I'd say there is an
2 increased risk for vulnerable individuals or for
3 individuals who suffer from mental disabilities of the
4 type which Mr. Brever has testified of these
5 residents.
6     MR. PLEDL: And do you think that this
7 neighborhood is going to be just as dangerous for
8 those types of individuals five years in the future?
9     ALDERMAN BAUMAN: I don't know. I would
10 hope not.
11     MR. PLEDL: What about one year in the
12 future?
13     ALDERMAN BAUMAN: I think it would be
14 substantially the same in one year.
15     MR. PLEDL: What about two years?
16     ALDERMAN BAUMAN: I really don't know.
17     MR. PLEDL: And do you think that the City
18 of Milwaukee has the ability to do something about a
19 neighborhood that's perceived to be extremely
20 dangerous?
21     ALDERMAN BAUMAN: Within narrow limits, yes.
22     MR. PLEDL: And there are contraints on what
23 the police department can do; is that what you're
24 saying?
25     ALDERMAN BAUMAN: There's always constraints

## Page 80

1 on what the police department can do, starting with
2 the Constitution of the United States running right on
3 down to the budget that the City seeks to pass every
4 year. You are correct, there are constraints on what
5 the police department can do.
6     MR. PLEDL: But the Common Council can, if
7 it wishes, can provide additional resources to the
8 police department and even direct that they be
9 employed in this particular neighborhood, right?
10     ALDERMAN BAUMAN: Like we've done. We've
11 done that, we've done that. I've requested additional
12 police services in this neighborhood since the day I
13 was sworn into office. There are additional police
14 resources devoted to this neighborhood. This
15 neighborhood receives far disproportionate police
16 resources than any other neighborhood in the 3rd
17 District. That is a fact, because I've requested it,
18 because the need is there, because the street level
19 crime is there. The police are there because the
20 criminals and thugs are there and prostitutes and drug
21 dealers are there. That's why the police are there.
22 I've asked for additional services, I've been given
23 additional services.
24     MR. PLEDL: Are you going to ask for more
25 services?

Case 2:04-cv-00652-CNC Filed 05/01/12 Page 21 of 37 Document 19-2

Page 81

1      ALDERMAN BAUMAN: I will continue to ask for
2 additional services. But your client needs to
3 consider a safer location six blocks away where they
4 wouldn't have this danger at their doorstep.
5      MR. PLEDL: You've mentioned the incident
6 involving Mr. Rutledge, and you've used the phrase 50
7 feet. Where did you come up with that figure?
8      ALDERMAN BAUMAN: Well, I pretty much
9 measured where the monument Mr. Rutledge was located
10 based on several eyewitness accounts to me was the
11 general location of his bludgeoning to death.
12      MR. PLEDL: That was down at the corner of
13 28th and Richardson?
14      ALDERMAN BAUMAN: No. It was on the middle
15 of the block of Richardson east of 28th Street between
16 28th and 27th and Richardson about two automobile
17 lengths or so.
18      MR. PLEDL: Mr. Rutledge was taken to the
19 hospital that very night, was he not?
20      ALDERMAN BAUMAN: But no one bothered to ask
21 how did you get all that blood coming out of your
22 head. That's the crack security forces at West
23 Samaria, that's their excellent security services,
24 which I testified to they have consulted to come up
25 with a security plan to enhance the protection of

Page 82

1 residents.
2      MR. PLEDL: And are you aware of any legal
3 requirement that the operator of any sort of
4 residential facility has to provide escorts for people
5 who walk around in the neighborhood?
6      ALDERMAN BAUMAN: I'm aware of common sense
7 and of basic human decency to recognize a risk when
8 you are taking the money of vulnerable adults in the
9 form of rent, when you're taking their money, you're
10 providing them a home, to recognize the reality of the
11 enhanced risk that they are exposed to, take
12 protective measures, whether it's a legal obligation
13 or not.
14      CHAIRMAN ZETLEY: One minute.
15      MR. PLEDL: You mentioned that you think
16 they ought to use additional security. You understand
17 they don't receive any funding beyond the $515 a month
18 rent?
19      ALDERMAN BAUMAN: I have no idea what their
20 financing is. I've never seen a financial statement,
21 I've not seen their books, I don't know what their
22 cash flow is, I don't know what their operating
23 expenses are, I don't know what Mr. Brever is paid
24 from that establishment, I have no idea, so the short
25 answer is I don't have the slightest idea who pays

Page 83

1 what or what their expense structure is. If you want
2 to take it as part of the record, we'll be happy to
3 examine it and come back here.
4      Now, enhanced security through block grant
5 or through any other form of public assistance that
6 I'm aware of other than a lump sum million dollar
7 proposal, which didn't even fit a category for this
8 year's block grant allocation. It's Mr. Brever who
9 has been obtaining block grant funds for the better
10 part of 10 years as part of a housing organization who
11 fully knows how the system works. It was not in good
12 faith.
13      CHAIRMAN ZETLEY: That's it. Thank you.
14 Attorney Pledl, you now have five minutes for your
15 closing statement.
16      MR. PLEDL: This is just a matter of
17 housekeeping, Mr. Chairman, and that is I just have a
18 question about what's the status of the two witnesses
19 who didn't testify? Are their affidavits part of the
20 record?
21      CHAIRMAN ZETLEY: Yes, they are part of the
22 record. Do you want to cross-examine them?
23      MR. PLEDL: Just was asking the question.
24      CHAIRMAN ZETLEY: I'm asking the question
25 back, do you have a desire to cross-examine them?

Page 84

1      MR. PLEDL: No, I don't. And I'm not making
2 a motion to submit any additional submissions or
3 whatever at this point in time with one provisal, and
4 this is a question for Mr. Cook and the Board; and
5 that is, the Board has heard that the residents at
6 West Samaria are very long-term permanent residents.
7 The residents at the Red Cross programs live there,
8 it's their only residence, but it's for a somewhat
9 shorter period of time. There's no distinction in the
10 case law between somebody who lives in a place for
11 three months or nine months versus somebody who lives
12 there for seven years, but if the Board has any
13 questions about that, I can certainly supply some
14 supplemental authority on halfway houses and
15 transitional facilities, but it doesn't seem like the
16 City has made an issue of that.
17      Concerning the Fair Housing Act, the people
18 at the Red Cross facility and portion of the
19 facility --
20      CHAIRMAN ZETLEY: Attorney Cook, let me
21 clarify. You're not challenging that either the Red
22 Cross program or the other programs at this location
23 meet the requirements for -- basically that they live
24 there, that that is their residence, are you
25 challenging that fact?

1  MR. COOK: No.
2  CHAIRMAN ZETLEY: So there will be no
3  further submissions after this hearing unless the
4  Board members request it. Thank you. Attorney Pledl,
5  go ahead.
6  MR. PLEDL: Yes. The criteria are
7  reasonable, necessary, and does the requested
8  accommodation provide equal opportunity. I'm going to
9  talk about them each separately, but the global issue
10  here is that the applicant is responsible for
11  supplying that prima facie case, then the
12  municipality's responsible for coming forward. It has
13  the burden to overcome the initial finding of
14  reasonableness, necessity, or equal opportunity.
15  And then here's the most important thing.
16  Even if the municipality comes forward with something,
17  the Board then has to engage in some weight because in
18  the final analysis, if something did impinge on a
19  legitimate interest of the City to some extent but it
20  helped people with disabilities a lot, well, it would
21  still be necessary to grant a reasonable
22  accommodation. So there are several different ways
23  this can be sliced and diced. We clearly think it's
24  reasonable, all the testimony is reasonable.
25  Once, obviously, previous members of this

1  Board thought it was reasonable enough to give it a
2  special use in the past. It's not so out of the
3  question to say it is consistent with the other uses
4  in that area, it doesn't impose an undue burden, and
5  so, therefore, it ought to be allowed to operate
6  there. It is already there. We don't need to
7  speculate about its operation or its effect on the
8  neighborhood.
9  The City has not even attempted to show that
10  it has an undue effect on the neighborhood. They are
11  going after a very specific thing saying that the way
12  it's operated; that is, whether there's enough
13  security, and just the fact that the neighborhood is
14  too dangerous allows this Board to properly invoke its
15  public health, safety, and welfare authority to say
16  it's unreasonable and we haven't submitted a prima
17  facie case.
18  First of all, I'm going to say that's not a
19  legitimate criteria. I've argued that extensively in
20  my two memoranda. I think the Board would rather not
21  decide that. If you have to decide it, you're going
22  to have to decide it, and you just don't think there's
23  any evidence here that it is a legitimate zoning
24  criteria, Dr. Frank's testimony on that is
25  uncontroverted. We have legal references, we have a

1  reference to the Board's own informational notebook
2  about how the process works, and it doesn't say give
3  evidence of how this will affect people in the
4  facility. It says tell us how your use will affect
5  the neighborhood. So that's, I think, compelling.
6  My point is that even if this Board were to say
7  tonight we do think we have that authority to regulate
8  things inside of the building or outside, the disabled
9  people are not able to live in the neighborhood if
10  it's too dangerous, just think that on this record the
11  court has to say the need here is so extensive, the
12  unmet need for housing services for people who are
13  homeless who also have mental health needs is so great
14  in our community that the need in this case is just
15  overwhelming.
16  And these are people who have lived there
17  for a long time. Relocating them, that's just
18  horrible. That is not something we should be
19  considering here unless it is part of a long-range
20  considered transition. And I think what you've heard
21  is that Tri-Corp is not opposed to that, but let's get
22  a reasonable accommodation granted here, let's have it
23  be for a significant term, and then let's go into the
24  planning process.
25  There are huge issues going on in this City

1  about creating housing trust funds, about creating
2  different types of services for people with
3  disabilities, about whether certain types of
4  residential options are appropriate and should be
5  regulated. So we need to get to the bottom of all of
6  those things.
7  CHAIRMAN ZETLEY: One minute.
8  MR. PLEDL: So I'm asking that it be granted
9  for a period of five to 10 years. This is a renewal.
10  There's a substantial investment here. I understand
11  the problem with loitering, litter, noise requirement,
12  I understand that. We're also quite happy to have a
13  requirement that Tri-Corp cooperate within the City in
14  any planning process to determine needs, look at
15  transition alternatives, but we think that's the
16  approach.
17  I think we have also shown that it's
18  necessary, also shown that it will grant equal
19  opportunity. So I thank you very much for your
20  attention.
21  CHAIRMAN ZETLEY: Thank you. At this time,
22  I'd like to ask the Board if they have questions.
23  Board Member Siker, do you have any questions?
24  BOARD MEMBER SIKER: No.
25  CHAIRMAN ZETLEY: Board Member Cameron?

Page 89

1      BOARD MEMBER CAMERON: No.

2      CHAIRMAN ZETLEY: Board Member Doyle?

3      BOARD MEMBER DOYLE: No.

4      BOARD MEMBER SZYMANSKI: No.

5      BOARD MEMBER JACKSON: No.

6      BOARD MEMBER DOYLE: I'd just like to say I

7 think this was a very good hearing. I feel that my

8 questions got answered by good testimony questions.

9      CHAIRMAN ZETLEY: The Chairman is not going

10 to ask any questions at this time. I think there's

11 been an incredible amount of information. I'm going

12 to ask that the Board hold this over and make a

13 decision after reviewing the record. The Board will

14 ask for the transcript in order to review the record

15 and make a decision at our next meeting, which is June

16 8th. It will be an administrative matter at that

17 point with no further testimony. Board will make a

18 decision at that time. Five members, including Board

19 Member Cameron, will decide.

20      I want to thank everybody for the

21 presentations today, for being civil. This is a very

22 important and passionate issue on both sides. There's

23 no question in the Chair's view that -- even Alderman

24 Bauman, I think you agree there's a need for these

25 issues to be addressed. The issue is how they are

Page 90

1 addressed, where they are addressed. These are not

2 easy decisions, although both sides would like to

3 argue they are easy decisions for the Board. They are

4 not easy decisions.

5      Federal law mandates the Board to decide

6 this reasonable accommodation case. There is some law

7 on the books both by federal law and by case law.

8 Some of it is up in the air, although Attorney Pledl

9 would argue some of it is not, but I'm going to direct

10 the Board to look at the City Attorney Opinion to this

11 Board in order to direct us, and the Board will make a

12 decision, and I thank everybody for coming tonight.

13 Thank you, Attorneys, for doing this in an appropriate

14 manner.

15      (Proceedings concluded at 8:55 p.m.)

16          * * *

Page 91

1 STATE OF WISCONSIN    )

2                    )

3 MILWAUKEE COUNTY    )

4

5      I, TERESE M. SCHIEBENES, of Milwaukee

6 Reporters Associated, Inc., 5120 West Blue Mound Road,

7 Milwaukee, Wisconsin 53208, certify that the

8 foregoing proceedings is a full and complete

9 transcript of my stenographic notes taken in the

10 foregoing proceedings.

11

12

13

14

15

16

17            TERESE M. SCHIEBENES

18            Certified Shorthand Reporter

19

20

21 Dated this     day of         , 2006.

22

23

24

**-$-**

$1 [1]   72:10
$12,000 [3]   25:1
25:6   61:20
$14,000 [1]   70:21
$18,000 [2]   24:23
25:5
$2.4 [1]   71:21
$515 [2] 13:19   82:17

**-'-**

'05 [1]   51:24

**-1-**

10 [6]   4:1   18:13
47:1   58:17   83:10
88:9
111 [1]   1:15
1110 [1] 1:13
12 [1]   25:3
15 [2]   57:5   57:7
15th [1]   45:2
16 [1]   14:16
168 [1]   70:20
16th [1] 2:12
1760 [1] 1:15
18 [2]   25:3   54:8
18th [1] 1:19
1988 [1] 54:8
1989 [1] 31:2
1:00 [1] 54:21

**-2-**

2 [2]   12:1   39:12
20 [2]   57:6   57:7
2003 [2] 6:24   45:2
2004 [4] 16:23   30:18
51:17   55:1
2005 [2] 2:7   68:8
2006 [6] 1:20   2:12
3:5   3:12   67:9
91:21
2010 [2] 44:11   44:22
26203 [2]   1:5
2:2
2713 [2] 1:5   2:3
27th [10] 3:5   21:17
54:19   56:9   57:9
57:19   58:13   65:7
70:8   81:16
2808 [1] 59:20
28th [3] 81:13   81:15
81:16

**-3-**

3 [3]   14:11   14:15
29:2
30 [10]   3:15   3:17

3:21   3:23   10:13
28:3   50:21   51:5
65:21   76:11
30-year [1]   40:9
3333 [1] 27:14
33rd [7] 18:2   70:18
71:15   75:3   75:25
76:21   78:11
3rd [4]   6:24   67:12
67:14   80:16

**-4-**

4 [1]   14:16
40 [3]   65:20   67:11
67:14

**-5-**

5 [1]   15:2
50 [5]   47:25   48:22
72:17   73:7   81:6
51 [1]   2:2
5120 [1] 91:6
52 [1]   54:22
53208 [1]   91:7

**-6-**

6 [1]   15:16
66 [1]   12:6

**-7-**

761 [1]   30:18

**-8-**

80-plus [1]   61:13
8:55 [1] 90:15
8th [1]   89:16

**-9-**

92 [3]   2:5   70:23
78:9
9th [2]   2:7   3:12

**-A-**

abandoned [2]   71:7
ability [4]   19:7
24:14   56:13   79:18
able [5]   31:6   33:2
34:4   68:15   87:9
above-entitled [1]
1:18
Absolutely [1] 76:20
absurd [3]   70:1
70:9   71:14
abuse [1]   67:23
accepted [1]   72:5
access [3]   7:21
34:13   77:9
accommodating [1]
78:20

accommodation [23]
2:9   7:13   7:16
7:24   8:2   8:15
10:7   10:10   10:13
46:1   46:15   47:17
47:20   48:8   49:17
51:14   52:7   53:13
53:15   85:8   85:22
87:22   90:6
accommodations [3]
7:3   27:11   76:23
accompanied [2]
58:18   58:22
accompany [1] 35:17
account [2]   46:3
51:20
accounted [1]   67:11
accounts [1]   81:10
accumulate [1] 54:16
accurate [4]   12:2
14:20   18:18   40:24
accustomed [2] 31:17
33:12
acknowledge [5]
52:15   52:19   67:25
68:1   68:18
acquire [1]   75:15
Act [1]   84:17
action [2]   2:11
2:16
active [1]   28:21
activities [1]   29:9
actual [4]   12:23
16:9   24:19   41:19
add-on [1]   32:9
added [1]   68:10
addition [1]   16:7
additional [13]   5:9
9:16   9:18   35:16
44:23   80:7   80:11
80:13   80:22   80:23
81:2   82:16   84:2
address [9]   6:21
8:8   31:7   39:15
40:19   49:21   52:23
53:8   61:7
addressed [5]   8:22
8:23   89:25   90:1
90:1
adequate [5]   5:7
5:8   26:16   38:12
adequately [2]   5:5
53:8
adjusting [1]   16:18
adjustment [1]   16:3
adjustments [5]
14:12   16:8   16:17
administrative [2]
4:13   89:16
administrators [1]
71:20
admitted [2]   52:14
66:12

adopted [1]   44:13
70:11
adult [2] 28:23   53:24
adults [4]   30:18
43:8   57:19   82:8
advanced [1]   28:22
advancing [1]   66:21
advantage [1]   56:20
adverse [1]   40:17
advise [2]   4:21
6:13
Advisory [1]   23:23
affect [3]   26:9
87:3   87:4
affidavit [25]   4:1
4:16   11:17   12:2
17:8   18:13   18:21
28:14   29:2   32:1
32:16   34:21   34:24
39:6   39:7   39:15
40:19   43:25   45:9
53:21   58:15   59:17
69:4   71:23   77:16
affidavits [9]   3:7
4:15   4:22   4:22
9:21   10:21   35:15
52:17   83:19
affirmed [1]   11:10
afford [4]   7:20
24:11   25:1   62:15
affordable [1]   72:3
again [2]   19:4
19:11   19:24   36:4
45:22   46:6   76:22
against [2]   42:24
43:6
agencies [3]   13:3
13:5   34:7
agency [1]   14:5
23:1
agent [2]   62:12
72:1
ago [2]   26:15   55:15
agree [10]   27:6
27:8   38:11   47:22
50:21   76:24   77:17
78:1   78:2   89:24
ahead [5]   10:1
11:12   65:17   65:18
85:5
air [1]   90:8
alcohol [1]   66:24
70:7
alderman [42]   3:24
4:16   7:1   11:2
11:4   11:6   17:10
28:3   65:16   65:19
72:15   73:25   74:6
74:9   75:5   75:8
75:13   76:1   76:5
76:10   76:20   76:25
77:4   77:13   77:16
77:25   78:3   78:7
79:1   79:9   79:13
79:16   79:21   79:25

80:10   81:1   81:8
81:14   81:20   82:6
82:19   89:23
Alderman's [1] 50:23
alley [3] 56:18   56:19
67:1
alleyways [1]   56:17
Allis [5] 26:13   68:14
74:17   74:18   74:18
allocated [1]   4:2
allocation [1]   83:8
allow [6]   4:3
5:4   5:10   5:18
5:18   52:7
allowed [3]   35:4
35:5   86:5
allowing [1]   5:14
5:20
allows [2]   55:10
86:14
Alternate [1]   1:11
alternative [6]   17:9
17:12   17:19   18:4
70:12   72:2
alternatives [5] 17:15
73:12   73:12   73:13
88:15
always [1]   17:20
24:14   30:9   31:3
70:4   79:25
American [3]   2:24
9:4   12:16
amount [1]   39:11
50:24   89:11
amputees [1]   15:13
analysis [6]   7:16
18:6   42:22   45:21
46:7   85:18
analyzed [1]   7:13
answer [1]   19:10
20:10   36:5   61:12
62:17   76:13   77:9
82:25
answered [2]   47:11
89:8
anyplace [1]   32:7
AODA [1]   78:25
apartment [1]   46:20
apartments [1] 33:16
36:7
appeal [1]   2:8
Appeals [1]   1:2
1:19   39:25
appear [1]   45:10
appearances [1]
2:22
appeared [2]   1:13
1:16
appellant [1]   10:2
applicable [1]   7:15
applicant [23]   1:14
2:7   2:13   3:15
3:22   4:4   4:4

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 25 of 37   Document 19-2

7:23  7:25  8:10
11:23  48:7  49:20
49:22  51:11  51:24
52:5  53:1  53:17
60:21  62:11  68:9
85:10

**applicant's** [3] 55:2
60:7  72:16

**applicants** [1] 65:22

**application** [5] 2:18
7:11  7:13  23:23
26:10

**apply** [1] 22:10

**appointments** [1]
37:3

**approach** [3] 44:14
52:25  88:16

**approached** [2] 32:8
69:6

**approaches** [1] 48:20

**appropriate** [10]
6:16  17:19  18:2
18:7  27:9  34:20
40:23  43:17  88:4
90:13

**approved** [1] 41:9

**approving** [1] 39:19

**April** [1] 67:8

**architect** [1] 75:17

**area** [30] 16:14  16:16
21:23  22:25  23:19
26:22  26:23  31:20
31:22  34:8  37:12
37:15  43:6  44:15
44:18  49:9  54:4
54:7  57:3  57:4
57:9  58:10  59:21
60:6  63:10  66:19
67:1  67:13  78:14
86:4

**areas** [3] 38:3  50:8
70:22

**argue** [2] 90:3
90:9

**argued** [1] 86:19

**arguing** [1] 66:14

**argument** [1] 5:2

**arguments** [1] 69:17

**armed** [1] 38:7

**Arnett** [2] 4:16
27:19

**arrangements** [1]
16:1

**arrests** [2] 67:8
67:9

**arrogance** [2] 71:3
73:10

**asks** [1] 75:14

**assaulted** [2] 38:3
55:5

**assaults** [1] 37:25

**assertion** [1] 71:23

**assess** [2] 37:13
43:20

**assessing** [1] 44:3

**assessment** [1] 45:5

**assign** [1] 34:16

**assigned** [1] 12:25

**assist** [1] 13:11

**assistance** [2] 72:7
83:5

**associated** [3] 1:21
23:10  91:6

**assume** [1] 19:2
42:7  76:6

**assuming** [4] 8:9
8:10  19:23  71:15

**assurances** [1] 75:23

**astounding** [1] 65:24

**attached** [1] 69:5

**attack** [1] 77:11

**attacked** [1] 55:15

**attacks** [2] 55:6
55:16

**attempt** [1] 63:8

**attempted** [2] 74:3
86:9

**attempting** [1] 36:16

**attend** [1] 60:23

**attended** [1] 69:10

**attention** [3] 44:20
72:23  88:20

**attorney** [40] 1:13
1:15  4:8  4:8
4:21  5:1  5:23
6:3  6:21  6:23
7:8  8:7  8:14
8:19  9:8  9:11
10:13  10:17  10:23
11:13  28:12  28:6
38:24  44:24  45:4
50:24  51:4  57:16
60:3  62:25  65:11
65:14  73:17  75:17
76:11  83:14  84:20
85:4  90:8  90:10

**attorney's** [1] 45:2

**attorneys** [4] 9:23
9:25  50:21  84:14

**authority** [3] 84:14
86:15  87:7

**automobile** [1] 81:16

**Autumn** [2] 12:10
35:21

**available** [5] 17:23
25:9  27:11  29:13
45:10

**Avenue** [1] 1:15

**average** [1] 57:5

**avoiding** [1] 21:6

**aware** [16] 21:21
27:17  28:4  35:20
35:24  36:8  36:24
37:3  37:24  46:22
52:20  52:21  54:17
82:2  82:6  83:6

**awareness** [1] 16:12

**away** [9] 21:17  33:1
47:1  57:23  63:21
70:20  74:23  78:19
81:3

**-B-**

**B** [1] 74:13

**background** [4] 11:19
28:18  29:3  39:11

**bad** [3] 54:24  73:10
74:18

**barber** [1] 22:8
22:9  36:22

**Barrett** [1] 77:15

**based** [14] 2:14
7:14  45:9  56:12
57:3  66:2  69:19
76:9  76:15  77:7
77:7  77:8  77:8
81:10

**basic** [1] 82:7

**basis** [6] 4:25  12:25
17:5  22:10  39:24
42:13

**bathroom** [1] 70:22

**bathrooms** [1] 70:23
78:10

**Bauman** [34] 4:17
17:10  51:18  65:18
65:19  72:15  73:25
74:6  74:9  75:5
75:8  75:13  76:1
76:5  76:20  77:4
77:16  77:25  78:3
78:7  79:1  79:4
79:13  79:16  79:21
79:25  80:10  81:1
81:8  81:14  81:20
82:6  82:19  89:24

**Bauman's** [1] 65:16

**Bay** [1] 74:19

**beaten** [4] 47:25
72:20  72:21  73:6

**become** [1] 29:17
33:11  48:6

**becomes** [1] 56:22

**beds** [1] 31:9

**begin** [1] 29:19
51:5

**beginning** [1] 29:2

**begins** [1] 14:15

**behalf** [9] 1:14
1:16  2:23  27:21
48:7  51:12  53:1
60:20  73:23

**Behavioral** [3] 32:4
34:12  77:22

**belief** [1] 18:14

**believes** [1] 8:12

**belong** [1] 37:23

**benefit** [1] 14:1

**benefits** [1] 32:12
33:4

**Beset** [5] 17:21  19:9

24:14  69:14  70:15

**better** [13]  23:5
23:7  24:15  62:3
69:13  74:14  74:22
76:23  77:2  77:10
77:11  78:10  83:9

**between** [3]  38:17
81:15  84:10

**beyond** [4]  32:1
49:25  63:14  82:17

**Bible** [1]  56:7

**big** [1] 76:22

**bit** [1]  51:19

**blew** [1] 53:4  62:16

**block** [8]  21:17
46:20  72:7  72:10
81:15  83:4  83:8
83:9

**blocks** [8]  57:23
63:13  63:14  63:21
70:20  74:15  78:18
81:3

**blood** [1]  81:21

**bludgeoning** [1]
81:11

**Blue** [1] 91:6

**Board** [85]  1:2
1:8  1:18  2:7
2:11  2:13  2:16
3:4  3:7  4:6
4:7  4:21  5:6
5:11  5:17  5:19
5:20  5:23  6:2
6:4  6:7  6:10
6:13  6:14  6:16
6:19  6:24  6:25
7:4  7:22  8:6
8:7  8:21  10:8
13:10  21:10  37:14
39:24  45:20  46:20
49:17  50:14  50:16
54:6  54:13  55:10
66:2  66:3  66:6
66:22  68:5  71:3
71:3  71:9  75:24
76:6  76:13  84:4
84:5  84:12  85:4
85:17  86:1  86:14
86:20  87:6  88:22
88:23  88:24  88:25
89:1  89:2  89:3
89:4  89:5  89:6
89:12  89:13  89:17
89:18  90:3  90:4
90:10  90:11  90:11

**Board's** [2]  87:1
7:14  7:18  87:1

**boards** [1]  36:6

**body** [1] 72:11

**bold** [1] 71:23

**books** [3]  60:3
82:21  90:7

**bothered** [1]  81:20

**bottom** [2]  14:15
88:5

**Boulevard** [1]  27:14

**bow** [1]  56:7

**BOZA** [1]  39:15

**break** [2]  50:12
50:18

**Brever** [88]  10:16
10:21  11:14  11:16
11:21  11:25  12:5
12:9  12:13  12:16
12:22  13:4  13:8
13:16  13:19  13:22
14:4  14:7  14:10
14:19  14:22  15:1
15:6  15:9  15:18
15:23  16:2  16:25
17:3  17:6  17:13
17:16  17:20  18:6
18:19  18:22  18:25
19:1  19:5  19:12
19:20  20:2  20:7
20:14  20:15  20:18
21:3  21:12  21:16
21:20  21:24  22:3
22:9  22:13  22:16
22:21  23:1  23:11
23:17  23:20  23:25
24:4  24:9  24:12
24:21  25:2  25:4
25:8  25:13  25:20
25:25  26:3  26:7
26:14  26:20  27:1
27:5  27:8  27:17
27:23  46:4  61:5
65:23  69:6  75:10
79:4  82:23  83:8

**brief** [1] 51:6

**briefed** [1]  9:20

**broad** [1]  42:6

**broader** [2]  20:24
44:16

**broker** [6]  25:12
25:15  25:19  25:21
25:23  26:5

**Brookfield** [1] 74:19

**brought** [1]  2:15

**brutally** [1]  47:24

**buddy** [3]  16:12
21:7  50:2

**budget** [1] 72:5
72:9  75:10  75:14
75:20  80:3

**building** [12]  9:7
13:15  26:22  36:10
38:16  46:20  48:21
56:25  61:14  78:9
78:9  87:8

**built** [2] 26:8  41:7

**burden** [11]  7:23
73:22  74:5  74:8
74:10  74:11  85:13
86:4

**bus** [2]  71:17  71:17

**business** [1]  53:25

**businesses** [1] 22:25

**buyer** [1]  25:21

**-C-**

camera [2]    49:9
61:14
cameras [6]    16:9
24:11   24:20   48:20
61:19   68:10
Cameron [4]    1:10
88:25   89:1   89:19
campus [1]    20:4
22:22
cancer [1]    15:14
cannot [1]    68:22
capacity [4]    21:2
59:22   77:2   77:12
car [1]    60:11
care [6]   19:8   26:24
40:20   69:21   71:11
73:5
carried [2]    38:21
56:7
case [41] 1:5    2:2
3:13   7:14   8:6
8:11   9:3   9:21
10:5   11:23   12:21
12:24   13:2   13:11
18:10   22:17   24:24
30:3   32:13   34:7
34:16   34:19   36:24
37:3   40:3   51:10
52:3   52:5   53:16
66:14   66:15   66:15
72:19   73:3   74:1
84:10   85:11   86:17
87:14   90:6   90:7
cases [2]    3:22
67:11
cash [1] 82:22
category [2]    72:10
83:7
CATHERINE [1]
1:10
cavalier [1]    72:15
CBRF [1]    14:24
center [2]    26:25
77:23
certain [6]    22:4
29:8   39:11   44:3
44:10   88:3
certainly [6]    52:6
52:18   68:13   69:11
74:6   84:13
Certified [1]    91:18
certify [1]    91:7
certiorari [1]    7:17
cetera [4]    23:16
27:4   42:25   56:5
Chair [7]    4:14
4:19   4:20   5:22
6:16   8:12   65:19
Chair's [4]    4:25
5:3   5:21   89:23
Chairman [53] 1:9
2:21   3:4   4:10

4:12   9:8    9:11
9:13   9:15   9:17
9:19   10:17   10:23
11:2   11:6   11:11
18:24   28:1   28:6
28:8   38:24   44:24
47:3   47:5   50:11
50:17   50:19   51:4
55:10   57:16   59:19
62:25   64:13   65:11
65:14   65:17   72:14
73:17   73:19   75:12
82:14   83:13   83:17
83:21   83:24   84:20
85:2   88:7   88:21
88:25   89:2   89:9
89:9
Chairman's [1] 51:8
challenge [1]    77:12
challenging [4] 84:21
84:25
changes [1]    15:25
Chapter [1]    2:25
characteristics [1]
15:20
characterize [1]
15:7
charges [1]    67:10
cheaper [1]    61:15
61:22   61:23
check [1]    65:22
chemical [1]    67:22
children [5]    43:8
57:19   57:25   58:4
64:17
choice [3]    68:18
68:24   68:24
choose [3]    22:11
68:21   68:22
chose [3]    68:12
68:17   68:17
chronic [1]    15:10
15:11   36:7
Church [1]    59:24
cited [1] 76:17
citizens [1]    71:10
71:11   74:17
city [50] 1:1   1:16
1:19   3:2   3:8
4:18   5:12   6:23
7:8   8:1   8:3
8:14   8:16   17:18
35:15   38:4   39:18
43:20   43:25   44:7
44:11   44:22   45:2
45:4   47:13   49:3
50:21   51:9   53:15
53:25   67:1   67:13
69:9   69:12   70:14
71:10   71:11   72:4
72:6   74:11   75:3
76:25   79:17   80:3
84:16   85:19   86:9
87:25   88:13   90:10
City's [3]    4:17
4:23   44:14

city-wide [1]    44:16
77:12
civil [1] 89:21
clarification [1]
9:5
clarify [1]    84:21
clarity [1]    9:2
clear [4] 43:10   50:20
68:6   70:10
clearly [4]    69:5
75:13   78:16   85:23
client [1]    81:2
clientele [1]    54:15
57:3
clients [10]    2:5
19:24   20:16   20:19
23:14   31:17   31:20
34:1   36:25   38:1
CLIFTON [1]    1:12
clinic [2]    22:15
22:19
clinical [3]    12:23
22:16   28:23
clinics [1]    31:19
close [4] 22:5   55:13
71:16   74:24
closely [1]    34:11
closest [1]    22:21
closing [1]    4:5
83:15
clothes [1]    60:3
Cocaine [1]    67:1
comfort [1]    78:20
comfortable [6]
16:11   21:5   31:21
37:21   67:17   71:13
coming [4]    46:24
81:21   85:12   90:12
comment [1]    6:13
6:20   7:1   10:3
72:16
comments [8]    3:23
6:5   6:8   8:25
9:1   9:24   51:22
68:4
commission [4] 26:11
26:2   26:8   72:1
committee [2]    23:23
65:20
common [9]    7:2
7:7   70:9   70:21
74:22   75:2   78:14
80:6   82:6
community [19]
19:16   23:2   23:22
23:22   25:11   30:13
33:16   34:14   34:16
35:12   35:23   36:10
40:13   60:1   60:19
63:4   76:7   76:11
87:14
community-based [1]
35:25
companies [1]    24:19

company [2]    22:23
24:22
compare [1]    42:9
comparison [1] 70:24
compatibility [1]
37:7
compatible [2] 37:12
37:15
compelling [1] 87:5
compensated [1]
25:24
complete [1]    91:8
completely [1] 36:17
71:21
compliant [1]    44:10
complies [1]    44:12
comply [4]    43:19
44:1   44:7   44:22
comprehensive [1]
43:19   44:1   44:8
44:13   44:14
comprises [1]   67:13
concern [3]    42:2
42:4   48:6
concerned [5]    41:19
60:14   60:16   69:18
74:10
concerning [3]   45:6
56:13   84:17
concerns [9]    40:2
40:20   41:12   41:21
51:8   51:19   52:15
53:7   64:25
concluded [2]    24:1
90:15
conclusion [1]   40:12
conditions [1]   71:5
conference [1]    3:4
conjunction [1] 18:8
connected [1]   32:11
connection [3]   51:7
53:22   59:17
consider [8]    6:18
8:6   8:7   42:9
45:7   61:25   66:22
81:3
consideration [2]
7:10   7:15
considered [4]    3:23
44:13   78:12   87:20
considering [1] 87:19
consistent [4]    41:8
45:3   45:7   86:3
constant [1]    60:9
Constitution [1]
80:2
constraints [1]   79:25
80:4
consulted [2]    20:9
81:24
consulting [1]    20:6
contact [4]    20:13
27:19   31:6   60:7

contains [2]    26:23
28:14
contested [3]    2:17
2:19   11:7
context [2]    6:8
6:14
contingent [1]   72:6
continuation [2]
39:19   40:14
continue [7]    2:4
35:4   35:5   45:15
52:4   73:15   81:1
continued [1]    66:4
continuing [1]   17:5
40:2
contraints [1]   79:22
convinced [2]    27:10
65:24
Cook [125]    1:15
3:1   3:1   4:8
4:11   6:21   8:8
9:11   9:12   10:23
10:25   11:4   18:25
19:2   19:16   19:17
19:23   20:5   20:11
20:15   20:23   21:9
21:14   21:18   21:21
22:2   22:8   22:12
22:14   22:18   22:23
23:8   23:12   23:18
23:21   24:1   24:6
24:10   24:17   24:24
25:3   25:6   25:10
25:18   25:22   26:2
26:4   26:10   26:18
26:21   27:2   27:6
27:13   27:19   27:24
28:2   28:5   36:13
36:15   37:6   37:11
37:24   38:5   38:7
38:18   38:18   38:23
43:18   47:6   47:12
47:18   47:22   48:5
48:15   48:18   49:5
49:16   50:10   51:2
51:4   51:6   53:20
53:24   54:3   54:6
54:9   54:13   54:25
55:4   55:12   55:22
55:25   56:2   56:11
56:23   57:6   57:7
57:9   57:14   59:12
59:15   59:21   59:25
60:5   60:13   60:18
60:23   61:1   61:4
61:7   61:10   61:17
61:21   62:2   62:7
62:10   62:18   62:24
65:14   65:15   65:18
73:23   84:4   84:20
85:1
cooperate [1]    88:13
corner [3]    54:18
56:9   81:12
correct [50]    9:8
9:9   11:15   11:16
11:21   11:24   11:25
12:8   12:9   12:13

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 27 of 37   Document 19-2

14:19   14:22   15:1
15:17   15:18   18:21
19:11   19:22   23:19
23:20   23:24   23:25
24:5   25:2   25:24
26:3   26:6   26:13
26:20   27:1   27:5
27:7   28:11   28:12
28:15   28:16   28:19
28:20   28:25   35:1
39:8   39:9   39:21
40:25   45:11   45:12
47:20   48:3   51:2
80:4
**cosponsors** [2]   75:6
75:8
**cost** [4]   14:3   24:12
24:19   25:1   61:18
61:24   72:2   75:15
**costs** [3] 75:16   75:18
75:18
**Council** [4]   7:2
7:7   75:2   80:6
**counsel** [1]   3:2
**counts** [1]   30:15
**county** [3]   32:17
33:15   91:3
**County's** [1]   77:22
**couple** [2]   55:18
77:1
**course** [4]   51:17
52:1   69:8   70:3
**court** [4] 6:11   7:7
7:13   87:11
**courts** [5]   7:18
8:13   8:21   10:11
10:12
**crack** [1]   81:22
**CRAIG** [1]   1:9
**create** [1]   77:2
**creates** [2]   8:2
8:16
**creating** [2]   88:1
88:1
**credentials** [1] 28:22
**crime** [6]   58:9
58:12   67:2   73:1
73:2   80:19
**criminals** [1]   80:20
**criteria** [8]   7:11
7:25   10:8   73:21
74:12   85:6   86:19
86:24
**criticisms** [1]   78:4
**Cross** [18]   2:24
9:4   9:7   12:16
18:10   30:24   31:11
31:24   32:20   33:7
33:17   63:3   77:21
78:5   78:8   84:7
84:18   84:22
**cross-examination** [6]
3:18   3:22   4:3
39:1   52:4   52:17

**cross-examinations**
[1]   3:21
**cross-examine** [3]
50:25   83:22   83:25
**CRUMP** [1]   1:12
**culpable** [2]   19:18
19:21
**current** [4]   17:10
46:21   75:20   77:11
**curriculum** [1] 28:18
39:7
**custody** [1]   68:19
**customarily** [1] 43:13
**customary** [1] 71:14
**cut** [1]   37:2
**cyclone** [1]   16:17

    -D-

**damn** [1]   73:10
**danger** [1]   81:4
**dangerous** [3]   21:6
41:24   78:23   79:7
79:20   86:14   87:10
**date** [1]   6:23
**dated** [5]   3:5
3:11   6:24   45:2
91:21
**David** [4]   16:1
48:11   55:25   60:18
**days** [2] 72:25   73:4
**DCD** [5] 3:14   8:25
9:2   9:13   9:14
**deal** [6]   5:15   7:2
53:1   53:3   53:7
72:5
**dealers** [1]   54:22
56:10   56:19   80:21
**dealing** [1]   21:22
45:23   67:21
**deals** [1] 16:24
**dealt** [1] 43:13
**death** [14]   19:2
19:5   19:19   20:1
20:13   20:24   23:10
48:11   55:23   56:24
60:18   62:22   73:7
81:11
**decency** [1]   82:7
**decide** [7]   34:19
53:10   86:21   86:21
86:22   89:19   90:5
**decision** [8]   4:25
7:18   7:19   68:7
89:13   89:15   89:18
90:12
**decisions** [4]   34:15
90:2   90:3   90:4
**deemed** [1]   4:2
**deficient** [1]   48:12
**defies** [1]   70:1
70:9
**definitely** [1]   37:20
**defy** [1] 70:13   70:14

70:14
**degree** [1]   66:10
**degrees** [1]   26:7
**delay** [1]   73:1
**Delbert** [1]   77:14
**deliberations** [1]
4:7
**demographics** [1]
15:3
**demonstrate** [4]
7:24   8:1   8:15
51:9
**demonstrated** [2]
51:12   51:15
**denial** [3]   2:14
7:14   8:4
**denied** [5]   2:6
2:10   2:11   47:17
47:19
**deny** [1] 53:18
**department** [8] 3:14
39:16   39:18   69:9
79:23   80:1   80:5
80:8
**departments** [1]
8:25
**departure** [1] 47:9
**dependency** [3] 66:25
67:22   70:7
**describe** [5]   12:19
12:20   12:21   31:24
32:17
**described** [6]   34:18
34:21   57:11   64:21
64:21   67:1
**description** [1] 12:2
**design** [4]   52:8
52:13   68:23   77:7
**designed** [1]   29:24
41:7
**desire** [1]   83:25
**detail** [1]   32:1
**determination** [2]
10:9   37:15
**determine** [3]   27:21
37:7   38:14
**Development** [2]
39:18   69:9
**devoted** [1]   80:14
**diced** [1]   85:23
**die** [1]   51:21
**died** [1]   51:21
**difference** [2]   40:4
40:8
**different** [9]   7:5
7:17   12:3   29:19
33:9   38:3   52:18
85:22   88:2
**difficult** [2]   29:15
31:5
**difficulty** [2]   29:9
31:2
**direct** [3]   80:8

90:9   90:11
**directed** [1]   65:16
**direction** [1]   9:23
**directly** [1]   61:14
**director** [1]   11:23
**disabilities** [15] 13:24
15:8   15:13   36:20
41:24   42:25   43:9
45:6   50:8   50:9
58:11   78:24   79:3
85:20   88:3
**disability** [3]   15:5
15:10   34:25
**disabled** [7]   18:15
43:10   44:21   45:10
46:9   77:5   87:8
**disagree** [1]   76:17
**discriminate** [1]
43:6
**discuss** [1]   4:14
23:4   24:12   29:2
**discussed** [1]   8:20
69:16
**discussion** [4]   17:7
24:4   62:7   62:10
**disorders** [1]   15:12
**disproportionate** [1]
80:15
**distance** [1]   74:23
**distinction** [1] 84:9
**District** [4]   67:12
67:12   67:15   80:17
**Division** [2]   32:5
34:12   77:22
**DNS** [3] 3:14   9:15
9:16
**doctor** [3]   47:6
49:5   63:25
**doctors'** [1]   37:2
**documentation** [1]
21:11
**doesn't** [8]   7:3
40:8   48:5   69:25
72:11   84:15   86:4
87:2
**dog** [1]   21:16
**dollar** [1]   83:6
**dollars** [1]   77:1
**DONALD** [1]   1:11
**done** [16]   5:4
20:4   29:17   30:18
37:6   37:10   37:10
44:18   52:5   52:21
53:6   53:12   61:22
80:10   80:11   80:11
**door** [3] 16:9   72:18
73:7
**doors** [1]   68:12
**doorstep** [1]   81:4
**Dope** [1]   67:1
**doubled** [1]   16:4
**down** [9]   20:25
38:13   38:21   46:8

51:25   56:18   70:8
80:3   81:12
**downtown** [2]   22:4
22:5   31:23
**Doyle** [4]   1:10
89:2   89:3   89:6
**DPW** [1]   39:17
**Dr** [42]   10:21   39:2
39:2   39:4   39:9
39:13   39:21   39:23
40:7   40:15   40:25
41:2   41:14   41:25
42:3   43:2   43:5
43:15   43:23   44:4
44:6   45:7   45:12
45:17   45:22   46:2
46:6   46:15   46:17
46:22   47:2   47:10
47:15   47:21   48:3
48:9   48:17   48:24
49:11   49:22   70:2
86:24
**dressed** [1]   56:4
**drug** [15]   23:13
36:21   54:20   54:22
56:10   56:19   57:12
60:2   66:24   67:8
67:9   67:9   67:21
70:7   80:20
**drugs** [2]   21:22
57:13
**due** [2]   2:17   48:2
**duly** [1]   11:10
**during** [6]   10:4
16:24   20:16   21:1
53:10   56:14
**duties** [1]   16:7

    -E-

**earmark** [1]   72:6
**ears** [1] 13:12
**east** [4]   1:15   27:10
31:18   81:15
**easy** [1] 90:2   90:3
90:4
**education** [1]   28:15
**effect** [1]   86:7
86:10
**effort** [2]   23:2
63:18   71:7
**efforts** [3]   49:2
49:24   51:12
**eight** [1] 30:10
**either** [7]   15:4
29:15   30:2   56:23
60:20   66:20   84:21
**elected** [1]   3:24
76:7
**element** [1]   44:19
**elevator** [1]   38:16
**elevators** [2]   38:12
78:15
**emergency** [1]   60:2
**emphatic** [1]   77:9

**empirical** [1] 39:24
**employed** [3] 13:3
13:4  80:9
**employees** [1] 13:6
**encompass** [1] 49:9
**encompassing** [1]
36:17
**end** [6]  5:10  5:23
16:18  42:16  42:17
42:20
**ended** [1]  14:18
**engage** [1]  85:17
**engineering** [1] 75:17
**enhance** [1]  81:25
**enhanced** [2] 82:11
83:4
**enhancing** [1]  16:9
**ensure** [1]  19:13
**enter** [1] 16:20
**Entities** [1]  18:10
**entitled** [2]  48:8
49:18
**entryway** [1]  16:8
**environment** [6]
33:13  42:18  68:16
68:20  68:25  71:14
**equal** [8]  7:20
18:17  35:11  46:13
50:24  85:8  85:14
88:18
**escort** [2]  36:9
63:20
**escorts** [2]  35:17
35:22  82:4
**especially** [1]  46:10
**essentially** [1]  45:5
**establish** [1]  49:17
**established** [2] 8:13
69:1
**establishment** [6]
54:14  66:5  72:18
73:6  73:11  82:24
**estate** [7]  25:11
25:15  25:18  25:23
26:5  62:12  72:1
**estimate** [1] 24:22
25:4
**estimates** [1]  24:18
**et** [4]  23:16  27:3
42:25  56:4
**evaluating** [1]  17:18
**evening** [6]  5:11
18:25  19:1  36:13
47:6  59:13
**event** [1]  2:9
**everybody** [7]  23:3
51:7  51:20  66:10
66:20  89:20  90:12
**everyone's** [1]  3:3
**everywhere** [1] 62:6
**evidence** [9]  24:24
42:12  47:7  52:3
55:6  76:9  77:10

**exactly** [3]  37:10
46:6  46:6
**examine** [1]  54:10
83:3
**example** [5]  23:8
23:13  36:21  38:12
56:15
**excellent** [1]  77:20
81:23
**except** [1]  41:16
**Excuse** [1]  43:23
**executive** [1]  11:22
**exist** [2] 72:11  73:13
**exists** [1]  74:23
**exit** [1]  16:19
**expanded** [1]  77:12
**expect** [1]  53:14
**expectation** [2] 68:6
76:14
**expecting** [1]  71:4
**expense** [1]  83:1
**expenses** [2]  75:16
82:23
**experience** [7]  28:15
28:19  42:21  56:12
76:10  76:11  76:15
**expert** [4]  20:1
20:6  20:8  20:9
**experts** [2]  59:9
69:22
**explained** [2]  24:13
25:13
**explore** [1]  72:2
**exploring** [1]  24:15
**exposed** [1]  82:11
**extensive** [5]  54:7
66:6  67:13  71:20
87:11
**extensively** [1] 54:4
67:4  86:19
**extent** [1]  85:19
**extra** [1] 71:6
**extremely** [1]  79:19
**eyes** [1] 13:11
**eyewitness** [1] 81:10

**-F-**

**face** [2]  70:1  71:14
**facie** [6] 8:1  8:11
51:10  74:1  85:11
86:17
**facilities** [7]  27:14
33:14  35:25  36:6
37:3  70:12  84:15
**facility** [49]  2:5
12:23  13:10  16:10
18:7  18:11  20:20
20:20  20:21  23:5
24:3  24:8  25:15
25:16  26:12  26:17
27:3  27:7  27:10

29:7  36:3  38:11
38:20  40:16  40:22
41:12  41:16  42:7
47:9  48:13  49:24
50:4  52:22  53:9
56:14  59:4  59:8
68:14  68:23  69:7
69:23  70:18  75:25
78:11  78:18  82:4
84:18  84:19  87:4
**fact** [8]  20:7  26:11
26:14  46:18  50:5
80:17  84:25  86:13
**factors** [2]  8:5
8:7
**facts** [3] 53:17  76:16
78:17
**factual** [1]  39:25
**fair** [3]  64:14  64:16
84:17
**fairly** [1]  45:13
**faith** [4] 72:12  72:13
73:10  83:12
**fall** [1]  23:2
**familiar** [3]  33:21
34:6  74:25
**far** [3]  21:22  74:10
80:15
**Farcon** [1]  56:7
**fashion** [1]  23:14
**feasible** [1]  17:12
**federal** [7]  7:14
7:21  7:25  10:12
50:5  90:5  90:7
**feeling** [1]  59:15
**feels** [1] 67:17
**fees** [1] 75:17
**feet** [5]  47:25  48:22
72:17  73:7  81:7
**felony** [1]  67:9
**felt** [1]  31:8
**fence** [1]  16:17
**fenced** [1]  26:22
**few** [2]  4:13  57:22
**fewer** [1]  42:20
**figure** [2]  58:25
81:7
**filed** [2] 39:5  77:13
**final** [2] 49:5  85:18
**financial** [4]  14:1
32:12  33:4  82:20
**financing** [1]  82:20
**finding** [1]  72:6
85:13
**fine** [4] 71:5  72:15
73:5  75:14
**fire** [1]  41:17
**fired** [1] 54:23
**firm** [1]  25:5
**first** [14] 11:19  12:7
13:9  15:3  15:20
28:14  38:14  42:4
51:7  53:19  73:22

**fiscal** [2]  12:3
15:20
**fit** [2]  77:6  83:7
**five** [10] 4:5  30:10
60:9  64:6  64:10
64:12  79:8  83:14
88:9  89:18
**fixtures** [1]  71:22
**flexibility** [1] 52:12
**flexible** [1]  50:7
**floor** [6] 12:12  12:15
12:17  33:19  38:13
78:15
**floors** [1]  38:17
**flow** [1] 82:22
**focus** [1]  41:20
69:3
**focused** [1]  7:19
**folks** [2] 31:9  32:10
**follow** [5]  2:19
62:6  63:3  64:18
76:6
**followed** [1]  76:12
76:15
**following** [6]  3:12
20:1  20:24  21:11
47:9  61:8
**food** [1] 60:2
**force** [1] 20:2
**forced** [3]  46:10
68:13  68:15
**forces** [1]  16:4
81:22
**foregoing** [2]  91:8
91:10
**forget** [5]  70:16
70:16  70:17  70:17
70:18
**form** [4] 4:1  21:9
82:9  83:5
**formally** [1]  44:13
**former** [5]  22:22
26:18  27:6  27:8
27:13
**formulate** [1]  37:14
**forth** [2] 2:15  23:15
**forthright** [1]  52:25
**fortunate** [1]  71:11
**forward** [9]  10:2
15:24  33:2  44:5
52:19  59:1  71:5
85:12  85:16
**found** [5]  30:18
37:12  66:2  77:19
**four** [2]  57:17  73:4
**Fox** [1]  74:19
**frame** [1]  54:10
55:14
**frank** [42]  10:22
39:2  39:3  39:4
39:9  39:13  39:21
39:23  40:7  40:15

40:25  41:2  41:14
41:25  42:3  43:2
43:5  43:15  43:23
44:4  44:6  45:7
45:12  45:17  45:22
46:2  46:6  46:15
46:17  46:22  47:2
47:10  47:15  47:21
48:3  48:9  48:17
48:24  49:11  49:22
52:25  70:2
**Frank's** [1]  86:24
**frankly** [3]  65:22
69:25  71:8
**fraud** [1]  72:11
**frequent** [1]  22:3
**friends** [1]  46:25
**front** [4] 6:18  11:17
67:7  73:7
**full** [2]  6:15  91:8
**fully** [1] 83:11
**fundamental** [1]
52:8
**funded** [3]  13:15
13:16  33:12
**funding** [5]  72:7
72:8  75:3  75:7
82:17
**funds** [2]  83:9
88:1
**furniture** [1]  71:22
**future** [1]  79:8
79:12

**-G-**

**gang** [1]  56:19
**gate** [2]  16:17  16:20
**general** [2]  41:2
81:11
**generally** [2]  41:20
54:16
**GEORGIA** [1]  1:10
**girl** [1]  54:23
**given** [9]  1:17
3:15  4:4  6:23
20:7  53:14  68:22
78:17  80:22
**giving** [2]  3:19
51:15
**global** [1]  85:9
**goes** [4]  8:5  14:15
54:10  73:9
**gone** [3] 9:25  10:6
49:25
**good** [14]  18:25
19:1  27:7  36:13
47:6  59:13  67:16
67:18  72:12  72:12
76:6  83:11  89:7
89:8
**government** [1] 50:6
**grant** [9] 35:3  72:7
72:10  75:24  83:4
72:15  83:9  85:21

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 29 of 37   Document 19-2

88:18
granted [8] 42:10
42:11 42:15 45:19
52:8 76:3 87:22
88:8
granting [1] 46:1
grants [1] 53:15
great [4] 42:15 69:3
71:12 87:13
greater [3] 2:24
69:21 70:7
greatly [1] 31:9
green [8] 26:22
26:23 27:2 52:9
56:13 56:16 68:11
70:18
Gregory [2] 1:15
3:1
grocery [2] 60:11
64:1
group [3] 16:14
31:3 34:12
groups [1] 76:8
guards [2] 58:18
58:22 71:6
guess [1] 22:21
guidance [1] 20:3

-H-

H [1] 1:9
habitation [1] 77:7
hair [1] 37:2
haircuts [1] 22:10
hairdresser [1] 22:12
half [2] 64:8 76:22
halfway [1] 84:14
handle [1] 78:16
handling [1] 27:20
happening [1] 55:23
happy [2] 83:2
88:12
harassment [1] 65:1
hard [2] 33:4 75:18
hardly [1] 56:21
hardship [2] 8:3
8:16
harm [1] 21:8
harp [1] 10:4
hat [1] 56:7
haven [8] 29:19
29:22 29:23 30:7
31:11 52:10 54:20
57:12
Havenswood [1]
76:21
Havenwood [1] 27:13
hazards [1] 41:18
head [2] 71:8 81:22
health [10] 28:24
30:21 32:5 34:12
42:5 66:3 77:22

77:24 86:15 87:13
hear [6] 51:22 53:2
53:5 68:8 69:23
73:19
heard [6] 38:8
66:6 69:20 69:24
84:5 87:20
hearing [23] 2:19
3:10 3:11 3:11
5:5 5:6 5:9
5:14 5:21 5:25
10:4 10:6 10:6
10:10 11:8 66:1
67:4 67:5 68:4
68:8 69:16 85:3
89:7
hearings [1] 39:16
hearsay [1] 55:8
heart [1] 69:15
heavily [1] 45:1
held [3] 3:4 60:20
69:10
Hello [1] 59:14
help [3] 29:8 63:24
63:25
helped [2] 32:13
85:20
helping [1] 30:24
HENRY [1] 1:9
Hi [1] 36:14
high [4] 8:12 67:2
67:2 67:3
Highland [8] 18:2
27:14 70:19 71:15
75:3 75:25 76:21
78:11
highlight [1] 9:20
himself [1] 23:10
hire [5] 19:25 20:5
25:18 25:20 72:1
hired [1] 13:1
hold [2] 28:21 89:12
Holding [1] 7:10
home [10] 14:25
26:19 27:7 27:9
64:19 65:8 70:23
70:25 73:9 82:10
homeless [11] 29:17
30:1 30:16 30:18
31:18 31:19 32:6
38:2 43:22 77:23
87:13
homes [1] 36:1
hope [1] 79:10
horrible [1] 87:18
hospital [2] 32:6
81:19
hot [1] 21:16
Hots [11] 21:17 21:19
21:22 21:25 54:11
54:14 57:20
hours [1] 16:24
house [10] 21:15
22:20 23:19 47:8

58:19 58:21 60:8
64:6 71:12 71:19
House/West [1]
67:10
housekeeping [1]
83:17
houses [1] 84:14
housing [29] 7:21
12:11 12:23 20:20
29:3 29:5 29:6
29:12 29:16 30:5
32:2 32:3 32:18
32:22 33:3 33:5
33:14 35:21 43:21
43:21 44:19 45:6
50:3 76:19 77:24
83:10 84:17 87:12
88:1
HUD [3] 23:23
26:10 77:14
HUD-funded [1]
29:24
huge [1] 87:25
human [2] 77:6
82:7
hundred [1] 76:18
hurt [1] 72:23

-I-

idea [6] 18:3 35:16
78:3 82:19 82:24
82:25
ideal [1] 76:21
ideally [1] 26:11
identified [1] 30:21
41:13
identify [1] 21:7
illness [1] 56:4
29:4 29:25 36:4
36:7 38:3
immediate [1] 63:10
impact [3] 40:13
40:17 73:2
impacts [2] 40:1
40:9 46:9
impinge [1] 85:18
important [6] 8:8
8:14 20:19 21:3
85:15 89:22
impose [1] 86:4
impossible [1] 86:24
improve [1] 70:11
71:4 71:4
improved [2] 43:16
68:10
improvements [1]
70:17
inappropriate [1]
48:12
Inc [1] 1:21 91:6
incapable [1] 48:12
incident [6] 48:22
55:14 64:20 64:21

65:3 81:5
incidentals [2] 23:15
36:22
inclination [1] 71:2
included [3] 3:9
28:17 32:15
including [4] 28:3
50:22 50:23 89:18
income [3] 13:23
13:24 34:4
incompatible [1]
41:3
increased [5] 24:7
43:16 62:3 77:2
79:2
incredible [2] 19:6
89:11
incur [2] 42:10 42:11
indeed [1] 76:15
independent [4]
14:21 14:24 33:16
34:13
indicate [2] 67:9
69:5
indicated [3] 3:25
61:17 70:2
indicates [2] 3:12
69:8
indicating [1] 4:19
indications [1] 48:14
individual [4] 12:25
15:14 78:13 78:14
individuals [18]
13:24 15:22 18:15
25:13 30:14 32:22
35:8 40:22 44:12
52:12 60:15 62:21
66:9 66:13 67:24
79:2 79:3 79:8
industry [1] 17:24
infinitely [1] 78:19
influence [1] 40:13
information [12]
2:15 3:6 3:9
3:25 5:6 5:18
27:21 30:17 39:12
45:9 76:3 89:11
informational [1]
87:1
informed [1] 4:20
21:4
initial [2] 2:14
85:13
injuries [1] 55:6
inquire [1] 50:13
inquiring [1] 69:6
inside [2] 78:8
87:8
installed [1] 49:8
installing [1] 24:20
instances [2] 7:23
37:24
institute [1] 22:23

instituted [2] 23:1
60:20
intact [1] 71:22
intended [2] 32:21
32:23
interact [1] 23:6
interest [5] 17:21
69:7 71:10 76:8
85:19
interested [1] 2:20
69:8
interests [2] 69:14
70:15
internally [1] 41:20
69:11
investigate [1] 20:15
investigation [3]
21:10 21:11 73:4
investigative [1]
21:2
investment [1] 88:10
invited [1] 23:2
invoke [1] 86:14
involve [1] 59:25
involved [1] 9:3
involves [1] 9:6
involving [4] 24:19
66:8 67:8 81:6
issue [18] 5:2
7:2 8:20 8:21
10:9 19:6 42:23
43:12 49:21 50:20
56:10 68:1 69:4
74:11 84:16 85:9
89:22 89:25
issues [13] 8:24
21:6 21:7 21:24
23:4 30:4 41:11
58:25 61:8 76:9
78:25 87:5 89:25
item [2] 2:2 2:18
itself [3] 18:3 17:24
78:1

-J-

J [1] 1:15
Jack [1] 4:15
JACKSON [2] 1:11
89:5
Jeanne [1] 28:10
judgment [2] 76:6
78:12
Judy's [7] 21:18
21:22 21:25 54:10
54:14 54:19 57:20
July [2] 51:17 55:1
June [2] 2:7 51:24
68:8 89:15
jury [1] 56:2
justify [1] 8:3
53:12

**-K-**

keep [2] 50:2   59:16
keeping [1]   17:10
Kilbourn [4]   54:19
   56:9   57:9   58:13
killed [1]   56:8
Kimberly [3]   4:16
   53:5   59:13
kind [7] 33:1   33:12
   52:11   53:13   58:21
   62:16   63:7
kinds [8]   29:8
   41:8   41:18   43:7
   43:9   43:16   70:3
   70:4
knew [1]   58:24
   72:24   72:25
knowing [1]   78:9
knowledge [3]   3:4
   61:2   78:8
known [2]   2:3
   57:10
knows [1]   83:11

**-L-**

land [1]   41:4
landlord [1]   13:9
large [3] 19:16   30:21
   52:11
larger [1]   53:9
last [16] 2:16   16:15
   23:2   23:23   24:22
   34:23   36:15   45:8
   51:13   54:8   66:1
   66:14   66:15   67:4
   68:4   69:16
law [11] 1:13   1:15
   7:14   7:21   8:6
   10:12   44:6   44:10
   44:11   50:5   70:16
   84:10   90:5   90:6
   90:7   90:7
layout [2]   68:23
   77:8
lead [2] 40:16   46:13
learning [1]   73:1
least [2] 30:10   48:19
leave [3] 8:16   33:7
   36:9
left [3]   14:18   32:7
   47:7
legal [4] 58:20   82:2
   82:12   86:25
legislation [1]   75:22
legitimate [3]   85:19
   86:19   86:23
length [1]   69:3
lengths [1]   81:17
LENI [1]   1:11
less [4]   14:10   14:24
   44:19   71:11

letter [7] 32:16   45:2
   75:10   75:11   75:13
   77:14   77:25
letters [1]   69:5
level [5] 67:2   67:2
   67:3   73:5   80:18
Lewis [1]   11:1
liberally [1]   5:17
library [1]   22:2
   22:4   22:5
licensed [1]   36:2
life [3] 24:15   33:1
   33:3
lifelong [1]   15:11
light [2] 49:6   49:6
likes [1] 73:6
limit [2] 36:16   46:11
limitation [1]   28:4
limitations [1]   24:13
limits [1]   79:21
list [4]   14:16   15:2
   28:14   30:9
listed [2]   39:12
   71:21
listened [1]   65:20
listing [1]   28:18
lists [2]   11:19   39:6
litigation [1]   8:19
litter [1] 88:11
live [14] 33:18   35:11
   36:8   41:24   50:8
   57:25   58:21   59:19
   61:12   63:24   84:1
   84:7   84:23   87:9
lived [8] 14:17   31:4
   31:4   37:18   64:5
   64:9   64:12   87:16
lives [3] 84:10   84:11
   91:17
living [14]   29:7
   30:5   30:20   34:13
   36:3   36:6   37:19
   42:16   42:17   42:21
   42:25   59:4   59:8
   75:25
local [3] 50:6   76:7
   77:15
located [3]   47:8
   66:25   81:9
location [14]   25:24
   25:25   66:5   68:3
   71:13   73:16   74:15
   74:21   74:22   74:23
   78:17   81:3   81:11
locations [2]   23:9
   74:14
logic [1] 48:10
loitering [1]   88:11
long-range [1]   87:19
long-term [1]   84:6
look [11] 20:25   33:2
   42:5   42:5   42:12
   52:20   70:12   71:25

73:12   88:14   90:10
looked [6]   4:20
   17:24   48:20   56:4
   73:13   78:12
looking [6]   17:8
   17:20   31:10   41:5
   53:9   73:11
lost [2]   48:1   73:4
Lowry [42]   10:21
   28:10   28:12   28:16
   28:20   28:25   29:6
   29:14   29:21   29:23
   30:9   30:15   31:1
   31:15   32:3   32:19
   32:23   33:9   33:20
   33:23   33:25   34:9
   34:11   34:22   35:1
   35:6   35:9   35:13
   35:19   35:24   36:11
   36:14   36:24   37:9
   37:17   38:1   38:6
   38:8   38:15   38:22
   46:4   76:17
Lucas [30]   4:15
   53:19   53:20   53:23
   54:2   54:5   54:8
   54:12   54:18   55:3
   55:7   55:15   55:24
   56:1   56:6   56:16
   57:1   57:5   57:8
   57:12   57:18   57:21
   57:24   58:2   58:6
   58:13   58:24   59:5
   59:10   59:12
lump [2] 72:9   83:6
Lutheran [1]   59:24

**-M-**

M [6]   1:10   1:10
   1:11   1:20   91:5
   91:17
Ma'am [1]   63:1
Mahal [1]   70:24
main [1] 51:19
maintain [1]   73:6
major [1]   73:2
makes [1]   40:7
man [2] 72:25   73:6
management [4]
   12:21   18:10   34:7
   77:20
manager [1]   30:4
managers [9]   12:25
   13:2   13:5   14:19
   32:13   34:17   34:19
   36:24   37:4
mandates [1]   90:5
manner [1]   90:14
March [2]   2:12
   3:5   67:8
market [1]   27:15
   72:3
material [2]   6:12
   6:22
materials [1]   6:7

matter [10]   1:4
   1:18   21:4   26:7
   39:16   40:23   53:4
   53:22   83:16   89:16
matters [2]   4:13
   9:20
may [5]   1:20   3:11
   21:7   23:9   50:13
Mayor [1]   77:15
meal [1] 31:19
mean [3]   29:5
   37:9   37:10
means [1]   29:6
measured [1]   81:9
measures [1]   82:12
mechanisms [1]
   16:10
medical [3]   20:21
   22:14   22:19
medications [1]
   23:16
meet [6] 23:3   23:4
   27:12   62:25   69:25
   84:23
meeting [5]   25:14
   44:20   61:4   64:25
   89:15
meetings [6]   24:5
   60:20   60:24   61:1
   69:10   69:11
meets [1]   7:24
member [16]   6:3
   6:4   6:8   6:14
   6:19   75:1   88:23
   88:24   88:25   89:1
   89:2   89:3   89:4
   89:5   89:6   89:19
members [9]   1:8
   6:13   56:19   58:19
   65:19   68:5   85:4
   85:25   89:18
memoranda [2] 5:4
   86:20
memorandum [5]
   4:18   4:18   4:24
   5:3   5:11
memorandums [1]
   3:7
mental [1]   15:5
   15:10   15:15   28:24
   29:4   29:25   30:21
   36:4   36:7   38:2
   79:3   87:13
mentally [1]   43:10
mentioned [4]   58:7
   69:17   81:5   82:15
met [9]   7:1   8:10
   8:11   16:14   23:18
   24:6   73:25   74:9
   74:12
Michael [1]   11:14
middle [1]   44:5
might [4]   25:9
   34:4   40:2   49:2
mile [1] 67:10   67:15

miles [1]   47:1
   63:9
million [4]   71:21
   72:10   77:1   83:6
Milwaukee [30] 1:1
   1:13   1:15   1:16
   1:19   1:20   2:24
   3:2   3:8   4:19
   29:19   30:7   30:19
   31:8   31:22   32:16
   33:13   34:8   38:4
   43:20   43:25   50:21
   53:25   67:13   74:12
   77:22   79:18   91:3
   91:5   91:7
mind [3] 17:10   25:16
   25:16
minimum [1]   53:16
minister [1]   59:23
minute [3]   64:13
   82:14   88:7
minutes [19]   3:16
   3:18   3:23   3:23
   4:1   4:5   10:14
   28:2   28:3   28:9
   38:25   44:25   50:22
   51:5   57:17   65:20
   65:21   72:14   83:14
model [2]   17:22
   17:23
money [1]   56:21
   60:12   64:18   64:19
   64:22   82:8   82:9
monitoring [1]   61:14
month [1]   13:20
   82:17
months [2]   84:11
   84:11
monument [1]   81:9
morning [1]   54:21
most [2] 12:2   15:11
motion [3]   4:15
   5:10   84:2
Mound [1]   91:6
Mount [1]   22:22
move [13]   14:23
   26:14   33:5   33:6
   33:9   33:10   34:3
   34:5   56:9   58:4
   64:15   74:20   77:10
moved [3]   14:21
   47:1   70:25
moves [1]   14:13
moving [9]   14:12
   46:19
Ms [69]   10:21   10:25
   28:12   28:16   28:20
   28:25   29:6   29:14
   29:21   29:23   30:9
   30:15   31:1   31:15
   32:3   32:19   32:23
   33:9   33:20   33:23
   34:22   35:1   35:6
   35:9   35:13   35:19
   35:24   36:11   36:14

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 31 of 37   Document 19-2

|  | 36:24 | 37:9 | 37:17 |
| | 38:1 | 38:6 | 38:8 |
| | 38:15 | 38:22 | 46:4 |
| | 59:14 | 59:18 | 59:20 |
| | 59:23 | 60:1 | 60:8 |
| | 60:16 | 60:22 | 60:25 |
| | 61:3 | 61:6 | 61:9 |
| | 61:11 | 61:20 | 62:1 |
| | 62:5 | 62:9 | 62:13 |
| | 62:23 | 63:5 | 63:17 |
| | 63:23 | 64:7 | 64:11 |
| | 64:16 | 64:24 | 65:5 |
| | 66:17 | | |

**municipality** [1]
86:16

**municipality's** [1]
85:12

**murder** [5]          49:6
49:12  49:14  53:8
61:8

**murdered** [2]       47:25
49:10

**must** [4] 3:25       8:1
26:24  51:9

**-N-**

**name** [2]           11:14
65:10

**Nancy** [1]          39:2

**narrow** [1]         79:21

**nature** [1]         2:17
36:23

**near** [5]  42:17  44:18
67:19  67:19  71:13

**nearest** [7]        21:14
22:2  22:8  22:12
22:14  22:19  23:13

**nearly** [1]         73:7

**necessarily** [1] 27:10
49:12

**necessary** [16]     7:20
18:16  35:8  35:9
46:1  66:23  68:2
73:14  74:2  74:13
74:14  74:21  78:16
85:7  85:21  88:18

**necessity** [1]      49:19
85:14

**need** [30]          15:11
29:3  30:13  30:22
31:9  32:5  34:14
34:16  38:19  40:8
44:3  44:11  44:12
44:22  46:5  50:1
52:22  61:15  64:3
65:22  71:8  72:23
76:18  80:18  86:6
87:11  87:12  87:14
88:5  89:24

**needed** [2]         23:15
32:12

**needs** [21]         12:24
18:7  26:16  27:12
30:8  31:7  42:5
43:21  44:20  51:20
52:21  63:7  65:25

| | 66:12 | 66:12 | 67:25 |
| | 69:25 | 78:20 | 81:2 |
| | 87:13 | 88:14 | |

**negative** [1]       40:12

**neighborhood** [63]
16:6  16:19  19:25
20:17  23:3  24:3
31:12  31:16  31:16
31:21  31:23  35:18
37:8  37:16  37:18
37:19  37:21  39:17
40:3  40:5  41:23
42:19  43:1  43:12
46:25  47:8  49:15
53:3  53:7  55:2
56:3  58:1  58:4
58:16  58:23  59:9
62:14  64:3  66:8
66:11  66:19  66:25
67:7  67:18  69:15
70:5  70:19  71:16
74:24  78:23  79:7
79:19  80:9  80:12
80:14  80:15  80:16
82:5  86:8  86:10
86:13  87:5  87:9

**neighbors** [3]      23:19
24:7  69:20

**neither** [1]        74:1

**net** [1]  75:18

**never** [4]          19:3
19:11  47:23  82:20

**new** [9]  2:15  24:2
26:12  26:15  26:18
67:11  68:13  75:15
77:3

**next** [2] 12:18  15:15
89:15

**nickname** [1]       57:10

**night** [2] 5:23  81:19

**nine** [2] 28:1  84:11

**nine-and-a-half** [1]
28:8  38:25

**noise** [1]          88:11

**non-disabled** [1]
77:6

**none** [1] 5:22

**normally** [3]       25:22
56:4  57:2

**North** [1]          1:13

**nose** [2] 71:9      71:9

**note** [1] 69:2

**notebook** [1]       87:1

**notes** [1]          91:9

**nothing** [9]        9:14
9:16  9:18  18:23
36:12  53:6  53:12
56:22  59:11

**notice** [3]         2:20
3:11  52:1

**notion** [1]         41:2

**novel** [1]          42:3

**now** [34] 8:25      10:13
12:18  15:15  18:4
24:1  24:6  26:10

| | 29:1 | 30:6 | 30:23 |
| | 31:10 | 32:20 | 33:21 |
| | 35:14 | 39:14 | 40:18 |
| | 41:22 | 43:18 | 47:19 |
| | 50:21 | 51:4 | 52:14 |
| | 53:18 | 58:15 | 58:19 |
| | 60:18 | 62:7 | 63:24 |
| | 71:2 | 72:9 | 76:16 |
| | 83:4 | 83:14 | |

**number** [2]         15:16
18:14

**nurse** [1]          28:22
28:23  67:16

**nurses** [1]         69:23

**nursing** [10]       14:24
26:18  27:7  27:9
27:13  28:24  36:1
70:23  70:25  77:23

**-O-**

**Object** [1]         55:8

**objections** [2]     4:9
39:19

**objects** [1]        5:21

**obligation** [1]     82:12

**observation** [1]  58:11

**observations** [1]
56:3

**obtaining** [2]      62:11
83:9

**obviously** [3]      67:24
76:4  85:25

**occasions** [1]      60:6

**occupied** [1]       77:5

**occupying** [1]      2:4

**occurred** [1]       19:21
52:24  55:17  73:2

**occurring** [3]      48:22
53:11  61:2

**occurs** [2]         41:16
65:3

**October** [1]        6:24
45:2

**off** [6]  16:24  32:25
53:4  54:18  56:9
62:17

**off-hours** [1]      16:3

**offer** [1] 72:5

**office** [2]         77:15
80:13

**official** [1]       2:16
21:2  21:9

**officials** [3]      3:24
69:10  76:7

**often** [4] 29:17  31:16
36:25  57:4

**oftentimes** [1]     34:2

**Old** [1]  1:13

**on-premise** [1] 68:16

**on-site** [1]        13:11
68:16

**once** [1] 7:25  70:25
85:25

| **one** [43] | 6:20 | 9:19 |
| | 10:3 | 12:20 | 15:13 |
| | 16:15 | 22:6 | 26:25 |
| | 27:20 | 29:1 | 39:14 |
| | 40:8 | 40:18 | 40:22 |
| | 41:19 | 42:5 | 43:24 |
| | 44:15 | 45:16 | 49:5 |
| | 49:13 | 50:20 | 51:19 |
| | 60:10 | 61:3 | 63:8 |
| | 64:2 | 64:13 | 64:25 |
| | 65:6 | 69:17 | 71:6 |
| | 72:22 | 72:23 | 72:24 |
| | 72:25 | 73:9 | 79:11 |
| | 79:14 | 81:20 | 82:14 |
| | 84:3 | 88:7 | |

**one-and-a-half** [1]
76:22

**ongoing** [1]        31:5

**onus** [1] 50:6

**opening** [1]        3:16
3:19  10:15  51:6

**operate** [8]        6:11
6:25  7:4  9:7
63:2  73:15  74:21
86:5

**operated** [1]       9:4
41:7  86:12

**operates** [2]       12:14
12:16  12:22

**operating** [4]      14:1
42:7  73:15  82:22

**operation** [9]      14:6
33:22  34:7  41:20
45:15  48:12  62:20
66:4  86:7

**operator** [2]       45:23
48:19  82:3

**operators** [1]      69:22

**opinion** [8]        5:8
6:23  7:8  7:10
8:5  45:25  77:7
90:10

**opportunities** [1]
46:13

**opportunity** [12]
5:12  5:25  7:21
18:17  30:3  33:1
35:11  54:9  55:1
85:8  85:14  88:19

**oppose** [1]         4:19

**opposed** [3]        40:6
78:5  87:21

**opposition** [4]     3:19
3:19  4:3  41:23

**options** [1]        24:15
25:9  49:1  88:4

**order** [12]         3:5
3:9  3:25  4:9
5:4  8:3  31:6
43:19  44:1  44:21
89:14  90:11

**ordinance** [1]      7:11

**ordinary** [2]       43:8
67:6

**organization** [3]
13:25  69:13  83:10

| **originate** [1] | 67:15 |
| **ought** [3] | 58:3 |
| 82:16  86:5 | |

**outdoor** [1]        71:18

**outreach** [4]       22:24
35:9  59:23  77:23

**outside** [3]        20:11
22:18  56:14  56:25
87:8

**overcome** [1]       85:13

**oversight** [1]      77:20

**overwhelming** [1]
28:22

**own** [4]  29:10  63:21
70:15  87:1

**-P-**

**P** [1]  1:9

**p.m** [1]  90:15

**page** [13]          11:19
12:1  12:18  14:15
14:16  15:2  15:15
15:16  18:13  28:14
29:2  34:23  39:12

**pages** [1]          45:8

**paid** [1] 64:2  82:23

**paragraph** [5]     14:14
14:16  45:14  58:17
77:18

**paragraphs** [2]  15:16
15:19

**paranoid** [1]       15:11
66:23  70:6  78:24

**parking** [1]        71:20
77:8

**part** [18] 2:8      3:23
4:2  31:15  32:15
41:22  48:1  66:7
68:5  69:12  75:12
77:16  83:2  83:10
83:10  83:19  83:21
87:19

**participate** [1]  17:18

**particular** [15]   16:5
17:11  18:1  18:7
18:11  31:16  38:11
42:23  66:5  66:11
68:3  68:23  69:2
73:16  80:9

**particularly** [1] 43:11

**parties** [3]        2:20
2:22  9:22

**partner** [1]        18:9

**partners** [1]       77:21

**parts** [1] 7:9

**pass** [1] 80:3

**passionate** [1] 89:22

**past** [6]  6:12  7:6
45:19  54:25  57:19
60:13  73:13  86:2

**patiently** [1]      65:20

**patrol** [1]         57:3

**patrolled** [1]      16:6

**patrols** [1] 43:16

**Paul's** [1] 59:24

**pay** [5] 13:17 13:18 13:19 14:2 62:16

**pays** [1] 82:25

**people** [67] 10:20 14:2 14:17 15:4 21:1 23:9 25:10 27:20 29:4 29:24 29:7 29:14 29:24 30:10 30:12 30:16 31:3 31:6 31:19 32:6 32:10 32:17 32:24 33:5 33:6 34:2 34:14 35:17 35:22 36:3 36:7 36:9 36:19 38:2 37:17 38:2 38:2 38:17 41:24 42:24 43:6 43:8 43:8 45:6 47:13 48:15 50:7 50:8 53:10 54:18 54:23 57:12 58:21 63:2 63:6 64:9 68:19 68:20 78:23 82:4 84:17 85:20 87:3 87:9 87:12 87:16 88:2

**per** [2] 13:19 70:21

**perceive** [1] 56:11

**perceived** [2] 43:14 79:19

**percent** [3] 14:11 67:11 67:14

**performing** [1] 29:9

**period** [4] 63:18 68:7 84:9 88:9

**permanent** [2] 32:22 84:6

**permission** [1] 45:19

**permit** [8] 2:10 41:5 45:14 47:16 47:18 48:1 51:25 75:24

**permits** [1] 56:15

**person** [1] 16:24

**personally** [1] 54:17

**persons** [4] 66:23 70:3 70:4 70:6

**perspective** [1] 31:14

**pertaining** [1] 2:6

**petitioned** [1] 2:13

**phase** [1] 10:6

**phrase** [1] 29:5 81:6

**physical** [2] 15:5 15:12

**pick** [2] 36:25 57:13

**picking** [1] 18:3

**picnic** [1] 27:3

**place** [22] 1:5 2:3 18:2 18:4 20:12 21:7 30:1 32:13 32:21 36:2 37:22 42:4 42:21 49:3 54:24 63:2 63:20 69:13 71:23 71:24 84:10

**places** [6] 31:11 32:5 33:10 36:5 36:8 37:1

**placing** [1] 40:2

**plan** [15] 12:3 15:20 43:19 44:1 44:9 44:10 44:13 44:15 44:16 44:18 44:21 68:9 71:4 72:8 81:25

**planning** [4] 44:14 44:23 87:24 88:14

**plans** [1] 44:15

**Pledl** [173] 1:13 2:23 2:23 4:8 4:10 4:21 5:1 5:23 6:3 8:19 9:9 9:10 10:13 10:15 10:17 10:20 11:13 11:14 11:17 11:22 12:1 12:6 12:10 12:14 12:18 13:2 13:6 13:14 13:18 13:21 13:25 14:5 14:8 14:14 14:20 14:23 15:2 15:7 15:15 15:19 15:24 16:22 17:1 17:4 17:7 17:14 17:17 18:1 18:13 18:20 18:23 28:6 28:7 28:10 28:13 28:17 28:21 29:1 29:11 29:18 29:22 30:6 30:12 30:23 31:10 31:24 32:15 32:20 33:6 33:17 33:21 33:24 34:6 34:10 34:18 34:23 35:2 35:7 35:10 35:14 35:20 36:2 36:12 38:24 39:2 39:5 39:10 39:14 39:22 40:4 40:11 40:18 41:1 41:10 41:22 42:1 42:22 43:4 43:12 43:24 44:5 44:24 45:1 45:8 45:13 45:18 45:25 46:3 46:12 46:16 46:18 46:23 47:4 50:13 50:24 51:3 55:8 57:16 57:18 57:22 57:25 58:3 58:7 58:15 59:3 59:6 59:11 62:25 63:1 63:11 63:19 64:5 64:8 64:14 64:20 65:2 65:12 65:13 73:18 73:19 74:3 74:7 75:1 75:6 75:23 76:2 76:16 76:24 77:13 77:17 78:2 78:4 78:22 79:6 79:11 79:15 79:17 79:22 80:6 80:24

**political** [1] 7:1

**poor** [1] 72:25

**population** [1] 31:2

**portion** [2] 13:14 84:18

**portions** [2] 4:17 4:23

**pose** [1] 42:20

**position** [4] 51:10 66:15 73:24 76:25

**positive** [1] 31:13

**possibilities** [1] 17:9

**possible** [1] 31:11 71:24

**potential** [1] 40:1

**potentially** [2] 17:23 21:6

**practice** [1] 28:22

**precisely** [2] 66:8 67:21

**predecessors** [1] 45:20

**prejudice** [1] 5:13

**premises** [5] 2:3 2:4 19:13 72:21 75:20

**prepare** [2] 5:5 5:7

**prepared** [1] 10:1

**present** [5] 4:5 13:12 61:5 71:22 73:14

**presentation** [8] 3:16 3:17 3:20 3:20 39:1 50:22 51:5 75:9

**presentations** [2] 10:1 89:21

**presented** [1] 34:14 42:13 66:2

**presently** [1] 40:5

**press** [1] 19:17

**presumably** [1] 43:7

**presumed** [1] 25:8

**presumes** [1] 48:10

**pretty** [3] 53:4 69:5 81:8

**prevent** [4] 41:3 46:24 49:14 53:11

**prevented** [1] 30:5 49:12

**previous** [1] 16:23 39:15 85:25

**previously** [3] 3:25 11:7 53:20

**price** [6] 24:18 24:18 26:8 26:9 70:21 72:4

**priced** [2] 70:20 74:15

**prima** [6] 7:25 8:11 51:10 74:1 85:11 86:16

**primary** [1] 13:22

**private** [2] 54:1 55:20

**problem** [8] 43:14 52:20 56:11 66:16 66:18 66:18 77:1 88:11

**problems** [2] 12:3 21:21 52:8 52:16 54:16 67:23

**procedural** [2] 8:24 50:20

**procedure** [5] 3:12 6:20 7:5 7:6 9:19

**procedures** [1] 6:25

**proceed** [1] 4:12

**proceeding** [2] 2:9 72:12

**proceedings** [5] 1:17 2:1 90:15 91:8 91:10

**process** [4] 70:13 87:2 87:24 88:14

**professional** [1] 11:19

**program** [24] 9:6 12:11 12:14 12:17 14:2 29:23 29:24 30:24 31:8 31:12 31:25 32:2 32:3 32:4 32:9 32:18 32:23 32:24 33:22 34:1 35:21 77:21 78:6 84:22

**programs** [16] 9:4 9:7 29:20 30:11 32:20 33:7 33:15 35:4 35:20 35:24 36:18 60:2 63:3 78:5 84:7 84:22

**prohibitions** [1] 42:24

**project** [2] 77:19 77:19

**promise** [1] 24:7

**proof** [1] 51:8 74:10

**properly** [1] 86:14

**properties** [1] 17:12

**property** [1] 16:18 17:11 17:19 26:9 27:22 36:20 48:1 52:10 52:13 55:2 56:12 56:25 60:7 61:19 62:20 69:18 71:19 71:20

**proportion** [1] 30:21

**proposal** [1] 75:9 83:7

**proposed** [1] 40:6 41:6

**proposition** [1] 66:22

**prosecution** [1] 73:3

**prosecutions** [1] 67:14

**prostitutes** [1] 80:20

**prostitution** [2] 57:13 67:3

**protection** [1] 48:5 81:25

**protective** [1] 82:12

**provide** [14] 7:12 15:21 19:8 19:12 36:9 36:19 50:1 55:16 59:9 61:18 62:3 80:7 82:4 85:8

**provided** [8] 12:24 26:1 40:21 47:17 53:17 59:16 63:12 68:11

**provider** [1] 13:9

**provides** [3] 18:17 30:1 39:24

**providing** [1] 54:1 82:10

**proving** [1] 74:12

**provisal** [1] 84:3

**provisions** [1] 44:1

**proximity** [1] 22:5

**psychiatric** [1] 28:23

**public** [11] 2:19 3:11 3:15 22:6 33:13 43:17 66:3 72:20 73:8 83:5 86:15

**public's** [1] 59:8

**purchase** [1] 72:6

**purpose** [3] 13:8 31:8 77:5

**pursuing** [1] 17:14

**put** [6] 11:17 31:11 47:13 48:19 52:1 59:3

**puts** [1] 50:6

-Q-

Case 2:12-cv-00216-CNC   Filed 03/01/13   Page 33 of 37   Document 19-2

**qualifications** [1]
39:6
**quality** [4]   40:20
40:20   41:10   41:11
**quarter** [1]   67:10
67:15
**questions** [14]   4:6
27:24   36:16   50:10
50:16   57:15   62:19
62:24   84:13   88:22
88:23   89:8   89:8
89:10
**quite** [6] 26:21   37:10
40:7   43:2   55:9
88:12
**quote** [1]   45:1
**quoted** [1]   19:17
**quotes** [1]   24:18

**-R-**

**radius** [1]   63:9
**Radonski** [1]   32:16
**range** [2]   15:13
24:23
**Rapes** [1]   38:9
**rather** [2]   7:21
86:20
**re-evaluate** [1] 17:5
**reach** [2]   39:25
55:9
**reaction** [1]   18:3
**read** [4] 7:9   35:14
35:18   75:11
**reading** [1]   58:17
**ready** [1]   71:21
**real** [8] 25:11   25:14
25:18   25:23   26:5
44:20   62:11   72:1
**reality** [3]   65:22
70:1   82:10
**realize** [1]   75:19
**really** [5]   42:13
52:12   52:25   53:3
79:16
**reason** [3]   5:19
49:7   76:16
**reasonable** [35] 2:9
7:3   7:12   7:16
7:20   10:7   10:10
10:12   18:16   35:3
45:16   46:1   47:20
48:8   48:18   48:25
49:2   49:8   49:16
49:19   51:12   52:7
53:13   53:15   66:23
68:2   74:1   74:13
85:7   85:21   85:24
85:24   86:1   87:22
90:6
**reasonableness** [1]
46:8   85:14
**reasonably** [1] 74:15
**receive** [3]   14:1
22:16   82:17

**received** [2]   25:4
32:12
**receives** [1]   80:15
**receiving** [1]   42:18
**recently** [1]   27:18
**recognize** [3]   70:5
82:7   82:10
**recommendation** [3]
24:2   43:24   45:4
**reconsider** [1]   2:13
**reconsideration** [1]
2:12
**record** [20]   2:22
6:2   6:6   6:18
7:22   11:11   40:10
40:16   48:13   66:7
68:5   69:8   75:12
78:18   83:2   83:20
83:22   87:10   89:13
89:14
**recreate** [1]   68:12
68:13   68:15   68:17
68:25
**recused** [1]   6:4
**Red** [25] 2:24   9:4
9:6   12:16   18:10
21:7   21:18   21:22
21:25   30:24   31:11
31:24   32:20   33:7
33:17   54:10   54:14
57:20   63:3   77:21
78:5   78:8   84:7
84:18   84:21
**redevelopment** [1]
72:7
**reference** [3]   23:21
35:16   87:1
**references** [1]   86:25
**referrals** [1]   33:14
**referred** [2]   23:22
60:4   69:9
**reflect** [2]   6:2
11:11
**regard** [6]   8:6
21:22   38:10   44:2
52:16   60:5
**regarding** [4]   3:9
3:10   5:2   60:20
**registered** [1]   28:22
**regular** [1]   60:17
**regulate** [1]   87:7
**regulated** [1]   88:5
**relate** [1]   15:16
**related** [3]   13:23
41:12   62:21
**relationships** [1]
31:5
**relocate** [2]   24:2
46:10
**relocating** [2]   69:7
87:17
**relocation** [5]   27:9
62:8   69:4   70:18
75:15

**remainder** [1]   16:4
**removed** [1]   38:20
**renewal** [1]   88:9
**renovation** [1]   75:16
**rent** [5] 13:16   14:2
63:6   82:9   82:18
**replace** [1]   77:3
**replacement** [1]
26:11
**report** [4]   56:21
58:11   64:23   65:2
**reported** [1]   55:4
55:9
**Reporter** [1]   91:18
**Reporters** [2]   1:21
91:6
**reports** [1]   3:14
67:7
**request** [8]   2:4
2:6   2:12   2:14
7:15   7:19   8:4
18:15   18:16   18:17
35:3   45:14   46:13
46:15   49:19   51:15
53:13   72:10   76:14
85:4
**requested** [5]   6:4
8:2   80:11   80:17
85:7
**requirement** [8] 15:4
43:20   44:8   44:9
58:20   82:3   88:11
88:13
**requirements** [1]
84:23
**requires** [1]   41:5
**reserve** [1]   65:15
**reserved** [1]   2:8
**residence** [5]   33:18
46:21   47:25   84:8
84:24
**residences** [1]   12:7
**resident** [1]   12:7
12:11   15:3   38:19
47:24   49:14   49:15
53:24   62:13   63:14
63:24   64:22   65:1
**residential** [1] 35:25
82:4   88:4
**residents** [78]   12:24
13:1   13:13   13:19
16:11   16:14   16:16
16:19   16:19   17:21
18:8   19:8   19:13
20:21   21:4   22:11
22:3   22:6   22:11
22:16   23:4   24:16
26:14   26:16   27:12
33:20   34:24   37:7
37:16   37:25   42:8
42:9   42:14   45:10
46:9   46:14   46:19
50:3   55:1   55:5
55:12   55:19   56:13
58:8   58:10   58:18

60:7   60:10   60:17
61:12   62:4   62:6
62:20   63:4   63:20
64:11   64:17   65:6
65:25   66:4   67:17
68:11   69:14   69:15
69:19   69:22   70:15
74:25   77:11   78:21
79:5   82:1   84:5
84:6   84:7
**residents'** [1]   13:23
48:6
**resolve** [1]   30:4
**resources** [4]   17:23
80:7   80:14   80:16
**respectfully** [1] 53:16
**respond** [1]   5:12
**response** [6]   42:1
43:17   61:10   61:22
62:19   65:16
**responsibility** [7]
49:23   50:4   62:6
63:2   63:6   72:17
73:8
**responsible** [2] 85:10
85:12
**rest** [2] 38:25   65:15
**restaurant** [3]   21:14
36:23   54:15
**restricting** [1]   36:5
**result** [5]   14:11
48:12   49:18   49:19
55:6
**resulted** [1]   21:25
**retain** [1]   25:22
**return** [1]   16:23
**review** [3]   7:17
7:22   89:14
**reviewed** [2]   6:6
68:4
**reviewing** [1]   89:13
**Reynolds** [1]   77:14
**Richard** [3]   4:15
10:25   53:19
**Richardson** [21]
1:5   2:3   21:15
22:20   30:25   32:21
33:8   33:19   40:23
42:8   42:21   46:10
47:7   49:14   58:19
58:21   67:10   71:12
81:13   81:15   81:16
**right** [27]   2:8
11:20   12:12   18:4
20:21   26:2   34:25
35:5   39:3   39:20
41:9   43:22   44:4
48:16   57:23   58:1
62:1   62:13   63:24
64:6   68:21   70:16
70:20   76:4   78:25
80:2   80:9
**right-of-way** [2]
72:20   73:9
**risk** [5] 70:4   70:7
79:2   82:7   82:11

**risks** [3] 42:9   42:10
42:20
**Road** [1] 91:6
**robbed** [1]   55:21
**robberies** [1]   38:7
**Robert** [3]   1:13
2:23   4:17
**room** [7] 13:10   14:12
36:6   46:20   52:11
70:22   78:15
**rooms** [7]   12:7
12:11   52:11   70:20
70:23   78:10   78:13
**routes** [1]   71:17
71:18
**rules** [4] 2:19   6:11
6:24   59:7
**ruling** [2]   5:21
5:22
**run** [5] 54:18   59:4
59:7   71:21   77:20
**running** [2]   32:9
80:2
**Rutledge** [20]   16:1
19:3   19:5   19:21
23:9   48:11   49:10
51:18   51:21   53:8
55:25   56:24   60:19
61:8   62:22   72:17
72:20   81:6   81:9
81:18
**Rutledge's** [3]   20:13
20:24   55:23

**-S-**

**safe** [13] 19:13   19:24
23:14   29:19   29:22
29:23   30:7   31:11
49:3   49:23   52:10
66:19   66:20
**safer** [5] 24:3   42:8
42:14   50:3   81:3
**safety** [16]   15:17
15:21   42:6   43:13
48:6   52:15   56:10
58:25   60:14   61:8
62:3   62:21   66:3
69:18   71:4   86:15
**sale** [2] 27:20   75:19
**sales** [2] 26:8   26:9
**Samaria** [50]   9:3
11:9   12:4   12:6
12:19   12:22   13:16
14:2   14:6   14:9
14:17   14:18   15:4
15:25   16:7   17:9
18:10   26:12   26:13
26:15   26:18   27:10
27:11   31:13   33:11
33:22   34:20   34:25
35:22   37:5   42:19
45:15   46:19   46:24
47:8   63:3   63:20
64:9   64:23   65:25
67:11   67:16   68:14
69:25   70:22   77:3

Case No. 80215-CNC   Filed 03/01/13   Page 34 of 37   Document 19-2

77:4  78:6  81:23
84:6

**Samaria's** [1]  13:14
**sanctions** [1]  21:25
**sand** [1] 70:13
**satisfactory** [2] 62:18
**says** [3]  58:17  77:18
87:4
**scare** [1] 64:17
**scheduled** [1]  2:18
**scheduling** [3]  3:4
3:5  3:8
**Schiebenes** [3]  1:20
91:5  91:17
**schizophrenia** [2]
66:24  70:6
**schizophrenia-related**
[1]  15:12
**schizophrenics** [2]
78:25
**school** [2]  57:22
60:3
**second** [4]  4:16
12:7  13:10  38:13
**Secondly** [1]  5:17
**secretary** [1]  1:12
2:2  3:13
**secure** [3]  19:14
68:16  68:20
**security** [41]  15:17
15:25  16:3  16:5
16:23  19:12  19:25
20:2  20:6  20:8
20:9  20:11  24:7
24:11  24:20  24:21
25:5  35:17  36:9
40:21  41:11  48:19
49:8  54:1  54:20
55:20  56:25  58:18
58:22  61:18  62:3
63:13  68:9  70:17
71:6  81:22  81:23
81:25  82:16  83:4
86:13
**see** [12]  19:15  34:2
40:15  48:9  48:14
49:7  52:1  55:1
57:18  71:8  72:3
77:24
**seek** [1] 51:13
**seeking** [1]  49:16
**seeks** [1]  80:3
**seem** [1] 84:15
**seller** [1]  26:1
**semi-regular** [1]
22:10
**sending** [1]  74:16
**sense** [6]  20:24
42:6  69:21  70:9
74:22  82:6
**sent** [1]  2:20
**separately** [1] 85:9
**serious** [2]  29:25
34:25

**serve** [3] 13:9  14:3
59:21
**served** [1]  66:4
**service** [8]  17:21
17:23  20:11  30:8
30:22  34:13  34:16
50:1
**serviced** [1]  48:16
**services** [30]  20:6
22:17  25:14  25:20
25:23  30:13  31:18
32:11  34:15  39:17
41:11  43:17  44:3
45:5  46:5  62:11
67:20  67:21  67:22
67:23  71:17  74:24
80:12  80:22  80:23
80:25  81:2  81:23
87:12  88:2
**session** [1]  50:19
**set** [9]  3:5  10:11
10:12  15:19  15:21
26:25  27:3  29:19
30:25
**settings** [1]  14:21
14:24
**seven** [2]  30:10
84:12
**several** [7]  8:20
16:15  26:15  30:7
76:18  81:10  85:22
**severity** [1]  15:8
**shelters** [1]  30:2
31:4
**shocked** [1]  56:8
**shoot-out** [1]  54:22
**shop** [2] 36:22  46:25
**shopping** [3]  37:1
60:11  64:1
**short** [4] 46:11  59:16
74:23  82:24
**shorter** [1]  84:9
**Shorthand** [1]  91:18
**shot** [2] 54:23  54:23
**shots** [1] 54:22
**show** [3] 21:10  52:5
86:9
**showed** [2]  71:1
71:1
**showing** [2]  8:1
74:4
**shown** [3]  52:3
88:17  88:18
**side** [5]  31:23  44:15
44:19  54:3  54:7
**sides** [5] 5:4  9:23
9:25  89:22  90:2
**significance** [1]
39:23
**significant** [5]  39:22
42:23  43:3  43:4
87:23
**Siker** [3]  1:11
88:23  88:24

**similar** [1]  26:12
**simply** [2]  41:5
47:16
**Sinai** [1] 22:22
**single** [2]  6:9
16:23
**singled** [1]  18:11
43:11
**sit** [2]  18:4  20:25
**site** [5]  13:7  22:17
22:19  75:3  75:15
**sites** [3] 30:7  31:20
**situation** [4]  5:16
47:23  47:24  66:13
**situations** [2]  29:15
**six** [8]  11:12  30:10
70:19  70:22  74:15
78:10  78:18  81:3
**six-block** [1]  74:20
**size** [1]  16:3
**sliced** [1]  85:23
**slightest** [1]  82:25
**soft** [2]  75:18
**solely** [1]  69:18
**someone** [4]  14:12
14:13  34:19  59:7
**somewhat** [1]  84:8
**somewhere** [1]  68:1
**soon** [1] 55:16
**sort** [7]  32:24  41:19
44:12  47:15  48:13
50:4  82:3
**sorts** [1] 36:8
**sought** [2]  7:24
20:3
**source** [2]  13:21
13:22
**south** [2]  27:1
27:2
**space** [7]  26:22
27:2  52:9  56:14
56:16  68:11  70:18
71:18
**speak** [3]  41:1
76:8  77:25
**Speakers** [1]  11:10
**speaking** [1]  9:22
55:13
**special** [23]  2:6
2:10  2:14  3:1
10:5  10:8  41:4
41:5  42:10  42:14
45:19  47:16  47:18
48:1  51:25  59:22
63:7  66:12  66:12
67:25  75:24  76:14
86:2
**specialized** [1] 28:23
**specific** [5]  3:9
39:19  44:8  44:9
78:7  86:11
**specifically** [4] 7:8
30:16  54:17  78:24

**speculate** [1]  40:8
86:7
**spend** [1]  26:5
**sponsor** [1]  75:21
**SSI** [1]  13:23
**St** [1]  59:23
**stable** [4]  30:5
33:2  33:3  33:5
**staff** [6]  16:5  16:24
58:19  58:22  64:23
69:23
**stairs** [1]  38:21
**stairways** [1]  41:17
**stand** [1]  11:8
21:16
**stand-alone** [1] 71:18
**standard** [2]  6:11
74:22
**standards** [1]  10:11
**started** [1]  67:12
**starting** [1]  44:11
80:1
**state** [7]  2:22  7:18
44:2  44:10  45:9
45:13  91:1
**statement** [12]  3:16
3:20  4:6  6:10
6:15  10:16  45:3
51:7  65:24  70:9
82:20  83:15
**statements** [1] 6:6
6:9  18:14  18:18
50:23  69:24
**States** [1]  80:2
**statistic** [1]  76:17
**status** [1]  83:18
**Statute** [1]  44:2
**stay** [3]  30:1  33:11
68:16
**stayed** [1]  34:1
**staying** [2]  30:2
34:3
**stenographic** [1]
91:9
**step** [1]  33:1
**steps** [1]  59:1
**stick** [1]  70:13
**still** [4]  8:18  74:23
74:24  85:21
**stipulate** [1]  66:9
**stop** [1]  46:18
**stopped** [5]  55:18
58:8  60:10  60:11
64:22
**stopping** [1]  65:6
**store** [4]  23:13  36:22
64:1  64:18
**story** [1] 52:18
**straight** [1]  61:11
62:17
**stranger** [1]  16:12
**strategy** [1]  70:10

**street** [1]  1:13
21:17  47:13  51:21
54:21  57:10  57:11
57:19  60:12  67:2
67:3  68:13  68:15
68:17  70:8  80:18
81:15
**streets** [7]  30:2
30:20  31:4  32:25
68:21  68:22  68:25
**stretcher** [1]  38:20
**stretchers** [1]  78:16
**stricken** [2]  6:5
6:12
**strike** [3]  4:15
4:22  4:22
**strong** [2]  5:2
38:7
**stronger** [1]  66:14
**structure** [5]  48:23
52:9  52:10  52:16
83:1
**study** [1]  30:14
30:17
**stumbled** [1]  72:21
72:22
**subject** [2]  50:15
50:17
**submission** [1] 51:10
**submissions** [2]
84:2  85:3
**submit** [4]  5:9
5:15  5:24  53:16
84:2
**submitted** [8]  3:6
4:1  5:19  10:21
35:15  39:11  53:21
86:16
**submitting** [1] 72:9
**subsequent** [2]  2:11
73:3
**subsidize** [1]  14:6
**substance** [1]  67:23
**substantial** [4]  3:6
26:21  53:6  88:10
**substantially** [1]
79:14
**such** [5] 2:20  7:22
14:24  30:14  40:22
**suffer** [3]  66:24
70:6  79:3
**suffered** [1]  55:5
**sufficient** [1]  17:2
52:7
**suggest** [1]  6:17
**suggested** [2]  17:11
75:4
**suggestion** [2]  18:1
43:18
**suggestions** [1] 16:15
**suitable** [1]  69:13
**Suite** [1] 1:15
**sum** [2]  72:10  83:6



**summer** [4]  16:5
16:22  24:22  71:7
**superior** [2]  74:21
78:19
**supervised** [1]  63:15
**supervision** [2] 40:21
56:17
**supplement** [2] 4:17
5:11
**supplemental** [3]
4:23  5:3  84:14
**supply** [1]  84:13
**supplying** [1]  85:11
**support** [4]  3:17
3:21  69:7  76:1
**supported** [6]  29:3
29:5  29:6  29:12
43:21  76:19
**supporting** [1] 75:2
**supportive** [2]  12:23
20:20  42:17
**supposed** [1]  65:8
**surrounding** [1]
16:6
**surveillance** [1]
61:13
**survey** [2]  21:12
78:13
**swear** [1]  10:18
**swing** [1]  26:25
**sworn** [5]  11:7
11:9  11:12  53:21
80:13
**system** [3]  16:8
49:9  83:11
**systems** [1]  50:2
**SZYMANSKI** [2]
1:9  89:4

**-T-**

**T-bone** [1]  56:18
**tables** [2]  26:23
27:3
**Taj** [1]  70:24
**taking** [3]  66:15
82:8  82:9
**target** [1]  75:21
**television** [1]  78:15
**tells** [1]  7:7
**temporary** [1]  32:24
**tend** [1]  76:12
**Tercse** [3]  1:20
91:5  91:17
**term** [1] 87:23
**terms** [4]  29:15
53:9  53:9  78:19
**test** [1]  71:7
**testified** [8]  37:11
47:23  67:4  67:5
67:16  74:25  79:4
81:24
**testifies** [1]  50:25

**testify** [5]  11:3
11:5  24:25  48:4
83:19
**testifying** [3]  48:7
61:22  67:24
**testimony** [18]  1:17
5:18  39:10  46:4
47:14  52:2  53:2
53:5  63:12  65:21
65:21  66:2  66:6
69:20  85:24  86:24
89:8  89:17
**thank** [24]  2:21
3:3  10:14  18:24
27:25  28:1  28:4
38:23  47:4  47:5
50:11  57:14  59:11
59:12  65:13  73:16
73:17  83:13  85:4
88:19  88:21  89:20
90:12  90:13
**therefore** [8]  8:22
44:9  51:14  53:6
53:12  73:14  74:20
86:5
**they've** [1]  58:9
**thinking** [1]  42:13
**thinks** [1]  6:16
**third** [7]  1:13
12:15  12:17  33:19
38:13  77:18
**thought** [2]  55:19
86:1
**THP** [2] 33:18  34:20
**three** [8] 10:20  50:15
55:15  55:24  72:14
73:4  76:10  84:11
**through** [10]  11:18
16:20  28:13  32:4
49:7  52:4  52:5
78:13  83:4  83:5
**throw** [1]  76:25
**thse** [1]  71:16
**thugs** [1]  80:20
**thumbing** [2]  71:8
71:9
**tie** [1]  56:7
**Time's** [1]  47:3
**times** [8]  3:10
16:15  55:22  55:22
55:24  57:6  57:7
76:22
**today** [9]  5:15
18:5  24:17  39:11
49:7  52:18  69:20
73:15  89:21
**toilets** [1]  78:14
**tonight** [5]  9:3
9:5  9:22  87:7
90:12
**too** [4]  41:23  78:23
86:14  87:10
**top** [2]  14:15  39:12
**topic** [1] 24:4
**total** [2] 3:17  3:21

**4:1  4:5
totality** [1]  42:12
**traditional** [1]  7:17
**traditionally** [1]
14:10
**traffic** [4]  9:17
9:18  39:17  65:7
**tragedy** [2]  16:1
19:14  19:21
**tragic** [1]  19:6
**training** [2]  16:11
50:2
**transcript** [3]  6:19
89:14  91:9
**transition** [2] 87:20
88:15
**transitional** [13]
2:5  12:11  32:2
32:3  32:18  32:24
35:21  36:3  36:6
59:4  59:8  75:25
84:15
**transport** [2]  23:14
38:13  38:16
**transportation** [3]
22:7  36:11  36:11
**transporting** [1]
38:19
**treat** [1] 31:9
**treatment** [1]  60:2
**Tri-Corp** [8]  2:24
3:8  11:23  13:6
19:20  52:14  87:21
88:13
**Tri-Corp's** [1]  77:23
**trial** [3]  3:7  4:17
4:23
**tried** [1]  71:6
**true** [5]  8:9  18:21
37:4  71:15  72:19
**truly** [1] 69:14
**trust** [1]  88:1
**try** [3]  36:4  50:2
70:11
**trying** [3]  41:3
49:17  50:1
**turned** [1]  51:25
**turning** [1]  12:1
12:18  15:15
**two** [17]  9:4  9:6
10:6  10:25  44:25
45:8  46:21  54:2
55:24  63:13  63:14
65:21  71:6  79:15
81:16  83:18  86:20
**two-block** [1]  63:9
**two-minute** [1]  71:2
**twofold** [1]  13:8
**type** [14] 21:2  22:24
24:18  24:18  30:8
34:15  48:15  54:13
54:15  54:16  70:16
70:17  79:16  79:4
**types** [5]  44:3

76:12  79:8  88:2
88:3
**typical** [1]  69:17
**typically** [6]  14:11
15:9  15:11  26:1
41:15  76:8

**-U-**

**ultimately** [3]  40:11
42:20  44:22
**Um-hum** [1]  47:21
**uncertainties** [1]
42:15
**uncontroverted** [1]
86:25
**under** [7]  4:12
6:25  7:21  10:8
10:9  44:6  73:20
**understand** [15] 20:19
23:19  27:16  28:5
30:6  41:15  41:22
41:25  47:14  50:5
59:15  63:11  82:16
88:10  88:12
**understood** [1] 50:14
**undertaken** [2]  7:18
49:2
**undue** [9]  7:6
8:16  40:12  73:22
74:5  74:7  74:11
86:4  86:10
**unfortunate** [1] 74:16
**unique** [1]  47:23
**unit** [1]  70:21
**United** [1]  80:2
**units** [1] 76:18
**unknown** [1]  45:23
**unless** [2]  85:3
87:19
**unmet** [1]  30:8
87:12
**unreasonable** [1]
8:2  8:15  48:25
51:16  73:21  73:23
74:4  86:16
**unsafe** [6]  41:17
43:7  43:7  43:11
58:5  66:6  66:20
69:1  70:3  70:4
**up** [2] 7:4  8:17
10:11  10:12  10:16
14:18  15:21  27:3
29:19  30:25  36:25
42:16  42:17  42:20
47:3  50:20  51:21
57:13  63:20  75:7
81:7  81:24  90:8
**up-front** [1]  72:1
**urban** [2]  67:6
70:5
**urge** [1]  6:10
**used** [11]  7:6
26:24  28:1  28:8
31:22  56:6  56:8

63:24  67:19  71:19
81:6
**uses** [4]  5:17  41:4
41:8  86:3
**usual** [2]  16:7
71:14
**utilize** [2]  22:6
25:14

**-V-**

**vacancies** [1]  14:8
**vacancy** [1]  14:11
**values** [1]  69:18
**variance** [1]  7:12
**various** [1]  14:17
58:16
**variously** [1]  66:25
**vermin** [1]  41:18
**versus** [1]  84:11
**victimized** [2]  19:15
70:8
**victims** [1]  58:9
58:12
**video** [1]  16:9
**view** [2] 5:3  89:23
**violence** [1]  67:3
**visit** [2] 40:16  46:25
**vitae** [2] 28:18  39:7
**vulnerable** [4]  66:9
66:10  79:2  82:8

**-W-**

**W** [1]  1:12
**waiting** [2]  30:9
30:11
**walk** [4] 56:17  56:18
58:23  68:21  68:22
78:13  82:5
**walked** [1]  63:14
**walking** [1]  57:19
70:8
**watch** [1]  72:17
**waters** [1]  72:3
**ways** [4] 23:5  23:5
23:6  85:22
**weather** [1]  66:15
**Wednesday** [1] 60:10
**weeks** [1]  55:15
**weigh** [1]  45:20
**weight** [4]  6:15
6:17  55:11  85:17
**welfare** [1]  42:6
66:3  86:15
**well-being** [2] 69:19
69:21
**Wells** [3]  58:14
59:20  65:7
**west** [70]  1:5
2:3  9:3  9:6
12:4  12:6  12:10
12:19  12:22  13:14

| | | |
|---|---|---|
| 13:16 | 14:1 | 14:6 |
| 14:9 | 14:17 | 14:18 |
| 15:4 | 15:25 | 16:7 |
| 17:9 | 18:9 | 26:12 |
| 26:13 | 26:22 | 27:11 |
| 27:14 | 30:24 | 31:13 |
| 31:23 | 33:7 | 33:11 |
| 33:19 | 33:22 | 34:20 |
| 34:24 | 35:21 | 35:22 |
| 37:5 | 40:22 | 42:18 |
| 42:21 | 44:15 | 44:19 |
| 45:15 | 46:9 | 46:19 |
| 46:24 | 47:8 | 49:14 |
| 54:3 | 54:7 | 59:20 |
| 63:3 | 63:20 | 64:9 |
| 64:23 | 65:24 | 67:15 |
| 68:14 | 69:25 | 70:22 |
| 74:17 | 74:17 | 74:18 |
| 77:3 | 77:4 | 78:5 |
| 81:22 | 84:6 | 91:6 |

**Westhaven** [1] 77:19
**Whitefish** [1] 74:19
**Williams** [30] 10:25
| 53:5 | 59:13 | 59:14 |
| 59:18 | 59:20 | 59:23 |
| 60:1 | 60:8 | 60:16 |
| 60:22 | 60:25 | 61:3 |
| 61:6 | 61:9 | 61:11 |
| 61:20 | 62:1 | 62:5 |
| 62:9 | 62:13 | 62:23 |
| 63:5 | 63:17 | 63:23 |
| 64:7 | 64:11 | 64:16 |
| 64:24 | 65:5 | |

**Williams'** [1] 4:16
**willing** [1] 17:17
**willingness** [1] 69:12
**Winkler** [3] 6:3
| 6:4 | 6:14 | |

**Winkler's** [1] 6:8
**Wisconsin** [6] 1:13
| 1:15 | 1:15 | 7:18 |
| 91:1 | 91:7 | |

**wish** [1] 5:15
**wishes** [1] 80:7
**within** [12] 39:6
| 41:12 | 41:16 | 46:20 |
| 47:25 | 48:22 | 63:13 |
| 67:10 | 67:15 | 74:15 |
| 79:21 | 88:13 | |

**without** [2] 42:24
| 50:9 | | |

**witness** [1] 50:25
| 53:19 | | |

**witnesses** [10] 3:17
| 3:20 | 9:21 | 10:18 |
| 10:24 | 11:12 | 50:15 |
| 50:23 | 66:7 | 83:18 |

**woman** [1] 24:25
**wonder** [2] 47:15
| 49:1 | | |

**wonderful** [1] 66:18
**words** [1] 55:14
**worked** [5] 3:10
| 16:10 | 31:1 | 33:4 |
| 54:3 | | |

**works** [3] 3:15

| | | |
|---|---|---|
| 83:11 | 87:2 | |

**World** [1] 1:13
**written** [2] 6:7
| 30:19 | | |

### -Y-

**year** [6] 16:15   23:23
| 47:19 | 79:11 | 79:14 |
| 80:4 | | |

**year's** [1] 83:8
**years** [15] 26:15
| 29:16 | 37:19 | 54:8 |
| 60:9 | 64:6 | 64:10 |
| 64:12 | 76:10 | 76:12 |
| 79:8 | 79:15 | 83:10 |
| 84:12 | 88:9 | |

**yet** [1] 67:16
**younger** [1] 64:17

### -Z-

**Zetley** [50] 1:9
| 2:21 | 3:3 | 4:12 |
| 9:8 | 9:11 | 9:13 |
| 9:15 | 9:17 | 9:19 |
| 10:17 | 10:23 | 11:2 |
| 11:6 | 11:11 | 18:24 |
| 28:1 | 28:6 | 28:8 |
| 38:24 | 44:24 | 47:3 |
| 47:5 | 50:11 | 50:17 |
| 50:19 | 51:4 | 55:10 |
| 57:16 | 59:19 | 62:25 |
| 64:13 | 65:11 | 65:14 |
| 65:17 | 72:14 | 73:17 |
| 73:19 | 75:12 | 82:14 |
| 83:13 | 83:21 | 83:24 |
| 84:20 | 85:2 | 88:7 |
| 88:21 | 88:25 | 89:2 |
| 89:9 | | |

**zoning** [7] 1:2
| 1:18 | 7:12 | 39:25 |
| 40:23 | 41:3 | 86:23 |