# ATTACHMENT D

State of Wisconsin : Circuit Court
Milwaukee County

# WHEDA v. Tri-Corp Housing
07 CV 13965



Video Deposition of
## Maria Prioletta
Recorded 03/20/2009 in Milwaukee, WI
9:39 am - 10:32 am, 48 mins. elapsed

## Magne-Script
(414) 352-5450

*17939 Standard transcript with exhibits*

```
 1              documents that you brought here today?
 2      A       Yes.
 3      Q       Could I see what they are?
 4      A       Sure.
 5                      MR. SMOKOWICZ:  And those, that's what you
 6              have here, correct?
 7                      WITNESS:  That's correct.  Mm-hmm.
 8                      REPORTER:  I'm sorry.  I didn't understand
 9              what you said, Mr. Smokowicz.
10                      MR. SMOKOWICZ:  I said that "That's what you
11              have here," and she said, "That's correct."
12                      REPORTER:  Thank you.
13                      MR. MACHULAK:  Okay.  If we could mark this
14              as Exhibit 132.
15                      MR. SMOKOWICZ:  I think you...
16      BY MR. MACHULAK:
17      Q       All right.  I assume we're looking at the same
18              document --
19      A       Yes.
20      Q       -- that I just marked as Exhibit 132.  Okay.  Can
21              you identify what this document is?
22                      (Exhibit 132 identified)
23      A       It's an e-mail that I sent to the Department of
24              City Development, my boss, Martha Brown, after
25              having attended a meeting at WHEDA regarding West
```

1      Samaria.
2   Q  Okay.  And this meeting was held where?
3   A  It was at the WHEDA offices.
4   Q  In Milwaukee?
5   A  Yes.
6   Q  And this would be on October 19, at -- I believe
7      it was in the afternoon?
8   A  [Nodding]
9               MR. SMOKOWICZ:  The meeting?
10              MR. MACHULAK:  Yes.
11              MR. SMOKOWICZ:  Or the e-mail?
12              MR. MACHULAK:  Both, to be honest with you.
13  Q  I mean the meeting was on October 19th in the
14     afternoon.
15  A  Yes.
16  Q  Right?
17  A  Mm-hmm.  Yes.
18              MR. SMOKOWICZ:  Just want to make sure we
19         got the question clear.
20              MR. MACHULAK:  It was a dual-purpose
21         question assigned to expedite the process.
22  Q  So the --
23              MR. SMOKOWICZ:  Nice try, John.
24              REPORTER:  I'm sorry.  I didn't understand
25         what you said.

1  Q   Could you spell that?
2  A   I hope -- I'm not quite sure I'll be correct in
3      spelling this. K-r-o-s-h-u-s.
4  Q   Okay. And then you said "Adam" -- go on to say
5      "Adam Geer," G-e-e-r, "from Heartland." And that
6      would be Heartland Housing?
7  A   "Andrew Geer from Heartland."
8  Q   Oh. Excuse me.
9  A   Mm-hmm.
10 Q   "And Alderman Bauman," correct?
11 A   That is correct.
12 Q   All right. It goes on to state, "Here's what was
13     discussed. It's not a matter of if WHEDA's going
14     to foreclose. It's when. They want Tri-Corp
15     out." Okay. Where did this information come
16     from?
17 A   I don't recall the conversation, so I don't
18     recall who said that.
19 Q   Can you tell me -- you honestly had a chance to
20     review your e-mail -- in your best recollection,
21     what happened at the meeting?
22 A   Right. That meeting was quite some time ago, so
23     I didn't have a clear recollection of the
24     meeting. What I can call from memory is that
25     WHEDA had indicated that Tri-Corp was in default

1  get a chance to read --
2  A  Yes.
3  Q  -- all the way through.  Let me just take a
4  moment to read that.
5  MR. SMOKOWICZ:  Should we go off the record
6  so you can do that?
7  MR. MACHULAK:  Yeah.  That's fine.
8  REPORTER:  Off the record.
9  (Off the record 9:52 - 9:54)
10  REPORTER:  We're back on the record.
11  BY MR. MACHULAK:
12  Q  Okay.  When you recited -- When you composed this
13  e-mail that we've marked as Exhibit No. 132, were
14  you trying to walk through the meeting
15  progressive?
16  A  Yes.
17  Q  Okay.  So I mean, the very first thing is this
18  line that I've read to you before, "It's not a
19  matter of if WHEDA's going to foreclose.  It's
20  when.  They want Tri-Corp out."  I mean, was that
21  right out of the box at the meeting?
22  A  I don't recall, as I said, that statement.  But I
23  do recall, in terms of starting the meeting,
24  WHEDA indicating that the mortgage was in
25  default.

```
 1              were definitely talking about closing down West
 2              Samaria, right?
 3       A      Again, I don't recall that in the conversation.
 4              I just recall the discussion regarding if
 5              something were done with it, what could -- what
 6              would potential reuses be, or who could
 7              potentially come in to help.
 8       Q      Okay.  In the e-mail, it says -- the one after
 9              "It's not a matter" -- in your first line that we
10              read about WHEDA, it says, "They are thinking
11              about the deed to appoint some type of temporary
12              receiver to manage things while everything shakes
13              out."  And is the "they" there WHEDA?
14       A      Yes.
15       Q      And it goes on to say, "They don't want to
16              proceed until they know where things are going,
17              both on a temporary basis, with a receiver
18              managing the building, and long-term."  Again,
19              the "they" is WHEDA?
20       A      Yes.
21       Q      And then here it goes on to say, "BOZA says he
22              still wants to ask BOZA to revoke their occupancy
23              permit and would not support any redevelopment of
24              the project, and has told Heartland that, as well
25              as the fact that he thinks it would be a bad idea
```

1    for them."
2         MR. SMOKOWICZ: I think you misspoke at the
3    beginning, John. I think you said "BOZA" --
4         WITNESS: You said "BOZA."
5         MR. SMOKOWICZ: -- and you meant Bauman.
6         WITNESS: And it was "Bauman."
7         MR. MACHULAK: Okay. Let me read it again
8    so it's clear.
9         MR. SMOKOWICZ: Good.
10   BY MR. MACHULAK:
11   Q  "Bauman said he still wants to ask BOZA to revoke
12      their occupancy permit and would not support any
13      redevelopment of the project, and has told
14      Heartland that, as well as the fact that he
15      thinks it would be a bad idea for them." Let me
16      just focus on that. So is this something that is
17      -- this obviously came from the meeting, correct?
18   A  Yes.
19   Q  Did you ever talk to Alderman Bauman before or
20      after the meeting on West Samaria?
21   A  I talked to him after the meeting about the
22      meeting. Don't recall the conversation, but I
23      have notes on it in this e-mail.
24   Q  Toward way at the end there.
25   A  Correct.

1  Q  Okay. And what was your understanding of the
2     proceedings before BOZA at the time of this
3     October meeting?
4  A  I wasn't real familiar with the proceedings
5     before BOZA.
6  Q  And when he -- in your notes here it says, "And
7     would" -- referring to Bauman -- "would not
8     support any redevelopment of the project, and has
9     told Heartland that." He made it clear to
10    Heartland that he didn't want Heartland in there
11    redeveloping this, right?
12        MR. SMOKOWICZ: I'm going to object to the
13        form of the question.
14 A  Yeah.
15 BY MR. MACHULAK:
16 Q  Is that right?
17 A  I think, again, I don't recall this particular --
18    a lot of the conversation about the meeting. I
19    do recall him telling Heartland that he didn't
20    think it was a good idea because of the location
21    and design of the building to pursue it as a
22    project.
23 Q  Okay. And he said that to them at this meeting,
24    right?
25 A  Yes.

| | | |
|---|---|---|
| 1 | Q | I mean, is this the only time you would have |
| 2 | | watched some interaction between Alderman Bauman |
| 3 | | and Heartland, correct? |
| 4 | A | Correct. |
| 5 | Q | And you didn't participate in any other meetings |
| 6 | | between Alderman Bauman and Heartland? |
| 7 | A | No. |
| 8 | Q | Then we go on to say, "He said that the property |
| 9 | | is a combination of three things: bad design, bad |
| 10 | | location, and bad operator." The "he" is |
| 11 | | referring to Alderman Bauman, again? |
| 12 | A | Yes. |
| 13 | Q | And he -- when it says the comment here, "Even if |
| 14 | | you change the operator, you can't overcome the |
| 15 | | other two," that again would be referred to some |
| 16 | | comment by Alderman Bauman? |
| 17 | A | Yes. |
| 18 | Q | How did Heartland react to this when he was |
| 19 | | saying this? |
| 20 | A | I don't recall. |
| 21 | Q | Now, did Alderman Bauman speak from -- I mean, |
| 22 | | when he was talking about this, had you assumed |
| 23 | | that he had been inside West Samaria and was |
| 24 | | familiar with the operation? |
| 25 | A | I would have no knowledge of that. |

**Prioletta, Maria**

| | |
|---|---|
| From: | Prioletta, Maria |
| Sent: | Friday, October 19, 2007 6:07 PM |
| To: | Brown, Martha |
| Subject: | West Samaria |



Had our meeting this afternoon. Present: the two Jims from the County, Antonio, Rae Ellen, Bill Boerigter and Adam from WHEDA, Andrew Geer from Heartland and Alderman Bauman.

Here's what was discussed:

It's not a matter of if WHEDA is going to foreclose, it's when. They want Tri Corp out.

They are thinking about the need to appoint some type of temporary receiver - to manage things while everything shakes out.

They don't want to proceed until they know where things are going - both on a temporary basis with a receiver managing the building and long term.

Bauman said he still wants to ask BOZA to revoke their occupancy permit, and would not support any redevelopment of the project, and has told Heartland that, as well as the fact he thinks it would be a bad idea for them. He said that the property is a combination of three things - bad design, bad location and bad operator. Even if you changed the operator, you can't overcome the other two. Also said that given the needs of the clients, this really should be a CBRF, and should be licensed and monitored by the State.

Heartland rep said they had only looked at it - had not done any work, and were not making any commitments to move forward. In past deals - where they had taken over an SRO - they usually would reduce density by about half - and would recommend the same thing here, plus the addition of onsite case management and services.

There are currently some vacant units, County thought 82 of the 91 units are occupied.

As I was listening to all of this, Antonio said he had mentioned it in passing to the Mayor (not discussed it, just said that they were working on it) and wanted to know what the City thought.

I replied

Like all the people in the room, our primary concern regardless of what was going to be proposed, was the welfare of the residents.

In regard to alternatives, I asked if they had done even some type of preliminary analysis of what it would cost to pursue a "Heartland" like alternative - reducing the density, rehabbing the building, creating more common space. And, had they considered where the money for this would come from. They had not - or at least, they indicated they had not.
I said I thought that it might be helpful to do this even from a very conceptual standpoint, so you could weigh the economic costs of pursuing that vs. any other alternative. Also told him that we respected their investment in the project.

I suggested if it's feasible, that regardless of what alternative they are going to pursue, it is going to involve some at least temporary relocation for a portion of the tenant base. Perhaps the County should stop placing tenants there.

WHEDA said they were going to "debrief" from the meeting, and perhaps go through the exercise of looking at the potential costs for various alternative.

Talked to Bauman afterwards - I might be wrong, but I think he could conceivably go along with a new owner, operator alternative. He didn't say this, but I think if it was a little more detailed alternative, and perhaps you had at least gone through the exercise of looking at other options, he would give careful consideration to it. I myself would like to know the financial costs of two alternatives - the possible Heartland alternative, and the tear it down alternative. In regard to the ter, I know it's an extreme, and that above all, there would have to be someplace good for the existing tenants to go, but here is significant cost to reinventing it, and it's still not a good special needs project..... To be fair, even if you did do that, I think it would be a while before you would attract any other type of development to the site.

1