# ATTACHMENT F

COURT OF APPEALS
DECISION
DATED AND FILED

May 10, 2011

A. John Voelker
Acting Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. 2010AP1443

STATE OF WISCONSIN

Cir. Ct. No. 2007CV13965

IN COURT OF APPEALS
DISTRICT I

WISCONSIN HOUSING AND ECONOMIC DEVELOPMENT AUTHORITY,

    PLAINTIFF,

  V.

TRI CORP HOUSING, INC.,

    DEFENDANT-THIRD-PARTY
    PLAINTIFF-APPELLANT,

RELIABLE WATER SERVICES, LLC, MILWAUKEE COUNTY HOME REPAIR AND ZIGNEGO READY MIX, INC.,

    DEFENDANTS,

  V.

ROBERT BAUMAN, ALDERMAN,

    THIRD-PARTY DEFENDANT-RESPONDENT.

APPEAL from a judgment of the circuit court for Milwaukee County: MEL FLANGAN, Judge. *Affirmed in part, reversed in part and cause remanded.*

Before Curley, P.J., Kessler and Brennan, JJ.

¶1    KESSLER, J. Tri-Corp Housing, Inc. appeals the summary judgment dismissing all of Tri-Corp's claims against Alderman Robert Bauman. Tri-Corp argues that the trial court erred when it: (1) granted summary judgment in Alderman Bauman's favor with regard to Tri-Corp's conspiracy and tortious interference with a contract or prospective contract claim because disputed issues of material fact existed as to both claims; and (2) concluded that Tri-Corp's damages were speculative. We have affirmed the trial court with regard to Tri-Corp's conspiracy claims against the Wisconsin Housing and Economic Development Authority (WHEDA) in a separate appeal and now affirm the trial court with regard to the conspiracy claims against Alderman Bauman. However, we conclude that issues of material fact exist regarding Tri-Corp's tortious interference with a contract or prospective contract claim against Alderman Bauman. Accordingly, we affirm in part and reverse in part and remand.

## BACKGROUND

¶2    This appeal arises out of a third-party complaint by Tri-Corp alleging claims of conspiracy and tortious interference with a contract or prospective contract against Alderman Bauman. In its complaint, Tri-Corp, a non-profit organization that provides housing to cognitively impaired individuals not in need of confinement, alleges that Alderman Bauman interfered with Tri-Corp's operation of West Samaria, a residential facility for the cognitively impaired. Tri-Corp contends that Alderman Bauman's interference prompted Milwaukee

County, a major source of residential referrals, to stop referring potential residents to West Samaria.

¶3      Tri-Corp previously appealed dismissal of all of its counterclaims against WHEDA, the entity that financed Tri-Corp's business activity through a mortgage secured in part by West Samaria. We affirmed that judgment, and the judgment foreclosing the WHEDA mortgage, in all respects in *Wisconsin Housing and Economic Development Authority v. Tri-Corp Housing Inc.*, No. 2010AP418, unpublished slip op. ¶1 (WI App Mar. 8, 2011) ("*Tri-Corp I*"). The dismissed counterclaims alleged: (1) breach of the duty of good faith; (2) tortious interference with commercial relations; (3) conspiracy in violation of WIS. STAT. § 134.01 (2009-10);[1] (4) common law civil conspiracy; (5) violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act and of the Wisconsin's Organized Crime Control Act ("WOCCA"); (6) violations of the Federal Fair Housing Act; (7) violation of the Americans with Disabilities Act; and (8) violation of the Rehabilitation Act. *Tri-Corp I*, No. 2010AP418, ¶7. *Tri-Corp I* is the law of the case in this appeal to the extent that the same legal issues have already been resolved. *See State v. Stuart*, 2003 WI 73, ¶23, 262 Wis. 2d 620, 664 N.W.2d 82 ("The law of the case doctrine is a longstanding rule that a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal.") (one set of quotation marks and citation omitted). Unpublished decisions may be cited when they establish the law of the case. WIS. STAT. § 809.23(3)(a).

---

[1] All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise noted.

¶4   Tri-Corp does not allege in its third-party complaint that Alderman Bauman caused it to default on its mortgage; however, its allegation that Alderman Bauman and WHEDA conspired against Tri-Corp by, among other things, WHEDA foreclosing on the mortgage, was dismissed on summary judgment and sustained by us with regard to WHEDA in *Tri-Corp I*. *See id.*, No. 2010AP418, ¶27. Tri-Corp argues here that a number of facts other than the WHEDA foreclosure collectively demonstrate that Alderman Bauman interfered with Tri-Corp's business relationship with Milwaukee County.

*Facts relevant to this appeal.*

¶5   It is undisputed for purposes of this appeal that:

- West Samaria existed as a housing facility for cognitively disabled persons at 2713 West Richardson Place, Milwaukee, since before 1993.

- In 1997, Alderman Bauman bought a home approximately two blocks from West Samaria.

- In 2003, WHEDA gave Tri-Corp a multi-family mortgage for approximately $1.6 million which was secured by two buildings: (1) West Samaria, and (2) New Samaria, located at 6640 West Beloit Road, West Allis, WI.

- Both facilities were operated by Tri-Corp to provide housing and meals for cognitively disabled persons.

- Approximately two-thirds of the residents at these facilities were referred to Tri-Corp by Milwaukee County.

4

- Rent was paid by each resident from funds provided to the resident by Milwaukee County and/or managed for the resident by a Milwaukee County employee.

- In the spring 2004 election Bauman was elected Alderman of the Aldermanic District in which West Samaria was located.

- Alderman Bauman was a vocal opponent of the West Samaria facility since at least 2005 and publically opposed Tri-Corp's special use permit to operate West Samaria.

- Antonio Riley was the Executive Director of WHEDA at times material to this appeal.

- Alderman Bauman and Riley knew each other and were friends.

- In June 2006, the Board of Zoning Appeals (BOZA) granted Tri-Corp the special use permit that Alderman Bauman opposed.

- Tri-Corp failed to make its June 2007 mortgage payment. On July 2, 2007, WHEDA notified Tri-Corp of the missed payment.

- In August 2007, Alderman Bauman and Riley met and discussed West Samaria. Alderman Bauman's handwritten notes, dated August 8, 2007, stated that the "[g]oal" regarding West Samaria was to "Relocate residents and RAZE." (Emphasis in original.)

- On August 10, 2007, WHEDA recovered the amount of the missed June payment plus late fees from a Tri-Corp account. This is the last mortgage payment WHEDA received from Tri-Corp.

5

- On October 19, 2007, WHEDA held a meeting with representatives from Milwaukee County responsible for residential referrals to West Samaria, along with Alderman Bauman, representatives from the Milwaukee Department of City Development, and Heartland Housing, an entity with potential interest in taking over the operation of West Samaria. Tri-Corp was not invited to attend. WHEDA announced the potential of a foreclosure on West Samaria and Alderman Bauman again expressed his dislike for the housing facility.

- On November 8, 2007, WHEDA told Tri-Corp it was going to foreclose.

- On November 19, 2007, WHEDA filed the foreclosure action.

Additional facts will be provided as relevant to the discussion.

## DISCUSSION

*Standard of Review.*

¶6   We review the grant or denial of a summary judgment motion *de novo*, applying the same methodology as the trial court. *Cole v. Hubanks*, 2004 WI 74, ¶5, 272 Wis. 2d 539, 681 N.W.2d 147. "On motion for summary judgment, the burden is on the moving party to establish the absence of a genuine issue of material fact." *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 984, 473 N.W.2d 506 (Ct. App. 1991). "Once the movant establishes a prima facie case for summary judgment, the court then must examine the affidavits in opposition to the motion. To defeat the motion, the opposing party must set forth

facts showing there is a genuine issue for trial." *Id.* (internal citation omitted; emphasis omitted).

¶7 We, like the trial court, may not decide issues of fact but must determine only whether a disputed issue of material fact exists. *Fischer v. Doylestown Fire Dep't*, 199 Wis. 2d 83, 87, 543 N.W.2d 575 (Ct. App. 1995). "Finally, if there is doubt as to whether a genuine issue of material fact exists, we will resolve those doubts against the party moving for summary judgment." *Kerry Inc. v. Angus-Young Assocs., Inc.*, 2005 WI App 42, ¶7, 280 Wis. 2d 418, 694 N.W.2d 407. "A factual issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991) (citation and one set of quotation marks omitted).

*A. Alderman Bauman's Opposition to West Samaria.*

¶8 It is undisputed that Alderman Bauman vocally opposed West Samaria, particularly following the deaths of two West Samaria residents. On July 4, 2004, a resident of West Samaria, David Rutledge, was assaulted by a gang outside the West Samaria facility. Rutledge was brought to West Samaria, a guard called 911, and Rutledge was transported to the hospital. Unfortunately, Rutledge died a few days later. In March 2006, and again in May of the same year, Alderman Bauman appeared before BOZA and characterized Tri-Corp's conduct with respect to Rutledge's death in ways that were factually untruthful.[2] Specifically, Alderman Bauman stated:

---

[2] Claims by Rutledge's Estate against Tri-Corp were dismissed on summary judgment in Milwaukee County Case 07-CV-7485.

7

> The cavalier comment was made, well, it's not the applicant's responsibility to watch over Mr. Rutledge 50 feet from the door of the establishment, but that's not all that happened in this case. While it's true that Mr. Rutledge was beaten on the public right-of-way, he also stumbled into the premises after he was beaten. He stumbled in. No one was there to ask him what happened, are you hurt, do you need attention, no one called the police, no one even knew what happened to the poor man....
>
> That is the level of care that this fine establishment likes to maintain. A man can get beaten nearly to death 50 feet in front of the door, and while it is the public's responsibility in the public right-of-way, he goes back into his home, and no one gives a damn.

¶9   In February 2007, three years after Rutledge's death, the Milwaukee Journal Sentinel reported that Joseph Droese, a resident of West Samaria, was found dead in his room.[3] Following Droese's death, Alderman Bauman emailed the City of Milwaukee Department of Neighborhood Services ("DNS") asking for an order to close West Samaria. The email, dated March 1, 2007, stated:

> Please take immediate action regarding West Samaria.... The fact that a resident died and was not discovered for 4 days suggests that the facility is not operating in compliance with their plan of operation or operating in a manner consistent with the health, safety and welfare of the public.
>
> Please issue the appropriate orders revoking their special use permit so this matter can be brought back before BOZA at the earliest possible time.

The DNS subsequently issued an order revoking Tri-Corp's special use permit.

¶10   Tri-Corp appealed the DNS order to BOZA. On April 19, 2007, shortly before Tri-Corp's issue came up on the agenda at a BOZA hearing,

---

[3] As a result of his death, Droese's parents sued both Milwaukee County and Tri-Corp. Their claims were dismissed by summary judgment in favor of both Milwaukee County and Tri-Corp in Milwaukee County Case 08-CV-942.

8

Alderman Bauman presented a letter he wrote to BOZA in which he claimed to have learned of "additional complaints about patient care" at West Samaria. In the letter, Alderman Bauman claimed to have received a report from the sister of a West Samaria resident, claiming that the resident was a victim of "mistreatment and possible sexual assault by West Samaria staff." Alderman Bauman also alleged that a separate unidentified individual, claiming to be a resident of West Samaria, called Alderman Bauman's office and claimed to be the victim of an unspecified assault by an unidentified individual inside of West Samaria. A subsequent police investigation found no factual support for any of the allegations Alderman Bauman made in his letter.

*B. The mortgage default and subsequent meetings.*

¶11   It is undisputed that Tri-Corp failed to make its June 2007 mortgage payment and that WHEDA later recovered the June payment plus late fees from Tri-Corp's bank account. After recovery of the June payment, WHEDA received no additional mortgage payments from Tri-Corp.

¶12   On August 8, 2007, Alderman Bauman met with Riley. Alderman Bauman's handwritten notes about the meeting say that Alderman Bauman's "[g]oal" regarding West Samaria was to "Relocate residents and RAZE" and that Heartland Housing may "wind down" operations. (Emphasis in original.)

¶13   WHEDA arranged a meeting on October 19, 2007, with Milwaukee County representatives responsible for referring residents to West Samaria, representatives of the Milwaukee Department of City Development, Alderman Bauman and representatives of Heartland Housing. Tri-Corp was not invited to attend. According to various summaries of the meeting, WHEDA indicated it would be foreclosing West Samaria and wanted Tri-Corp out. Discussion

9

involved moving residents from West Samaria because of the foreclosure. A City of Milwaukee Department of City Development attendee reported that Alderman Bauman discouraged Heartland representatives from taking over operations of West Samaria because "the property is a combination of three things—bad design, bad location and bad operator." The attendee's summary of the meeting stated that Alderman Bauman thought Heartland's take over would be a "bad idea" because changing operators would not overcome the problem of "bad design [and] bad location."

¶14  After the October 19, 2007 meeting, Milwaukee County stopped referring residents to West Samaria, and began steps to relocate existing residents. Similar activity did not occur for New Samaria residents, although the property was part of the same mortgage and subject to the same foreclosure as West Samaria.

¶15  Ultimately, summary judgment dismissing Tri-Corp's third-party claims against Alderman Bauman was granted. Tri-Corp appeals the dismissal of two of those claims. We discuss them separately.

C. *The Conspiracy Claim.*

¶16  Tri-Corp alleged that Alderman Bauman conspired with WHEDA to close West Samaria. The conspiracy claim was based both on common law conspiracy and on WIS. STAT. § 134.01. In *Tri-Corp I*, we affirmed dismissal of both of the same claims by Tri-Corp against WHEDA. *Id.*, No. 2010AP418, ¶1. As material to this appeal, we concluded that the common law and § 134.01 conspiracy claims were properly dismissed as to WHEDA because:

> [T]here is no evidence beyond mere speculation and conjecture that Alderman Bauman and Riley conspired to

> ruin Tri-Corp's business at West Samaria … That Riley and Alderman Bauman knew each other and were friends was undisputed; that [Alderman] Bauman was a vocal opponent of the West Samaria facility was undisputed; that WHEDA as Tri-Corp's lender had meetings that involved Alderman Bauman was undisputed. But these facts, even when taken together, do not allow even an inference that Alderman Bauman and Riley acted with malice, with the common purpose to injure Tri-Corp's business.

*Tri-Corp I*, No. 2010AP418, ¶27.

¶17  In *City of Milwaukee v. NL Industries, Inc.*, 2005 WI App 7, ¶25, 278 Wis. 2d 313, 691 N.W.2d 888 (Ct. App. 2004), we held that "[a] civil conspiracy in Wisconsin is a 'combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful.'" *Id.* (citation and some quotation marks omitted). Tri-Corp did not allege, and provided no evidence, that Alderman Bauman conspired with any entity other than WHEDA, through Riley. The conspiracy claims against Alderman Bauman's alleged co-conspirator, WHEDA, were dismissed on summary judgment, and affirmed on appeal. *See Tri-Corp I*, No. 2010AP418, ¶27. Because Alderman Bauman cannot conspire with himself, Tri-Corp's conspiracy claim against Alderman Bauman must also be dismissed. *See NL Industries*, 278 Wis. 2d 313, ¶25.

D. *Intentional Interference with a Contract or Prospective Contract.*

¶18  Tri-Corp alleged that Alderman Bauman interfered with its contractual or prospective contractual relationships by "causing Milwaukee County and people in need of services to discontinue their use of West Samaria" and that the interference was "malicious and intentional, and neither justified nor privileged." There are no allegations in the Third-Party Complaint

11

that Alderman Bauman interfered with Tri-Corp's mortgage contract with WHEDA.

¶19    Tri-Corp argues that Alderman Bauman's adamant expression of his undisputed dislike for West Samaria *before* Tri-Corp defaulted on its mortgage, his conduct during his meetings with WHEDA representatives *after* Tri-Corp's default, and his conduct at the October 2007 meeting organized by WHEDA announcing its eventual plan to foreclose, intentionally interfered with Tri-Corp's business relationship with Milwaukee County. Although Alderman Bauman correctly notes the absence of a formal contract between Tri-Corp and Milwaukee County, we cannot conclude that the trial court properly dismissed the tortious interference claim. The trial court found that no causal connection existed between Alderman Bauman's conduct at the October 2007 meeting and the County's decision to halt referrals to West Samaria. The trial court further found that a jury would not be able to draw a connection between WHEDA's contractual right to foreclose on West Samaria as soon as the default occurred and Alderman Bauman's conduct at a meeting three months later. We conclude, however, that questions of fact remain as to whether Alderman Bauman's conduct wrongfully interfered with the County's decision to discontinue referrals to West Samaria.

¶20    To succeed on a claim for tortious interference with a contract or a prospective contract, a party must demonstrate the following elements:

> (1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere.

12

*Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶44, 294 Wis. 2d 274, 717 N.W.2d 781 (citation and internal quotation marks omitted). Alderman Bauman argues that no contract between Tri-Corp and the County existed. He further contends that his long and public opposition to West Samaria was based on what he felt was in the best interest of the residents, who resided in his aldermanic district. He also contends that statements he made pertaining to West Samaria were privileged. We examine whether there are disputed material facts, or disputed inferences from undisputed material facts, as to each element of this tort.

*(1) Did Tri-Corp have a commercial relationship with Milwaukee County?*

¶21    It is not disputed that Milwaukee County had an established pattern of referring cognitively disabled persons to West Samaria.[4] Although the County had no contractual obligation to do so, it provided referrals, along with counselors to assist the residents, and it frequently acted as payees for the residents. Residents, or case managers who served as the payees for the residents, paid Tri-Corp approximately $535 per month for their rooms, three daily meals, room cleaning and security. The referrals from the County accounted for residents in approximately sixty-one of the ninety-two available rooms. It is undisputed that Milwaukee County was not obliged to continue to make referrals to West Samaria, and that it did not directly pay Tri-Corp for the services provided to the residents.

¶22    The law relating to interference with a business relationship has been described in terms of an existing or prospective contractual relationship. Wisconsin first adopted the cause of action for intentional interference with an existing contractual relationship in *Mendelson v. Blatz Brewing Co.*, 9 Wis. 2d

---

[4] The record does not indicate how long this pattern of referrals existed, nor the reasons Milwaukee County chose to make referrals to Tri-Corp at both West Samaria and New Samaria.

13

487, 491, 101 N.W.2d 805 (1960). *See* **Cudd v. Crownhart**, 122 Wis. 2d 656, 659, 364 N.W.2d 158 (Ct. App. 1985). In *Mendelson*, our supreme court adopted the original version of the RESTATEMENT (FIRST) OF TORTS. § 766 (1939), which incorporated causes of action for existing and prospective contracts. *See* **Crownhart**, 122 Wis. 2d at 659. Since then, the law of torts in Wisconsin appears to have evolved to include intentional interference with business relationships, not necessarily established by formal contracts. *See* RESTATEMENT (SECOND) OF TORTS. § 766B cmt. c (1979). With regard to prospective contracts, § 766B provides that an individual improperly interferes with a prospective contract by "(a) inducing or otherwise causing a third person not to enter into or continue [a] prospective relation or (b) preventing the other from acquiring or continuing [a] prospective relation." *See id.*; *see also* **Foseid v. State Bank of Cross Plains**, 197 Wis. 2d 772, 788, 541 N.W.2d 203 (Ct. App. 1995). The comments to this section recognize that the voluntary conferring of commercial benefits may be protectable with regard to prospective contracts. *See* § 766B cmt. c. Specifically, the comments provide:

> [I]ncluded [in relationships protected against intentional interference of prospective contracts] [are] interference with a continuing business or other customary relationship not amounting to a formal contract....
>
> It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include ... voluntary conferring of commercial benefits in recognition of a moral obligation.

*Id.*; *see also* **Magnum Radio, Inc. v. Brieske**, 217 Wis. 2d 130, 136, 577 N.W.2d 377 (Ct. App. 1998) (recognizing that "Wisconsin has long adhered to the basic interference-with-contract rule of RESTATEMENT (FIRST) OF TORTS. § 766 (1979)"). There are numerous business relationships which are long term and commercially valuable but which could not be considered a contract. Protecting

such relationships from improper interference in the same way commercial relationships evidenced by contract are protected appears to be contemplated by § 766B.

¶23   Although Tri-Corp and the County did not have a formal contract, as discussed, it is not disputed that the County had a history of referring residents to West Samaria. While Wisconsin does not appear to have specifically considered a case involving one party's intentional interference with an established history of business referrals by a second entity to a third entity, Wisconsin's adoption of the RESTATEMENT (SECOND) OF TORTS § 766B would reasonably include protection of an established business relationship not formalized by a contract. The current record does not allow us to conclude that summary judgment dismissing Tri-Corp's claim that Alderman Bauman intentionally interfered with its commercial relationship with Milwaukee County was proper.

*(2) Did Alderman Bauman interfere with Tri-Corp's commercial relationship with Milwaukee County?*

¶24   At the October 19, 2007 meeting, in the context of whether Heartland, rather than Tri-Corp, should run West Samaria after foreclosure, Alderman Bauman is reported as stating that "the property is a combination of three things—bad design, bad location and bad operator. Even if you changed the operator, you can't overcome the other two." This statement of opinion is consistent with his long expressed opposition to West Samaria. Tri-Corp argues that this statement to Heartland dissuaded it from taking over the operation of West Samaria and is evidence of Alderman Bauman's efforts to interfere with Milwaukee County's practice of referring residents to West Samaria.

15

¶25     Tri-Corp also contends that a jury might properly infer that Alderman Bauman interfered with Tri-Corp's commercial relationship with Milwaukee County by persuading the County to remove residents from West Samaria. Alderman Bauman responds that there were other reasons the County had for moving residents, namely, the WHEDA foreclosure. The trial court found that it would be irresponsible for the County not to plan for the residents' relocation once it was apparent the facility would be closed. Because the County did not move residents from New Samaria, despite New Samaria being under the same mortgage as West Samaria, we conclude that the competing inference that Alderman Bauman did interfere with Tri-Corp's relationship with Milwaukee County as to West Samaria made summary judgment improper. *See* **Premier Cmty. Bank v. Schuh**, 2010 WI App 111, ¶14, 329 Wis. 2d 146, 789 N.W.2d 388.

*(3) Was Alderman Bauman's interference intentional?*

¶26     Interference with a business relationship is actionable only if the interference is intentional and improper. *See* **Crownhart**, 122 Wis. 2d at 660 ("To have the requisite intent, the defendant must act with a purpose to interfere with the [prospective] contract."). Here, the record shows an admitted pattern of active opposition to West Samaria and Tri-Corp by Alderman Bauman for a period of at least two years. Specifically, Alderman Bauman expressed negative opinions about West Samaria and its operators in front of Milwaukee County representatives at the BOZA meeting in April 2007, and again at the October 19, 2007 meeting organized by WHEDA and attended by county representatives. Alderman Bauman's comments pertaining to Rutledge's death were factually untruthful and the contents of Alderman Bauman's letter alleging patient mistreatment were not substantiated by a police investigation. A jury could infer that Alderman Bauman's admitted opposition and subsequent actions reflected an

16

intent to close West Samaria by influencing Milwaukee County to discontinue its referrals and remove residents from West Samaria.

*(4) Was Alderman Bauman a cause of damages to Tri-Corp?*

¶27  Tri-Corp alleged in its Third-Party Complaint that Alderman Bauman interfered with its contract and prospective contract by "causing Milwaukee County and people in need of services to discontinue their use of West Samaria." Tri-Corp argued at summary judgment that because Alderman Bauman had induced WHEDA to foreclose and to pressure Milwaukee County to remove the residents, its damages included both the effect of the WHEDA foreclosure and the County's removal of residents. We have already concluded that the trial court properly dismissed Tri-Corp's claims that WHEDA and Alderman Bauman conspired to improperly foreclose the WHEDA mortgage, *see* ***Tri-Corp I***, No. 2010AP418, ¶20, and that as to WHEDA, there is no "evidence of any causal connection between the meeting [on October 19, 2007] and any damages suffered by Tri-Corp." *Id.*, ¶24. However, causation of damage is not necessarily limited to one cause. *See* WIS JI—CIVIL 2780 (Before finding that a defendant's conduct was *a cause* of claimed damages, a jury "must find that the defendant's conduct was *a substantial factor*; that is, it had a substantial influence in producing the damages claimed by the plaintiff. In other words, there must be *a real causal connection* between defendant's conduct and plaintiff's claimed damages.") (emphasis added).

¶28  There is evidence in the record of an email by a Milwaukee County employee who observed Alderman Bauman's public presentation to BOZA strongly opposing Tri-Corp's occupancy permit request to BOZA. The email reported that presentation to another Milwaukee County employee. In October

17

2007, at the meeting attended by Milwaukee County representatives, Alderman Bauman argued against continuing the operation of West Samaria and urged another operator not to take over the facility. Milwaukee County did not remove residents of New Samaria, although that facility was subject to the same WHEDA mortgage and the same foreclosure involving West Samaria. A jury could reasonably infer from these undisputed facts that Alderman Bauman's charges were a substantial factor in Milwaukee County's decisions not to continue to refer residents to West Samaria and to remove existing residents. It is also true that a jury might reach contrary inferences because other factors, such as those cited by the trial court, were the bases for the decisions. However, at summary judgment a court is not permitted to choose between alternative inferences. *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 665, 476 N.W.2d 593 (Ct. App. 1991). If the facts in the record support competing inferences, one of which favor the party against whom summary judgment is sought, then that party is entitled to a trial and summary judgment must be denied. See *Village of Hobart v. Brown Cnty.*, 2005 WI 78, ¶19, 281 Wis. 2d 628, 698 N.W.2d 83.

*(5) Were Alderman Bauman's statements privileged?*

¶29     Alderman Bauman argues that all of his statements were privileged and thus Tri-Corp could not sustain a claim of tortious interference with its business. However, the question of privilege does not appear to have been mentioned by either party during any of the summary judgment hearings and the trial court did not make findings on this issue. Alderman Bauman's briefing on the issue, as well as Tri-Corp's reply, put forth very brief arguments. We do not consider this adequate briefing of the extremely complex issue of the extent and application of legislative or other privilege in the context of an intentional

18

tort,[5] particularly as the issue was not raised before the trial court. We decline to consider this issue. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633, (Ct. App. 1992) (We need not consider issues that are inadequately briefed.).

## CONCLUSION

¶30   We conclude that the facts in the record could support the inference that the closing of West Samaria was not a necessary consequence of the WHEDA mortgage foreclosure, and that Alderman Bauman's efforts were a cause of Milwaukee County's decision to remove residents it had referred to West Samaria and not to refer others. On remand, the question of what damages related to Milwaukee County's decisions and whether all or any part of Alderman Bauman's statements were privileged can be addressed by the trial court and, if appropriate, the fact finder at trial.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded.

Not recommended for publication in the official reports.

---

[5] For example, our supreme court noted that "a defendant, who otherwise would stand in a position of privilege in causing a termination of contract, enjoys no privilege if his object is to put pressure upon the plaintiff and coerce him into complying with the defendant's wishes in some collateral matter." ***Mendelson v. Blatz Brewing Co.***, 9 Wis. 2d 487, 492-93, 101 N.W.2d 805 (1960).

19