UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

**TRI-CORP HOUSING, INC.,**

        Plaintiff,                      Case No. 12-CV-216-CNC

vs.

**ROBERT BAUMAN**

        Defendant.
_____

### AFFIDAVIT OF MICHAEL S. BREVER
### IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

STATE OF WISCONSIN    )
                           ) SS
MILWAUKEE COUNTY    )

      MICHAEL S. BREVER, being first duly sworn on oath, deposes and says:

      1.     I am submitting this affidavit in opposition to the defendant, Robert Bauman's motion for summary judgment.

      2.     As stated in the affidavit submitted to the Court on February 1, 2013, Tri-Corp is a nonprofit-organization which was organized to promote low income housing for residents of Milwaukee County. One of Tri-Corp's missions is and always has been to provide housing for individuals with mental illness who are not in need of confinement.

      3.     I served as the executive director of Tri-Corp from the inception of the company in 1998 forward. Tri-Corp was a corporation formed by the merger of three nonprofit corporations, of one of which I was an executive director. The three corporations were South Community Organization, Southeast Affordable Housing, and Housing with Help, Inc. I had served as

1

executive director of South Community Organization from 1982 forward and had been an employee of South Community Organization as a vista volunteer since 1981. South Community Organization was the largest of the three organizations involved in the merger, and I, in essence, expanded my duties when all three of the organizations merged.

4. Prior to the events of the complaint, Tri-Corp was a community leader in the area of low income and supportive housing. While serving as the full-time executive director, I saw the organization grow from a budget of approximately $35,000 per year in 1981, to an annual budget of $6.5 million in 2004. The staff of our nonprofit grew from two to sixty-five employees over the same time period. Tri-Corp had approximately 850 low income and supportive housing units under its management of which 250 were owned by a peer agency.

5. I was the person directly in charge of the supportive housing that Tri-Corp offered for persons with mental disabilities. With respect to the day to day operations, I oversaw 30 to 35 employees involved in Tri-Corp's providing supportive housing, contracted with Milwaukee County and the American Red Cross to offer the facilities at established rates to people with mental disabilities, oversaw the revenues and managed and approved the expenses of the facilities. I did this on a day to day basis from 1998 forward.

6. From my day to day contact with West Samaria I can state that the living conditions for our residents were good. The building was well maintained, and offered individual rooms for 92 residents. The acquisition of this building was financed by WHEDA in the early 1990's. In 1999 and 2000, Tri-Corp raised and spent $400,000 for a major overhaul of the West Samaria building.

2

7.      The people who live at West Samaria (and New Samaria) had limited means of supporting themselves.  Tri-Corp provided housing for its residents without government grants, tailoring its charge for room, board, and room cleaning to the modest social security income received by its residents. Residents received on average approximately $650.00 to $825.00 per month in social security income. They were charged approximately $535.00 for room, three meals a day, room cleaning, security, and whatever else could be afforded to make their lives better. Tri-Corp relied upon private charities to supplement its operation and to better the lives of its residents. Local organizations sponsored Christmas parties, performance events, and supplied volunteers for painting, gardening, landscaping, and the like.

8.      In 2000 Tri-Corp received a plaque and award from WHEDA "in recognition of [its] commitment to provide affordable housing to the citizens of the State of Wisconsin." Likewise in 2000 West Samaria received an award from NAMI (the National Alliance for the Mentally Ill of Greater Milwaukee) "in appreciation for [its] commitment to the pursuit of wellness."  As executive director of Tri-Corp, I received an award from WHEDA in 1999 "[i]n appreciation of your excellence in management practices, provision of affordable housing and your willingness to share your talents with other nonprofit Organizations in need." [See Exhibits D, E, and F to the Affidavit of Michael S. Brever that was filed in this case on February 1, 2013.]

9.      For approximately eight years, part of the West Samaria facility had been leased to the Red Cross, where the Red Cross provided for up to thirty-one individuals with chronic mental illness.  The Red Cross program received a "best practices" award from the U.S. Department of Housing and Urban Development ("HUD") for its Autumn West program at West Samaria.  This is a very high distinction and would not have been awarded to the Red Cross had there been even

3

questionable living conditions at West Samaria. HUD expressed its commitment to West Samaria in an April 7, 2006, letter from the Director of the Milwaukee Field Office to Mayor Barrett. [Machulak Afd, Exhibit "M"].

10. I have reviewed the affidavit of James H. Hill, which was submitted to the Court on March 1, 2013, in connection with Mr. Bauman's motion for summary judgment. I disagree with the contents of that affidavit.

11. In that affidavit, Mr. Hill states that sometime "prior to October 19, 2007" he had visited the property known as West Samaria, but is unclear as to what date.

12. As Mr. Hill states, in 2007 he was the Director of the Milwaukee County Behavioral Health Division. The Director had people working under him who in their regular jobs would visit West Samaria and New Samaria. If there was an occasion for the Director to visit West Samaria, I would have expected to know about it. I do not recall Mr. Hill's visiting West Samaria.

13. Mr. Hill states in his affidavit that the "living condition that [he] observed at West Samaria convinced [him] that clients receiving services through our County Behavioral Health system should not continue to live at that location." Mr. Hill never told me at any point in time that he planned on moving residents because of the "living conditions" at West Samaria, and that is something that I would have remembered.

14. Mr. Hill states that he "believed at that time that the living conditions at New Samaria were better than those existing at West Samaria." Mr. Hill does not state in his affidavit that he visited New Samaria, and I do not recall that he did.

15. Furthermore, West Samaria and New Samaria were managed and operated in the same way, and if anything, West Samaria had the advantage that residents had single rooms.

4

Residents at New Samaria had to share rooms with a roommate. Tri-Corp provided residents of West Samaria and New Samaria with three meals a day. The menus for both facilities were exactly the same because meals were prepared out of the same kitchen. In his affidavit, Mr. Hill does not state what "living conditions" he is referring to, or is comparing.

16. I know from my own knowledge that Milwaukee County's moving the residents of West Samaria (and not the residents of New Samaria) after October 19, 2007, was not the result of living conditions, or any difference in living conditions.

17. Before October 19, 2007, Tri-Corp had a positive relationship with Milwaukee County. Milwaukee County continually referred residents to West Samaria. All residents had certified chronic mental illness and some form of certified disability. Each of these individuals had a case manager (arranged by Milwaukee County) who served as an advocate for the individual and helped them with various functions including interaction with government agencies, scheduling appointments, and in many cases serving as payee with respect to funds received by or on behalf of the individual. The caseworkers assigned to individuals referred to West Samaria were generally either Milwaukee County employees or employees of private, non-profit organizations funded by Milwaukee County. Milwaukee County itself leased seven rooms in West Samaria through the time that the decision was made to relocate residents from West Samaria, due to the interference of Mr. Bauman.

18. It is absolutely clear to me that the reason that Milwaukee County relocated residents from West Samaria (and not New Samaria) was Mr. Bauman's persistent and eventually successful effort to bring about the closure of West Samaria.

19. West Samaria, formerly knows as "Richardson House" was a residence for people of limited means including cognitively disabled individuals since at least 1977. [Machulak Afd,

5

Exhibit "J"]. In 2005, the Board of Zoning Appeals of the City of Milwaukee ("BOZA") denied West Samaria a special use permit, and Tri-Corp applied to BOZA for a "reasonable accommodation" under the Fair Housing Act Amendments Act, the Americans with Disabilities Act, and the Rehabilitation Act. [Machulak Afd, Exhibit "K"].

20. Mr. Bauman fought Tri-Corp at every step of the way both in his public comments and his statements to BOZA. For example, as reported by the Milwaukee Journal Sentinel on May 18, 2006, Mr. Bauman stated that West Samaria was "not fit for human habitation." [Machulak Afd, Exhibit "N"]. In a March 23, 2007 press release Bauman stated "West Samaria has repeatedly demonstrated that they are unwilling or unable to provide quality care to the mentally disabled residents who live there." [Machulak Afd, Exhibit "S"].

21. I do not believe that Mr. Bauman has ever been inside West Samaria. For as long as Tri-Corp has owned and operated West Samaria (1998), Alderman Bauman never expressed any interest to me, or as far as I know to anyone else at Tri-Corp, in visiting the facility. Mr. Bauman was invited to tour West Samaria, but never accepted the invitation.

22. At the May 18, 2006 hearing where BOZA considered the issue of whether it should make a "reasonable accommodation", Mr. Bauman totally misrepresented facts regarding the death of David Rutledge. On July 4, 2004, David Rutledge, a resident of West Samaria, was assaulted by a gang about a block away from the West Samaria facility. Another resident saw him and brought him back to West Samaria. The security guard called 911, and David Rutledge was transported to the hospital within a very short time of the assault. Unfortunately, David Rutledge died a few days later in the hospital. This is shown by the police reports. [Machulak Afd, Exhibits "G", "H" and "I"].

23. The May 18, 2006 hearing was adjourned to June 8, 2006. On June 8, 2006, BOZA unanimously determined that West Samaria was entitled to a "reasonable accommodation" and granted Tri-Corp a special use permit to continue to operate West Samaria for its mentally disabled residents. [Machulak Afd, Exhibits "O" and "P"].

24. Approximately nine months later, on March 2, 2007, Tri-Corp was notified that the Department of Neighborhood Services ("DNS") had revoked its right to occupy West Samaria and that Tri-Corp and its residents had thirty days to vacate West Samaria. As we later learned, Mr. Bauman had directed DNS to order a closure of West Samaria under the pretense that the DNS had conducted some sort of investigation after the death of a West Samaria resident named Joseph Droese. DNS made no such investigation of West Samaria. Tri-Corp was not responsible for the death of Joseph Droese, but Bauman used the event to promote the closure of West Samaria, just as he had done with respect to the death of David Rutledge. At prior hearings before BOZA, representatives of DNS were present and expressed no concerns with West Samaria when asked. [Smokowicz Afd, Attachment B, p. 9].

25. Mr. Bauman directed DNS to revoke the permit for West Samaria after reading a newspaper article which incorrectly reported that a resident had died but was not discovered for four days. The resident, Joseph Droese had passed away of natural causes six weeks earlier on January 20, 2007. The statement that Joseph Droese had died, but was not discovered for four days, was not true. A staff member said that she had seen him up and about the day before he died in his room. I believe that the Journal reported "four days" because his mother told the reporter that the last time she spoke with him was four days before he died.

7

26. Joseph Droese's parents later sued both Milwaukee County and Tri-Corp. Their claims were dismissed by summary judgment in favor of both Milwaukee County and Tri-Corp in Milwaukee County Case 08–CV–942.

27. Tri-Corp appealed the March 2, 2007 order issued by DNS. The appeal was first brought before BOZA on March 22, 2007. My recollection is that DNS acknowledged that it had not conducted an investigation before issuing its order. At that time BOZA stayed the order pending a further hearing in April. The hearing was scheduled for April 19, 2007.

28. At the April 19, 2007, hearing, Mr. Bauman grabbed center stage and surprised everyone present with a letter where he claimed that one of the inmates of West Samaria was mistreated by staff and that one inmate had been sexually assaulted. [Machulak Afd, Exhibit "T"]. There was absolutely no truth to these allegations, as was later shown by an investigation by the police department. From what I saw, Mr. Bauman was grand-standing before the board and a possible television audience. A TV camera is set up for meetings such as these so that hearings can be broadcast on the City Channel. I do not know whether this hearing was ever broadcast. The April 19, 2007 hearing was adjourned.

29. After DNS revoked West Samaria's permit on March 2, 2007, occupancy went down. This was due to the fact that case workers were uncertain as to whether or not West Samaria would be able to continue to offer housing for its residents. Until occupancy again stabilized, Tri-Corp lost considerable revenue. Furthermore, Tri-Corp had to continue to pay legal counsel to address the potential revocation of Tri-Corp's permit. The lost revenue and additional expense damaged Tri-Corp in the months that preceded September 2007.

8

30. Later in 2007, as case workers came to understand that West Samaria would continue to remain in operation, occupancy began to rebuild. On September 6, 2007, BOZA decided to continue the reasonable accommodation granted to Tri-Corp and vacate the order that had been issued by DNS at Mr. Bauman's direction on March 2, 2007. [Machulak Afd, Exhibits "A" and "W"].

31. However later in 2007, Mr. Bauman's persistent efforts to undermine Tri-Corp and West Samaria led to his interfering with Tri-Corp's relationship with, among others, its lender and with Milwaukee County.

32. After a private meeting between Mr. Bauman and the head of WHEDA, WHEDA arranged a meeting which took place on October 19, 2007, involving representatives of Milwaukee County, a prospective purchaser of West Samaria, representatives of the Milwaukee Department of City Development, and Alderman Bauman at WHEDA's Milwaukee office to address what would be the future of West Samaria. Tri-Corp was not invited to attend this meeting, and in fact no one at Tri-Corp was even informed that such a meeting would take place. I learned about the October 19, 2007 meeting after the fact, from Rae Ellen Packard of WHEDA, in an email on October 24, 2009. I now know that in advance of this October 19, 2007 meeting, the director of WHEDA, Antonio Riley, and Rae Ellen Packard of his staff met with Alderman Bauman in his office. I did not know of this until I learned of it during this law suit.

33. On November 8, 2007, WHEDA surprised Tri-Corp when Rae Ellen Packard called and told me that WHEDA intended to foreclose the mortgage on West Samaria and New Samaria. This was a surprise in view of discussions we had just had in August 2007. I responded that there were alternatives to the foreclosure, especially given the Tri-Corp assets available to bring the mortgage current. Later, on November 12, 2007, I sent Rae Ellen Packard a letter by

9

email indicating Tri-Corp's willingness to liquidate the assets subject to one of its other WHEDA loans to bring the Samaria loans current. I asked: "Can we bring the mortgage current using the proceeds from anticipated sales and thereby avoid the foreclosure action?" Tri-Corp had the ability to bring itself current with pending sales of other properties which WHEDA was involved in as the mortgage lender.

34. On the same day, November 12, 2007, WIHEDA sent me a proposed "news release" to be issued by WHEDA encaptioned "WHEDA, Milwaukee County, Tri-corp Housing Announcing Closing of Housing Facility." I thought this "news release" was outrageous. It said among other things, that there had been a decision to close West Samaria which came "after Milwaukee County, the Wisconsin Housing and Economic Development Authority, industry experts, and the facility's owner [Tri-Corp] determined it would be in the best interest of the residents." The news release went on to state that "after much investigation, it was determined that the property was not serving the residents in its current capacity and the residents would be better served in other housing throughout Milwaukee County." I immediately contacted Tri-Corp's board president, Jack West, and attorney, John Machulak. John Machulak asked WHEDA to change the press release to correct the misinformation that Tri-Corp agreed with the decision to move the residents. He even prepared and sent back a proposed revised press release which eliminated any inference that Tri-Corp believed that West Samaria should be closed, WHEDA issued its press release without correcting it.

35. The next day, on November 13, 2007, Rae Ellen Packard of WHEDA sent me an email which stated:

> "I am responding to your letter (below) requesting WHEDA's approval to allow potential loan proceeds from the sale of collateral held by WHEDA under the SCO-1 loan (WHEDA No. 1173) to be applied to the existing delinquency of

10

Housing with Help (WHEDA No. 2643). As I indicated in our recent conversation, that request is denied."

36. On November 19, 2007, WHEDA filed a foreclosure action against both West Samaria and New Samaria. According to its complaint, there was a balance of $1,277,286 due on the loan (for both West Samaria and New Samaria), but this figure did not subtract the money in the replacement reserve for this loan. After subtracting the $340,892 reserve, there was a balance of $936,394 in principal and interest.

37. The treatment that Tri-Corp received from WHEDA was entirely different from the treatment Tri-Corp received just months earlier. Although Tri-Corp was late on its loan payments, no one from WHEDA threatened to foreclose upon Tri-Corp for this or any of its other loans until Mr. Bauman interfered with Tri-Corp's relationship with WHEDA.

38. Before the events involved in this case, Tri-Corp (through its predecessor organizations) had a long and positive history of dealing with WHEDA. In 1992, South Community Organization received a $497,000 loan from WHEDA to refinance the renovation of twelve single family homes and duplexes (a total of 26 housing units) targeted for low income residents, which facilitated lower rents. In 1993, South Community Organization received a second $694,975 loan for approximately eight single and multi-family homes (a total of 27 units) for low income families. During these years Tri-Corp/South Community Organization received the distinction of being the highest rated nonprofit producer of low income housing in the City of Milwaukee. It received substantial funding from Community Block Grant and other sources.

39. In the year 2000, because of Tri-Corp's good standing, WHEDA asked Tri-Corp to assist WHEDA when another nonprofit organization known as Westside Housing Cooperative became seriously in default with its obligations. Westside was on the brink of bankruptcy, in

11

default on its loans with its lenders, including M&I Bank, TCF Bank, Interbay, WHEDA, and the Milwaukee County HOLF program, in default on the payment of its property taxes, and obliged to pay approximately $30,000 in fines for building code violations. Tri-Corp, which had no prior relationship with Westside, was asked by WHEDA, Alderman Henningsen, Municipal Judge Gramling, and others to assist in the management of this troubled agency. Tri-Corp did not replace Westside's board of directors; rather it entered into a contract to hopefully translate its own success in low-income housing rehabilitation into assistance for Westside's board.

40. When Tri-Corp began its work, Westside had 283 housing units which were subject to foreclosure and at risk of becoming board-ups. From 2000 forward, Tri-Corp assisted in the improvement and orderly sale of 233 of the original 283 units. Of the units sold, 115 went to low-income owner occupants and "buy in your neighborhood" investors. Tri-Corp wrote a grant for and obtained a grant for Federal Home Loan Bank funds, which in turn enabled 14 low-income families to become first time home buyers when they acquired 14 of these properties. By November 30, 2003, Westside's portfolio was reduced to 50 units without any foreclosure actions, all property taxes were current, and there were no outstanding fines for building code violations. Through Tri-Corp's intervention, Westside obtained a grant to complete an audit of its books and filed tax returns which had been seriously delinquent.

41. Throughout this process of fixing Westside Housing Cooperative, Tri-Corp worked with WHEDA. WHEDA's agreements with Westside had provisions requiring Westside to pay into replacement reserves, as do the documents at issue in this foreclosure action. In salvaging Westside Housing Cooperative, Tri-Corp was able to use Westside's replacement reserves to, among other things, pay delinquent property taxes, pay fines, pay off

12

M&I Bank on prior mortgages, and generally, to accomplish a multitude of purposes that did not involve property repairs or capital improvements.

42. In 2002, Tri-Corp obtained a $400,000 loan from WHEDA as part of a $4,122,000 purchase of 58 duplexes (known as "Metro Homes") from a rental company known as Metropolitan Associates. Bank One provided a $3 million loan as part of this effort and LISC provided a $750,000 loan. Tri-Corp's object was to perform rehabilitation where needed and, to the extent possible, sell the properties to low-income owner-occupants. The programs succeeded, and all three loans were paid back in full in 2003.

43. In July 2007, when Tri-Corp received a notice of default from WHEDA in connection with the loan for West Samaria and New Samaria, Marie Banach (Tri-Corp's controller) and I drove to Madison and met with representatives of WHEDA, including Rae Ellen Packard, to discuss various means of bringing the loan current. These included using sale proceeds of other properties in Tri-Corp's portfolio to make up the missed payments and using the replacement reserves from West Samaria and New Samaria or from other Tri-Corp properties. I explained that Mr. Bauman's efforts to close West Samaria had taken their toll on occupancy in the previous year, but that occupancy was coming back to its previous levels. Ms. Packard told me that WHEDA would work with Tri-Corp on the loan, meaning that WHEDA would work with Tri-Corp to bring the loan current.

44. All of this changed after Mr. Bauman met with WHEDA, and then later, with WHEDA and Milwaukee County on October 19, 2007.

13

45. Bauman interfered with Tri-Corp's previously good relationship with Milwaukee County. Mr. Bauman succeeded in causing Milwaukee County to relocate the residents of West Samaria. This had nothing to do with any delinquency on the mortgage. If that were the case, WHEDA would have promoted a closure of both facilities, West Samaria and New Samaria.

*/s/ Michael S. Brever*
Michael S. Brever

Subscribed and sworn to before me
this 15th day of April, 2013.

*/s/ John E. Machulak*
Notary Public, Milwaukee County
State of Wisconsin
My Commission is Permanent