UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

TRI-CORP HOUSING, INC.,

        Plaintiff,

      v.                            Case No. 12-C-216

ROBERT BAUMAN, Alderman,

        Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFF'S § 1983 CLAIM (DOC. 15), DECLINING TO EXERCISE
SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS,
AND REMANDING CASE TO MILWAUKEE COUNTY CIRCUIT COURT

     Defendant has moved for summary judgment on plaintiff's tortious interference,

defamation, and § 1983 claims.   This legal dispute began in the Milwaukee County Circuit

Court on March 14, 2008, as a foreclosure action brought by the Wisconsin Housing and

Economic Development Authority ("WHEDA") against Tri-Corp Housing, Inc. ("Tri-Corp").

Tri-Corp responded with numerous counterclaims against WHEDA, including a state law

tortious interference claim and alleged violations of the Federal Fair Housing Act ("FHA"),

Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.  Tri-Corp also asserted

claims against third-party defendant City of Milwaukee Alderman Robert Bauman.  The

Milwaukee County Circuit Court granted summary judgment in favor of WHEDA on all of its

claims and counterclaims, and entered judgment in favor of Bauman.  On appeal, the court

affirmed with respect to WHEDA, but reversed in part and remanded on Tri-Corp's claim

of tortious interference with a contract or prospective contract against Bauman.  *Wisconsin*

*Hous. and Econ. Development Auth. v. Tri-Corp Housing, Inc.,*  2011 WL 781079 at *7 (Wis.

Ct. App. March 9, 2011)(unpublished decision) and 2011 WL 1760449 (Wis. Ct. App. May 10, 2011)(unpublished decision), *cert. denied*, 2011 WI 100 (Wis. S. Ct. Sept. 1, 2011). Then, on remand to the Milwaukee County Circuit Court, Tri-Corp filed an amended third-party complaint against Bauman adding a § 1983 claim for violations of the FHA, ADA, and the Rehabilitation Act. Bauman filed a notice of removal and has since moved for summary judgment.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith. Com, Inc.,* 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).

2

The following findings of fact are based on the submissions of the parties to the extent they comply with Civil Local Rule 56(b)(2)(B) and (b)(3)(B) (E.D. Wis.). Tri-Corp is a nonprofit organization established to promote low income housing for residents of Milwaukee County. One of its missions has been to provide housing for individuals with mental illness and are not in need of confinement. (Brever Aff. ¶ 1.) Tri-Corp was formed by the merger of three nonprofit corporations – South Community Organization, Southeast Affordable Housing, and Housing with Help, Inc. Michael S. Brever began to serve as the executive director of Tri-Corp in 1998. He oversaw 30 to 35 employees involved in Tri-Corp's supportive housing, contracted with Milwaukee County and the American Red Cross to offer the facilities to people with mental disabilities, oversaw the revenues, and managed and approved the expenses of the facilities. (Brever Aff. ¶ 4.)

Prior to the events underlying the complaint, Tri-Corp was a community leader in low income and supportive housing. It grew from a budget of approximately $35,000 per year in 1981 to an annual budget of $6.5 million in 2004 and a staff of sixty-five employees. Tri-Corp had approximately 850 low income and supportive housing units under its management. (Brever Aff. ¶ 3.)

Tri-Corp operated two buildings that provided housing, meals, laundry, and other services to more than 160 disabled residents: (1) " West Samaria" located at 2713 West Richardson Place in Milwaukee; and (2) "New Samaria" located at West Beloit Road in West Allis. (*Id.*) The acquisition of the West Samaria building was financed by WHEDA in the early 1990s, and Tri-Corp raised and spent $400,000 for a major overhaul of the West Samaria building from 1999-2000. (*Id.* at ¶ 6.) On April 17, 2003, Tri-Corp completed a

3

separate loan transaction with WHEDA, pledging West Samaria and New Samaria to secure the agreement. (Smokowicz Aff. Att A at ¶ 21 and Att. E.)

The people living in West Samaria and New Samaria had limited means of support. Hence, Tri-Corp provided housing without government grants, tailoring charges for room, board, and room cleaning to the modest social security income received by its residents. Residents, who received on average approximately $650 to $825 per month in social security income, were charged approximately $535 for room, three meals a day, room cleaning, and security. Private charities supplemented Tri-Corp's operation. (Brever Aff. ¶ 6.)

Tri-Corp managed and operated West Samaria and New Samaria in the same manner. Residents of West Samaria had single rooms whereas residents at New Samaria shared rooms with a roommate. Milwaukee County made referrals to both locations and most residents participated in programs administered by the county, with the exception of thirty of the ninety-two rooms in West Samaria which were leased to the Red Cross for its program serving mentally disabled individuals. (Smokowicz Aff. Att. A at ¶ 5 and Att. F at ¶ 5.)

All residents of West Samaria had certified chronic mental illness and a certified disability. Each had a case manager (arranged by Milwaukee County) who served as an advocate and helped the resident in various ways, including interaction with government agencies, scheduling appointments, and serving as the payee respecting funds received by or paid on behalf of the resident. (Brever Aff. ¶ 17.) Generally, the caseworkers assigned to persons referred to West Samaria were Milwaukee County employees or employees of private, non-profit organizations funded by Milwaukee County. (*Id.*)

4

After the Board of Zoning Appeals of the City of Milwaukee ("BOZA") denied West Samaria a special use permit in 2005, Tri-Corp applied to BOZA for a "reasonable accommodation" under the FHA, ADA, and the Rehabilitation Act. (Brever Aff. ¶ 19; Machulak Aff. Ex. K.) At a May 18, 2006, BOZA meeting to determine whether a reasonable accommodation should be granted to West Samaria because a special use permit had been denied, Bauman stated under oath:

> The cavalier comment was made, well, it's not the applicant's responsibility to watch over Mr. Rutledge 50 feet from the door of the establishment, but that's not all that happened in this case. While it's true that Mr. Rutledge was beaten on the public right-of-way, he also stumbled into the premises after he was beaten. He stumbled in. No one was there to ask him what happened, are you hurt, do you need attention, no one called the police, no one even knew what happened to the poor man ...

> That is the level of care that this fine establishment likes to maintain. A man can get beaten nearly to death 50 feet in front of the door, and while it is the public's responsibility in the public right-of-way, he goes back into his home, and no one gives a damn ...

(Smokowicz Aff. Att. A, at ¶ 2, Att. B, at pp. 72-73.) As reported by the Milwaukee Journal Sentinel on May 18, 2006, Bauman also told BOZA that West Samaria was "unfit for human habitation." (Brever Aff. ¶ 20; Machulak Aff, Ex. N.) Bauman's reference to "Mr. Rutledge" involved an incident in which Rutledge was beaten near West Samaria and helped by another resident who brought him back to the facility. (Smokowicz Aff., Att. A at ¶ 13.) A security guard at West Samaria called 911 and Rutledge was transported to the hospital within a half an hour. (*Id.*)

The May 18, 2006, BOZA meeting was a "contested public hearing" during which Tri-Corp and the City of Milwaukee appeared through counsel and had the opportunity to make opening statements, present witnesses, and cross-examine witnesses. (Smokowicz Aff.,

5

Att. B at pp. 2-4.) Notwithstanding Bauman's opposition, on June 8, 2006, BOZA unanimously determined that West Samaria was entitled to a "reasonable accommodation" under federal law and granted Tri-Corp a special use permit to continue to operate West Samaria for its mentally disabled residents. (Brever Aff. ¶ 23; Machulak Aff, Exs. O and P.)

On February 28, 2007, the Milwaukee Journal Sentinel reported that Joseph Droese, a resident of West Samaria being monitored by a Milwaukee County caseworker, was found dead in his room. (Smokowicz Aff., Att. A at ¶ 14.) The next day, Bauman sent the following e-mail to Martin Collins at the City of Milwaukee Department of Neighborhood Services ("DNS"):

> Please take immediate action regarding West Samaria, 2713 W. Richardson Pl. The fact that a resident died and was not discovered for 4 days suggests that the facility is not operating in compliance with their plan of operation or operating in a manner consistent with the health, safety and welfare of the public.
>
> Please issue the appropriate orders revoking their special use permit so this matter can be brought back before BOZA at the earliest possible time.

(Machulak Aff., Exs. Q and R; Brever Aff. ¶¶ 24 and 25.)

Bauman's e-mail referred to Droese, who had passed away of natural causes on January 20, 2007. (Brever Aff. ¶ 25.) Later, Droese's parents sued Milwaukee County and Tri-Corp, however, their claims were dismissed pursuant to a motion for summary judgment in favor of both defendants in Milwaukee County Case 08–CV–942. (Brever Aff. ¶ 26.)

The day after receiving Bauman's e-mail, on March 2, 2007, DNS issued an order to revoke the special use permit and gave Tri-Corp and its residents thirty days to vacate West Samaria. (Brever Aff. ¶ 24; Smokowicz Aff., Ex. A.) Before revoking Tri-Corp's right to occupy West Samaria, DNS did not interview anyone connected with West Samaria or

otherwise visit West Samaria to investigate the circumstances of Droese's death. (Brever Aff. ¶ 24.) Yet, at the hearings before BOZA prior to the DNS revoking the permit, representatives of DNS were present and expressed no concerns with West Samaria. (Brever Aff. ¶ 24; Smokowicz Aff, Att. B at p. 9.)

On the day that DNS revoked West Samaria's permit, Bauman sent an e-mail to his constituents at WestSide_Milwaukee@yahoogroups.com stating: "[t]he Department of Neighborhood Services has determined that the recent events at West Samaria violate its plan of operation. DNS is going to issue an order revoking the Special Use Permit and order the property vacated." (Machulak Aff., Ex. R.)

Tri-Corp appealed the March 2, 2007, DNS, and that appeal was brought before BOZA on March 22, 2007. (Brever Aff. ¶ 27.) DNS acknowledged that it had not conducted an investigation before issuing its order on March 2, 2007. (Brever Aff. ¶ 27.) On March 22, 2007, BOZA stayed the order pending a further hearing on April 19, 2007. (Brever Aff. ¶ 27.)

Before the BOZA hearing took place, Bauman drafted and delivered a letter to BOZA claiming that an individual called his office and stated that he had been assaulted by another patient while talking on the public payphone outside of West Samaria and that staff did nothing after he complained. Bauman also stated that an individual told him that her sister had been the victim of mistreatment and possible sexual assault by West Samaria staff. (Brever Aff. ¶ 28; Machulak Aff., Ex. T.) A subsequent police investigation produced no foundation for the allegations of mistreatment and sexual assault. (Smokowicz Aff., Att. A at ¶ 17.)

In addition, Bauman was quoted in a March 23, 2007, City of Milwaukee News Release stating: "The problem with BOZA's action is that West Samaria has repeatedly demonstrated that they are unwilling or unable to provide quality care to the mentally disabled residents who live there." (Machulak Aff., Ex. S.)

After DNS revoked West Samaria's permit on March 2, 2007, occupancy at West Samaria went down because case workers were uncertain whether West Samaria would be able to continue offering housing for its residents. (Brever Aff. ¶ 29.) Also, Tri-Corp had to continue to pay legal counsel to address the potential revocation of its permit. (*Id*.) However, by the fall of 2007, occupancy of West Samaria was recovering. (Brever Aff. ¶ 30.)

In any event, on September 6, 2007, James Hill, the Director of the Milwaukee County Behavioral Health Division, testified before BOZA and recommended that BOZA proceed with an amended plan of operation because his staff, the Red Cross, Set Ministries, and Tri-Corp were producing "good results." (Machulak Aff., Ex. A at p. 8.) Afterward, BOZA decided to continue the "reasonable accommodation" granted to Tri-Corp and to vacate the order that had been issued by DNS on March 2, 2007. (Brever Aff. ¶ 21; Machulak Aff, Exs. A and W.)

Earlier, on July 2, 2007, WHEDA sent Tri-Corp a notice that it had missed a payment due on July 11, 2007. WHEDA had attempted an automatic withdrawal of $19,509.95 but there were insufficient funds in Tri-Corp's bank account to cover the payment. A second attempt to withdraw the funds on July 11, 2007, failed also. In July of 2007 when Tri-Corp received the notice of default from WHEDA in connection with the loan for West Samaria and New Samaria, WHEDA told Tri-Corp that WHEDA would work with Tri-Corp to bring the

8

loan current. (Brever Aff. ¶ 43.) On August 10, 2007, WHEDA was able to draw $20,111.43.

In August of 2007, Bauman met with the Executive Director of WHEDA, Antonio Riley, and Bauman's notes, dated August 8, 2007, stated that the "[g]oal" with respect to West Samaria was to "Relocate residents and RAZE." (Smokowicz Aff., Att. F at ¶ 5 and Att. C at pp. 68-69.) On October 19, 2007, WHEDA held a meeting with representatives from Milwaukee County responsible for residential referrals to West Samaria, Bauman, representatives from the Milwaukee Department of City Development, and Heartland Housing, an entity with potential interest in taking over the operation of West Samaria. Tri-Corp was not invited to attend. (Brever Aff. ¶ 32.) When the meeting convened, Riley announced that WHEDA would be foreclosing on the mortgage. At the meeting, Bauman said, among other things, that he would not support any redevelopment of West Samaria and told Heartland that he would not support any redevelopment of the West Samaria property because it is a combination of three things - bad design, bad location, and a bad operator - and even if you change the operator you cannot overcome the other two. (Smokowicz Aff., Att. D at pp. 19-21 and Ex. 132.)

In November of 2007, Tri-Corp had the ability to bring itself current on the mortgage for West Samaria and New Samaria with the proceeds of pending sales of other properties which WHEDA was involved in as the mortgage lender. (Brever Aff. ¶ 33.) On November 19, 2007, WHEDA filed a foreclosure action against both West Samaria and New Samaria. According to its complaint, there was a balance of $1,277,286 due on the loan (for West Samaria and New Samaria), excluding money in the replacement reserve for this loan. After subtracting the $340,892 reserve, there was a balance of $936,394 in principal and

9

interest.  (Brever Aff. ¶ 36.)  No one from WHEDA threatened to foreclose upon Tri-Corp for this or any of its other loans before Bauman spoke with representatives of WHEDA. (Brever Aff. ¶ 37.)

Jim Mathy, who worked for Milwaukee County and supervised the relocation of residents of West Samaria, testified that occupants of the property were relocated as a result of the discussion of "foreclosure" at the October 19, 2007, meeting involving Bauman, WHEDA, and Milwaukee County.  (Machulak Aff., Ex. F at pp. 25-26.)  In an e-mail to Riley dated November 5, 2007, Hill stated that "Starting today, BHD case managers are being 'strongly discouraged' from referring any consumers to [West Samaria] in light of the impending foreclosure."  (Machulak Aff., Ex. C at WH0064.)  At no time did Hill advise Brever that he planned to move residents because of the living conditions at West Samaria. (Brever Aff. ¶ 13.)  Milwaukee County stopped referring residents to West Samaria and started relocating residents before WHEDA filed foreclosure proceedings.  (Machulak Aff., Exs. C and D.)  However, Milwaukee County did not relocate residents from New Samaria after the October 19, 2007, meeting and during the pendency of the foreclosure proceedings.  (Smokowiz Aff., Ex. F.)

Bauman has never been inside West Samaria.  (Brever Aff. ¶ 21.)  For as long as Tri-Corp has owned and operated West Samaria (1998), Bauman never asked to tour the facility.  (Brever Aff. ¶ 21.)  Bauman was invited to tour West Samaria, but never accepted the invitation.  (*Id.*)

## CONCLUSIONS OF LAW

This case was removed to federal court after four years in Milwaukee County Circuit Court and a remand from the Wisconsin Court of Appeals.  As the parties prepared for a

10

state circuit court trial on Tri-Corp's tortious interference claim against Bauman, Tri-Corp's newly asserted § 1983 claim provided the basis for removal. The issue that is now before this court is whether the § 1983 claim is viable, and, if so, whether there is a genuine issue of material fact for trial.

Section 1983 provides a federal remedy against anyone acting under the color of state law who deprives "any citizen of the United States ... of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. An individual defendant can be liable under § 1983 in his official or in his individual capacity.

Tri-Corp's amended third party complaint does not state in what capacity it has sued Bauman. If it is in his official capacity, the claim is really a claim against the City of Milwaukee. *See generally Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Municipal liability under § 1983 requires an allegation that "a deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 415, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Generally, municipal liability can take three forms: (1) an express policy that causes a constitutional deprivation; (2) an unconstitutional widespread practice that is so permanent and well-settled that it constitutes a "custom or usage" with force of law; or (3) a person with final policy-making authority caused the constitutional deprivation. *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000).

Bauman filed the motion for summary judgment seeking dismissal of this action arguing that Tri-Corp sued him in his individual capacity, and Tri-Corp never responded that it intended to bring an official capacity suit. Moreover, Tri-Corp presented no evidence that

11

the City of Milwaukee had an express policy, an unconstitutional widespread practice that was so permanent and well-settled that it constituted a "custom or usage" with force of law, or that Bauman, a City of Milwaukee alderman, had final policy-making authority with respect to an alleged deprivation. Additionally, at the hearing on Bauman's motion for summary judgment, Tri-Corp conceded that Bauman, as a Milwaukee alderman, did not have formal authority over BOZA, the DNS or WHEDA, and that BOZA granted Tri-Corp a reasonable accommodation. Counsel for Tri-Corp also confirmed on the record that Tri-Corp is proceeding against Bauman in his individual capacity only and that it has no official capacity claims before this court.

With that in mind, the court turns to Tri-Corp's third cause of action in the amended third party complaint labeled "VIOLATION OF 42 U.S.C. § 1983." (Doc. 1-1 at 10.) On its own, § 1983 does not provide a source of substantive rights but rather a method for vindicating federal rights conferred elsewhere in the federal statutes and constitution. *See Graham v. Connor,* 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). To this end, Tri-Corp has alleged that Bauman's conduct deprived it of the following rights:

> [t]he right to assist persons with disabilities to have equal access to housing under the Federal Fair Housing Act, including 42 U.S.C. §§ 3604, 3615 and 3617; under the Americans With Disabilities Act, including 42 U.S.C. §§ 12132 & 12203 and 28 C.F.R. § 351.30; and under the Rehabilitation Act, including 29 U.S.C. § 794, because as a result of his conduct, persons with disabilities, among other things (a) were denied or otherwise had housing made unavailable to them on the basis of their disabilities; (b) terms and conditions were imposed on supported housing for people with disabilities that are not imposed on similar residential uses for persons without disabilities; (c) persons with disabilities were denied the right to move into residential districts which right is enjoyed by persons with disabilities;

12

(d) persons with disabilities were provided with rights, privileges, advantages and services that are not as effective as those provided to others, and (e) persons with disabilities were denied the right to integrated community services.

(Doc. 1-2, p. 10 at ¶ 51.)

The Supreme Court has emphasized "that § 1983 does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120, 125 S. Ct. 1453, 1458 (2005). If a plaintiff establishes that the statute confers an individual right, the right is presumptively enforceable under § 1983. *Gonzaga University v. Doe,* 536 U.S. 273, 284, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). However, the "State may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* at n. 4 (quoting *Smith v. Robinson*, 468 U.S. 992, 1004-1005, n. 9, 104 S. Ct. 3457, 82 L. Ed.2d 746 (1984)). To do so, the state has the burden to demonstrate that Congress shut the door to private enforcement either expressly, through "specific evidence from the statute itself," Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 423, 107 S. Ct. 766, 93 L. Ed. 2d 781 (1987), or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing v. Freestone*, 520 U.S. 329, 341, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997)."

The statutes at issue, the FHA, ADA and the Rehabilitation Act, are "separate but interrelated federal laws that protect persons with disabilities from discrimination." *Wisconsin Cmty. Serv., Inc. v. City of Milwaukee,* 465 F.3d 737, 746 (7th Cir. 2006). Each contains an enforcement scheme, which Bauman argues is incompatible with individual enforcement under § 1983.

13

At least four circuit courts of appeal have held that a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a state official in her individual capacity to vindicate rights under Title II of the ADA and/or Section 504 of the Rehabilitation Act because that claim is barred by the comprehensive remedial scheme of those Acts. *Vinson v. Thomas,* 288 F.3d 1145, 1156 (9th Cir. 2002); *Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir. 1999); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir.1999) (en banc), *cert. granted on other grounds*, 120 S. Ct. 1003 (2000), *cert. dismissed*, 120 S. Ct. 1265 (2000); and *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997). Moreover, in *Alsbrook*, the Eighth Circuit reaffirmed a prior decision that no § 1983 action was available against the state officials on two grounds: first because Title II of the ADA has a detailed remedial scheme and second, "more fundamentally," because the plaintiff could not bring an action against the state commissioners in their individual capacities directly under the ADA.

The Seventh Circuit Court of Appeals has acknowledged that a plaintiff "runs the risk that a court might decide that the statutory scheme in one way or another forecloses § 1983 relief" when the alleged violation is a statutory right. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 281 (7th Cir. 2003)(citing *Wright*, 479 U.S. at 418 and *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S. Ct. 2615, 69 L. Ed.2d 435 (1981)). Moreover, the Seventh Circuit has consistently declined to find that other similar statutes preclude § 1983 relief when the § 1983 claim is based directly on a constitutional violation rather than a statutory one. *Id.* In *Alexander v. Chicago Park Dist.*, the Seventh Circuit held that the remedial scheme in Title VI is comprehensive, and that Congress did not intend to allow violations of Title VI to be remedied through § 1983.

14

773 F.2d 850, 856 (7th Cir. 1985). And, at least one district court in the circuit has adopted the reasoning of the other circuits and dismissed the § 1983 claim on the ground that the Title II of the ADA and the Rehabilitation Act offer comprehensive remedial schemes precluding a § 1983 claim. *Jones v. Regional Transp. Auth.*, 2012 WL 2905797, at *6 (N.D. Ill. July 16, 2012).

Not only does there appear to be an issue with whether Tri-Corp can assert a § 1983 claim for violation of these statutes, but it also appears that Tri-Corp cannot pursue an ADA or Rehabilitation Act claim against Bauman as an individual. Tri-Corp cites Title II of the Americans with Disabilities Act which provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Tri-Corp relies on section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), which contains an antidiscrimination provision similar to the ADA's that applies to state programs and activities that receive federal funding. Bauman, who is sued in his individual capacity, is not a public entity or personally refusing Tri-Corp access to a federally-funded program.

If Tri-Corp is unable to proceed on its § 1983 claim based on violations of the ADA and Rehabilitation Act, it must rest on its sole remaining § 1983 claim which is based on Bauman's alleged violation of the FHA. In *South Middlesex Opportunity Council, Inc. v. Town of Framingham*, the district court found that "the FHA contains a comprehensive enforcement mechanism for the rights cited by the Plaintiffs under 42 U.S.C. § 3604" and, therefore, "the FHA enforcement mechanism forecloses complementary relief through § 1983." *South Middlesex Opportunity Council, Inc. v. Town of Framingham*,

15

No. 07–CV–12018, 2008 WL 4595369, at *15–16 (D. Mass. Sept. 30, 2008)(unpublished decision); *see also Homebuilders Ass'n of Mississippi, Inc. v. City of Brandon, Miss.*, No. 07–CV–716, 2009 WL 1635763, at *11 n. 3 (S.D. Miss. June 10, 2009) (recognizing the holding in *South Middlesex* with respect to parallel claims under § 3604 of the FHA and § 1983 and allowing the defendant to raise this issue at trial). The district court in *South Middlesex Opportunity Council, Inc.,* reasoned as follows:

> I find the FHA contains a comprehensive enforcement mechanism for the rights cited by the Plaintiffs under §§ 3604 and 3617. Section 3613 provides that private persons can seek judicial relief within two years "after the occurrence or termination of an alleged discriminatory housing practice .... " 42 U.S.C. § 3613. Section 3602 defines "discriminatory housing practice" as "an act that is unlawful under §§ 3604, 3605, 3606, or 3617 of this title." 42 U.S.C. § 3602. Furthermore, § 3613 specifies that the aggrieved person can pursue relief in the federal courts without regard to complaints filed under § 3610, which governs complaints filed with the Secretary of Housing and Urban Development. §§ 3610(a), 3613(a)(2).

2008 WL 4595368 at *15.

Tri-Corp cites *Wright,* 479 U.S. at 424, claiming that the "United States Supreme Court has determined that when it enacted the Fair Housing Act, Congress did not intend to preclude causes of action under 42 U.S.C. § 1983 to enforce rights under that statute." However, *Wright* was not a Fair Housing Act case. Rather, the plaintiffs, who were public housing tenants, sued the defendant housing authority under § 1983 alleging that the housing authority violated the Brooke Amendment to the Housing Act of 1937 which imposed a rent ceiling and required public housing authorities to include a reasonable utility allowance in tenants' rent. *Id.* at 419, 107 S. Ct. at 768. The Court held that the plaintiffs could use § 1983 to pursue claims for violations of the Brooke Amendment because the Department of Housing and Urban Development's administrative scheme of enforcement

16

did not preclude private enforcement and there was no other private judicial remedy provided by the Housing Act. Notably, Justices O'Connor, Rehnquist, Powell and Scalia dissented failing to find "that the statute's language or legislative history supports its [the majority's] conclusion that Congress intended to create a statutory entitlement to reasonable utilities." *Id.* at 433–34, 107 S. Ct. at 775–76.

In the case at bar, it is difficult to distinguish Tri-Corp's pleading under § 1983 from that of the plaintiff in *South Middlesex Opportunity Council*, 2008 WL 4595369 at *15. Tri-Corp has alleged that Bauman deprived it of the right to assist persons with disabilities in securing equal access to housing under the Federal Fair Housing Act, including 42 U.S.C. §§ 3604, 3615 and 3617. Tri-Corp never attempted to address the regulatory scheme of § 3613, which covers violations of § 3604 and § 3617. Instead, at the hearing, plaintiff's counsel argued for the first time that a subsequent decision from the District of Massachusetts, *South Middlesex Opportunity Council,* 752 F. Supp. 2d 85 (D. Mass. 2010), confirms that Tri-Corp may bring a separate claim under § 3617 for interference. The problem with this argument is that the case cited by Tri-Corp addressed FHA claims independent of any § 1983 claim because the court had previously dismissed the § 1983 claim alleging violations of the FHA. It did not discuss the issue before this court, which is whether the FHA's remedial scheme precludes a § 1983 claim for a violation of § 3617.

Assuming for the sake of argument that Tri-Corp has a viable claim under § 1983 based on a FHA claim, the court must determine the nature of that claim, whether there is a genuine issue of material fact and/or whether Bauman is entitled to qualified immunity. Section 3604(f) prohibits discrimination in housing on the basis of disability. 42 U.S.C. § 3604(f). It is illegal to discriminate in the sale or rental of housing, or to otherwise make

17

unavailable or deny, a dwelling to any buyer or renter because the renter has a handicap. Section 3604 is a "broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995). Congress intended for the FHA to apply to zoning ordinances and other laws that would restrict the placement of group homes. H.R. Rep. No. 100-711, at 24 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2185 (stating that the amendments "would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps").

Bauman argues that the pertinent "reasonable accommodation" provision is set forth in 42 U.S.C. § 3604(2)(A) (presumably (f)(2)(A)). That section makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap ...." Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity of a dwelling." 42 U.S.C. § 3604(3)(B). In addition, § 3617, which is referenced in the third party amended complaint, makes it unlawful:

> to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

Tri-Corp's brief in opposition to summary judgment addresses Bauman's qualified immunity claim with respect to § 1983 but nothing more. The majority of Tri-Corp's brief

18

focuses on its state law claims and it is not until the end of the brief that Tri-Corp argues

that its § 1983 claim should not be summarily dismissed on the ground that "qualified

immunity" protects Bauman as a matter of law.  However, at the hearing on January 14,

2015, Tri-Corp argued that it was lulled into responding to Bauman's arguments and failed

to raise an independent interference claim under § 3617 based on Bauman's request that

the DNS revoke Tri-Corp's special use permit and his efforts relating to BOZA and WHEDA.

Tri-Corp also conceded that the DNS had discretion respecting its response to Bauman's

request and that Bauman had no legal authority over BOZA or WHEDA.  The court notes

that the Wisconsin Court of Appeals concluded that there was no evidence in the state court

record that WHEDA's decision to foreclose was based on the disabilities of the residents,

that WHEDA conspired with Bauman, or that the October 19, 2007, meeting between

WHEDA, Milwaukee County, and Bauman was "undertaken with the intent to interfere with

Tri-Crop's relationship with Milwaukee County."

Even if Tri-Corp had asserted a viable claim under § 1983 for a violation of 42 U.S.C.

§ 3617, it cannot overcome the doctrine of qualified immunity.  This shields officials from

liability if their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have been aware. *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982); *see also Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir.1994), *citing Siegert

v. Gilley*, 500 U.S. 226, 232 (1991).  A constitutional right is "clearly established" if its

contours are sufficiently apparent that a reasonable official would understand that his

conduct violated that right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Tri-Corp failed to cite authority establishing clear statutory or constitutional rights

applicable to Bauman's conduct between 2004 and 2007 with respect to DNS, BOZA and/or

WHEDA.  Rather, Tri-Corp cited *Nelson v. Streeter*, for its holding that there can be a "simple case" such as this, where,"to ask the question is to answer it."  *See Nelson*, 16 F.3d 145, 148 (7th Cir. 1994)  (no qualified immunity where city aldermen seized a painting that they did not like from a private art institute because the painting showed the former male city mayor wearing women's underwear).  Tri-Corp asserts that its entitlement to a reasonable accommodation was clearly established at the time of the events; however, counsel simultaneously concedes that Tri-Corp received a reasonable accommodation.

Without any evidence that it was denied a reasonable accommodation, its continued focus on Tri-Corp's "clearly established right" to a reasonable accommodation is misguided. The issue for the qualified immunity analysis is whether the "precedents on the books when the defendants acted ... clearly established that their conduct violated § 3617 even though it violated nothing else in the Fair Housing Act."  *Hidden Village, LLC v. City of Lakewood, Ohio,* 734 F.3d 519 (6th Cir. 2013).  In *Hidden Village*, the Sixth Circuit granted qualified immunity to individuals on similar facts reasoning that the Sixth Circuit had never held that a defendant could violate § 3617 without violating §§ 3603–3606.  Further, the Sixth Circuit commented on the fact that there was no consensus of persuasive authority:

> Just the opposite. By 2007, the Fifth Circuit had held that a violation of §§ 3603–3606 is indispensable to a § 3617 claim.  *See McZeal v. Ocwen Fin. Corp.,* 252 F.3d 1355 (5th Cir. 2001) (unpublished).  The Seventh Circuit had twice reserved the question.  *South–Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 886 (7th Cir. 1991); *MHDC v. Village of Arlington Heights*, 558 F.2d 1283, 1288 n. 5 (7th Cir. 1977). Another Seventh Circuit opinion implied that the defendants' interpretation was right. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004). Hidden Village, meanwhile, does not identify a single federal appellate court decision that had clearly come out on its side of this debate.  The best we have found is dictum to that effect from the Ninth Circuit, see *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975), and a

20

handful of decisions from district courts. This state of affairs circa 2007 does not amount to the "robust consensus" that the qualified immunity test demands.

In *Bloch v. Frischholz*, the Seventh Circuit Court of Appeals acknowledged that "whether a violation of § 3617 can exist without a violation of § 3604 or any other FHA provision is a question we have routinely reserved" and "[c]ourts are split on this issue." 587 F.3d 771, 781 (7th Cir. 2009). Counsel for Tri-Corp conceded as much at the hearing on Bauman's motion.

In the final analysis, Tri-Corp failed to provide this court with case law clearly establishing that Bauman's efforts to contact various city and state entities regarding a housing provider in his aldermanic district would be actionable as interference under § 3617 after Tri-Corp was granted a reasonable accommodation to operate West Samaria and Bauman did not violate any other section of the FHA. Whether Bauman could be liable today under § 1983 for a separate violation of § 3617 is not at issue. Instead, the question is whether it was clearly established at the time of the charged conduct and the answer to that question is no.

Because Tri-Corp's § 1983 claim does not survive Bauman's motion for summary judgment, the court turns to the remaining state law claims. Ordinarily, a district court should relinquish jurisdiction over supplemental state-law claims if all federal claims are dismissed before trial. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009). However, a district court is not required to give up jurisdiction, *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 883 (7th Cir. 2009), and

21

must make "a considered determination" as to whether it should hear the state claims. *See Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010).

Tri-Corp never addressed this issue in its briefing or during the hearing on the motion for summary judgment, but the court notes that this case was pending in Milwaukee County Circuit Court for four years. Indeed, the Milwaukee County Circuit Court decided Tri-Corp's claims against Bauman on summary judgment, substantial resources were devoted to this case in the state courts, and this case was ready to proceed to trial just prior to Tri-Corp's addition of the § 1983 claim. Under these facts and hearing no argument from Tri-Corp, the court will exercise its discretion to remand the case to Milwaukee County Circuit Court. Now, therefore,

IT IS ORDERED that defendant's motion for summary judgment is granted with respect to the § 1983 claim.

IT IS FURTHER ORDERED that the court declines to exercise supplemental jurisdiction over the state law claims.

IT IS FURTHER ORDERED that this case is remanded to Milwaukee County Circuit Court for further proceedings on the defamation and tortious interference claims.

Dated at Milwaukee, Wisconsin, this 22nd day of January, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE