UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------

TRI-CORP HOUSING, INC.,         )
                                                )
                   Plaintiff,    )  Case No. CV 12-216
                                                )  Milwaukee, Wisconsin
      vs.                                   )
                                                )  July 15, 2013
 ROBERT BAUMAN, ALDERMAN,       )  9:06 a.m.
                                                )
                   Defendant.     )

---------------------------------------------------------------

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 TRI-CORP HOUSING, INC.:       Machulak Robertson & Sodos
                               By: ROBERT E. MACHULAK
                               1733 N Farwell Ave
                               Milwaukee, WI 53202
                               Ph: 414-271-0760
                               Fax: 414-271-6363
                               machulak@lawmessage.com
 For the Defendant
 ROBERT BAUMAN, ALDERMAN:     Milwaukee City Attorney's Office
                               By: JAN A. SMOKOWICZ
                               200 E Wells St - Rm 800
                               Milwaukee, WI 53202-3551
                               Ph: 414-286-2601
                               Fax: 414-286-8550
                               jsmoko@milwaukee.gov

 U.S. Official Transcriber:   JOHN T. SCHINDHELM, RMR, CRR,
 Transcript Orders:         WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1              TRANSCRIPT OF PROCEEDINGS

2            Transcribed From Audio Recording

3                   *     *     *

4          THE CLERK:  This is Tri-Corp Housing, Inc. vs. Robert

5     Bauman, Case No. 12-C-216, here for a motion hearing.  May I

6     have the appearances, please?

7          MR. MACHULAK:  Your Honor, John Machulak appearing on

8     behalf of Tri-Corp Housing, Inc.  Also with me is Michael S.

9     Brever who is the executive director of the organization.  Good

10    morning.

11         THE COURT:  Good morning to both of you.

12         MR. SMOKOWICZ:  Assistant city attorney Jan Smokowicz

13    on behalf of the defendant Robert Bauman.  Good morning, Your

14    Honor.

15         THE COURT:  Good morning, Mr. Smokowicz.

16         Mr. Smokowicz, this is your motion, but before we get

17    into any particulars I'd like to inquire whether there has been

18    any change in the status of this case or any issues that may

19    have been raised with respect to the motion.

20         MR. SMOKOWICZ:  None from our perspective, Your Honor.

21         THE COURT:  Mr. Machulak?

22         MR. MACHULAK:  Not that I know of, Your Honor.

23         THE COURT:  Very well, Mr. Smokowicz.  You may

24    proceed.

25         MR. SMOKOWICZ:  Your Honor, I think the arguments have

1 been well set forth in both sides' briefs. I do want to point

2 out a couple of things because I didn't have the opportunity to

3 file a responsive brief. But if the Court wishes, and I'm sure

4 the Court set this matter for hearing because it has certain

5 questions. I'd be happy to --

6         THE COURT: Indeed.

7         MR. SMOKOWICZ: -- address any of those if you'd

8 rather just cut to the chase and pepper me with the questions,

9 so to speak.

10         THE COURT: Well, my first inquiry is a general one,

11 that is: why do you believe that the witnesses' testimony is

12 unsupported and incapable of being received as expert or lay

13 testimony?

14         MR. SMOKOWICZ: Well, perhaps I should take the lay

15 testimony part of it first, Your Honor. And even as

16 Mr. Machulak -- and it may -- it may benefit from relying -- or

17 citing to, I should say -- a large portion of his response, but

18 in essence I don't think he has the sufficient personal

19 involvement and I don't think that this is the kind of situation

20 where the rule envisioned testimony from, especially as a

21 layperson, as an owner of an ongoing profitable business.

22         For example, if you look at Mr. Machulak's citation at

23 Page 7 of his brief, he quotes from *Von der Ruhr vs. Immtech*,

24 and it says there, in part, on Page 7, quote:

25         "For example, the owner of an established business

1    with a documented history of profits," close quote, may testify
2    about continued profits or that sort of thing.
3            Well, the problem here with respect to profits is that
4    there weren't any.  We've indicated and established in the
5    submission that we made initially that this was a very
6    unprofitable venture for a number of years before any kind of
7    alleged interference or in this case we were also talking about
8    allegedly unlawful action by Alderman Bauman under federal law.
9            Also on that same page there's a citation and I think
10   it's to one of the cases that we cited, the company, or *Titan*
11   case where there's reference to an owner of a small business,
12   and that's also at Page 7.  And there again we don't have an
13   owner of a business, we have an executive director who is akin
14   to a manager of a business.  And as a result of that what we
15   don't have is a person who is responsible ultimately for valuing
16   the business and valuing the property in particular, because
17   there's no indication of Mr. Brever making those kinds of
18   judgments, those kind of evaluations — what's the property
19   worth, how much should we pay for the property.  In fact, that's
20   absent from their submissions, Your Honor.
21           If you look at their submission carefully, Mr. Brever
22   is not indicated to be the person who made the judgment about
23   exactly how much they should pay for the property because he
24   didn't make the judgment as to how much the property was worth
25   or not worth even at the time of purchase much less years later

1    when this property fell into difficulty.  And it may very well

2    be with a nonprofit like this one of two things happen:  Either

3    they acquire the requisite expertise from a real estate broker,

4    real estate person who is a buyer's broker, for example; or they

5    may have obtained the expertise from someone outside the

6    business; or he may have relied upon the comptroller who is

7    referred to in the submission; or he may have relied upon the

8    expertise of the board members.

9         And I don't have evidence of this one way or the

10   other, but my own personal experience of sitting on nonprofit

11   boards -- and Mr. Machulak sits on the Tri-Corp board.  He's an

12   attorney.  He's well versed in business matters.  They may have

13   relied upon that expertise in valuing -- in making a valuation

14   judgment about the property itself.  And that's --

15        THE COURT:  Well, it would appear that the plaintiff

16   is looking to the fact that Mr. Brever was intimately involved

17   in the daily operations of Tri-Corp and has a long history with

18   the entity.  Why isn't that sufficient?

19        MR. SMOKOWICZ:  Because again, Your Honor, I think the

20   case law that both sides rely upon here need -- or demand more

21   than just intimate knowledge or involvement in some sense.

22        I mean, for example, if you look at Mr. Brever's own

23   affidavit, and I'll just pick out an example here at Paragraph 8

24   on Page 3 of his affidavit, he says he oversaw the acquisition

25   of the New Samaria building, for example.  And he obtained

1  appraisals and evaluations of the buildings and secured the

2  financing.

3        Well, he's not making the judgments there.  He's not

4  saying under oath that he made any of those judgments or that he

5  reached any of those opinions or conclusions.  He may have

6  obtained them, he may have personal involvement in the sense of

7  having seen them, but he doesn't have -- he didn't have the

8  mechanical operation, the mechanical functioning of making the

9  judgment itself.

10        And it's particularly troubling here if you look, for

11  example, at his analysis in his affidavit here where he comes up

12  with a range of a million and a half dollars for this property,

13  up to $15 million for this property.

14        If I were going to buy or sell that building, which

15  it's gone now, the city took it for its -- for the -- nobody

16  took it, nobody else wanted it.  We didn't take it for the value

17  of the mortgage.  We didn't pay off the mortgage and take the

18  property.  Nobody took that building except the City of

19  Milwaukee for a small sum of money for -- I'm not sure if the

20  Court is familiar with this, but in the city of Milwaukee there

21  are a lot of city services that are billed to both for-profits

22  and non-for-profits as part of the water bill.  And the water

23  bill was unpaid for several years to this building.  And we took

24  it -- the City of Milwaukee took it for the value of the water

25  bill basically, and the city services.  And the building was not

1   sold by the city, it was not rehabilitated by the city.  The

2   city demolished the building because it really did not have

3   substantial value as an ongoing building.  It was originally, as

4   I understood it, constructed as a rooming house which

5   historically had value in the city of Milwaukee for various

6   things including -- including things like individuals who were

7   working at nearby factories who may not have an apartment, may

8   not want to pay for an apartment, may not have been married and

9   the like.  But historically rooming houses are not particularly

10  common or profitable in the city of Milwaukee to my knowledge

11  anymore.

12          In any event, that kind of range, 1 1/2 million to

13  15 million, what is this building really worth?  I mean, how can

14  you say that this person has concrete lay or expert knowledge

15  about the value of the building with such a huge range of value.

16          If I were going to buy the building, getting back to

17  my initial point, if I were going to buy or sell the building

18  how would I know in a negotiation with Mr. Brever what he thinks

19  the building's worth?  I mean, this is kind of like saying I

20  work every day with the cars in the automobile lot at the car

21  dealership.  I may work with them every day, but I'm not the

22  person who makes the judgment about what to buy or sell the car

23  for.

24          And that's the problem here.  There are other people

25  who may have had much more knowledge about that kind of thing,

7

1  but they're not named.  Comptroller is not named.  She

2  apparently I assume had an accounting degree.  Members of the

3  board who may have negotiated the deal for the building or some

4  real estate broker who may have been involved with the deal — or

5  even New Samaria, they're not named.  And we're kind of adrift

6  here.

7           THE COURT:  All right.  Mr. Machulak, I'd like to hear

8  your response.  And, first of all, would you please focus on

9  Mr. Brever's credentials that you are relying upon as a basis

10  for offering him as a lay or expert who can give testimony

11  respecting the value and damages.

12          MR. MACHULAK:  Thank you, Your Honor.

13          Your Honor, Mr. Brever has been with the organization

14  since 1981 — first as a Vista worker, then in 1982 as an

15  employee, then in 1998, when Tri-Corp was formed by merger with

16  the other organization, the chief executive director of all

17  three.  There is nobody in the organization that has more

18  knowledge than Mr. Brever about the finances, the intimate

19  details of how the organization works.

20          Tri-Corp throughout the years -- manager is -- is one

21  layer of his activity, but spearhead is another.  I mean, the

22  organization has a volunteer board of people who are in various

23  walks of life that come to a board meeting once a month to find

24  out what Mr. Brever has done or put before him in the

25  organization.  The board members don't go out and search out a

1    New Samaria, a West Samaria, they --

2            THE COURT:  But what gives him the ability to offer

3    testimony respecting value?  Yes, he has a history.  History is

4    history, but the particulars of the history are what's key to

5    one's ability to offer testimony concerning value.

6            MR. MACHULAK:  Well, Your Honor, I think value is one

7    part of -- one part of damages.  I mean, the real question --

8            THE COURT:  But what credentials does he possess that

9    gives him the ability to offer particular testimony regarding

10   value?  I know the history.  That's pretty clear he's had a long

11   history with the entity, but where's the beef?

12           MR. MACHULAK:  Okay.  He's bought and sold in his

13   capacity hundreds of properties for the organizations over the

14   years.  He has gone in and proven up the value to lenders to --

15           THE COURT:  Tell me -- give me some particulars

16   regarding value.

17           MR. MACHULAK:  With --

18           THE COURT:  I -- like everybody else, I've bought

19   cars, but I'm not a mechanic.

20           MR. MACHULAK:  Well, in the case of New Samaria and in

21   the Samarias where you're providing housing for mentally

22   disabled people he has gone and negotiated -- looked at --

23   searched out a number of places, alighted upon New Samaria not

24   far from the -- from the events that we're talking about here,

25   negotiated --

9

1            THE COURT:  What about the value of these properties?

2    What gives him --

3            MR. MACHULAK:  He has --

4            THE COURT:  -- special insight into valuation of this

5    particular entity or other entities of this type?

6            MR. MACHULAK:  His involvement in negotiating purchase

7    price and establishing entities --

8            THE COURT:  Give me some particulars, please.

9            MR. MACHULAK:  For New Samaria which was, you know,

10   part of the whole picture here, Mr. Brever located -- after

11   searching through a number of sites located a nursing home that

12   was suitable.  Now, the value added to any location is working

13   with the municipality to make sure that you go into the place

14   and it will be -- the municipality will go along with your

15   intended use of it.  That involved considerable time, effort,

16   investment on the part of the time of the organization.

17           So when you look at a property like this and you're

18   talking about like West Samaria like Mr. Smokowicz is talking

19   about, yeah, maybe to -- to a nonprofit involved in providing

20   places for rooms for mentally handicapped people, knowing what

21   the facility -- knowing that this facility is suitable -- is

22   historically suitable gives it its special value versus to

23   somebody who is just saying I want to buy an apartment complex.

24           THE COURT:  Yes, but how does he go about setting a

25   value?

 1          MR. MACHULAK:  Well, in his analysis that I gave you
 2    we know that the New Samaria was done at arm's length.  Because
 3    that was a purchase, there was investment in it to make it --
 4          THE COURT:  Well, you tell me what was done because I
 5    don't know.
 6          MR. MACHULAK:  Okay.  When the New Samaria was
 7    acquired, which is not long in the past to the events here,
 8    there had to be a nursing home -- it was a nursing home that was
 9    up for sale.  What had to be done is it had to be modified, it
10    had to be approved for use as a facility for an added investment
11    for -- a facility for people who has a -- had little handicaps.
12    That's all invested money on top of the structure.  When you
13    look at what it cost to put that structure together it does give
14    an excellent comparable to West Samaria, the other one.
15          THE COURT:  Well, that doesn't tell me about
16    Mr. Brever's ability to testify.
17          MR. MACHULAK:  Well, Your Honor, his --
18          THE COURT:  Do you wish to have him take the stand to
19    provide some specifics that perhaps will give us some insight
20    into his competence?
21          MR. MACHULAK:  That will be fine, Your Honor.
22          THE COURT:  Mr. Brever?
23          THE CLERK:  Do you solemnly swear or affirm under the
24    penalty of perjury to tell the truth, the whole truth and
25    nothing but the truth?

1          THE WITNESS:  I do.

2          THE CLERK:  State your name and spell your first name

3    for the record.

4          THE WITNESS:  My name is Michael Brever.  The last

5    name is B-R-E-V-E-R.

6          THE COURT:  Mr. Machulak, do you wish to ask questions

7    of the witness or do you wish to just tender him?  Do you wish

8    to just tender him for examination or are you going to ask

9    questions of him?

10          MR. MACHULAK:  Whatever the Court prefers.  I mean, I

11    could ask him some background questions.  That would I think be

12    helpful.

13          THE COURT:  Proceed.  Proceed.

14          MICHAEL BREVER, PLAINTIFF WITNESS, DULY SWORN

15                      DIRECT EXAMINATION

16    BY MR. MACHULAK:

17    Q.  Mr. Brever, you are the executive director of the plaintiff

18    Tri-Corp Inc., yes?

19    A.  Correct.

20    Q.  And how long have you been executive director?

21    A.  Since the organization's founding in 1998.

22    Q.  Okay.  And currently you have, because of the status of

23    Tri-Corp, you have other full-time employment, correct?

24    A.  That is correct.

25    Q.  What is your full-time employment at present?

1    A.   I'm the development manager at Milwaukee Public Television.

2    Q.   And before you became involved in Tri-Corp what was your

3    educational background?

4    A.   I had an undergraduate degree from UWM, a bachelor of arts.

5    I had a Master's Degree in Management from Cardinal Stritch

6    University.

7    Q.   Okay.  And when you began to -- let me just cut to the chase

8    on some of the judge's questions here.  You were involved in the

9    acquisition of -- of New Samaria, were you not?

10   A.   I was.

11   Q.   Could you just briefly explain to the Judge what that

12   process involved.

13   A.   First of all, it began with a directive from the board to

14   create a better housing environment for the people that were

15   living with us.  A decision was made by our board of directors

16   that East Samaria was no longer adequate to serve the needs of

17   the disabled individuals under our care.  And so I commenced a

18   search for a new facility, understanding the special needs of

19   our unique clientele and the services that were required to

20   prepare and provide for them adequately.

21          I did, in fact, use the services of a real estate

22   broker.  I had used a young lady by the name of Kathy Merkle

23   from RE/MAX Realty.  And she went out and identified several

24   potential properties.  I think over a period of months I

25   probably was in and out of 10 or 15 different facilities that

1    potentially would have met our needs.

2           The particular property that became New Samaria on

3    67th and Beloit at that time was owned by a gentleman by the

4    name of Larry Rice who managed Title 19 nursing homes.  It had

5    actually been a convent prior to his acquisition of it, as well

6    as a medical care facility.

7           I had, first of all, determined that the zoning was

8    potentially going to be an issue given the fact that it was a

9    medical care facility and we function as a room-and-board.  And

10   as a result of that I had to petition the City of West Allis to

11   grant us a variance, so to speak.  I'm not certain specifically

12   what West Allis calls it.  Milwaukee would call it a variance of

13   the zoning code to accommodate our needs.  That was a lengthy

14   and a legal process.  I headed the organization's efforts in

15   that regard.  I did, in fact, retain legal counsel to assist us

16   in that as well, but I was the spokesperson for the organization

17   and the strategist, if you will, as we proceeded with that.

18          I also had to work with our lender, the Wisconsin

19   Housing and Economic Development Authority, who had a blanket

20   mortgage across two parcels.  What was then called East Samaria

21   and what this court nows knows as West Samaria.  I had to work

22   with the Wisconsin Housing and Economic Development Authority to

23   break apart that financing because New Samaria in West Allis was

24   going to require specific financing as well.

25          It was WHEDA's choice to enter into a blanket mortgage

1    again with us.  I had to negotiate that process and the

2    particulars of that particular deal with WHEDA.  In the process

3    of that I had to ensure that valuations were there.  WHEDA

4    mandated that we would not exceed a 1.15 debt coverage ratio,

5    which is an analysis of the revenue of the building to the

6    expenses of the building.  In essence you couldn't accrue more

7    than 15 percent discretionary cash over and above mandatory

8    expenses of the building.  And I had to demonstrate based on the

9    potential rent revenue for the building and what the expenses

10   would be that we would fall under those guidelines.

11            There was a purchase price that needed to be

12   negotiated.  Once all of that had been done to ensure that the

13   loan that we would take on would meet the parameters of the

14   WHEDA guidelines, and once that had been facilitated we

15   proceeded to closing.

16            In many ways, although it has no bearing on this

17   particular case, the hardest part of it all was shutting down a

18   facility that served 86 chronically mentally ill and relocating

19   them to a facility that served 75.  We had to create a degree of

20   attrition so that we would not have too many residents at the

21   time of the move.  There were movers that had to be acquired.

22   Most of the residents that we dealt with had no families and so

23   we had to serve as their advocates and guardians as the move

24   transpired.

25            And in a nutshell that's what I did to facilitate the

1    closing of this particular property.

2    Q.   Now, Mr. Brever, are you able to translate your experience

3    with New Samaria to the West Samaria in terms of what the value

4    of a facility that can serve people in this population is?

5    A.   Actually, given the fact that our residents lived under a

6    fixed income which ranged anywhere from $650 a month to $925 a

7    month, depending upon what the guidelines of the SSI program

8    determined was appropriate for them, the income that came to our

9    residents, our inability to charge rent was very static between

10   the two facilities.

11         It was very much a similar model from one building to

12   the next.  We provided 24-hour staffing at both facilities.  We

13   provided three meals a day at both facilities.  We worked with

14   our residents to ensure that some type of case management was in

15   place for all of them.  Given the fact that we were under one

16   blanket mortgage, the expenses to both buildings were relatively

17   similar given the fact that the greatest monthly expense is, in

18   fact, the mortgage that we had to pay on the two campuses.

19         So the models both in terms of a practice functioning

20   and provision of services, plus in terms of finances, was very,

21   very similar.

22         THE COURT:  Go ahead.

23   BY MR. MACHULAK:

24   Q.   Are you -- when you -- before -- what I want to say the

25   events of this case, I mean, was there a problem with occupancy

1   with New Samaria and West Samaria?

2           MR. SMOKOWICZ:  I'm going to object to the form of the

3   question as vague.

4           THE COURT:  Rephrase.

5           MR. MACHULAK:  Okay.

6   BY MR. MACHULAK:

7   Q.  Can you tell the Judge the history of the occupancy of the

8   New and West Samaria?

9   A.  At West Samaria in particular?

10  Q.  Yes.

11  A.  At West Samaria occupancy was extremely high prior to the

12  events that led to this hearing.  We were typically well in

13  excess of 90 percent, most times at 95 percent.  Vacancies were

14  transitional in nature and typically during the duration of the

15  repair to a unit.

16          Approximately a third of the facility was rented at

17  all times by the Red Cross for a specific program that they

18  managed called Autumn West.  So those were guaranteed

19  occupancies during our management of the facility.

20          There also is an issue in the city of Milwaukee, and

21  in Milwaukee County as well, that there is a tremendous shortage

22  of units available to residents of this particular kind.  And

23  not only did we have a historically high occupancy that was only

24  affected by transitional -- someone moving out and it takes a

25  month or two to move someone in, but typically there was a

1   waiting list of people to move in.

2          Now, in our particular case it wouldn't typically be a

3   John or a Jane Doe that was on a waiting list.  What it was was

4   a caseworker for Milwaukee County or one of Milwaukee County's

5   sub-grantees who would say to us, "I have a client who needs a

6   room, when will you have a vacancy for me?"

7          So in essence the relationship commenced with outreach

8   from a caseworker and not necessarily the resident that lived in

9   our unit.

10  Q.  In your affidavit you mentioned that in 2003, $400,000 was

11  just put into West Samaria, the building that Mr. Smokowicz was

12  talking about.  Can you explain to the Judge how that happened?

13  A.  We had done a needs assessment in 1999, shortly after

14  Tri-Corp came into being.  The new management wanted to get a

15  feel for our capital needs, the state of our infrastructure, and

16  as a result of that we actually had an architect on our staff at

17  that time who performed a capital needs assessment and it was

18  determined that the bathrooms in particular were wholly

19  inadequate for the needs of our clients.  It was also determined

20  that the method of entry into the building was rather antiquated

21  given the fact that this was an extremely vulnerable population

22  and we needed to have a secure entrance, a buzz-in system if you

23  will, and pricing was done to determine what the cost of these

24  improvements would be.  A new flooring in rooms, complete

25  gutting and renovation of all the bathrooms, a new entryway,

1    et cetera.

2              And once the original budget was construed a

3    fund-raising campaign commenced.  We were very successful

4    through two specific grant sources.  The Jane Petit Bradley

5    Foundation was very generous to us, as well as the Federal Home

6    Loan Bank out of Chicago was very generous to us.  There was

7    some small grants as well, but those two sources comprised the

8    bulk of the $400,000.

9              Over a period of 12 months the bathrooms were, in

10   fact, gutted and completely renovated, making them completely

11   ADA compliant and cleanable.  Part of the issue was that there

12   were wood surfaces throughout the former bathrooms and we went

13   through a process which created a poured concrete floor with a

14   textured surface, Formica tops throughout and things like that.

15   We upgraded the plumbing so that we could have the high force

16   systems installed.  And over a period of 12 to 18 months we

17   facilitated the renovation.

18   Q.  And in Mr. Smokowicz' position with the judge he mentioned

19   the fact that you can -- you could look at the value of West

20   Samaria with a fairly wide range from a million and a half to

21   something substantially higher than that.  Can you explain to

22   the Judge what your basis is for that?

23             MR. SMOKOWICZ:  I'm going to object to the form of the

24   question.  I didn't look at it that way.  That's just a

25   reference to what Mr. Brever has submitted in a brief --

1              THE COURT:  Rephrase, please.

2              MR. MACHULAK:  I'll rephrase.

3    BY MR. MACHULAK:

4    Q.  Can you explain to the Judge why there would be considerable

5    range -- or there could be a considerable range in value for a

6    housing unit for somebody with mental disabilities?

7    A.  I think specifically it's that this isn't a traditional

8    rental facility.  This is a facility that provides for a special

9    needs population that incorporates a care component and, as a

10   result of that, doing a formulation based specifically on a rent

11   analysis doesn't do justice to what we try to determine as a

12   valuation.

13             We do know that based on the closing that transpired

14   in 2003 and the appraisals that were done of New Samaria, that

15   there was approximately a $16,000 per-unit valuation placed on

16   the units of New Samaria.  And that gets to the low end for the

17   valuation on West Samaria.  West Samaria in and of itself was

18   tax exempt in the city of Milwaukee, and so there is no

19   valuation from the city tax assessor to go by.

20             So I looked at it as a unit basis.  What was the

21   assumption in determining a mortgageable value, if you will, at

22   New Samaria.  Once again the service model was extremely

23   similar, the services we provided were virtually identical, and

24   as a result a per-unit basis seemed an appropriate valuation.

25             The other valuations that I did were based on, in

1  fact, the rent potential over a period of time.  Looking at the

2  cost to replace with a new facility.  The City of Milwaukee and

3  Milwaukee County readily admitted that there is a shortage of

4  units even today for this particular special needs population,

5  and so there is new construction happening quite frequently

6  typically using Section 42 tax credits and home funds or block

7  grant dollars as a blend.  Those units are costing as much as

8  $160,000 per unit to build because of the unique amenities

9  required to ensure that the -- the building is adequate to meet

10  the needs of the clientele, to ensure that it is acceptable to

11  city standards and a service model standard for Milwaukee

12  County, and that got me to the high end of the valuation.

13  Q.  Okay.  And the -- and that was comparing what other projects

14  that serve the same type of population would cost?

15  A.  At the time I looked at this there were actually several

16  projects that were under construction that, according to

17  articles in the Milwaukee Journal, were costing approximately

18  $160,000 a unit to build.

19  Q.  Okay.

20      Your Honor, I guess my question, do you want him to

21  talk about other damages?  I know I would be asking him to

22  testify as to reputational damage, for example.

23      THE COURT:  (No audible response.)

24      MR. MACHULAK:  Okay.

25  BY MR. MACHULAK:

1    Q.  Mr. Brever, in preparing for your testimony and your

2    affidavit to try to get our arms around how to prove

3    reputational damage to Tri-Corp as a result of this incident,

4    could you explain to the Judge how we calculate reputational

5    damage?

6              MR. SMOKOWICZ:  I'm going to object to the form of the

7    question.  We?

8              MR. MACHULAK:  Yes.

9    BY MR. MACHULAK:

10   Q.  Well, you calculate -- that we, Tri-Corp, calculates its

11   reputational damage.

12             MR. SMOKOWICZ:  Your Honor, I just want to make sure

13   here we're talking about who is making this calculation.

14             MR. MACHULAK:  Mr. Brever on behalf --

15             THE COURT:  Rephrase.

16   BY MR. MACHULAK:

17   Q.  Mr. Brever, could you explain how you calculate reputational

18   damage sustained by Tri-Corp.

19   A.  Prior to the events that we're discussing today, Tri-Corp

20   was actually seen as the largest and most successful nonprofit

21   housing producer in the city of Milwaukee.  We had had a 20-year

22   relationship with the Block Grant Program of the City of

23   Milwaukee, and for many years we had been viewed as the largest

24   and the most successful provider of that housing.  We were

25   receiving grants in excess of a million dollars through the

1    block grant and the Home Funds Program of the City of Milwaukee.

2    That was approximately two-thirds of an annual base of support

3    that we received from grant revenue of approximately 1.5 to

4    $1.6 million.

5            In the world of nonprofits there really are somewhat

6    of a different way of calculating damages to a nonprofit.  You

7    can take the financial losses of today and count that as the

8    loss.  The real loss to a nonprofit, however, is its loss

9    towards credibility and its reputation.

10            Its credibility and its reputation is its gateway to

11   future income, future program services, future opportunities to

12   work with the community on new opportunities.  Arguably at the

13   time of these events, Tri-Corp was seen as one of the best in

14   the city of Milwaukee and by the end of these events it was

15   discredited and in a state of disarray.  Our grants had gone

16   from an annual of approximately 1.5, down to about $25,000.  Our

17   ability to continue to provide services which were dependent

18   upon those grants became extinct.  We weren't able to function

19   under those parameters.

20            Arguably if a nonprofit has a difficult program and is

21   seen as not succeeding at it, it might affect its potential to

22   conduct business today.  But as long as it has a good reputation

23   and credibility and an ability to move forward, it has an

24   ability to rebound.  And that was taken away from Tri-Corp.

25   There was no ability to come back and provide new partnerships

1 and new programs and new services to the community that we

2 strove to serve.

3 Q.  And are you able to put a dollar amount on the reputational

4 damage?

5 A.  You know, at the time of these events Tri-Corp was working

6 with WHEDA, assisting a pure nonprofit that was in a complete

7 state of disarray.  We were downsizing their portfolio to a

8 manageable amount, infusing new management practices for them.

9 We had several Section 42 low-income housing tax credit projects

10 in our portfolio.  We were managing upwards of 850 units of

11 housing, approximately 600 of which were under our ownership.

12 We had a $20 million balance sheet at that time, we had an

13 annual budget of approximately $6 million, and all of that was

14 gone by the time that these events played themselves out.

15         So that's what I look at as a potential valuation for

16 the corporation.

17 Q.  Going back to the more specific damages that were sustained

18 by the organization in 2007, when basically the decision was

19 made to empty out West Samaria, -- not -- by others -- can you

20 explain to the Judge what economically, how that economically

21 impacted -- how the emptying out of West Samaria impacted the

22 rest of the organization?

23 A.  Given the fact that West and New Samaria were under one

24 mortgage we couldn't just walk away and abandon West Samaria

25 because New Samaria would have closed as well.  What that would

1    have entailed was putting approximately 160 individuals who

2    suffered from chronic mental illness into an extremely

3    vulnerable state, potentially homelessness.  At that time there

4    was a dearth of available units in the city and county of

5    Milwaukee that would even accept individuals who had these

6    special needs.  And so we felt an obligation to maintain the

7    housing as long as possible.

8            As I've explained, when we initially took the loans

9    out with WHEDA they mandated that we have no more than a 1.15

10   debt coverage ratio, which in essence means 15 percent

11   discretionary cash over and above the cost to manage the

12   facilities.  That had to pay for every sundry item that we put

13   into the facilities.  As a result of that, there was extremely

14   little discretionary cash and high occupancy was the key to a

15   successful model.

16           As that occupancy dwindled we no longer had the

17   ability to sustain our bills and to ensure that we could provide

18   adequately for the needs of our residents.  That was exacerbated

19   by the fact that the Red Cross had a program with us which

20   provided housing for 31 individuals at West Samaria and they had

21   no place to move them.  I mean, this was not moving one or two

22   residents at a time, this was finding an adequate facility that

23   would take over the housing and the support needs of 31

24   individuals en masse.

25           As a result of that we actually felt an obligation to

1    maintain staffing, the provision of food, security, et cetera

2    almost up to a year after the facility ceased to function

3    financially.  I believe it was October of the following year

4    when the Red Cross was finally able to move out.  All that while

5    New Samaria was at full occupancy but in financial jeopardy

6    because of the situation of the mortgage.

7    Q.  And as far as the facts and figures showing how much was

8    coming in and how much was going out to sustain the building

9    over this period of time, do you have exact figures on this

10   month by month?

11   A.  I did submit a chart in my affidavit that did that, but I

12   believe at the end of our analysis it was cumulatively a little

13   bit over $600,000, and again given the fact that by WHEDA

14   mandate most of that money was used to sustain the building and

15   the service model.  I mean, that basically was a shortage in the

16   program.

17   Q.   Mr. Brever, is there anybody else at Tri-Corp that had as

18   much oversight knowledge -- I don't want you to pump yourself

19   up -- but as much knowledge of the organizational history as

20   yourself?

21   A.  There wouldn't be.

22   Q.  And you were -- this is your full-time occupation, your

23   day-to-day involvement from -- for as long as you've been

24   working for Tri-Corp?

25   A.  That's correct.

1          MR. MACHULAK:  That's all -- that's all I have,

2     Your Honor.

3          THE COURT:  Mr. Smokowicz?

4          MR. SMOKOWICZ:  I have a few questions, Your Honor.

5                     CROSS-EXAMINATION

6     BY MR. SMOKOWICZ:

7     Q.  Mr. Brever, first of all, with respect to your educational

8     background you mentioned that you had a bachelor's degree at

9     UWM, correct?

10    A.  That is correct.

11    Q.  And your bachelor's degree at UWM is not in accounting,

12    correct?

13    A.  That is correct.

14    Q.  And your degree -- your post-graduate degree at Cardinal

15    Stritch is in management, correct?

16    A.  That is correct.

17    Q.  That is also not in accounting, correct?

18    A.  Correct.

19    Q.  Now, with respect to the purchase of New Samaria, just so

20    that we have a timeframe, you haven't mentioned when it was

21    purchased but my understanding from your affidavit is 2001; is

22    that correct?

23    A.  Yes.

24    Q.  And the events that we're talking about here in terms of the

25    mortgage foreclosure on West Samaria, that occurred six years

1    later in 2007, correct?

2    A.  That is correct.

3    Q.  So it's my understanding, in terms of the property

4    valuation, you're attempting to extrapolate the value of the

5    property at West Samaria at least in part on your knowledge

6    based upon events that occurred six years earlier at New

7    Samaria, correct?

8    A.  That was one effort, yes.

9    Q.  Okay.  So let's look at your involvement in New Samaria.

10   First of all, the New Samaria property itself is located, as you

11   mentioned, in West Allis, correct?

12   A.  That is correct.

13   Q.  At about 66th or 67th and Beloit Road, correct?

14   A.  It was, yes.

15   Q.  And as opposed to West Samaria that was located where in the

16   city of Milwaukee?

17   A.  2713, I believe, West Richardson.

18   Q.  So that's near State Street; is that correct?

19   A.  Yes.

20   Q.  To around 22nd and State Street?

21   A.  27th and State Street.

22   Q.  27th.

23   A.  Yes.

24   Q.  Pardon me, I misspoke.  27th and State Street.  Now, in

25   reaching your evaluation analysis you haven't compared or

28

1    contrasted the character of the two buildings, correct?

2    A.  I did not.

3    Q.  So, for example, it looks like, if I look at your affidavit

4    that was attached to our motion -- or accompanied our motion and

5    your affidavit --

6              THE COURT:  Is that Document 12-1?

7              MR. SMOKOWICZ:  It's Document 12-1, yes, Your Honor.

8    And I was looking at Exhibit 2 of that in particular.

9    BY MR. SMOKOWICZ:

10   Q.  Mr. Brever, that's an assessor's record from the City of

11   West Allis.  Do you recall that affidavit and attaching that

12   assessor's record?

13   A.  Yes.

14   Q.  You do?  Okay.  And it refers there to the fact on the

15   second page of that -- so that would be Document 12-1, Page 8 of

16   111 -- it refers to that property having an acreage of 1.117

17   acres of land?  Does that sound familiar to you?

18   A.  I'd have to refresh my memory but that sounds about right,

19   yes.

20   Q.  Okay.  You haven't compared that to the size of the acreage

21   for West Samaria over on Richardson Place, have you?

22   A.  I did not.

23   Q.  And as a matter of fact, one of the criticisms of West

24   Samaria was that there really was no external land area enclosed

25   around the building for the residents to sit outside, for

1   example, outside the building.  The building butted up against

2   the sidewalk, didn't it?

3   A.   The building was very close to the property line, yes.

4   Q.   Yeah, yeah.  And so as opposed to New Samaria which had some

5   open land around it, correct?

6   A.   It did.

7   Q.   Yeah.  Okay.  And you haven't, of course, looked at any

8   properties around 27th and Richardson Place to attempt to come

9   to some kind of evaluation of the property, correct?

10  A.   I did not.

11  Q.   And, in fact, you don't know -- do you know whether or not

12  there were similar properties size wise and age wise around that

13  property?

14  A.   The only property that I'm aware of is a former nursing

15  home, I believe it was on Highland Boulevard, but I'm not

16  familiar with the valuations on it.

17  Q.   And I assume also you're not particularly familiar with the

18  size of the rooms inside that building, correct?

19  A.   Now, which building?

20  Q.   The one, the former nursing home near Richardson Place.

21  A.   The one on Highland Boulevard?

22  Q.   Yes.

23  A.   Yeah, I'm not familiar with the building.

24  Q.   Okay.  Now, with respect to New Samaria you say that you did

25  the search for the building, correct?

1    A.   That is correct.

2    Q.   But you also had the assistance of a real estate broker; is

3    that correct?

4    A.   I did.

5    Q.   Did the real estate broker provide you with various items of

6    information such as the listing price?

7    A.   She did.

8    Q.   Did the real estate broker provide you with advice with

9    respect to whether the listing price for New Samaria was within

10   range of the actual value of the property?

11   A.   We were aware of the assessment on the property because --

12            THE COURT:  One second.  Testify to what you know,

13   knew, or what you know.  All right?  Not what we know.

14            THE WITNESS:  Okay.

15            THE COURT:  I don't know who "we" would be.

16            THE WITNESS:  I understand.  I was aware of the

17   assessment for the City of West Allis.  I mean, that's just a

18   perfunctory thing that I typically do when I determine whether a

19   property is an appropriate acquisition for us or not.  I knew

20   what the purchase price was.  I typically did not rely --

21   BY MR. SMOKOWICZ:

22   Q.   Just a second.  Mr. Brever, what I asked you was whether she

23   had provided you information about the listing price.  She did

24   that, right?

25   A.   She did.

1   Q.  And did she provide you the information with respect to the

2   assessment or did you obtain that on your own?  Or did somebody

3   else give that to you?

4   A.  Yeah, I don't recall.  I could have looked it up.  She may

5   have given it to me.  I'm not positive.

6   Q.  And with respect to -- with respect to the properties at

7   West Samaria, of course, on Richardson Place, that didn't have

8   an assessment value, correct?

9   A.  Correct.

10  Q.  Because it's a nonprofit that was not taxed in the city of

11  Milwaukee.

12  A.  That is correct.

13  Q.  All right.  So part of your basis for valuing New Samaria is

14  just what did the city assessor in West Allis think the property

15  was worth; is that fair?

16  A.  It was one portion of an analysis, yes.

17  Q.  Okay.  And did you obtain information from other -- well,

18  strike that.

19          Were you involved in the actual negotiation of the

20  purchase?

21          THE COURT:  Of which property?

22          THE WITNESS:  Of New Samaria?

23  BY MR. SMOKOWICZ:

24  Q.  Of New Samaria, yes.

25  A.  Yes, I was.

1   Q.   All right.  And did you rely upon other individuals to come

2   up with the offer price that you were going to make for that

3   property?

4   A.   I used my real estate broker to write the offer.

5   Q.   And did your real estate broker make the suggestion as to

6   how much to offer for that property?

7   A.   No.

8   Q.   Who made the suggestion as to offer how much for that

9   property?

10  A.   I formulated that opinion myself.

11  Q.   And that was based solely upon the assessment value?

12  A.   And our ability to generate the revenue necessary to sustain

13  the building.  What I felt WHEDA might be willing to provide as

14  a mortgage on it based on the 1.15 debt.  There's a series of

15  analyses that I would put into it.

16  Q.   But Mr. Brever, let me just make clear about this now here

17  something.  I understand that you were concerned about how much

18  you can get to finance the property, but we're talking about

19  what's the property worth?  And other than the assessment did

20  you have any other source of information to guide you as to what

21  the property was worth?

22  A.   There was an eventual appraisal done on the property, but it

23  was after the offer was accepted.

24  Q.   And you did not perform the appraisal, correct?

25  A.   I did not.

1    Q.  And, in fact, the appraisal was performed by the mortgagor,

2    I assume, WHEDA?

3    A.  There was an appraisal done on behalf of the mortgagor,

4    correct.

5    Q.  And who was that performed by?

6    A.  I don't recall who the specific appraiser was.  I'm sorry.

7    Q.  And you have not produced that in the materials that you

8    have here, correct?

9              MR. MACHULAK:  I -- I object to the form --

10             THE COURT:  One second.  Is there an objection?

11             MR. MACHULAK:  Yes.  I object to the vagueness of the

12   materials produced because we did have a document --

13             THE COURT:  Overruled.

14             MR. MACHULAK:  Pardon?

15             THE COURT:  Overruled.

16             THE WITNESS:  I'm sorry, you're asking did I provide a

17   copy of the appraisal?

18   BY MR. SMOKOWICZ:

19   Q.  As part of your affidavits in support of --

20   A.  Correct.

21   Q.  Let me just -- as a part of your affidavits in support of

22   your opinion about the value of this property did you ever

23   provide the appraisal for New Samaria?

24   A.  As part of the affidavit I did not.

25   Q.  Okay.  As part of the affidavit for your supporting the

1  value of West Samaria, did you ever provide an appraisal from
2  WHEDA for the value of that property?
3  A.  I believe there were --
4  Q.  In your affidavits.
5  A.  In my affidavit I did not.  But I believe in the submissions
6  there were.
7  Q.  And in terms of those appraisals you did not perform either
8  of those appraisals, correct?
9  A.  That is correct.
10 Q.  You mentioned also that at some point after -- or at some
11 unidentified time $300,000 was put into the West Samaria
12 building for renovations, correct?
13 A.  I believe it was closer to 400,000.
14 Q.  All right.  When did that renovation occur?
15 A.  We did the capital needs assessment in '99.  I believe the
16 renovation occurred in 2001.
17 Q.  So again approximately six years before the foreclosure,
18 that was when this work was performed, correct?
19 A.  Correct.
20 Q.  All right.  Once again did you perform any kind of appraisal
21 of the property in order to obtain the grants or the financing
22 for it?
23 A.  No.
24 Q.  Did anyone else at that time perform an appraisal of the
25 property to determine the overall value of the property West

1    Samaria at Richardson Place at that time?

2    A.  In 2001?

3    Q.  Whenever you did this renovation work.

4    A.  No.

5    Q.  Now, you've also made some reference to replacement cost of

6    $160,000 per unit, correct?

7    A.  Based on new standards for new construction, right.

8    Q.  Right.  And can you tell the Judge just how old the

9    Richardson Place building is or was?

10   A.  It was acquired by Housing With Help in '76.  I believe it

11   was -- I believe it was constructed 10 to 15 years prior to

12   that.

13   Q.  So 1966.

14   A.  Somewhere in that area, I believe.

15   Q.  Or the early '60s perhaps?

16   A.  Possibly.

17   Q.  Okay.  Now, when you talk about replacement costs you're

18   talking about new construction, correct?

19   A.  Yes.

20   Q.  Not 50-year-old buildings, correct?

21   A.  Correct.

22   Q.  When you're talking about replacement costs, by the way,

23   what you're relying on is not something that you did personally,

24   but you're replying upon a report in the Journal Sentinel

25   newspaper, correct?

1    A.   Correct.

2    Q.   So you did not actually go out there at that time and do any

3    of the calculations for the replacement cost, correct?

4    A.   Correct.

5    Q.   You also mentioned that in valuing the facility you have to

6    take into account the care component, correct?

7    A.   Correct.

8    Q.   And when you talk about the care component in terms of this

9    property, West Samaria, included things such as meals, correct?

10   A.   Yes.

11   Q.   And what else did it include?

12   A.   There was 24-hour staffing at the facility.  There was

13   access to case management.  We had meeting rooms that people

14   could utilize to meet with their caseworkers and things like

15   that.  If the caseworker required it or requested it we would

16   arrange transportation to doctor's appointments or things of

17   that nature.  So it was a variety of things.

18   Q.   Was that all covered by the rents that were charged?

19   A.   Yes.

20   Q.   So if you looked at the rent that was charged to these

21   individuals which was payable out of their SSI money, we would

22   know what that care component is, correct?

23   A.   It was not -- it was not broken out.

24   Q.   It was not broken out, but it was covered by it, correct?

25   A.   That is correct.

1    Q.  Now, you keep referring to the events in your testimony.

2    You're talking about what happened in 2007 in terms of the

3    foreclosure, correct?

4    A.  Yes.

5    Q.  Again in terms of valuing reputation of the -- or goodwill

6    of the business, of this nonprofit business, Mr. Brever, you are

7    not an accountant, correct?

8    A.  That is correct.

9    Q.  And this is not something that's -- the item of goodwill,

10   it's not something that's included in any of your financial

11   statements that were produced at any time for WHEDA, for

12   example, correct?

13   A.  Correct.

14   Q.  And it's not included in the annual statements that are

15   attached, let's say, for example, to your affidavit from the

16   state court case.  For example, I'm looking at Page 68 of 93 on

17   Document 12-2.  Mr. Brever, it's not part of your annual

18   reports, correct?

19   A.  Correct.

20   Q.  So you didn't really give us a goodwill number here, did

21   you?

22   A.  I'm not sure I understand the question.

23   Q.  Well, what is the exact dollar amount of lost goodwill here?

24   To the penny.

25   A.  I view it as the ability of the agency's --

1          MR. SMOKOWICZ:  Your Honor, I'm going to move to

2     strike the answer as nonresponsive.  I want to know the number.

3          THE COURT:  It is stricken.

4          THE WITNESS:  Could you -- I'm not sure I understand

5     the question.

6     BY MR. SMOKOWICZ:

7     Q.  I'll repeat it.  What is the exact dollar amount of lost

8     goodwill here that you are claiming, to the penny?

9          MR. MACHULAK:  Well, I'll object to the form of the

10    question.

11         THE COURT:  Overruled.

12         THE WITNESS:  To the penny.

13    BY MR. SMOKOWICZ:

14    Q.  What is the exact dollar amount?

15    A.  I'm not certain I can give you a specific answer to the

16    penny.

17    Q.  What is the exact dollar amount to the dollar, amount of

18    lost goodwill here?

19    A.  I would think given the fact that the organization at the

20    time of these occurrences was a thriving $6 million a year

21    enterprise, I would say $6 million.

22    Q.  So you're saying the gross -- is that gross income?

23    A.  Yes.

24    Q.  So you're saying that the value of goodwill lost here is the

25    gross income amount of $6 million before a penny of expenses is

1    applied?

2    A.   That was my dollar amount, yes.

3    Q.   And your basis for that is?

4    A.   The annual revenue stream for the organization.

5    Q.   Again, my question is this:  What is your basis for choosing

6    that number as the lost goodwill?

7    A.   A nonprofit's ability to function in a community is its

8    reputation within that community.  Our reputation at that time

9    was sufficient to justify $6 million a year in revenue to

10   provide the programs that we were providing.  That reputation no

11   longer exists.

12   Q.   Have you done any academic study to determine that it's

13   proper to value lost goodwill of a nonprofit in that fashion?

14   A.   I have not.

15   Q.   Have you taken any classes to educate you in that regard?

16   A.   I have not.

17   Q.   Have you consulted with your attorney in order to come up

18   with that number?

19   A.   I haven't, no.

20   Q.   And as a matter of fact, have you consulted with your

21   attorney in preparing the affidavits that you have in support of

22   the damages claims here?

23   A.   The attorney asked me to consider several questions which I

24   formulated answers to, but that was it.  And actually, I don't

25   mean to nitpick here, but I don't have an attorney, Tri-Corp has

1    an attorney.

2            THE COURT:  Off the record, please.

3            MR. SMOKOWICZ:  Yes.

4            (Proceedings was interrupted at 10:08:04 a.m., until

5    10:41:35 a.m.)

6            THE COURT:  Be seated, please.

7            Do you wish to offer any additional testimony?

8            MR. SMOKOWICZ:  Your Honor, I had a few more questions

9    for Mr. Brever.

10           THE COURT:  Mr. Brever.

11   BY MR. SMOKOWICZ:

12   Q.  Mr. Brever, before we had to take the break it's my

13   recollection that you testified that the loss of goodwill amount

14   here is $6 million, correct?

15   A.  That is what I said before, but I'd like to clarify that if

16   I could.

17   Q.  Well, let's get a little clarification here.

18   A.  Okay.

19   Q.  You submitted an affidavit to this court in response to our

20   motion with regard to your testimony as an expert witness in

21   this case.  Do you recall that?

22   A.  I do.

23   Q.  And that affidavit is dated February 1st of 2013.  Does that

24   sound consistent with your recollection?

25   A.  I believe so.

1  Q.  And do you recall -- if you need me to have you show it

2  perhaps Mr. Machulak has it, but this is Document Number 14 in

3  this case and I'm focusing on Page 14 at Paragraph 40 of this

4  document.

5          MR. MACHULAK:  Do [Indiscernible].

6          MR. SMOKOWICZ:  Your Honor, let me just see if the

7  witness needs this.

8  BY MR. SMOKOWICZ:

9  Q.  The last sentence in that paragraph reads, quote:

10         "Measuring reputation and goodwill by this standard,

11  Tri-Corp's loss of goodwill easily amounts to $300,000 per year,

12  and there is no doubt in my mind that Tri-Corp would be in

13  existence today and for many years to come but for Mr. Bauman's

14  conduct," close quote.

15         Do you recall swearing to that statement, Mr. Brever?

16  A.  I do.

17  Q.  Now, Mr. Brever, I've also got an affidavit from you from

18  March 20th of 2009, that was part of you're initial submission

19  to this court on the motion.  That's Document 12-1 is your

20  affidavit, and Page 5 of 111 of that.

21         And I know I'm skipping around so I'd ask the Court to

22  let me know when it's ready, and Mr. Machulak as well.

23         THE COURT:  Which page?

24         MR. SMOKOWICZ:  Well, by my copy it's Page 5 of 111.

25         THE COURT:  That's the last page.

1          MR. SMOKOWICZ:  And Document 12-1.

2          THE COURT:  I have it.

3          MR. SMOKOWICZ:  And it's Mr. Brever's -- it's the

4    signature page from Mr. Brever's March 20th, 2009 affidavit.

5    BY MR. SMOKOWICZ:

6    Q.  Do you remember this affidavit, Mr. Brever, executing it in

7    state court?

8    A.  It was years ago, but yes.

9    Q.  And I'm going to read the last sentence of that affidavit.

10   Quote:  "Based on this documentation it is my opinion" -- or

11   excuse me -- "in my opinion the damage to Tri-Corp's reputation

12   is not less than $10 million," close quote.

13          Do you recall swearing to that statement, Mr. Brever?

14   A.  I do.

15   Q.  So we've got three figures here today, correct?  $6 million,

16   $10 million, and $300,000 a year from 2007, which by my math

17   works out to something around the order of $1.8 million.  Is

18   that correct?

19          MR. MACHULAK:  Object as argumentative.

20   [Indiscernible] in the affidavit.

21          THE COURT:  The last statement does appear to be

22   unsupported.  Do you wish to rephrase?

23   BY MR. SMOKOWICZ:

24   Q.  Well, we've got at least two, 6 million versus 10 million,

25   correct?

1    A.   I believe so.

2    Q.   And the third one you had in your affidavit that you

3    submitted to this court which was loss of goodwill in the amount

4    of $300,000 per year, right?

5    A.   Yes.

6    Q.   And, of course, that's measured from the time the mortgage

7    was foreclosed, correct?

8    A.   Actually the impact to Tri-Corp preceded that.  There were

9    many actions on the part of the alderman that led to the

10   mortgage foreclosure, and that's when the losses commenced.

11   Q.   Well, Mr. Brever, I apologize for not being able to intuit

12   that since your affidavit doesn't include a starting date.

13             THE COURT:  Ask the -- ask the question, please.

14             MR. SMOKOWICZ:  I apologize and I will ask it this

15   way.

16   BY MR. SMOKOWICZ:

17   Q.   Your affidavit here talks about $300,000 per year, what year

18   does that begin?

19   A.   It was based on the grant revenue to create housing, which

20   actually was a program area of the organization, at least two

21   years before the foreclosure.  And, based on my experience,

22   grant revenue of up to a million dollars to create housing earns

23   development fees and those development fees are potentially on a

24   million dollar grant, upwards of $300,000 a year.

25   Q.   So, Mr. Brever, if I understood your answer correct, the

1   beginning year is 2005?

2   A.   The impact on the organization was 2005.

3   Q.   So this is 2013, correct?

4   A.   Yes.

5   Q.   And that's eight years, correct?

6   A.   Yes.

7   Q.   So if my math works out correctly, that's eight times

8   300,000 which is $2.4 million, correct?

9   A.   Yes.

10  Q.   So we have three different figures here, 2.4, 10 million,

11  and 6 million, correct?

12          MR. MACHULAK:   Well, I'll object again to the form of

13  the question.

14          THE COURT:   Overruled.

15          THE WITNESS:   Yes.

16  BY MR. SMOKOWICZ:

17  Q.   Mr. Brever, lastly, you mentioned that -- in your earlier

18  testimony that you had been involved in numerous sales

19  transactions, correct?

20  A.   Yes.

21  Q.   And that was for properties that Tri-Corp owned, correct?

22  A.   Yes.

23  Q.   Most if not almost all of those properties --

24  A.   Could I clarify that last one?  We were also managing

25  properties on behalf of a pure organization and I facilitated

1  sales on behalf of West Side Housing Cooperative as well.

2  Q.  I appreciate the clarification.

3  A.  Thank you.

4  Q.  Most of those properties were single- or maybe perhaps two-

5  or three-family units, correct?

6  A.  Most of them were that, yes.  There were some multi-family's

7  involved as well.

8  Q.  So basically we're talking about residential homes, duplexes

9  and an occasional apartment type building, correct?

10  A.  Yes.  Correct.

11  Q.  All right.  And in this particular situation we are talking

12  about West Samaria which had -- which was a rooming house type

13  building, correct?

14  A.  It was.

15  Q.  And it had -- how many was it?

16  A.  93.

17  Q.  92.  92?

18  A.  92.  Yes.

19  Q.  92.  Units.

20         Thank you, Your Honor.  That's all I have.

21         THE COURT:  Any redirect?

22         MR. MACHULAK:  I do, Your Honor.

23         THE COURT:  Just so that you know I have another

24  hearing starting at 11:00 o'clock.

25         MR. MACHULAK:  Okay.

1                          REDIRECT EXAMINATION

2     BY MR. MACHULAK:

3     Q.  Mr. Brever, showing you --

4                THE COURT:  You have to speak in the mic.

5                THE WITNESS:  Should I just go get the paper?

6                THE COURT:  He can hand you the paper and then ask the

7     question after he gets back in front of a mic.

8     BY MR. MACHULAK:

9     Q.  Mr. Brever, I am showing you your affidavit that

10    Mr. Smokowicz has just asked you about which is Document

11    Number 14.  And I want to direct your attention to Paragraph 40.

12               In Paragraph 40 is where -- well, where does the

13    $300,000 figure come from, the annual $300,000 figure?

14    A.  It's my experience based on development fees that can be

15    earned by a nonprofit through the work that's generated by grant

16    revenue.  Typically when we would acquire and renovate

17    properties we would expend up to 145 percent of the value of the

18    property in renovation.  That would generate development fees

19    and, as a result of that, that's what this figure is based on.

20    We had anticipated $300,000 for each million dollars that we

21    received in grants and awards and that's how we did our

22    budgeting at that time.

23    Q.  And did that figure work out for you?

24    A.  It did.

25    Q.  And when you and Mr. Smokowicz asked you to compare that

1    figure to $6 million, a figure that you gave on the stand, how

2    does that compare?

3    A.   It would have been -- again, I mean, I don't testify in

4    court on a daily basis and I certainly don't testify in federal

5    court on a daily basis.  I misspoke in stating that the

6    6 million was our annual budget so that was the goodwill.  In

7    reality when I initially analyzed this I measured our goodwill

8    based on development fees and I should have said that.

9    Q.   Okay.  So in the -- if you take 300,000 a year is it fair to

10   say it takes a multiple about that, of that to get an overall

11   loss of goodwill?

12   A.   I do.  It's based on the number of years since the

13   circumstances here, and also an anticipated growth in potential

14   revenue as well.

15   Q.   Okay.  And Mr. Smokowicz asked you some questions about --

16   let me ask you before we leave there, is there any better way to

17   measure goodwill for the organization?

18             MR. SMOKOWICZ:  I object to the form of the question.

19   It calls for speculation.

20             THE COURT:  Sustained.

21   BY MR. MACHULAK:

22   Q.   When you -- going back to some of the earlier questions.

23   You were asked a question of whether or not you were an

24   accountant.  Were you familiar with accounting from your

25   day-to-day involvement with Tri-Corp?

1    A.   I was involved with the accounting on a day-to-day basis,

2    yes.

3    Q.   And regardless of whether or not you're an accountant did

4    the Tri-Corp generate financial information on a month-to-month

5    basis that you relied upon?

6    A.   Yes.

7    Q.   Did you have any difficulty at all understanding and

8    assessing what that financial information meant?

9    A.   I did not.

10   Q.   And does that financial information, in fact, support the

11   figures that you've entertained -- that you've put into your

12   affidavit?

13   A.   I believe it does.

14   Q.   In terms of looking at -- you were asked some questions

15   about the 2008 tax assessment for the West Allis property New

16   Samaria.  The tax assessment for the 2008 was $1,171,900,

17   correct?

18   A.   I believe that's correct.

19   Q.   And how many units did West Samaria have versus New Samaria?

20   A.   It's a different type answer than you might have for West

21   Samaria because New Samaria housed 75 residents.  Some of the

22   units were dual occupancy, but it housed 75 residents and West

23   Samaria housed 92 in single-room occupancy.

24   Q.   Okay.  So in West Samaria how many of the residents occupied

25   double-occupancy rooms?

1    A.   None, in West Samaria.

2    Q.   And in New Samaria how many occupied dual?

3    A.   I believe 66 lived in dual occupancy.

4    Q.   So in your view does the assessment for New Samaria indicate

5    a value for New Samaria -- for West Samaria?

6            MR. SMOKOWICZ:  Objection, beyond the competence of

7    this witness to testify.  Calls for speculation, based on

8    assessment.

9            THE COURT:  Repeat your question?

10   BY MR. MACHULAK:

11   Q.   Does the value that you've -- see for the West Samaria --

12   for the New Samaria property indicate some value for the New

13   Samaria property?

14           MR. SMOKOWICZ:  I'm going to object to the form of the

15   question.  Calls for --

16           THE COURT:  Sustained.  Form of question.

17   BY MR. MACHULAK:

18   Q.   If you were going to make an analysis on the property tax

19   data for New Samaria, how many units would you break into -- how

20   many units would you divide the million one apart?

21           MR. SMOKOWICZ:  I'm going to object to the form of the

22   question.  It's confusing.  Also calls for speculation here

23   based upon someone else's work, the assessor's work.

24           THE COURT:  Sustained.  Moreover, he's already

25   provided a value.

1              MR. MACHULAK:  Okay.

2    BY MR. MACHULAK:

3    Q.  Would you use your value in using the other method for New

4    Samaria how many units did you assume were in New Samaria?

5    A.  Again, the primary method was the number of residents that

6    lived within the facility because the service model is as equal

7    to the valuation of the campus as it is the individual units.

8    So I broke it out by residents that lived in the facility.

9              Given the fact that there were 75 meals given three

10   times a day, there was staffing on an entire campus.  It's not

11   just a number of units, it's the number of people living there.

12   Q.  Okay.  So the number of people there you're --

13   A.  75.

14   Q.  Okay.  That's all.

15             THE COURT:  You may step down.

16             THE WITNESS:  Thank you.

17             THE COURT:  The Court is going to sustain the defense

18   objection to Mr. Brever offering opinion testimony in this case.

19   There are multiple reasons for this decision.

20             First, to the extent that the plaintiff is attempting

21   to offer Mr. Brever as a witness -- as a lay witness, the

22   plaintiff needs to demonstrate that Mr. Brever's testimony is

23   based upon information that he has observed personally.

24             To that -- in that regard the Court notes that one of

25   the key factors in Mr. Brever's valuation is his reliance upon a

1  newspaper article.  Mr. Brever has not researched the data

2  underlying that newspaper article.

3  Number 2.  Mr. Brever has not offered through his

4  affidavit or through his testimony the particulars with regard

5  to his work with the numbers at Tri-Corp.  He has talked about

6  what occurred when Tri-Corp was acquiring property back in 2001.

7  He has talked about dealings with WHEDA.  He has talked about

8  housing units.  But he has not given particulars regarding what

9  he knows and what he put together with respect to the financing

10 of Tri-Corp and/or West Samaria.

11 The Court further notes that Mr. Brever did not

12 prepare information based upon what was going on in the

13 neighborhood or with comparable housing for disabled persons

14 within the city of Milwaukee or the Milwaukee metropolitan area.

15 He has not placed -- in fact, what he has done in several

16 instances is he has taken information regarding the newest

17 property and then superimposed that on the other property.

18 The West Allis facility was acquired earlier and it

19 appears from what I've heard that the Milwaukee facility on

20 State Street is very different than the other facility.  The

21 State Street property does not have a lot of area surrounding

22 it, whereas the West Allis facility has a lot of -- has real

23 estate surrounding it.

24 The Court notes also that with respect to reputation

25 Mr. Brever has given three different figures regarding how he

1    would value the reputation or goodwill of the -- of the entity,

2    and those figures are just inconsistent.  An expert, whether he

3    is a lay expert or a business expert or a person who has been

4    tendered as an expert, needs to provide objective data upon

5    which his or her opinion rests.  Much of what the Court has

6    heard here is just speculation and it does not take into account

7    things such as costs.

8           Mr. Brever, for example, just testified that

9    development, when you get a grant of about a million dollars you

10   would anticipate $300,000 in development revenue.  Well, the

11   mere fact that you have revenue doesn't mean that you are going

12   to have any net income.  You may have gross income, but it's not

13   net income.  And if your gross income is going to be eaten up by

14   costs, at the end of the day you have nothing.

15          And in this particular instance, as Mr. Smokowicz has

16   pointed out, Tri-Corp was a losing proposition generally over

17   the life that, as was testified to, in most years there was a

18   loss.  In 2005 there was a loss of $63,113.70, however, in 2006

19   there was a profit of $41,527.91; in 2007, a loss of

20   $140,783.52, and in 2008 a profit of $18,043.86, for a net loss

21   of $144,325.45.

22          So the entity was not for its life a profit-making

23   venture.  When I say "profit" I'm acknowledging the fact that

24   this is a nonprofit entity and the way it was set up revenues

25   were not to exceed I think you said 15 percent -- I should say

1  you shouldn't have additional monies after your operating

2  expenses of more than 15 percent.

3        The Court has tried to lean over backwards in

4  assessing what Mr. Brever had to say.  And it acknowledges that

5  an officer of an entity may, under certain circumstances, offer

6  an opinion as to value.  However, in this particular instance

7  the plaintiff has not provided all of the details that are

8  essential to allowing Mr. Brever as an executive director or

9  officer of Tri-Corp to testify with respect to value.

10        The Court further notes that the Milwaukee entity was

11 not one that was on the tax rolls, and it certainly makes it

12 difficult for the executive director to testify with respect to

13 value.

14        The Court does note, however, that the West Allis

15 facility was assessed.  But the assessment is not something that

16 was done by Mr. Brever.  It was something that was done by the

17 city using a formula.  And it has not been shown that the

18 formula that was used in West Allis is the same formula that's

19 used in the city of Milwaukee, or in other entities.

20        Therefore, Mr. Brever can't testify to the value of

21 the Milwaukee facility utilizing the West Allis numbers in terms

22 of the demand for the Milwaukee facility.  He has not testified

23 to the demand.  He has not testified to whether or not there was

24 an ongoing demand for the Milwaukee facility.  He has not

25 testified to any data that provides a basis for his reputation

1    testimony.

2            For example, Mr. Brever did not testify to having

3    spoken with any experts in the area.  He has not testified to

4    talking with anyone in the community generally regarding the

5    reputation of Tri-Corp.  The essence of his testimony is: on

6    some occasions in the past Tri-Corp was asked to assist WHEDA in

7    running other entities, and essentially that's all that we have

8    with regard to reputation testimony.

9            Any change in the reputation of Tri-Corp was ignored.

10   And there is just not enough data in the record, and

11   particularly in the affidavits that have been offered by

12   Tri-Corp, to support Mr. Brever's testimony.

13           Under some circumstances perhaps the plaintiff could

14   have demonstrated more, but in this particular instance

15   sufficient information is not in the record and, therefore, the

16   Court will not permit Mr. Brever to offer his opinion testimony

17   during any trial of this matter, should we get past the pending

18   motion for summary judgment.

19           That does not mean that Mr. Brever cannot testify to

20   objective facts.  He certainly is entitled to testify to

21   objective facts.  But his opinion with respect to valuation is

22   being rejected.

23           Is there anything further at this time?

24           MR. MACHULAK:  Your Honor, by way of clarification on

25   the objective facts, part of his testimony was the

1  month-to-month dollar loss sustained which is -- by the

2  organization as the facility became empty, was forced empty.

3  Are those objective facts --

4        THE COURT:  He can testify to data that is -- that he

5  is personally aware of.  And I'm trying to point that out: data

6  that he was personally aware of.  And so to the extent that

7  there may be something beyond that data that he concludes that

8  is certainly subject to objection, I don't know what information

9  Mr. Brever has with respect to individual sums or particular

10 sums that he would come up with as losses.  If that's something

11 that he concluded and he has and objective basis for coming to

12 that conclusion, he's certainly qualified -- he would certainly

13 be permitted to testify to that.  But it's unclear exactly what

14 he knew and when he knew it.

15        Is there anything else at this time?

16        MR. SMOKOWICZ:  Not from the defendant, Your Honor.

17        THE COURT:  Very well.  We stand in recess.

18        Oh, the Court will continue to proceed on the motion

19 for summary judgment unless the parties wish to evaluate -- wish

20 to reevaluate their positions respecting the same.  Are you able

21 to make any decision in that regard at this time?

22        MR. SMOKOWICZ:  Not in the courtroom, Your Honor, but

23 obviously we will look into that as well.

24        THE COURT:  Mr. Machulak?

25        MR. MACHULAK:  Same answer, Your Honor, I guess.

1          THE COURT:  All right.

2          MR. SMOKOWICZ:  Thank you very much, Your Honor.

3          THE COURT:  All right.  We're in recess.

4          THE BAILIFF:  All rise.

5          (Audio file concluded at 11:10:41 a.m.)

6                          *      *      *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter and Transcriptionist for the United States District
Court for the Eastern District of Wisconsin, do hereby certify
that the foregoing pages are a true and accurate transcription
of the audio file provided in the aforementioned matter to the
best of my skill and ability.


Signed and Certified March 4, 2014.

/s/John T. Schindhelm

John T. Schindhelm


John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

